## A. Settlement Statement

U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0265

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1.☐ FHA   2.☐ RHS   3.☐Conv. Unins.<br>4.☐ VA   5.☐ Conv. Ins. | | | 6. File Number<br>18-1168S | 7. Loan Number<br>N/A | 8. Mortgage Insurance Case Number |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| BURGESS MATTOX BEY INVESTMENT TRUST<br>2625 PIEDMONT RD, NE; STE 56-507<br>ATLANTA, GA 30324 | HANNAH NGUYEN<br>1096 GARNER CREEK DRIVE, SW<br>LILBURN, GA 30047 | CASH |

| G. Property Location | H. Settlement Agent | |
|---|---|---|
| 1054 MORGAN GARNER DRIVE<br>LILBURN, GA 30047<br><br>GWINNETT COUNTY | HOLLINGSWORTH & ASSOCIATES, LLC | |
| | Place of Settlement<br>2250 SATELLITE BLVD<br>SUITE 225   (770) 263-9993<br>DULUTH, GEORGIA 30097 | I. Settlement Date<br>04/25/18 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | | |
|---|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | | |
| 101. Contract sales price | 600,000.00 | 401. Contract sales price | | 600,000.00 |
| 102. Personal property | | 402. Personal property | | |
| 103. Settlement charges to borrower (line 1400) | 4,090.00 | 403. | | |
| 104. | | 404. | | |
| 105. | | 405. | | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | | |
| 106. City/town taxes          to | | 406. City/town taxes          to | | |
| 107. County taxes             to | | 407. County taxes             to | | |
| 108. Assessments              to | | 408. Assessments              to | | |
| 109. 2018 County Solid Waste Fee   04/25 to 12/31 | 133.86 | 409. 2018 County Solid Waste Fee   04/25 to 12/31 | | 133.86 |
| 110. | | 410. | | |
| 111. | | 411. | | |
| 112. PERSONAL PROPERTY PURCHASE FUNDS | 50,000.00 | 412. PERSONAL PROPERTY PURCHASE FUNDS | | 50,000.00 |
| 120. GROSS AMOUNT DUE FROM BORROWER | 654,223.86 | 420. GROSS AMOUNT DUE TO SELLER | | 650,133.86 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT TO SELLER | | |
| 201. Deposit or earnest money | 65,000.00 | 501. Excess Deposit (see instructions) | | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | | 230.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loans taken subject to | | |
| 204. | | 504. Payoff of first mortgage loan | | |
| | | NO OPEN LOANS | | |
| 205. Funds Received - 4/24/18 | 2,628.00 | 505. Payoff of second mortgage loan | | |
| 206. Funds Received - 4/10/18 | 250,000.00 | 506. | | |
| 207. Funds Received - 4/10/18 | 250,000.00 | 507. | | |
| 208. Funds Received - 4/10/18 | 61,000.00 | 508. | | |
| 209. | | 509. 2ND HALF HOA DUES          · | | 550.00 |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | | |
| 210. City/town taxes          to | | 510. City/town taxes          to | | |
| 211. County taxes         01/01 to 04/25 | 2,184.69 | 511. County taxes         01/01 to 04/25 | | 2,184.69 |
| 212. Assessments              to | | 512. Assessments              to | | |
| 213. | | 513. | | |
| 214. CREDIT FOR PREPAID RENT | 25,066.00 | 514. CREDIT FOR PREPAID RENT | | 25,066.00 |
| 215. CREDIT FOR PREPAID HOA DUES | 641.67 | 515. CREDIT FOR PREPAID HOA DUES | | 641.67 |
| 216. | | 516. | | |
| 217. | | 517. | | |
| 218. | | 518. | | |
| 219. | | 519. | | |
| 220. TOTAL PAID BY / FOR BORROWER | 656,520.36 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | | 28,672.36 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | | |
| 301. Gross amount due from borrower (line 120) | 654,223.86 | 601. Gross amount due to seller (line 420) | | 650,133.86 |
| 302. Less amounts paid by/for borrower (line 220) | 656,520.36 | 602. Less reduction amount due to seller (line 520) | | 28,672.36 |
| 303. CASH          TO          BORROWER | 2,296.50 | 603. CASH          TO          SELLER | | 621,461.50 |



GOVERNMENT
EXHIBIT
**2**

028937

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT    SETTLEMENT STATEMENT    PAGE 2

File Number: 15-1168s

| | | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|---|
| L. SETTLEMENT CHARGES: | | | | | | |
| 700. | TOTAL SALES/BROKER'S COMMISSION based on price $ | | @ | % | | |
| | Division of commission (line 700) as follows: | | | | | |
| 701. | $ | to | | | | |
| 702. | $ | to | | | | |
| 703. | Commission paid at Settlement | Realtor Holds Deposit | | | | |
| 704. | | | | | | |
| 800. | ITEMS PAYABLE IN CONNECTION WITH LOAN | | | P.O.C. | | |
| 801. | Loan Origination Fee | % | | | | |
| 802. | Loan Discount | % | | | | |
| 803. | Appraisal Fee | to | | | | |
| 804. | Credit Report | to | | | | |
| 805. | Lender's Administration Fee | to | | | | |
| 806. | Tax Service Fee | to | | | | |
| 807. | Georgia Residential Loan Fee | to | | | | |
| 808. | | | | | | |
| 809. | | | | | | |
| 810. | | | | | | |
| 811. | | | | | | |
| 812. | | | | | | |
| 813. | | | | | | |
| 814. | | | | | | |
| 815. | | | | | | |
| 900. | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | | | |
| 901. | Interest from | to | @$ | /day | | |
| 902. | Mortgage Insurance Premium | to | | | | |
| 903. | Hazard Insurance Premium | yrs. to | | | | |
| 904. | | | | | | |
| 905. | | | | | | |
| 1000. | RESERVES DEPOSITED WITH LENDER FOR | | | | | |
| 1001. | Hazard Insurance | mo. @$ | / mo. | | | |
| 1002. | Mortgage Insurance | mo. @$ | / mo. | | | |
| 1003. | City property taxes | mo. @$ | / mo. | | | |
| 1004. | County property taxes | mo. @$ | / mo. | | | |
| 1005. | Annual Assessments | mo. @$ | / mo. | | | |
| 1006. | | mo. @$ | / mo. | | | |
| 1007. | | mo. @$ | / mo. | | | |
| 1008. | Aggregate Reserve for Hazard/Flood Ins, City/Count | | | | | |
| 1100. | TITLE CHARGES | | | | | |
| 1101. | Settlement or closing fee | to | | | | |
| 1102. | Abstract or title search | to  HOMESTEAD TITLE COMPANY, INC. | | | 185.00 | |
| 1103. | Title examination | to | | | | |
| 1104. | Title insurance binder | to  HOMESTEAD TITLE COMPANY, INC. | | | 85.00 | |
| 1105. | Document Prep Fee | to  HOMESTEAD TITLE COMPANY, INC. | | | 438.00 | |
| 1106. | Courier/Overnight Fees | to | | | | |
| 1107. | Attorney's fees | to  HOLLINGSWORTH & ASSOCIATES, LLC | | | 450.00 | |
| | (includes above item No: | | ) | | | |
| 1108. | Title insurance | to  Investors Title Ins. Co. | | | 2,190.00 | |
| | (includes above item No: | | ) | | | |
| 1109. | Lender's coverage | | | | | |
| 1110. | Owner's coverage | 600,000.00 --- 2,190.00 | | | | |
| 1111. | | | | | | |
| 1112. | Post, Imaging Tax Search | HOMESTEAD TITLE COMPANY, INC. | | | 130.00 | |
| 1113. | | | | | | |
| 1200. | GOVERNMENT RECORDING AND TRANSFER CHARGES | | | | | |
| 1201. | Recording fees  Deed $  12.00 | ; Mortgage $ | ; Releases $ | | 12.00 | |
| 1202. | City/county/stamps  Deed $ | ; Mortgage $ | | | | |
| 1203. | State tax/stamps  Deed $  600.00 | ; Mortgage $ | | | 600.00 | |
| 1204. | | | | | | |
| 1205. | | | | | | |
| 1300. | ADDITIONAL SETTLEMENT CHARGES | | | | | |
| 1301. | SURVEY | to | | | | |
| 1302. | Pest inspection | to | | | | |
| 1303. | HOA Letter - Reimbursement | AMERICAN EXPRESS | | | | 230.00 |
| 1304. | | | | | | |
| 1305. | | | | | | |
| 1306. | | | | | | |
| 1307. | | | | | | |
| 1308. | | | | | | |
| 1400. | TOTAL SETTLEMENT CHARGES | (enter on lines 103 and 502, Sections J and K) | | | 4,090.00 | 230.00 |

028938

## ACKNOWLEDGEMENT AND RECEIPT OF SETTLEMENT STATEMENT

DATE: 04/25/18

Purchaser and Seller acknowledge that each has received, reviewed, and approved the entries appearing on the Settlement Statement, and each acknowledge receipt of a copy of same. Seller warrants the correctness of all payoff amounts for outstanding liens and encumbrances; if any deficiency occurs, upon demand, Seller shall immediately remit the same to the settlement agent. If any computation, charge or proration required by the contract of sale is erroneous, whether through miscalculation or otherwise, Borrower and Seller agree to re-prorate or adjust based on the correct figures as determined by the parties, regardless of the source of the error.

The Purchaser and Seller agree to adjust between themselves tax prorations shown on the Settlement Statement when the actual ad-valorem tax bill is rendered, and to adjust for any additional or revised tax bills which may be issued or unpaid for any current or prior tax year. Seller agrees to promptly forward to Purchaser any tax bill hereafter received for the property. Seller acknowledges his responsibility for any charges arising out of a transfer of a tax fifa to a third party including transfer fees, penalties, interest and any attorney fees incurred by HOLLINGSWORTH & ASSOCIATES, LLC, in collecting any of the foregoing which collection is specifically authorized by Seller. The payment of all mortgage loans is based on the best information available to the Settlement Agent at the time of closing. Seller agrees in the event the payment amounts are incorrect that Seller will immediately remit to Settlement Agent all necessary funds in order to pay the mortgage loans in full.

Purchaser, Seller, and all other parties to this transaction, including those receiving real estate brokerage commissions, by acceptance of the benefits of the closing of this transaction, acknowledge that all checks issued by the law firm of HOLLINGSWORTH & ASSOCIATES, LLC and its release or recording of all documents are subject to all checks, sight drafts and other instruments accepted by such law firm in payment of amounts due under this Settlement Statement being honored for immediate payment by the institution on which such instruments are drawn.

Purchaser and Seller acknowledge HOLLINGSWORTH & ASSOCIATES, LLC in handling this Closing, exclusively represented Purchaser, notwithstanding who paid its fees, and no legal opinions are rendered to Seller, who acknowledges they have been provided an opportunity to review documents in advance as required by law and to obtain independent legal counsel, if they desired. Without limiting the aforegoing, the parties further acknowledge in passing upon questions of title, including the contents of any property restrictions, only the Purchaser's legal position was considered. HOLLINGSWORTH & ASSOCIATES, LLC has also served as agent for the title insurer and has been compensated for this pursuant to Line 1107-8. Surveys are obtained at Purchaser's request only. Any title policy may exclude coverage as to matters concerning surveys. Purchaser and Seller acknowledge that it is their responsibility to comply with the withholding requirements of O.C.G.A. § 48-7-128 and that any payments made by HOLLINGSWORTH & ASSOCIATES, LLC pursuant to said law are paid as an accommodation based on the information provided by the Seller. Recording fees and courier fees are estimates and may actually vary when finally determined; any excess will be retained by HOLLINGSWORTH & ASSOCIATES, LLC as a fee any shortfall will be paid by HOLLINGSWORTH & ASSOCIATES, LLC.

Purchaser and Seller acknowledge that settlement agent makes no representations as to the status of any outstanding or past due water, sewerage or other utility bills applicable to the property. The status of such items shall be determined by, and are the exclusive responsibility of the Purchaser and Seller.

Purchaser hereby acknowledges that a real property tax return and application for homestead exemption is required by law and is to be filed with the county tax collector in which the property lies, between January 1 and March 31 of the year immediately following settlement and that such filings are the sole responsibility of Purchaser. Seller warrants that all required tax returns and applicable exemption applications have been filed for the current tax year. Seller further agrees to reimburse Purchaser for any penalties caused by Seller's failure to file a proper and timely tax return.

Purchaser and Seller agree that should any inadvertent errors or omissions later be discovered in any documents executed at settlement, they shall promptly execute such corrective documents and remit such sums as may be required to adjust or correct such errors or omissions. As part of the consideration of this sale, the contract between the parties is by reference incorporated herein and made a part hereof; the terms and conditions contained therein shall survive the closing and shall not merge upon delivery of the Warranty Deed.

HANNAH NGUYEN - SELLER

- SELLER

BY:
HOLLINGSWORTH & ASSOCIATES, LLC
Settlement Agent

BURGESS MATTOX BEY INVESTMENT TRUST - PURCHASER

BY: BURGESS MATTOX MARQUET, as Trustee

028939

BK5591 5PG0130

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

18 MAY 31  PM 2: 00

RICHARD ALEXANDER, CLERK

Return Recorded Document to:
Hollingsworth & Associates, LLC
2250 Satellite Blvd; Suite 225
Duluth, Georgia 30097

## LIMITED WARRANTY DEED

STATE OF GEORGIA

COUNTY OF GWINNETT                                        File #:18-1168S

   This Indenture made this 25th day of April, 2018 between

### HANNAH NGUYEN

of the County of **GWINNETT**, State of Georgia, as party or parties of the first part, hereinafter called Grantor, and

### BURGESS MATTOX BEY INVESTMENT TRUST

as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

   W I T N E S S E T H  **that:**  Grantor, for and in consideration of the sum of **TEN AND 00/100'S ($10.00) Dollars** and other good and valuable considerations in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee,

### SEE ATTACHED EXHIBIT 'A' LEGAL DESCRIPTION

This Deed is given subject to all easements and restrictions of record, if any.

   **TO HAVE AND TO HOLD** the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee forever in **FEE SIMPLE.**

   **AND THE SAID** Grantor will warrant and forever defend the right and title to the above described property unto the said Grantee against the claims of all persons claiming by or through Grantor.

   **IN WITNESS WHEREOF**, Grantor has hereunto set grantor's hand and seal this day and year first above written.

Signed, sealed and delivered in the presence of:

_____
Witness

_____
Notary Public

Barbara Hollingsworth
NOTARY PUBLIC
Gwinnet County, GEORGIA
My Comm. Expires 02/08/2021

_____ (Seal)
**HANNAH NGUYEN**

_____ (Seal)

PT-61 # 67-2018-012367
GWINNETT CO. GEORGIA
REAL ESTATE TRANSFER TAX
$_____600.00_____
RICHARD T. ALEXANDER, JR. CLERK OF
SUPERIOR COURT

0047459-77

028941

12

BK5591SPG0131

EXHIBIT "A"

LEGAL DESCRIPTION

FILE NO.: 18-1168S

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 93 OF THE 6TH
DISTRICT, GWINNETT COUNTY, GEORGIA BEING LOT 83, BLOCK A, GARNER CREEK
AT PARKVIEW SUBDIVISION, PHASE 1, AS PER PLAT RECORDED IN PLAT BOOK 124,
PAGES 66-69, GWINNETT COUNTY RECORDS, SAID PLAT BEING INCORPORATED
HEREIN BY REFERENCE THERETO.

028942

PT-61 (Rev. 2/18)

## To be filed in GWINNETT COUNTY

PT-61 067-2018-012367

| SECTION A – SELLER'S INFORMATION (Do not use agent's information) | | | SECTION C – TAX COMPUTATION | |
|---|---|---|---|---|
| SELLER'S LAST NAME | FIRST NAME | MIDDLE | Exempt Code If no exempt code enter NONE | NONE |
| NGUYEN | HANNAH | | | |
| MAILING ADDRESS (STREET & NUMBER) | | | 1. Actual Value of consideration received by seller Complete Line 1A if actual value unknown | $600,000.00 |
| 1096 GARNER CREEK DRIVE SW | | | | |
| CITY, STATE / PROVINCE / REGION, ZIP CODE, COUNTRY | DATE OF SALE | | 1A. Estimated fair market value of Real and Personal property | $0.00 |
| LILBURN, GA 30047 USA | 4/15/2018 | | | |
| SECTION B – BUYER'S INFORMATION (Do not use agent's information) | | | 2. Fair market value of Personal Property only | $0.00 |
| BUYERS'S BUSINESS / ORGANIZATION / OTHER NAME | | | 3. Amount of liens and encumbrances not removed by transfer | $0.00 |
| BURGESS MATTOX BEY INVESTMENT TRUST | | | | |
| MAILING ADDRESS (Must use buyer's address for tax billing & notice purposes) | | | 4. Net Taxable Value (Line 1 or 1A less Lines 2 and 3) | $600,000.00 |
| 2625 PIEDMONT ROAD NE STE. 56-507 | | | | |
| CITY, STATE / PROVINCE / REGION, ZIP CODE, COUNTRY | Check Buyers Intended Use (X) Residential ( ) Commercial ( ) Agricultural ( ) Industrial | | 5. TAX DUE at .10 per $100 or fraction thereof (Minimum $1.00) | $600.00 |
| ATLANTA, GA 30324 USA | | | | |

| SECTION D – PROPERTY INFORMATION (Location of Property (Street, Route, Hwy, etc)) | | | | | |
|---|---|---|---|---|---|
| HOUSE NUMBER & EXTENSION (ex 265A) | PRE-DIRECTION, STREET NAME AND TYPE, POST DIRECTION | | | | SUITE NUMBER |
| 1054 | MORGAN GARNER Drive | | | | |
| COUNTY | CITY (IF APPLICABLE) | | MAP & PARCEL NUMBER | | ACCOUNT NUMBER |
| GWINNETT | LILBURN | | 6093-389 | | |
| TAX DISTRICT | GMD | LAND DISTRICT | ACRES | LAND LOT | SUB LOT & BLOCK |
| | | 6 | | 93 | LOT 83 BLOCK A ...* |

| SECTION E – RECORDING INFORMATION (Official Use Only) | | | | |
|---|---|---|---|---|
| DATE | DEED BOOK | DEED PAGE | PLAT BOOK | PLAT PAGE |
| | | | | |

ADDITIONAL BUYERS
None

...* This symbol signifies that the data was too big for the field. The original values are shown below.
SUB LOT & BLOCK:          LOT 83 BLOCK A GARNER CREEK AT PARKVIEW

028946





028957

PRINTED ON LINEMARK PAPER • HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

| 0066886 | 11-24 |
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

6688601913

Remitter:    BURGESS MATTOX BEY INVESTMENT TRUST
Operator I.D.:   u624500         ga003810

April 09, 2018

PAY TO THE ORDER OF    ***HOLLINGSWORTH & ASSOCIATES LLC . ***

***Sixty-five thousand dollars and no cents***

**$65,000.00**

Payee Address:
Memo:        EARNEST MONEY 1054 GARNER DR SW

WELLS FARGO BANK, N.A.
5505 LAWRENCEVILLE HWY NW
LILBURN, GA 30047
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $ 65,000.00

AUTHORIZED SIGNATURE

⑈6688601913⑈ ⑉121000248⑈4861 513315⑈

EMD

028967

PRINTED ON LINEMARK PAPER · HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

| 0066886 | 11-24 |
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

6688601109

Remitter:   BURGESS MATTOX BEY INVESTMENT TRUST
Operator I.D.:   u624500        ga003810

PAY TO THE ORDER OF     ***HOLLINGSWORTH & ASSOCIATES, LLC ***

April 09, 2018

***Two hundred fifty thousand dollars and no cents***

**$250,000.00**

Payee Address:
Memo:        FULL SETTLEMENT 1054 MORGAN GARNER DR SW

WELLS FARGO BANK, N.A.
5505 LAWRENCEVILLE HWY NW
LILBURN, GA 30047
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $  250,000.00

AUTHORIZED SIGNATURE                AUTHORIZED SIGNATURE

⑈6688601109⑈  ⑆121000248⑈4861  50936 2⑈

---

PRINTED ON LINEMARK PAPER · HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

| 0066886 | 11-24 |
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

6688601108

Remitter:   BURGESS MATTOX BEY INVESTMENT TRUST
Operator I.D.:   u624500        ga003810

PAY TO THE ORDER OF     ***HOLLINGSWORTH & ASSOCIATES, LLC. ***

April 09, 2018

***Two hundred fifty thousand dollars and no cents***

**$250,000.00**

Payee Address:
Memo:        FULL SETTLEMENT 1054 MORGAN GARNER DR SW

WELLS FARGO BANK, N.A.
5505 LAWRENCEVILLE HWY NW
LILBURN, GA 30047
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $  250,000.00

AUTHORIZED SIGNATURE                AUTHORIZED SIGNATURE

⑈6688601108⑈  ⑆121000248⑈4861  50936 2⑈

---

PRINTED ON LINEMARK PAPER · HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

| 0066886 | 11-24 |
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

6688601912

Remitter:   BURGESS MATTOX BEY INVESTMENT TRUST
Operator I.D.:   u624500        ga003810

PAY TO THE ORDER OF     ***HOLLINGSWORTH & ASSOCIATES, LLC ***

April 09, 2018

***Sixty-one thousand dollars and no cents***

**$61,000.00**

Payee Address:
Memo:        FULL SETTLEMENT 1054 MORGAN GARNER DR SW

WELLS FARGO BANK, N.A.
505 LAWRENCEVILLE HWY NW
LBURN, GA 30047
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $  61,000.00

AUTHORIZED SIGNATURE

⑈6688601912⑈  ⑆121000248⑈4861  513315⑈

028968

# LEASE FOR RESIDENTIAL PROPERTY



**Georgia REALTORS**

**2018 Printing**

For and in consideration of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned Landlord (  **Hannah Nguyen**  ) and the undersigned Tenant (_____, ERIC M. BALDWIN, MARQUET ANTWAIN BURGESS MATTOX, ) do hereby agree as follows;

**A.  PRIMARY TERMS.** The primary terms of this Lease are set forth in this Section and are subject to the explanations and clarifications set forth in Corresponding Paragraphs Section B of the Lease.

**Lease.** Landlord agrees to lease to Tenant, and Tenant agrees to lease from Landlord, the Premises identified herein on this date of 01-23-2018 on the terms and conditions of which are set forth below.

1. **Property Address:** 1054 Morgan Garner Drive _____ **Unit** _____
   City Lilburn _____ **County** Gwinnett _____ **Georgia** 30047 _____ (**"Premises"**)

2. **Lease Date:** _____ **Last Day of Lease ("Lease End Date"):** _____
   Tenant may terminate this Agreement without penalty if possession is not granted within N/A _____ days of the Lease Start Date ("Approved Delay Period").

3. **Rent.**
   a. **Rent:** Tenant shall pay monthly rent of $ 3500 _____. The Total Rent Due From Tenant over the initial Lease Term shall be: $ 42000 _____ Rent Shall Be Payable To HANNAH NGUYEN _____
   and delivered to: 4500 SATELLITE BLVD, SUITE 2380, DULUTH GA 30096 _____
   ("Rent Payment Address") unless another address is specified by the above-referenced party receiving the rent following the notice provisions herein.
   b. **Due Date for Rent:** Rent must be paid by ☐ Check ☑ Cash ☑ Certified Check ☑ Money Order ☐ Credit Card ☐ ACH or ☐ EFT. Rent shall be paid no later than 5P _____.m. on the 3RD ____ day of the month ("Due Date"). Rent paid after the Due Date shall be late and must include additional rent of $ 350 _____ ("Additional Rent for Late Payment")
   c. **Credit Card:** If rent is paid by Credit Card rent must include a credit card convenience fee of N/A _____
   d. **Service Charge:** Tenant shall immediately pay Landlord a service charge of $ 35 _____ ("Service Charge") for all dishonored checks or rejected electronic (ACH) payments.

   **Security Deposit.**
   a. Tenant shall pay HANNAH NGUYEN _____ as "Holder" a security deposit of $ 3500 _____ by: ☐ Check ☑ Cash ☑ Certified Check ☑ Money Order ☐ Credit Card ☐ ACH or ☐ EFT.
   b. **Security Deposit Bank Account:** The security deposit will be held in:
      ☐ Escrow Account at _____ Bank; OR ☐ General Account at _____ Bank.

5. **Notice Not to Renew Lease.** A party electing not to renew the Lease shall be required to provide 30 _____ days notice of the same to the other party.

6. **Re-Key Fee Paid By Tenant upon Lease Termination:** $ 100

7. **Non-Refundable Administrative Fee Paid by Tenant:** $ 50

8. **Pets.** Tenant ☐ shall or ☑ shall not be allowed to keep pets on the premises. If pets are allowed a separate pet exhibit must be attached hereto and is incorporated into this Lease.

9. **Smoking.** Tenant ☐ shall or ☑ shall not be allowed to smoke, in any form, on or in the Premises.

10. **Utilities.** Utilities provided by Landlord: ☐ Water ☐ Sewer ☐ Gas ☐ Electricity ☐ Trash Pickup ☐ Cable ☑ None
    ☐ Other: _____

11. **Early Termination by Tenant.** Tenant ☐ shall **OR** ☑ shall not have the right to terminate this Lease early. If Tenant has a right to terminate the Lease early, Tenant must:
    ☐ a. Give Landlord no less than _____ days prior notice of the termination.
    ☐ b. Comply in ALL respects with the requirements set out in Paragraph B.11.
    ☐ c. Pay $_____ or _____% of the total rent that otherwise would have been owed through the Lease End Date, not later than _____ days from the date Notice to Terminate is received.
    ☐ d. Pay an Early Lease Termination Administrative Fee of $_____, not later than _____ days from the date Notice to Terminate is received.

12. **Early Termination by Landlord.** Landlord shall have the right to terminate the Lease early upon not less than 30 ____ days notice and upon such termination and Tenant vacating the Premises, Landlord shall credit Tenant with the sum of $ 0 _____ ("Early Termination Fee to Tenant") which shall first be applied against any monies owing from Tenant to Landlord with the balance thereafter being paid to Tenant by Landlord.

13. **Holding Over Rate.** The daily rate for holding over beyond the expiration or termination of the Lease is $ 200

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH ___ KHOA KEVIN DO ___ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2018 by Georgia Association of REALTORS®, Inc.        F40, Lease for Residential Property, Page 1 of 10 01/01/18

14. **Fee to Prepare Lease Amendment:** $200

15. **Use:** Only the following people are authorized to occupy the Premises: ERIC M. BALDWIN, MARQUET ANTWAIN BURGESS MATTOX,
    NYCHOLAS, NIARA, NAILAH, NAKEISHA

**Appliances provided by Landlord:**

| | | | | |
|---|---|---|---|---|
| ☐ Compactor | ☐ Dryer | ☑ Microwave | ☑ Range | ☐ Washer | ☐ Other:_____ |
| ☑ Dishwasher | ☐ Electric | ☑ Oven | ☑ Built-in | ☐ Wine/Drink Cooler | ☐ Other:_____ |
| ☐ Disposal | ☐ Gas | ☐ Electric | ☐ Free-standing | ☑ Venthood | ☐ Other:_____ |
| | | ☐ Gas | ☑ Refrigerator | | ☐ Other:_____ |

17. **Lawn & Exterior Maintenance.** ☑ Tenant OR ☐ Landlord shall maintain the lawn and perform exterior maintenance as described elsewhere herein.

18. **Pest Control.** Pest Control, as specified elsewhere in the Lease, shall be the responsibility of and paid for by:
    ☑ Tenant OR ☐ Landlord.

19. **Propensity of Flooding.** The Premises ☐ have OR ☑ have not flooded at least three (3) times within the past five (5) years.

20. **Lead Based Paint.** The Premises ☐ were (attach F54 Lead-Based Paint Exhibit) OR ☑ were not built prior to 1978.
    Tenant ☐ has OR ☑ has not received a copy of the *Protect Your Family from Lead in Your Home* pamphlet.

21. **Liquidated Damages Paid By Tenant.**
    a. **Fee to Halt Dispossessory Action:** The fee paid by Tenant to halt dispossessory actions in certain situations as set forth elsewhere herein shall be $ 200 ("Fee to Halt Dispossessory Action") plus an Administrative Fee of $ 50 per occurrence.
    b. **Denial of Access Charge:** Tenant agrees to pay $ 100 for each incident where Tenant denies Landlord access to the Premises ("Denial of Access Fee") as described elsewhere herein.
    c. **Unauthorized Pet Charge:** $ 2000 per incident. Every day the violation occurs shall be deemed a separate incident.
    d. **Unauthorized smoking within the Premises charge:** $ 5000
    e. **Utility Disconnection Charge for un-authorized disconnection of utility service:** $ 200

22. **Renewal.**
    a. **Term:** The Lease ☐ shall automatically renew in _____ month increments (each of which shall be referred to as a "Renewal Term") or ☑ shall renew on a month to month basis with all other terms and conditions of the Lease remaining the same including, but not limited to, the number of days notice required to terminate the Lease. If the month to month option is selected, then the language below regarding the "Automatic Renewal" of the Lease shall not be applicable or part of this Lease.
    b. **Automatic Renewal:** Upon the first day of the calendar month following the twelve (12) month anniversary of the Lease Start Date, and every twelve (12) months thereafter, the rent will automatically Increase 10 % over the immediately preceding rental rate rounded up to the next $5.00 increment. Landlord shall have the right to increase the rent above this percentage upon notice being given to Tenant at least ninety (90) days prior to the end of the then applicable Lease Term or Renewal Term. Upon the receipt of such notice, Tenant shall have thirty (30) days thereafter to notify Landlord of Tenant's decision either to: (1) terminate the Lease effective upon the end of the current term of the Lease; or (2) accept the increase in the rent above the percentage increase set forth elsewhere in the Lease. If Tenant fails to timely respond to the notice of rent increase above the percentage increase set forth elsewhere herein, then Tenant shall be deemed to have accepted the increase in rent for the subsequent Renewal Term. After the expiration of 1 Renewal Terms, the Lease shall automatically become a month-to-month Lease if not otherwise terminated. All other terms and conditions of this Lease, including the notice provisions, shall remain the same and in full force and in effect.

23. **Brokerage Relationships in this Transaction:**

| a. Leasing Broker is _____ and is: | b. Listing Broker is Remax Grand South _____ and is: |
|---|---|
| (1) ☐ representing Tenant as a client. | (1) ☐ representing Landlord as a client. |
| (2) ☑ working with Tenant as a customer. | (2) ☑ working with Landlord as a customer. |
| (3) ☐ acting as a dual agent representing Landlord and Tenant. | (3) ☐ acting as a dual agent representing Tenant and Landlord. |
| (4) ☐ acting as designated agent where: | (4) ☐ acting as designated agent where: |
| has been assigned to exclusively represent Tenant. | has been assigned to exclusively represent Landlord. |

24. **Material Relationship Disclosure:** Broker and/or their affiliated licensees disclose the following material relationships:
    Owner is GA Real Estate Licensee

25. **Disclosure of Ownership and Agents.**
    a. **Owner Disclosure:** The name and address of the Owner of record of the Premises or the person authorized to act for and on behalf of the Owner for the purpose of serving of process and receiving demands and notices is as follows:
    HANNAH NGUYEN, KEVIN DO

    b. **Manager Disclosure:** The name and address of the person authorized to manage the Premises and Property is as follows:
    Brokerage Firm: _____ (hereinafter "Manager").
    Address of Brokerage Firm: _____

    Contact Person: _____    Phone Number: _____

## B. CORRESPONDING PARAGRAPHS

1. **Agreement to Lease.** The parties agree to enter into this Lease for the Premises which may be further described in Exhibit "A". The Premises may be part of a larger property ("Property"). If so, Tenant shall have the right to use the common areas of the Property subject to: (a) all rules, regulations and covenants applicable thereto; and (b) the common areas being reduced, modified, altered or being made subject to further use restrictions adopted by Landlord, in its sole discretion, or any community association responsible for the same. While Tenant may use and enjoy the Premises to the fullest extent permitted in this Lease, no estate or permanent legal interest in the Premises is being transferred or conveyed by Landlord to Tenant herein. Landlord shall have the right to assign this Lease to a subsequent owner of the Premises.

2. **Term and Possession.** If Landlord is unable to deliver possession of Premises on the Start Date, rent shall be abated on a daily basis until possession is granted. Neither Owner, Landlord or Broker shall be liable for any delay in the delivery of possession of Premises to Tenant.

3. **Rent.** Tenant shall pay rent in advance to Landlord monthly, and on or before the Due Date during the Lease Term to the Rent Payment Address (or at such other address as may be designated from time to time by Landlord in writing). If the Lease Start Date or the Lease End Date is on the second day through the last day of any month, the rent shall be prorated for that month. Mailing the rent payment shall not constitute payment. Rent must be actually received by Landlord to be considered paid. Tenant acknowledges that all funds received by Landlord will be applied to the oldest outstanding balance owed by Tenant to Landlord. Rent not paid in full by the Due Date shall be late. Landlord may, but shall have no obligation to accept any rent paid after the Due Date. If late payment is made and Landlord accepts the same, the payment must include Additional Rent for Late Payment in the form of cash, cashier's check, certified check or wire transfer of immediately available funds, and if applicable, the Service Charge for any returned check. Landlord reserves the right, upon notice to Tenant, to refuse to accept personal checks from Tenant after one or more of Tenant's personal checks have been returned by the bank unpaid.

4. **Security Deposit.**
   a. **Move-In Inspection:** Prior to Tenant tendering a Security Deposit, Landlord shall provide Tenant with "Move-In, Move-Out Inspection Form" attached hereto and incorporated herein by reference itemizing any existing damages to Premises. Prior to taking occupancy, Tenant will be given the right to inspect Premises to ascertain the accuracy of the form. Both Landlord and Tenant shall sign the form and Tenant shall be entitled to retain a copy of the form. Tenant acknowledges that Tenant has carefully inspected the Premises, is familiar with the same and that the Premises are in a good and habitable condition.

   b. **Deposit of Same:** Holder shall deposit the Security Deposit within five (5) banking days of receiving the same into the bank and account referenced herein. If Landlord is managing the property, the Security Deposit may be deposited in a general account, and it will not be segregated and will be co-mingled with other funds of Holder.
   *[NOTE: If Landlord or Landlord's spouse or minor children own more than ten (10) rental units, if Landlord is not a natural person or if Landlord is a real estate licensee or if the management, including rent collection, is performed by third persons, natural or otherwise, for a fee, the Security Deposit must be deposited into an escrow account.]*
   All interest earned on the above-referenced account shall belong to the Holder. Holder shall have the right to change the bank in which the Security Deposit is held upon notice to Landlord and Tenant, provided that the type of account remains the same. Landlord shall have the right upon fourteen (14) days prior notice to Holder and Tenant to change the Holder of the Security Deposit and / or the bank account into which the Security Deposit is deposited; provided that the new Holder designated by Landlord is a licensed Georgia real estate broker and the bank account into which the Security Deposit is deposited into is an escrow/trust account.

   c. **Security Deposit Check Not Honored:** In the event any Security Deposit check is dishonored, for any reason, by the bank upon which it is drawn, Holder shall promptly notify all parties to this Agreement of the same. Tenant shall have three (3) banking days after notice to deliver good funds to Holder. In the event Tenant does not timely deliver good funds, Landlord shall have the right to terminate this Lease upon notice to Tenant.

   d. **Return of Security Deposit:** The balance of the Security Deposit to which Tenant is entitled shall be returned to Tenant by Holder within thirty (30) days after the termination of this Agreement or the surrender of Premises by Tenant, whichever occurs last (hereinafter "Due Date"); provided that Tenant meets the following requirements: (1) the full term of the Lease has expired; (2) Tenant has given the required written notice to vacate; (3) the Premises is clean and free of dirt, trash and debris; (4) all rent, additional rent, fees and charges have been paid in full; (5) there is no damage to the Premises or the Property except for normal wear and tear or damage noted at the commencement of the Lease in the Move-In Move-Out Inspection Form signed by Landlord and Tenant; and (6) all keys to the Premises and to recreational or other facilities, access cards, gate openers and garage openers have been returned to Landlord or Manager.

   e. **Deductions from Security Deposit:** Holder shall have the right to deduct from the Security Deposit: (1) the cost of repairing any damage to Premises or Property caused by Tenant, Tenant's household or their invitees, licensees and guests, other than normal wear and tear; (2) unpaid rent, utility charges or pet fees; (3) cleaning costs if Premises is left unclean; (4) the cost to remove and dispose of any personal property; (5) late fees and any other unpaid fees, costs and charges referenced herein.

   f. **Move-Out Statement:** Holder shall provide Tenant with a statement ("Move-Out Statement") listing the exact reasons for the retention of the Security Deposit or for any deductions there from. If the reason for the retention is based upon damage to Premises, such damages shall be specifically listed in the Move-Out Statement. The Move-Out Statement shall be prepared within three (3) banking days after the termination of occupancy. If Tenant terminates occupancy without notifying the Holder, Holder may make a final inspection within a reasonable time after discovering the termination of occupancy. Tenant shall have the right to inspect Premises within five (5) banking days after the termination of occupancy in order to ascertain the accuracy of the Move-Out Statement. If Tenant agrees with the Move-Out Statement, Tenant shall sign the same. If Tenant refuses to sign the Move-Out Statement, Tenant shall specify in writing, the items on the Move-Out Statement with which Tenant disagrees within three (3) banking days. For all purposes herein, a banking day shall not include Saturday, Sunday or federal holidays.

029018

Copyright© 2018 by Georgia Association of REALTORS®, Inc.

**g. Delivery of Move-Out Statement:** Holder shall send the Move-Out Statement, along with the balance, if any, of the Security Deposit, to Tenant on or before it is due under state law. The Move-Out Statement shall either be delivered personally to Tenant or mailed to the last known address of Tenant via first class mail. If the letter containing the payment is returned to Holder undelivered and if Holder is unable to locate Tenant after a reasonable effort, the payment shall become the property of Landlord ninety (90) days after the date the payment was mailed.

**h. Right of Holder to Interplead Security Deposit:** If there is a bona fide dispute over the Security Deposit, Holder may, (but shall not be required to), interplead the funds into a court of competent jurisdiction upon notice to all parties having an interest in the Security Deposit. Holder shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses including reasonable attorneys' fees actually incurred. The prevailing defendant in the interpleader lawsuit shall be entitled to collect its attorneys' fees and court costs and the amount deducted by Holder from the non-prevailing party. All parties hereby agree to indemnify and hold Holder harmless from and against all claims, causes of action, suits and damages arising out of or related to the performance by Holder of its duties hereunder. All parties further covenant and agree not to sue Holder for damages relating to any decision of Holder to disburse the Security Deposit made in accordance with the requirements of this Lease or to interplead the Security Deposit into a court of competent jurisdiction.

**5. Notices.**

**a. Required Notice to Lease Termination or Raising the Rent:** Either party must provide the other party with the number of days notice to terminate the Lease set forth elsewhere herein. Landlord must provide Tenant with the same number of days notice prior to increasing the rental rate.

**b. Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving the notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.

**c. Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party; (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein); provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein). Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

**d. When Broker Authorized to Accept Notice for Client:** No Broker shall have the authority to accept notice on behalf of a Tenant or Landlord except that a Broker acting as the Manager hereunder shall be authorized to receive notices on behalf of Landlord and notices delivered to Manager shall for all purposes herein be deemed to be notice to Landlord provided that the notice is delivered to Manager following the notice proceedings set forth here to Manager's address, facsimile number or e-mail address of Manager set forth herein (or subsequently provided by the Manager to Tenant following the notice provisions herein).

**6. Re-Key Fee.** Upon vacating the Premises Tenant agrees to pay the fee to rekey the locks set forth elsewhere herein either upon the termination of the Lease or to replace any mailbox keys or access cards not returned by Tenant at move out.

**7. Administrative Fee.** Prior to the commencement of occupancy, Tenant shall pay Holder the non-refundable Administrative Fee set forth elsewhere herein.

**8. Pets.** No pets are allowed or shall be kept in the Premises or on the Property unless a separate pet exhibit is attached to and incorporated into this Lease.

**9. No Smoking.** Unless specifically authorized in this Agreement, Premises shall be a smoke free zone and smoking shall not be permitted therein. This includes electronic cigarettes and vaping.

**10. Utilities.** Landlord shall have no responsibility to connect utilities the responsibility of which to pay for shall be that of the Tenant. Tenant shall select and connect all utilities to be paid for by Tenant within three (3) banking days from the commencement of the Lease and shall keep these utilities on through the completion of the Move-Out Inspection. In the event Landlord fails to disconnect any utilities serving the Premises after completing the move in Inspection and Tenant receives the benefit of such utilities paid for by Landlord, Tenant shall, upon receiving a bill for the same, immediately pay the cost thereof as additional rent to Landlord. In addition, Tenant shall immediately cause any such utility to be transferred to Tenant's name so that the bill goes to and is paid directly by Tenant.

**11. Early Termination by Tenant.**

**a. Right to Terminate Early:** Tenant shall have the right to terminate this Lease early only if Tenant has expressly been given the right to terminate the Lease early as provided elsewhere herein, Tenant is not in default hereunder at the time of giving notice, Tenant has strictly complied with all of the provisions of this paragraph, Tenant continues to pay rent on time and in full for the months prior to the Termination Date, Tenant pays any additional fees due for this section on time as set out in the Primary Terms section, and termination is as of the last day of a calendar month. If all of these conditions have been met, Tenant may terminate this Lease by following the procedures set forth elsewhere herein and returning the Premises in a clean and rent ready condition, ordinary wear and tear excepted. To be effective, any notice for early termination must be signed by all Tenants. Tenant's election of early termination shall not relieve Tenant of responsibilities and obligations regarding damage to Premises and/or Property. Tenant may not apply the security deposit toward the payment of any of Tenant's financial obligations set forth herein.

Copyright© 2018 by Georgia Association of REALTORS®, Inc.

029019

b. **Military Activation:** Notwithstanding any provision to the contrary contained herein, if Tenant is called to active duty in the military during the term of this Lease, Tenant shall present to Landlord the official orders activating Tenant; then and in that event, this Lease shall be controlled by the Service Members' Civil Relief Act of 2003 as amended in 50 U.S.C.A. § 50-534.

c. **Active Military:** If Tenant is on active duty with the United States military and Tenant or an immediate family member of Tenant occupying Premises receives, during the term of this Lease, permanent change of station orders or temporary duty orders for a period in excess of three (3) months, Tenant's obligation for rent hereunder shall not exceed: (1) thirty (30) days rent after Tenant gives notice under this section; and (2) the cost of repairing damage to Premises or Property caused by an act or omission of Tenant. If Tenant is active duty military and presents to Landlord a copy of official orders of transfer to another military location, then and in that event, Tenant shall be required to give Landlord the notice to terminate early set forth elsewhere herein but shall have no obligation to pay an Early Lease Termination Administrative Fee or additional rent other than for thirty (30) days after Tenant gives notice under this section.

12. **Early Termination by Landlord.** Landlord may terminate the Lease prior to the lease expiration date and in such event Tenant agrees to vacate the Premises subject to the following:

a. Landlord shall give Tenant written notice of the early termination and to vacate (in which case Tenant shall still owe rent through the notice period); and

b. After Tenant has vacated the Premises, Landlord shall credit to Tenant the Early Termination Fee to Tenant as liquidated damages for disturbing Tenant's quiet enjoyment of the Premises and for the inconvenience of moving early. This credit will be applied to the Tenant account at the time the Tenant vacates the Premises and shall be included with any applicable security deposit refund. The foregoing shall not relieve the Tenant of his or her responsibilities and obligations regarding any damage to the property.

13. **Holding Over.** Tenant shall have no right to remain in the Premises after the termination or expiration of this Lease. Should Tenant fail to vacate the Premises upon the termination or expiration of this Agreement, Tenant shall pay Landlord the per day Holding Over Fee set forth elsewhere herein for every day that Tenant holds over after the expiration or termination of this Lease. Acceptance of the Holding Over Fee by Landlord shall in no way limit Landlord's right to treat Tenant as a tenant at sufferance for unlawfully holding over and to dispossess Tenant for the same.

14. **Fee to Prepare Lease Amendment.** Tenant may not sublet Premises in whole or in part or assign this Lease without the prior written consent of Landlord which consent may be withheld for any reason or for no reason. This Lease shall create the relationship of Landlord and Tenant between the parties hereto. Should Landlord consent to modifying the names of the Tenant on this Lease, Tenant agrees to pay Manager the Fee to Prepare Lease Amendment set forth elsewhere herein.

15. **Use.** Premises shall be used for residential purposes only and shall be occupied only by those persons listed in this Agreement. Premises and Property shall be used by Tenant and Tenant shall cause all occupants of the Premises and their guests, invitees, licensees and contractors of Tenant to use the Premises and Property in accordance with all federal, state, county, and municipal laws and ordinances. Tenant agrees that any violation or noncompliance of the above resulting in fines, sanctions or penalties being imposed against Landlord or Manager shall be the financial responsibility of and immediately paid by the Tenant to Landlord as Additional Rent. Tenant shall be responsible for ensuring that Tenant, all occupants of the Premises and their respective invitees, licensees, contractors and guests comply with the Rules and Regulations set forth below and not engage in any activity while on Property or in Premises that is unlawful, would endanger the health and safety of others or would otherwise create a nuisance. In the event Tenant or any of the above-named parties are arrested or indicted for any unlawful activity occurring on Property or for a felony occurring off of the Property and said charges are not dismissed within thirty (30) days thereafter, Tenant shall be deemed to be in default of this Lease and Landlord may, but shall not be obligated to, terminate this Lease upon notice to Tenant. For the purpose of this Lease, an unlawful activity shall be deemed to be any activity in violation of local, state or federal law.

16. **Appliances.** Only the appliances described elsewhere herein are provided by Landlord as part of this Agreement and included in this Lease. Tenant acknowledges that Tenant has inspected these appliances and that the same are in good working order and repair.

17. **Lawn and Exterior Maintenance.** The party maintaining the lawn shall keep the lawn mowed and edged, beds free of weeds, shrubs trimmed, trash and grass clippings picked up on a regular basis (minimum of once every two weeks in growing season and fall leaf season) and shall keep the Premises, including the yard, lot, grounds, walkways and driveway clean and free of rubbish, trash and debris. Landlord shall be responsible for any other maintenance of the Premises or the Property required under O.C.G.A. 44-7-13.

18. **Pest Control.** Landlord will be responsible for termite and rodent control. The term "pest control" herein means addressing any problems in the Premises with ants, cockroaches, spiders and other insects and preventing the infestation thereof and the party responsible for the same is set forth elsewhere herein). Tenant shall be responsible for the immediate treatment of any bed bugs in the Premises by a licensed Georgia pest control operator and the immediate and permanent removal from the Premises of any mattresses, bedding, clothing and other similar items that may contain bed bugs or bed bug larvae.

19. **Propensity for Flooding.** When the owner of real property, either directly or through an agent, seeks to lease or rent that property for residential occupancy, prior to entering a written agreement for the leasehold of that property, the owner shall, either directly or through an agent, notify the prospective tenant in writing of the property's propensity of flooding if flooding has damaged any portion of the living space covered by the lease or attachments thereto to which the tenant or the tenant's resident relative has sole and exclusive use under the written agreement at least three times during the five-year period immediately preceding the date of the lease. This disclosure set forth elsewhere herein is to fulfill that requirement.

20. **Lead-Based Paint**. For any Premises built prior to 1978, Tenant acknowledges that Tenant has received and read the Protect Your Family From Lead in Your Home, and signed the Lead-Based Paint Exhibit attached hereto and incorporated herein by reference. Any approved painting or other alterations by Tenant that disturb lead-based paint shall be performed in accordance with the EPA's Renovate Right brochure (http://www.epa.gov/lead/pubs/renovaterightbrochure.com).

21. **Liquidated Damages**. It is acknowledged by Landlord and Tenant with respect to any reference in the Lease to liquidated damages, that the actual damages of the party being paid such damages are hard to calculate and that the liquidated damages referenced in the Lease are a reasonable pre-estimate of the party's actual damages and not a penalty.

   a. **Fee to Halt Dispossessory Action**: Landlord can file a dispossessory action against Tenant if any rent or other fees and charges owed by Tenant are not paid in full by the Due Date. In the event that a dispossessory action is filed against the Tenant and then dismissed prior to a court hearing because Tenant pays the amounts owed, Tenant shall also pay Landlord, as liquidated damages, the Fee to Halt Dispossessory Action in the amount set forth elsewhere herein. This fee shall immediately be paid as additional rent along with all other amounts paid to halt the dispossessory action.

   b. **Denial of Access, Right of Access, Signage**: Upon 24 hours advance notice to Tenant, Landlord and Landlord's agents shall have the right Monday through Saturday from 9:00 a.m. to 8:00 p.m. and Sunday from 1:00 p.m. to 6:00 p.m. to access the Premises to inspect, repair, and maintain the same and/or to show the Premises to prospective tenants and buyers. In addition, Landlord and Landlord's agents may enter the Premises at any time to investigate potential emergencies. Evidence of water leaks, fire, smoke, foul odors, sounds indicating the possibility of an injured person or animal and other similar evidence of an emergency shall all be sufficient grounds for Landlord and Landlord's agents to enter Premises and Property for this purpose. During the last sixty (60) days of the term of the Lease, and during any period when Premises is being leased month to month, Landlord and Landlord's agents may also place a "for rent" or "for sale" sign in the yard or on the exterior of the Premises or on the Property, may install a lockbox and may show the Premises and the Property to prospective tenants or purchasers during the hours listed above. Tenant agrees to cooperate with Landlord and Landlord's agents who may show the Premises and/or Property to prospective tenants or buyers. In the event a lockbox is installed, Tenant shall secure keys, jewelry, prescription drugs and other valuables and agrees to hold Landlord and Landlord's agents harmless for any loss thereof. For each occasion where the access rights described above are denied, Tenant shall pay Landlord the Denial of Access Fee as liquidated damages in the amount set forth elsewhere herein.

   c. **Unauthorized Pet Charge**: Except for those Pets authorized by a Pet Addendum attached to this lease (if applicable), no other animals are authorized to be within the Premises. This includes, but is not limited to, animals which belong to guests or animals which are only staying temporarily. Should Landlord or Manager ever witness an unauthorized animal within the Premises, Tenant agrees to pay Landlord the Unauthorized Pet Charge as liquidated damages in the amount set forth elsewhere herein for each occasion where Landlord/Manager observed the unauthorized animal.

   d. **Unauthorized Smoking within Premises**: Many people are very sensitive to the smell of smoke whether cigarette, cigar, or any other substances and removing smoke odor is costly. If Tenant is NOT authorized to smoke within the Premises as set forth elsewhere herein and Landlord or Manager note that smoking has occurred within the Premises, Tenant agrees to pay Landlord the Unauthorized Smoking within Premises charge as described elsewhere herein.

   e. **Utility Connection Charge**: In order for Landlord or Manager to perform an accurate move out inspection, utilities to the Premises need to be on. Should Tenant disconnect the utilities prior to the Move-Out Inspection, thereby interfering with Landlord's ability to perform a complete inspection, Tenant agrees to pay to Landlord the Utility Disconnect Fee as liquidated damages as set forth elsewhere herein.

22. **Renewal Term.** Either party may terminate this Lease at the end of the term by giving the other party the Notice Not to Renew Lease Term. If neither party gives the required notice, the Lease will automatically renew as described elsewhere herein. If the Renewal Term paragraph calls for an increase in the rental rate the rental charge for any Renewal Term shall be rounded up to the next $5.00 increment. All other terms of the existing Lease shall remain the same. The additional term shall begin on the first day following the end of the preceding term unless either party gives notice to the other prior to end of the then current term of that party's decision to terminate the Lease at the end of the current term. If this Lease has not been terminated during the final renewal term, this Lease will continue on a month to month basis until the same is terminated in accordance with Georgia Law.

23. **Agency and Brokerage.**

   a. **Agency Disclosure**: In this Lease, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the Broker's affiliated licensees and employees. No Broker in this transaction shall owe any duty to Tenant or Owner/Landlord greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.; The Broker(s) that are party(s) to this Agreement are representing the Landlord and/or Tenant.

   b. **Brokerage**: The Broker(s) identified herein have performed valuable brokerage services and are to be paid a commission pursuant to a separate agreement, or agreements. Unless otherwise provided for herein, the Listing Broker will be paid a commission by the Landlord, and the Leasing Broker will receive a portion of the Listing Broker's commission pursuant to a cooperative brokerage agreement.

24. **Material Relationship Disclosure**. For the purposes of this Agreement, a material relationship shall mean any actually known personal, familial, or business relationship between the broker or the broker's affiliated licensees and a client which would impair the ability of the broker or affiliated licensees to exercise fair and independent judgment relative to another client. Any such material relationship will be disclosed in Material Relationship Paragraph above.

25. <u>Disclosure of Ownership and Agents.</u> At or before the commencement of a tenancy, the Landlord or an agent or other person authorized to enter into a rental agreement on behalf of the Landlord shall disclose to Tenant in writing the names and addresses of the following persons:

   a. <u>Owner.</u> The owner of record of the Premises or a person authorized to act for and on behalf of the owner for the purposes of serving of process and receiving and receipting for demands and notice; and (b) The person authorized to manage the Premises. These Parties are named in the Owner Disclosure and Manager Disclosure Paragraph of this Agreement.  In the event of a change in any of the names and addresses required to be contained in such statement, the Landlord shall advise Tenant of the change within thirty (30) days after the change either in writing or by posting a notice of the change in a conspicuous place on the Property.

   b. <u>Manager.</u> If no Manager is identified in the Manager Disclosure Paragraph above, the Owner shall be deemed to be self-managing the Premises and shall be deemed the Landlord for all purposes herein. If a Manager is identified in Manager Paragraph above as the Manager hereunder, Manager is authorized to manage the Premises on behalf of the Landlord and exercise any and all of the rights and powers granted in this Agreement to Landlord. In such event, Tenant shall communicate with Landlord through the Manager and rely on the notices and communications of Manager as having been fully authorized by Landlord. Manager shall have no rights, duties, obligations or liabilities greater than what is set forth in the Management Agreement between Owner and Manager, a copy of which is incorporated herein by reference. No real estate broker or the broker's affiliated licensees shall be deemed to be responsible for any aspect of managing the Property unless the Broker is identified as the Manager herein and has agreed to serve in that capacity. Any Broker serving as the Manager shall have the authority to either execute this Lease on behalf of Landlord as Landlord's managing agent or to execute this Lease as Manager itself if so authorized by Owner. It shall be presumed that any Manager executing this Lease as a Landlord or as the agent of the Landlord has the authority to do so.

## C.  OTHER TERMS AND CONDITIONS

1. <u>Default.</u>
   a. **Default Generally:**  Tenant shall be in default of this Lease upon the occurrence of any of the following:
     (1)  Tenant fails to abide by any of the terms and conditions of this Lease.
     (2)  Tenant files a petition in bankruptcy (in which case this Lease shall automatically terminate and Tenant shall immediately vacate the Premises leaving it in the same condition it was in on the date of possession, normal wear and tear excepted).
     (3)  Tenant fails to timely pay rent or other amounts owed to Landlord under this Lease.
     (4)  Tenant fails to reimburse Landlord for any damages, repairs and costs to the Premises or Property (other than normal wear and tear) caused by the actions, neglect or intentional wrongdoing of Tenant or members of Tenant's household and their invitees, licensees and guests.
     (5)  Prior to the end of the Lease, Tenant either moves out of the Premises or shuts off any of the utilities serving the Premises without the consent of Landlord.
   b. **Effect of Default:** If Tenant defaults under any term, condition or provision of this Lease, Landlord shall have the right to terminate this Lease by giving notice to Tenant and pursue all available remedies at law or in equity to remedy the default.  All rent and other sums owed to Landlord through the end of the Lease term shall immediately become due and payable upon the termination of the Lease due to the default of Tenant. Such termination shall not release Tenant from any liability for any amount due under this Lease. All rights and remedies available to Landlord by law or in this Lease shall be cumulative and concurrent. Notwithstanding anything to the contrary contained herein, in the event of a non-monetary default by Tenant that is reasonably capable of being cured, Landlord shall give Tenant notice of the same and a three (3) day opportunity to cure the default.

2. <u>Tenant's Responsibilities.</u>
   a. **Repairs and Maintenance:** Tenant has inspected Premises and acknowledges that it is in good condition, free of defects and fit for residential occupancy. Tenant shall promptly notify Landlord of any dangerous condition or need for maintenance existing in Premises or on the Property. Upon receipt of notice from Tenant, Landlord shall, within a reasonable time period thereafter, repair the following: (1) all defects in Premises or Property which create unsafe living conditions or render Premises untenable; and (2) to the extent required by state law, such other defects which, if not corrected, will leave Premises or Property in a state of disrepair. Except as provided above, Tenant agrees to maintain Premises in the neat, sanitary and clean condition free of trash and debris. All of Tenant's trash shall be kept in designated trash containers and removed from the Premises at least once each week.  Tenant obligation to maintain the Premises includes, but not limited to, replacing any light bulbs which fail during the Lease Term and regularly changing HVAC filters.  Tenant shall be responsible for any clogged plumbing within the Premises.  Landlord shall be responsible for all other plumbing issues between the Premises and the street or the Premises and the septic tank or in any plumbing line outside of the Premises which exclusively serves the Premises.  Tenant shall be responsible for any damages to the Premises and/or Property caused by Tenant's abuse or neglect of the Premises/Property.  Any expenses incurred by Landlord to remedy any violations of this provision shall be paid by Tenant to Landlord as additional rent within fourteen (14) days of the receipt of an invoice from Landlord. If Tenant submits a service request or repair request to Landlord, and the contractor responding to this request on behalf of Landlord determines that the item is working correctly, Tenant agrees to reimburse Landlord for the amount for the contractor's invoice.
   b. **Smoke Detector:** Tenant acknowledges that Premises is equipped with a smoke detector(s) that is in good working order and repair. Tenant agrees to be solely responsible to check the smoke detector every thirty (30) days and notify Landlord immediately if the smoke detector is not functioning properly.
   c. **Freezing of Pipes:** To help in preventing the freezing of pipes, Tenant agrees that when the temperature outside falls below 32°F, Tenant shall: (1) leave the thermostat regulating the heat serving Premises in an "on" position and set to a minimum of 60°F; and (2) leave the faucets dripping.

Copyright© 2018 by Georgia Association of REALTORS®, Inc.          F40, Lease for Residential Property, Page 7 of 12, 01/01/18

    d. **Mold and Mildew:** Tenant ackno⁀edges that mold and/or mildew can grow in any portion of the Premises or Property that are exposed to elevated levels of moisture and that some forms of mold and mildew can be harmful to their health. Tenant therefore agrees to regularly inspect the Premises for mold and/or mildew and immediately report to Landlord any water intrusion problems mold and/or mildew (other than in sinks, showers, toilets and other areas designed to hold water or to be wet areas). Tenant shall not block or cover any heating, ventilation, or air conditioning ducts located in the Premises. Tenant acknowledges having read the "A Brief Guide to Mold, Moisture in Your Home" found at www.epa.gov and shall follow the recommendations contained herein.

    e. **Access Codes:** Landlord shall provide Tenant with all access codes to all entrance gates and security systems, if any, located on the Premises or the Property. Within three (3) business days of vacating the property Tenant will provide Landlord with all access that are currently in use for entrance gates and security systems located on the Premises or the Property.

    f. **Premises Part of Community Association:** If the Premises or a part of the Property are subject to either a Declaration of Condominium, a Declaration of Covenants, Conditions and Restrictions, rules and regulations adopted pursuant to the Declaration and/or other similar documents (hereinafter collectively "C.A. Documents"). Tenant agrees to strictly comply with all use and occupancy restrictions contained therein in using the Premises and the Property. In the event any fine or specific assessment is levied against the Premises or the Owner thereof as a result of Tenant violating the use and occupancy restrictions set forth in the C.A. Documents, Tenant shall immediately pay the same to Landlord as additional rent.

3. **Rules and Regulations.** Tenant shall be responsible for violations of these Rules and Regulations caused by Tenant, any occupant of the Premises and their guests, invitees, licensees and contractors.

    a. Tenant is prohibited from adding, changing or in any way altering locks installed on the doors of the Premises without prior written permission of Landlord which permission shall not be unreasonably withheld; provided that, Tenant provides Landlord with a key or current code thereto, as the case may be, and uses a type and make of lock approved by Landlord.

    b. Motor vehicles shall only be parked on the paved portions of the Premises and the Property intended for use as parking spaces and whose use is not reserved to others.

    c. Motor vehicles with expired or missing license plates, non-operative vehicles and vehicles which drip oil or antifreeze shall not be parked or kept on the Premises or the Property.

    d. No waterbeds shall be used on the Premises or Property without the prior written consent of the Landlord.

    e. Tenant shall not shower in a shower which does not have a fully operational shower curtain or shower enclosure.

    f. No space heaters or window air conditioning units shall be used to heat or cool Premises except with the written consent of Landlord.

    g. Tenant shall comply with all posted rules and regulations governing the use of any recreational facilities, if any, located on the Premises or Property.

    h. Tenant shall only skateboard, skate, rollerblade or bicycle on paved portions of the Premises or Property and while wearing proper safety equipment.

    i. Tenant shall be prohibited from improving, altering or modifying the Premises or Property (including painting and landscaping) during the term of this Agreement without the prior written consent of the Landlord. Any improvements, alterations or modifications approved by Landlord shall be deemed to be for the sole benefit of Tenant and Tenant expressly waives all rights to recover the cost or value of the same. Landlord shall have the right but not the obligation to condition the approval of requested modifications on Tenant removing the same prior to the end of the Lease Term and restoring the affected area to a condition equal to or better than it was prior to the modification.

    j. No window treatments currently existing on any windows shall be removed or replaced by Tenant without the prior written consent of Landlord. No sheets, blankets, towels, cardboard, newspaper or other make-shift temporary window treatments shall be used on the Premises or Property.

    k. Other than normal household goods in quantities reasonably expected in normal household use, no goods or materials of any kind or description which exceed the normal structural weight loads for the Premises or Property, are combustible or would increase fire risk or increase the risk of other injuries or casualties, shall be kept or placed on the Premises or Property.

    l. No nails, screws or adhesive hangers except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of the Premises or Property.

    m. Tenant shall not engage in any behavior in the Premises or on the Property, including, but not limited to, yelling, screaming, playing loud music, playing the television at an excessive volume that unreasonably disturbs other tenants in the sole, reasonable opinion of Landlord constitutes a nuisance.

    n. All appliances, equipment and systems on or serving the Premises shall only be used in accordance with the manufacturer's operating instructions.

    o. Tenant shall not flush down a toilet any sanitary napkins, paper towels, diapers or other item not intended to be disposed of in a toilet.

    p. The Premises shall only be used for residential purposes. No trade or business uses shall be permitted except with the prior written consent of Landlord and provided that such use is permitted under applicable zoning laws.

    q. Any product or material that is a potential environmental hazard shall only be disposed of in accordance with all applicable federal laws and regulations.

4. **Property Loss.** Storage of personal property by Tenant in Premises or in any other portion of Property shall be at Tenant's sole risk. Tenant has been advised to obtain renter's insurance that provides comprehensive insurance for damage to or loss of Tenant's personal property. Tenant agrees to look solely to Tenant's insurance carrier for reimbursement of losses resulting from such events and hereby indemnifies and agrees to hold Landlord harmless from any claims, causes of action or damages relating to the same. Landlord shall have no responsibility or liability for Tenant's personal property.

5. **Disclaimer.**

   a. **General**: Tenant and Landlord acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Tenant and Landlord agree that no Broker shall have any responsibility to advise Tenant and/or Landlord on any matter including but not limited to the following except to the extent Broker has agreed to do so in a separately executed Property Management Agreement: any matter which could have been revealed through a survey, title search or inspection of Property or Premises; the condition of the Premises or Property, any portion thereof, or any item therein; building products and construction and repair techniques; the necessity of any repairs to Premises or Property; mold; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; any condition(s) existing off the Premises and Property which may affect the Premises or Property; and the uses and zoning of the Premises and Property whether permitted or proposed. Tenant and Landlord acknowledges that Broker is not an expert with respect to the above matters and that, if any of these matters or any other matters are of concern, Tenant should seek independent expert advice relative thereto. Tenant and Landlord acknowledge that Broker shall not be responsible to monitor or supervise any portion of any construction or repairs to the Premises or Property and such tasks clearly fall outside the scope of real estate brokerage services.

   b. **Construction Disclaimer**: Tenant acknowledges that the Premises, or portions thereof, may have been constructed at times when different and less stringent building codes were in place. Tenant shall not assume that the Premises or Property are energy efficient or contain products or features designed to protect residents against injuries or damage that might exist if the Premises and Property had been constructed in accordance with all current building codes.

   c. **Neighborhood Conditions**: Tenant acknowledges that in every neighborhood there are conditions which different tenants may find objectionable. It shall be Tenant's duty to become acquainted with any present or future neighborhood conditions which could affect the Premises or Property including without limitation land-fills, quarries, high-voltage power lines, cemeteries, airports, stadiums, odor producing factories, crime, schools serving the Premises and Property, political jurisdictional maps and land use and transportation maps and plan. If Tenant is concerned about the possibility of a registered sex offender residing in a neighborhood, or if Meth is known to have been manufactured in the house, in which Tenant is interested, Tenant should review the Georgia Violent Sex Offender Registry available on the Georgia Bureau of Investigation Website at **www.gbi.georgia.gov** and the National Clandestine Laboratory Register – Georgia at **www.dea.gov**.

6. **Miscellaneous.**

   a. **Time of Essence**: Time is of the essence of this Lease.

   b. **No Waiver**: Any failure of Landlord to insist upon the strict and prompt performance of any covenants or conditions of this Lease or any of the Rules and Regulations set forth herein shall not operate as a waiver of any such violation or of Landlord's right to insist on prompt compliance in the future of such covenant or condition, and shall not prevent a subsequent action by Landlord for any such violation. No provision, covenant or condition of this Lease may be waived by Landlord unless such waiver is in writing and signed by Landlord.

   c. **Definitions**: Unless otherwise specifically noted, the term "Landlord" as used in this Lease shall include its representatives, heirs, agents, assigns, and successors in title to Property and the term "Tenant" shall include Tenant's heirs and representatives. The terms "Landlord" and "Tenant" shall include singular and plural, and corporations, partnerships, companies or individuals, as may fit the particular circumstances. The term "Binding Agreement Date" shall mean the date that this Lease has been signed by the Tenant and Landlord and a fully signed and executed copy thereof has been returned to the party making the offer to lease.

   d. **Joint and Several Obligations**: The obligations of Tenant set forth herein shall be the joint and several obligations of all persons occupying the Premises.

   e. **Entire Agreement**: This Lease and any attached addenda and exhibits thereto shall constitute the entire Agreement between the parties and no verbal statement, promise, inducement or amendment not reduced to writing and signed by both parties shall be binding.

   f. **Attorney's Fees, Court Costs and Costs of Collection**: Whenever any monies due hereunder are collected by law or by attorney at law to prosecute such an action, then both parties agree that the prevailing party will be entitled to reasonable attorney's fees, plus all court costs and costs of collection.

   g. **Indemnification**: Tenant agrees to indemnify and hold Landlord, Broker and Manager harmless from and against any and all injuries, damages, losses, suits and claims against Landlord, Broker and/or Manager arising out of or related to: (1) Tenant's failure to fulfill any condition of this Lease; (2) any damage or injury happening in or to the Premises and the Property or to any improvements thereon as a result of the acts or omissions of Tenant or Tenant's family members, invitees or licensees; (3) Tenant's failure to comply with local, state or federal law; (4) any judgment, lien or other encumbrance filed against the Premises or Property as a result of Tenant's actions and any damage or injury happening in or about the Premises or Property to Tenant or Tenant's family members, invitees or licensees (except if such damage or injury is caused by the intentional wrongful acts of Landlord or Broker); (5) failure to maintain or repair equipment or fixtures, where the party responsible for their maintenance uses commercially reasonable efforts to make the necessary repairs and Tenant covenants not to sue Landlord, Broker or Manager with respect to any of the above-referenced matters. In addition to the above Tenant agrees to hold Broker and Manager harmless from and against Owner of the Property not paying or keeping current with any mortgage, property taxes or home owners association fee's on the Property or not fulfilling the Owner's obligations under this lease. For the purpose of this paragraph, the term "Broker" shall include Broker and Broker's affiliated licensees, employees and if Broker is a licensed real estate brokerage firm, then officers, directors and owners of said firm.

   h. **Keys**: Landlord may release keys to or open the Premises to any of the occupants listed herein.

   i. **Waiver of Homestead Rights**: Tenant for himself and his family waives all exemptions or benefits under the homestead laws of Georgia.

   j. **Governing Law**: This Lease may be signed in multiple counterparts and shall be governed by and interpreted pursuant to the laws of the State of Georgia. This Lease is not intended to create an estate for years on the part of Tenant or to transfer to Tenant any ownership interest in the Premises or Property.

029024

**k. Security Disclaimer:** Tenant ackr... .edges that: (1) crime can occur in any neighbo....ood including the neighborhood in which the Premises and Property is located; and (2) while Landlord may from time to time do things to make the Premises and Property reasonably safe, Landlord is not a provider or guarantor of security in or around the Premises and / or the Property. Tenant acknowledges that prior to occupying Property, Tenant carefully inspected all windows and doors (including the locks for the same) and all exterior lighting and found these items: (a) to be in good working order and repair; and (b) reasonably safe for Tenant and Tenant's household and their invitees, licensees and guests knowing the risk of crime. If during the term of the Lease any of the above items become broken or fall into disrepair, Tenant shall give notice to Landlord of the same immediately.

**l. Disclosure Rights:** Landlord may disclose information about Tenant to law enforcement officers, governmental officials and for business purposes.

**m. Rental Application:** Only those people indicated on Tenant's rental application are permitted to reside at the Premises, with the exception of any minor children born to, or adopted by, Tenant. If it is later discovered that the information disclosed on rental application by Tenant was incomplete or inaccurate at the time it was given, Tenant shall be in default of this Lease and Landlord may pursue any and all of Landlord's remedies regarding said default.

**n. Fair Housing Disclosure:** Landlord, Broker and Manager are committed to leasing and managing the Premises without regard to race, color, national origin, religion, handicap, familial status, sex, sexual orientation or gender identity.

7. **Destruction of Property.** If flood, fire, storm, mold, other environmental hazards that pose a risk to the occupants health, other casualty or Act of God shall destroy (or so substantially damage as to be uninhabitable) the Premises, rent shall abate from the date of such destruction. Landlord or Tenant may, by written notice, within thirty (30) days of such destruction, terminate this Lease, whereupon rent and all other obligations hereunder shall be adjusted between the parties as of the date of such destruction. If Premises is damaged but not rendered wholly untenable by flood, fire, storm, or other casualty or Act of God, rent shall abate in proportion to the percentage of Premises which has been damaged and Landlord shall restore Premises as soon as is reasonably practicable whereupon full rent shall commence. Rent shall not abate nor shall Tenant be entitled to terminate this Lease if the damage or destruction of Premises, whether total or partial, is the result of the negligence of Tenant or Tenant's household or their invitees, licensees, or guests.

8. **Mortgagee's Rights.** Tenant's rights under this Lease shall at all times be automatically junior and subordinate to any deed to secure debt which is now or shall hereafter be placed on the Premises or Property. If requested, Tenant shall execute promptly any certificate that Landlord may request to effectuate the above.

9. **GAR Forms.** The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form he or she should consult an attorney. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

10. **Additional Rules & Regulations.** In addition to the rules and regulations generally listed in this Agreement, the following additional rules also apply:

_____

_____

_____

11. **Beware of Cyber Fraud.** Fake e-mails attempting to get you to wire money to criminal computer hackers are increasingly common in real estate transactions. Under this scam, computer hackers fraudulently assume the online identity of the actual mortgage lender, closing attorney and/or real estate broker with whom you are working in the real estate transaction. Posing as a legitimate company, they then direct you to wire money to them. In many cases, the fake e-mail is sent from what appears to be the authentic web page of the legitimate company responsible for sending the wiring instructions. You should use great caution in wiring funds based solely on wiring instructions sent to you by e-mail. Independently verifying the wiring instructions with someone from the company sending them is the best way to prevent fraud. In particular, you should treat as highly suspect any follow up e-mails you receive from a mortgage lender, closing attorney and/or real estate broker directing you to wire funds to a revised account number. Never verify wiring instructions by calling a telephone number provided along with a second set of wiring instructions since you may end up receiving a fake verification from the computer hackers trying to steal your money. Independently look up the telephone number of the company who is supposed to be sending you the wiring instructions to make sure you have the right one.

12. **Exhibits.** All exhibits attached hereto listed and selected below or referenced herein are made a part of this Lease. If any such exhibit conflicts with any preceding paragraph, said exhibit shall control;

☐ Legal Description Exhibit (F147) "_____"

☐ Owner's Property Disclosure Statement Exhibit (F49) "_____"

☑ Move In/Move Out Inspection Form (F43) " A _____"

☐ Lead-Based Paint Exhibit (F54) "_____"

☐ Pet Exhibit (F137) "_____"

☐ Consent to Take Pictures and Video of Property (F46) "_____"

☐ Other _____

☐ Other _____

☐ Other _____

029025

**SPECIAL STIPULATIONS:** The following :pecial Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph (including any changes thereto made by the parties), shall control:

Tenant submitted a total of $44,332 on December 20, 2017.

Tenant moved in December 20, 2017 so prorated rent for December 20, 2017 to December 31, 2017 is $1166.

In addition, tenant wishes to keep the two bed sets and mattresses at a cost of $3000.

The annual Homeowners Association fee is $550 x 2 = $1100 for term of lease until December 20th 2018.

With a monthly rate of $3500, the remaining payment of $39,066 will cover for rent from January 1, 2018 to December 5, 2018.

Any additional person(s) not named in item 15 shall not be occupying the property for longer than 7 days per visit.

Tenant is not allowed to conduct any type of business at the premise.

Please note that any violation of this lease will result in forfeiture of the total payments at initial lease contract.

Tenant is required to notify landlord of any payment made.

Landlords have right to inspection property on monthly basis.

Additional Special Stipulations ☐ are or ☑ are not attached.

IN WITNESS WHEREOF, the parties hereto have set their hand and seal the day and year as of written above.

1 Tenant's Signature

Eric Baldwin                     1-23-2018
Print or Type Name               Date

1 Landlord's Signature

HANNAH NGUYEN     1-23-18
Print or Type Name               Date

Tenant's Address for Receiving Notice

Landlord's Address for Receiving Notice
LILBURN, GA 30047

(678) 914-4258
Tenant's Phone Number: ☑ Cell  ☐ Home  ☐ Work

(404) 702-8368
Landlord's Phone Number: ☑ Cell  ☐ Home  ☐ Work
CANDNINCORPORATE@GMAIL.COM

Tenant's E-mail Address

Landlord's E-mail Address

2 Tenant's Signature

Print or Type Name               Date

Tenant's Address for Receiving Notice

2 Landlord's Signature

Print or Type Name               Date

Landlord's Address for Receiving Notice

(404) 484-5764
Tenant's Phone Number: ☑ Cell  ☐ Home  ☐ Work

Landlord's Phone Number: ☐ Cell  ☐ Home  ☐ Work

Tenant's E-mail Address

Landlord's E-mail Address

Additional Signature Page (F150) ☐ is ☑ is not attached.

Additional Signature Page (F150) ☐ is ☑ is not attached.

**Leasing Broker/Affiliated Licensee Contact Information**

Leasing Broker

**Listing Broker/Affiliated Licensee Contact Information**

Remax Grand South
Listing Broker: If adjacent box is checked ☐, Listing Broker is also the Manager herein and shall have the authority to act as the agent of the Landlord hereunder.

Broker/Affiliated Licensee Signature   Date

Broker/Affiliated Licensee Signature   Date   1/23/18

Print or Type Name        GA Real Estate License #

Print or Type Name        GA Real Estate License #

Licensee's Phone Number     Fax Number

(678) 481-1483
Licensee's Phone Number     Fax Number
KEVIN@DOFINANCIALS.COM

Licensee's E-mail Address

Licensee's Email Address

REALTOR® Membership

REALTOR® Membership

Broker's Address

4500 SATELLITE BLVD, SUITE 2380
Broker's Address
DULUTH, GA 30096

Broker's Phone Number     Fax Number

MLS Listing Number: _____

Broker's Phone Number     Fax Number

MLS Office Code     Brokerage Firm License Number

MLS Office Code     Brokerage Firm License Number

**Binding Agreement Date:** The Binding Agreement Date in this Lease is the date of  1/23/18  and has been filled in by   Hannah Nguyen

Copyright© 2018 by Georgia Association of REALTORS®, Inc.

029027

2017R00120 - 010

## AFFIDAVIT AND CERTIFICATION

I, _JOHN H. HOLLINGSWORTH_ state and certify that the following is true and correct:
[Name]

1.      On or about _July 15_, 2018, I received a Grand Jury Subpoena dated _Nov 21, 2018_, directed to and requiring that certain records of this business/financial institution be produced to the grand jury on or before _Dec 19, 2018_.

2.      I am the custodian of records for _HOLLINGSWORTH & ASSOCIATES, LLC_ or I am otherwise knowledgeable concerning the manner in which records of this business are created and maintained.

3.      In response to the above referenced subpoena, the following records are being produced [Describe, using an attached sheet if necessary]:

_HARD COPIES OF ORIGINAL DOCUMENTS IN MY FILE._

4.      The records accompanying this affidavit: (A) were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) were kept in the course of the regularly conducted activity; and (C) were made by the regularly conducted activity as a regular practice.

I declare and certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _July 16_, 2019.

_____
[Signature]
JOHN H. HOLLINGSWORTH, MANAGING ATTORNEY
[Name and Title]
2250 SATELLITE COURT #225
[Address]
DULUTH, GA 30097
[City, State, Zip Code]
(770) 263-9993
[Telephone Number]
(770) 263-9994
[Facsimile Number]

Sworn to and subscribed before me
This _16th_ day of _July_, 20_19_.

_____
NOTARY PUBLIC, STATE OF _GEORGIA_

EVELYN ALVAREZ
MY COMMISSION EXPIRES
NOTARY PUBLIC
NOVEMBER 12, 2019
GWINNETT COUNTY, GEORGIA