# Affidavit of true and exact copy of the CONGRESSIONAL RECORD, Proceedings and debates of the 90th Congress, First Session, Vol. 113, Part 12, June 12, 1967, to June 20, 1967

I do hereby verify this is a true and exact copy of the **CONGRESSIONAL RECORD, Proceedings and debates of the 90th Congress, First Session, Vol. 113, Part 12, June 12, 1967, to June 20, 1967** from the Library of Congress. Total of 8 pages were verified with the Library of Congress, blue ribbon and seal attached to the original reproduction.

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 14th, 2021 By: _Taurignsreserved Bey_

> A Notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

## JURAT

State of California

County of San Diego

Subscribed and sworn to (or affirmed) before me on this 14th day of October, 2021 by _Terrell El-Bey_, proved to me on basis of satisfactory evidence to be the person(s) who appeared before me.

I certify UNDER PENALTY OF PERJURY on the laws of the state of California that the foregoing paragraph is true and correct WITNESS my hand and seal.

_____
Notary Public

Seal:



AVEY EL-BEY
Commission No. 2307843
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
Commission Expires November 1, 2023



**LIBRARY OF CONGRESS**

Office of Business Enterprises
Duplication Services Section

    THIS IS TO CERTIFY that the online collections of the Library of Congress contain a serial entitled **CONGRESSIONAL RECORD, Proceedings and Debates of the 90th Congress, First Session, Vol. 113, Part 12, June 12, 1967, to June 20, 1967,** and that the attached photocopies from that serial - the title page, and pages 15641 through 15646, on which appears *The 14th Amendment –Equal Protection Law or Tool of Usurpation-* are a true representation from that work.

    IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on July 18, 2019.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress





# United States of America

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 90th CONGRESS
FIRST SESSION

## VOLUME 113—PART 12

JUNE 12, 1967, TO JUNE 20, 1967

(PAGES 15309 TO 16558)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1967

Case 3:20-cr-00044-CAR-CHW   Document 93-4   Filed 07/19/22   Page 4 of 10

groups from other nations. This bipartisan organization is doing something more than just talking about international understanding—it is doing something about it.

If mankind is ever to abolish war from the face of the earth, we first must break down the barriers of mistrust and suspicion among the peoples of the world. There is no better way to accomplish this than through just such programs as this one conducted by the American Council of Young Political Leaders.

These young people will be the leaders of the world in years to come. They will be better leaders, more understanding and tolerant leaders, if they are able to expand their knowledge of other nations, other peoples, and other political systems.

This is why, Mr. Speaker, I am so pleased with the work being done by the American Council of Young Political Leaders. They have my wholehearted support in their program to further world understanding.

## THE 14TH AMENDMENT—EQUAL PROTECTION LAW OR TOOL OF USURPATION

Mr. PRYOR. Mr. Speaker, I ask unanimous consent that the gentleman from Louisiana [Mr. RARICK] may extend his remarks at this point in the RECORD and include extraneous matter.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arkansas?

There was no objection.

Mr. RARICK. Mr. Speaker, arrogantly ignoring clearcut expressions in the Constitution of the United States, the declared intent of its drafters notwithstanding, our unelected Federal judges read out prohibitions of the Constitution of the United States by adopting the fuzzy haze of the 14th amendment to legislate their personal ideas, prejudices, theories, guilt complexes, aims, and whims.

Through the cooperation of intellectual educators, we have subjected ourselves to accept destructive use and meaning of words and phrases. We blindly accept new meanings and changed values to alter our traditional thoughts.

We have tolerantly permitted the habitual misuse of words to serve as a vehicle to abandon our foundations and goals. Thus, the present use and expansion of the 14th amendment is a sham—serving as a crutch and hoodwink to precipitate a quasi-legal approach for overthrow of the tender balances and protections of limitation found in the Constitution.

But, interestingly enough, the 14th amendment—whether ratified or not—was but the expression of emotional outpouring of public sentiment following the War Between the States.

Its obvious purpose and intent was but to free human beings from ownership as a chattel by other humans. Its aim was no more than to free the slaves.

As our politically appointed Federal judiciary proceeds down their chosen path of chaotic departure from the peoples' government by substituting their personal law rationalized under the 14th amendment, their actions and verbiage brand them and their team as secessionists—rebels with pens instead of guns—seeking to divide our Union.

They must be stopped. Public opinion must be aroused. The Union must and shall be preserved.

Mr. Speaker, I ask to include in the RECORD, following my remarks, House Concurrent Resolution 208 of the Louisiana Legislature urging this Congress to declare the 14th amendment illegal. Also, I include in the RECORD an informative and well-annotated treatise on the illegality of the 14th amendment—the play toy of our secessionist judges—which has been prepared by Judge Leander H. Perez, of Louisiana.

The material referred to follows:

H. CON. RES. 208

A concurrent resolution to expose the unconstitutionality of the 14th admendment to the Constitution of the United States; to interpose the sovereignty of the State of Louisiana against the execution of said amendment in this State; to memorialize the Congress of the United States to repeal its joint resolution of July 28, 1868, declaring that said amendment had been ratified; and to provide for the distribution of certified copies of this resolution

Whereas the purported 14th Amendment to the United States Constitution was never lawfully adopted in accordance with the requirements of the United States Constitution because eleven states of the Union were deprived of their equal suffrage in the Senate in violation of Article V, when eleven southern states, including Louisiana, were excluded from deliberation and decision in the adoption of the Joint Resolution proposing said 14th Amendment; said Resolution was not presented to the President of the United States in order that the same should take effect, as required by Article 1, Section 7; the proposed amendment was not ratified by three-fourths of the states, but to the contrary fifteen states of the then thirty-seven states of the Union rejected the proposed 14th Amendment between the dates of its submission to the states by the Secretary of State on June 10, 1866 and March 24, 1868, thereby nullifying said Resolution and making it impossible for ratification by the constitutionally required three-fourths of such states; said southern states which were denied their equal suffrage in the Senate had been recognized by proclamations of the President of the United States to have duly constituted governments with all the powers which belong to free states of the Union, and the Legislatures of seven of said southern states had ratified the 13th Amendment which would have failed of ratification but for the ratification of said seven southern states; and

Whereas the Reconstruction Acts of Congress unlawfully overthrew their existing governments, removed their lawfully constituted legislatures by military force and replaced them with rump legislatures which carried out military orders and pretended to ratify the 14th Amendment; and

Whereas in spite of the fact that the Secretary of State in his first proclamation, on July 20, 1868, expressed doubt as to whether three-fourths of the required states had ratified the 14th Amendment, Congress nevertheless adopted a resolution on July 28, 1868, unlawfully declaring that three-fourths of the states had ratified the 14th Amendment and directed the Secretary of State to so proclaim, said Joint Resolution of Congress and the resulting proclamation of the Secretary of State included the purported ratifications of the military enforced rump legislatures of ten southern states whose lawful legislatures had previously rejected said 14th Amendment, and also included purported ratifications by the legislatures of the States of Ohio and New Jersey although they had withdrawn their legislative ratifications several months previously, all of which proves absolutely that said 14th Amendment was not adopted in accordance with the mandatory constitutional requirements set forth in Article V of the Constitution and therefore the Constitution itself strikes with nullity the purported 14th Amendment.

Now therefore be it resolved by the Legislature of Louisiana, the House of Representatives and the Senate concurring:

(1) That the Legislature go on record as exposing the unconstitutionality of the 14th Amendment, and interposes the sovereignty of the State of Louisiana against the execution of said 14th Amendment against the State of Louisiana and its people;

(2) That the Legislature of Louisiana opposes the use of the invalid 14th Amendment by the Federal courts to impose further unlawful edicts and hardships on its people;

(3) That the Congress of the United States be memorialized by this Legislature to repeal its unlawful Joint Resolution of July 28, 1868, declaring that three-fourths of the states had ratified the 14th Amendment to the United States Constitution;

(4) That the Legislatures of the other states of the Union be memorialized to give serious study and consideration to take similar action against the validity of the 14th Amendment and to uphold and support the Constitution of the United States which strikes said 14th Amendment with nullity; and

(5) That copies of this Resolution, duly certified, together with a copy of the treatise on "The Unconstitutionality of the 14th Amendment" by Judge L. H. Perez, be forwarded to the Governors and Secretaries of State of each state in the Union, and to the Secretaries of the United States Senate and House of Congress, and to the Louisiana Congressional delegation; a copy hereof to be published in the Congressional Record.

VAIL M. DELONY,
*Speaker of the House of Representatives.*
C. C. AYCOCK,
*Lieutenant Governor and President of the Senate.*

---

THE 14TH AMENDMENT IS UNCONSTITUTIONAL

The purported 14th Amendment to the United States Constitution is and should be held to be ineffective, invalid, null, void and unconstitutional for the following reasons:

1. The Joint Resolution proposing said Amendment was not submitted to or adopted by a Constitutional Congress. Article I, Section 3, and Article V of the U.S. Constitution.

2. The Joint Resolution was not submitted to the President for his approval. Article I, Section 7.

3. The proposed 14th Amendment was rejected by more than one-fourth of all the States then in the Union, and it was never ratified by three-fourths of all the States in the Union. Article V.

I. THE UNCONSTITUTIONAL CONGRESS

The U.S. Constitution provides:

Article I, Section 3. "The Senate of the United States shall be composed of two Senators from each State * * *"

Article V provides: "No State, without its consent, shall be deprived of its equal suffrage in the Senate."

The fact that 23 Senators had been unlawfully excluded from the U.S. Senate, in order to secure a two-thirds vote for adoption of the Joint Resolution proposing the 14th Amendment is shown by Resolutions of pro-

test adopted by the following State Legislatures:

The New Jersey Legislature by Resolution of March 27, 1868, protested as follows:

"The said proposed amendment not having yet received the assent of the three-fourths of the states, which is necessary to make it valid, the natural and constitutional right of this state to withdraw its assent is undeniable * * *."

"That it being necessary by the constitution that every amendment to the same should be proposed by two-thirds of both houses of congress, the authors of said proposition, for the purpose of securing the assent of the requisite majority, determined to, and did, exclude from the said two houses eighty representatives from eleven states of the union, upon the pretence that there were no such states in the Union; but, finding that two-thirds of the remainder of the said houses could not be brought to assent to the said proposition, they deliberately formed and carried out the design of mutilating the integrity of the United States senate, and, without any pretext or justification, other than the possession of the power, without the right, and in palpable violation of the constitution, ejected a member of their own body, representing this state, and thus practically denied to New Jersey its equal suffrage in the senate, and thereby nominally secured the vote of two-thirds of the said houses." [1]

The Alabama Legislature protested against being deprived of representation in the Senate of the U.S. Congress.[2]

The Texas Legislature by Resolution on October 15, 1866, protested as follows:

"The amendment to the Constitution proposed by this joint resolution as Article XIV is presented to the Legislature of Texas for its action thereon, under Article V of that Constitution. This Article V, providing the mode of making amendments to that instrument, contemplates the participation by all the States through their representatives in Congress, in proposing amendments. As representatives from nearly one-third of the States were excluded from the Congress proposing the amendments; the constitutional requirement was not complied with; it was violated in letter and in spirit; and the proposing of these amendments to States which were excluded from all participation in their initiation in Congress, is a nullity." [3]

The Arkansas Legislature, by Resolution on December 17, 1866, protested as follows:

"The Constitution authorized two-thirds of both houses of Congress to propose amendments; and, as eleven States were excluded from deliberation and decision upon the one now submitted, the conclusion is inevitable that it is not proposed by legal authority, but in palpable violation of the Constitution." [4]

The Georgia Legislature, by Resolution on November 9, 1866, protested as follows:

"Since the reorganization of the State government, Georgia has elected Senators and Representatives. So has every other State. They have been arbitrarily refused admission to their seats; not on the ground that the qualifications of the members elected did not conform to the fourth paragraph, second section, first article of the Constitution, but because their right of representation was denied by a portion of the States having equal but not greater rights than themselves. They have in fact been forcibly excluded; and, inasmuch as all legislative power granted by the States to the Congress is defined, and this power of exclusion is not among the powers expressly or by implication, the assemblage, at the capitol, of representatives from a portion of the States, to the exclusion of the representatives of another portion,

cannot be a constitutional Congress, when the representation of each State forms an integral part of the whole.

"This amendment is tendered to Georgia for ratification, under that power in the Constitution which authorizes two-thirds of the Congress to propose amendments. We have endeavored to establish that Georgia had a right, in the first place, as a part of the Congress, to act upon the question, 'Shall these amendments be proposed?' Every other excluded State had the same right.

"The first constitutional privilege has been arbitrarily denied. Had these amendments been submitted to a constitutional Congress, they never would have been proposed to the States. Two-thirds of the whole Congress never would have proposed to eleven States voluntarily to reduce their political power in the Union, and at the same time, disfranchise the larger portion of the intellect, integrity and patriotism of eleven co-equal States."[5]

The Florida Legislature, by Resolution of December 5, 1866, protested as follows:

"Let this alteration be made in the organic system and some new and more startling demands may or may not be required by the predominant party previous to allowing the ten States now unlawfully and unconstitutionally deprived of their right of representation to enter the Halls of the National Legislature. Their right to representation is guaranteed by the Constitution of this country and there is no act, not even that of rebellion, can deprive them of its exercise."[6]

The South Carolina Legislature by Resolution of November 27, 1866, protested as follows:

"Eleven of the Southern States, including South Carolina, are deprived of their representation in Congress. Although their Senators and Representatives have been duly elected and have presented themselves for the purpose of taking their seats, their credentials have, in most instances, been laid upon the table without being read, or have been referred to a committee, who have failed to make any report on the subject. In short, Congress has refused to exercise its Constitutional functions, and decide either upon the election, the return, or the qualification of these, selected by the States and people to represent us. Some of the Senators and Representatives from the Southern States were prepared to take this test oath, but even these have been persistently ignored, and kept out of the seats to which they were entitled under the Constitution and laws.

"Hence this amendment has not been proposed by 'two-thirds of both Houses' of a legally constituted Congress, and is not, Constitutionally or legitimately, before a single Legislature for ratification."[7]

The North Carolina Legislature protested by Resolution of December 6, 1866 as follows:

"The Federal Constitution declares, in substance, that Congress shall consist of a House of Representatives, composed of members apportioned among the respective States in the ratio of their population, and of a Senate, composed of two members from each State. And in the Article which concerns Amendments, it is expressly provided that 'no State, without its consent, shall be deprived of its equal suffrage in the Senate.' The contemplated Amendment was not proposed to the States by a Congress thus constituted. At the time of its adoption, the eleven seceding States were deprived of representation both in the Senate and House, although they all, except the State of Texas, had Senators and Representatives duly elected and claiming their privileges under

the Constitution. In consequence of this, these States had no voice on the important question of proposing the Amendment. Had they been allowed to give their votes, the proposition would doubtless have failed to command the required two-thirds majority. * * *

If the votes of these States are necessary to a valid ratification of the Amendment, they were equally necessary on the question of proposing it to the States; for it would be difficult, in the opinion of the Committee, to show by what process in logic, men of intelligence could arrive at a different conclusion."[8]

II. JOINT RESOLUTION INEFFECTIVE

Article I, Section 7 provides that not only every bill which shall have been passed by the House of Representatives and the Senate of the United States Congress, but that:

"Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill."

The Joint Resolution proposing the 14th Amendment[9] was never presented to the President of the United States for his approval, as President Andrew Johnson stated in his message on June 22, 1866.[10] Therefore, the Joint Resolution did not take effect.

III. PROPOSED AMENDMENT NEVER RATIFIED BY THREE-FOURTHS OF THE STATES

1. Pretermitting the ineffectiveness of said resolution, as above, fifteen (15) States out of the then thirty-seven (37) States of the Union rejected the proposed 14th Amendment between the date of its submission to the States by the Secretary of State on June 16, 1866 and March 24, 1868, thereby further nullifying said resolution and making it impossible for its ratification by the constitutionally required three-fourths of such States, as shown by the rejections thereof by the Legislatures of the following states:

Texas rejected the 14th Amendment on October 27, 1866.[11]

Georgia rejected the 14th Amendment on November 9, 1866.[12]

Florida rejected the 14th Amendment on December 6, 1866.[13]

Alabama rejected the 14th Amendment on December 7, 1866.[14]

North Carolina rejected the 14th Amendment on December 14, 1866.[15]

Arkansas rejected the 14th Amendment on December 17, 1866.[16]

South Carolina rejected the 14th Amendment on December 20, 1866.[17]

Kentucky rejected the 14th Amendment on January 8, 1867.[18]

---

[1] New Jersey Acts, March 27, 1866.
[2] Alabama House Journal 1866, pp. 210–213.
[3] Texas House Journal, 1866, p. 577.
[4] Arkansas House Journal, 1866, p. 287.
[5] Georgia House Journal, November 9, 1866, pp. 66–67.
[6] Florida House Journal, 1866, p. 76.
[7] South Carolina House Journal, 1866, pp. 33 and 34.
[8] North Carolina Senate Journal, 1866–07, pp. 92 and 93.
[9] 14 Stat. 358 etc.
[10] Senate Journal, 39th Congress, 1st sess., p. 563, and House Journal p. 809.
[11] House Journal 1866, pp. 576–584—Senate Journal 1866, p. 471.
[12] House Journal 1866, p. 68—Senate Journal 1866, p. 72.
[13] House Journal 1866, p. 76—Senate Journal 1866, p. 8.
[14] House Journal 1866, pp. 210–213—Senate Journal 1866, p. 183.
[15] House Journal 1866–1867, p. 183—Senate Journal 1866–1867, p. 138.
[16] House Journal 1866, pp. 288–291—Senate Journal 1866, p. 262.
[17] House Journal 1866, p. 284—Senate Journal 1866, p. 230.
[18] House Journal 1867, p. 60—Senate Journal 1867, p. 62.

Virginia rejected the 14th Amendment on January 9, 1867.[18]

Louisiana rejected the 14th Amendment on February 6, 1867.[19]

Delaware rejected the 14th Amendment on February 7, 1867.[20]

Maryland rejected the 14th Amendment on March 23, 1867.[21]

Mississippi rejected the 14th Amendment on January 31, 1867.[22]

Ohio rejected the 14th Amendment on January 15, 1868.[23]

New Jersey rejected the 14th Amendment on March 24, 1868.[24]

There was no question that all of the Southern states which rejected the 14th Amendment had legally constituted governments, were fully recognized by the federal government, and were functioning as member states of the Union at the time of their rejection.

President Andrew Johnson, in his Veto message of March 2, 1867,[25] pointed out that:

"It is not denied that the States in question have each of them an actual government, with all the powers, executive, judicial, and legislative, which properly belong to a free State. They are organized like the other States of the Union, and, like them, they make, administer, and execute the laws which concern their domestic affairs."

If further proof were needed that these States were operating under legally constituted governments as member States of the Union, the ratification of the 13th Amendment by December 8, 1865 undoubtedly supplies this official proof. If the Southern States were not member States of the Union, the 13th Amendment would not have been submitted to their Legislatures for ratification.

2. The 13th Amendment to the United States Constitution was proposed by Joint Resolution of Congress,[26] and was approved February 1, 1865 by President Abraham Lincoln, as required by Article I, Section 7 of the United States Constitution. The President's signature is affixed to the Resolution.

The 13th Amendment was ratified by 27 states of the then 36 states of the Union, including the Southern States of Virginia, Louisiana, Arkansas, South Carolina, Alabama, North Carolina and Georgia. This is shown by the Proclamation of the Secretary of State December 18, 1865.[27] Without the votes of those 7 Southern State Legislatures the 13th Amendment would have failed. There can be no doubt but that the ratification by these 7 Southern States of the 13th Amendment again established the fact that their Legislatures and State governments were duly and lawfully constituted and functioning as such under their State Constitutions.

3. Furthermore, on April 2, 1866, President Andrew Johnson issued a proclamation that "the insurrection which heretofore existed in the States of Georgia, South Carolina, Virginia, North Carolina, Tennessee, Alabama, Louisiana, Arkansas, Mississippi and Florida is at an end, and is henceforth to be so regarded."[28]

On August 20, 1866, President Andrew Johnson issued another proclamation[29] pointing out the fact that the House of Representatives and Senate had adopted identical Resolutions on July 22nd[30] and July 20th, 1861,[31] that the Civil War forced by disunionists of the Southern States, was not waged for the purpose of conquest or to overthrow the rights and established institutions of those States, but to defend and maintain the supremacy of the Constitution and to preserve the Union with all equality and rights of the several states unimpaired, and that as soon as these objects are accomplished; the war ought to cease. The President's proclamation on June 13, 1865, declared the insurrection in the State of Tennessee had been suppressed.[32] The President's proclamation on April 2, 1866[33] declared the insurrection in the other Southern States, except Texas, no longer existed. On August 20, 1866,[34] the President proclaimed that the insurrection in the State of Texas had been completely ended; and his proclamation continued: "the insurrection which heretofore existed in the State of Texas is at an end, and is to be henceforth so regarded in that State, as in the other States before named in which the said insurrection was proclaimed to be at an end by the aforesaid proclamation of the second day of April, one thousand, eight hundred and sixty-six.

"And I do further proclaim that the said insurrection is at an end, and that peace, order, tranquility, and civil authority now exist, in and throughout the whole of the United States of America."

4. When the State of Louisiana rejected the 14th Amendment on February 6, 1867, making the 10th state to have rejected the same, or more than one-fourth of the total number of 36 states of the Union as of that date, thus leaving less than three-fourths of the states, possibly to ratify the same, the Amendment failed of ratification in fact and in law, and it could not have been revived except by a new Joint Resolution of the Senate and House of Representatives in accordance with Constitutional requirement.

5. Faced with the positive failure of ratification of the 14th Amendment, both Houses of Congress passed over the veto of the President three Acts known as Reconstruction Acts, between the dates of March 2 and July 19, 1867, especially the third of said Acts, 15 Stat. p. 14 etc., designed illegally to remove with "Military force" the lawfully constituted State Legislatures of the 10 Southern States of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Arkansas, Louisiana, and Texas. In President Andrew Johnson's Veto message on the Reconstruction Act of March 2, 1867,[35] he pointed out these unconstitutionalities:

"If ever the American citizen should be left to the free exercise of his own judgment, it is when he is engaged in the work of forming the fundamental law under which he is to live. That work is his work, and it cannot properly be taken out of his hands. All this legislation proceeds upon the contrary Assumption that the people of each of these States shall have no constitution, except such as may be arbitrarily dictated by Congress, and formed under the restraint of military rule. A plain statement of facts makes this evident.

"In all these States there are existing constitutions, framed in the accustomed way by the people. Congress, however, declares that these constitutions are not loyal and republican, and requires the people to form them anew. What, then, in the opinion of Congress, is necessary to make the constitution of a State 'loyal and republican?' The original act answers the question: It is universal negro suffrage, a question which the Constitution leaves exclusively to the States themselves. All this legislative machinery of martial law, military coercion, and political disenfranchisement is avowedly for that purpose and none other. The existing constitutions of the ten States conform to the acknowledged standards of loyalty and republicanism. Indeed, if there are degrees in republican forms of government, their constitutions are more republican now, than when these States—four of which were members of the original thirteen—first became members of the Union."

In President Andrew Johnson's Veto message on the Reconstruction Act on July 19, 1867,[36] he pointed out various unconstitutionalities as follows:

"The veto of the original bill of the 2d of March was based on two distinct grounds, the interference of Congress in matters strictly appertaining to the reserved powers of the States, and the establishment of military tribunals for the trial of citizens in time of peace.

. . . . .

"A singular contradiction is apparent here. Congress declares these ten State governments to be illegal governments, and then provides that these illegal governments shall be carried on by federal officers, who are to perform the very duties on its own officers by this illegal State authority. It certainly would be a novel spectacle if Congress should attempt to carry on a legal State government by the agency of its own officers. It is yet more strange that Congress attempts to sustain and carry on an illegal State government by the same federal agency.

. . . . .

"It is now too late to say that these ten political communities are not States of this Union. Declarations to the contrary made in those acts are contradicted again and again by repeated acts of legislation enacted by Congress from the year 1861 to the year 1867.

"During that period, while these States were in actual rebellion, and after that rebellion was brought to a close, they have been again and again recognized as States of the Union. Representation has been apportioned to them as States. They have been divided into judicial districts for the holding of district and circuit courts of the United States, as States of the Union only can be districted. The last act on this subject was passed July 23, 1866, by which every one of these ten States was arranged into districts and circuits.

"They have been called upon by Congress to act through their legislatures upon at least two amendments to the Constitution of the United States. As States they have ratified one amendment, which required the vote of twenty-seven States of the thirty-six then composing the Union. When the requisite twenty-seven votes were given in favor of that amendment—seven of which votes were given by seven of these ten States—it was proclaimed to be a part of the Constitution of the United States, and slavery was declared no longer to exist within the United States or any place subject to their jurisdiction. If these seven States were not legal States of the Union, it follows as an inevitable consequence that in some of the States slavery yet exists. It does not exist

---

[18] House Journal 1866–1867, p. 108—Senate Journal 1866–1867, p. 101.
[19] McPherson, Reconstruction, p. 194; Annual Encyclopedia, p. 452.
[20] House Journal 1867, p. 223—Senate Journal 1867, p. 176.
[21] House Journal 1867, p. 1141—Senate Journal 1867, p. 808.
[22] McPherson, Reconstruction, p. 194.
[23] House Journal 1868, pp. 44–50—Senate Journal 1868, pp. 33–38.
[24] Minutes of the Assembly 1868, p. 743—Senate Journal 1868, p. 356.
[25] House Journal, 39th Congress, 2nd Session, p. 563 etc.
[26] 13 Stat. p. 567.
[27] 13 Stat. p. 774.
[28] Presidential Proclamation No. 153, General Records of the United States, G.S.A. National Archives and Records Service.
[29] 14 Stat. p. 814.
[30] House Journal, 37th Congress, 1st Session, p. 123 etc.
[31] Senate Journal, 37th Congress, 1st Session, p. 91 etc.
[32] 13 Stat. 763.
[33] 14 Stat. p. 811.
[34] 14 Stat. 814.
[35] House Journal, 39th Congress, 2nd Session, p. 569 etc.
[36] 40th Congress, 1st Session, House Journal p. 232 etc.

in these seven States, for they have abolished it also in their State constitutions; but Kentucky not having done so, it would still remain in that State. But, in truth, if this assumption that these States have no legal State governments be true, then the abolition of slavery by these illegal governments binds no one, for Congress now denies to these States the power to abolish slavery by denying to them the power to elect a legal State legislature, or to frame a constitution for any purpose, even for such a purpose as the abolition of slavery.

"As to the other constitutional amendment, having reference to suffrage, it happens that these States have not accepted it. The consequence is, that it has never been proclaimed or understood, even by Congress, to be a part of the Constitution of the United States. The Senate of the United States has repeatedly given its sanction to the appointment of judges, district attorneys, and marshals for every one of these States; yet, if they are not legal States, not one of these judges is authorized to hold a court. So, too, both Houses of Congress have passed appropriation bills to pay all these judges, attorneys, and officers of the United States for exercising their functions in these States. Again, in the machinery of the Internal Revenue laws, all these States are districted, not as 'Territories,' but as 'States.'

"So much for continuous legislative recognition. The instances cited, however, fall far short of all that might be enumerated. Executive recognition, as is well known, has been frequent and unwavering. The same may be said as to judicial recognition through the Supreme Court of the United States.

* * *

"To me these considerations are conclusive of the unconstitutionality of this part of the bill now before me, and I earnestly commend their consideration to the deliberate judgment of Congress. [And now to the Court:]

"Within a period less than a year the legislation of Congress has attempted to strip the executive department of the government of some of its essential powers. The Constitution, and the oath provided in it, devolve upon the President the power and duty to see that the laws are faithfully executed. The Constitution, in order to carry out this power, gives him the choice of the agents, and makes them subject to his control and supervision. But in the execution of these laws the constitutional obligation upon the President remains, but the powers to exercise that constitutional duty is effectually taken away. The military commander is, as to the power of appointment, made to take the place of its President, and the General of the Army the place of the Senate; and any attempt on the part of the President to assert his own constitutional power may, under pretence of law, be held as official insubordination. It is to be feared that these military officers, looking to the authority given by these laws rather than to the letter of the Constitution, will recognize no authority but the commander of the district and the General of the Army.

"If there were no other objection than this to this proposed legislation, it would be sufficient."

No one can contend that the Reconstruction Acts were ever upheld as being valid and constitutional.

They were brought into question, but the Courts either avoided decision or were prevented by Congress from finally adjudicating upon their constitutionality.

In Mississippi v. President Andrew Johnson, (4 Wall. 475-502) where the suit sought to enjoin the President of the United States from enforcing provisions of the Reconstruction Acts, the U.S. Supreme Court held that the President cannot be enjoined because for the Judicial Department of the government to attempt to enforce the performance of the duties by the President might be justly characterized, in the language of Chief Justice Marshall, as "an absurd and excessive extravagance." The Court further said that if the Court granted the injunction against enforcement of the Reconstruction Acts, and if the President refused obedience, it is needless to observe that the Court is without power to enforce its process.

In a joint action, the states of Georgia and Mississippi brought suit against the President and the Secretary of War, (6 Wall. 50-78, 164 U.S. 554).

The Court said that:

"The bill then sets forth that the intent and design of the Acts of Congress, as apparent on their face and by their terms, are to overthrow and annul this existing state government, and to erect another and different government in its place, unauthorized by the Constitution and in defiance of its guarantees; and that, in furtherance of this intent and design, the defendants, the Secretary of War, the General of the Army, and Major-General Pope, acting under orders of the President, are about getting, in motion a portion of the army to take military possession of the state, and threaten to subvert her government and subject her people to military rule; that the state is holding inadequate means to resist the power and force of the Executive Department of the United States; and she therefore insists that such protection can, and ought to be afforded by a decree or order of his court in the premises."

This applications for injunction by these two states to prohibit the Executive Department from carrying out the provisions of the Reconstruction Acts directed to the overthrow of their government, including the dissolution of their state legislatures, were denied on the grounds that the organization of the government into three great departments, the executive, legislative and judicial, carried limitations of the powers of each by the Constitution. This case when the same way as the previous case of Mississippi against President Johnson and was dismissed without adjudicating upon the constitutionality of the Reconstruction Acts.

In another case, ex parte William H. McCardle (7 Wall. 506-515), a petition for the writ of habeas corpus for unlawful restraint by military force of a citizen—not in the military service of the United States—before the United States Supreme Court. After the case was argued and taken under advisement, and before conference in regard to the decision to be made, Congress passed an emergency Act, (Act March 27, 1868, 15 Stat. at L. 44), vetoed by the President and repassed over his veto, repealing the jurisdiction of the U.S. Supreme Court in such case. Accordingly, the Supreme Court dismissed the appeal without passing upon the constitutionality of the Reconstruction Acts, under which the non-military citizen was held by the military without benefit of writ of habeas corpus, in violation of Section 9, Article I of the U.S. Constitution which prohibits the suspension of the writ of habeas corpus.

That Act of Congress placed the Reconstruction Acts beyond judicial recourse and avoided tests of constitutionality.

It is recorded that one of the Supreme Court Justices, Grier, protested against the action of the Court as follows:

"This case was fully argued in the beginning of this month. It is a case which involves the liberty and rights, not only of the appellant but of millions of our fellow citizens. The country and the parties had a right to expect that it would receive the immediate and solemn attention of the court. By the postponement of this case we shall subject ourselves, whether justly or unjustly, to the imputation that we have evaded the performance of a duty imposed on us by the Constitution, and waited for Legislative interposition to supersede our action, and relieve us from responsibility. I am not willing to be a partaker of the eulogy or opprobrium that may follow. I can only say . . . I am ashamed that such opprobrium should be cast upon the court and that it cannot be refuted."

The ten States were organized into Military Districts under this unconstitutional "Reconstruction Acts," their lawfully constituted legislatures illegally were removed by "military force," and they were replaced by rump, so-called Legislatures, seven of which carried out military orders and pretended to ratify the 14th Amendment, as follows:

Arkansas on April 6, 1868;[9]
North Carolina on July 2, 1868;[10]
Florida on June 9, 1868;[11]
Louisiana on July 9, 1868;[11]
South Carolina on July 9, 1868;[12]
Alabama on July 13, 1868;[13] and Georgia on July 21, 1868.[14]

6. Of the above 7 States whose Legislatures were removed and replaced by rump, so-called Legislatures, six (6) Legislatures of the States of Louisiana, Arkansas, South Carolina, Alabama, North Carolina and Georgia had ratified the 13th Amendment, as shown by the Secretary of State's Proclamation of December 18, 1865, without which 6 States' ratifications, the 13th Amendment could not and would not have been ratified because said 6 States made a total of 27 out of 36 States or exactly three-fourths of the number required by Article V of the Constitution for ratification.

Furthermore, governments of the States of Louisiana and Arkansas had been re-established under a Proclamation issued by President Abraham Lincoln December 8, 1863.[15]

The government of North Carolina had been re-established under a Proclamation issued by President Andrew Johnson dated May 29, 1865.[16]

The government of Georgia had been re-established under a proclamation issued by President Andrew Johnson dated June 17, 1865.[17]

The government of Alabama had been re-established under a Proclamation issued by President Andrew Johnson dated June 21, 1865.[18]

The government of South Carolina had been re-established under a Proclamation issued by President Andrew Johnson dated June 30, 1865.[19]

These three "Reconstruction Acts"[20] under which the above State Legislatures were illegally removed and unlawful rump or puppet so-called Legislatures were substituted in a mock effort to ratify the 14th Amendment were unconstitutional, null and void, ab initio, and all acts done thereunder were also null and void, including the purported ratification of the 14th Amendment by said 6 Southern puppet State Legislatures of

---

[9] McPherson, Reconstruction, p. 53.
[10] House Journal 1868, p. 15, Senate Journal 1868, p. 15.
[10] House Journal 1868, p. 9, Senate Journal 1868, p. 8.
[11] Senate Journal 1868, p. 21.
[11] House Journal 1868, p. 60, Senate Journal 1868, p. 14.
[12] Senate Journal, 40th Congress, 2nd Sess., p. 725.
[13] House Journal, 1868, p. 50.
[14] Vol. I, pp. 288–306; Vol. II, pp. 1429–1448—"The Federal and State Constitutions," etc., compiled under Act of Congress on June 30, 1906, Francis Newton Thorpe, Washington Government Printing Office (1909).
[15] Same, Thorpe, Vol. V, pp. 2799–2800.
[16] Same, Thorpe, Vol. II, pp. 800–832.
[17] Same, Thorpe, Vol. I, pp. 110–132.
[18] Same, Thorpe, Vol. VI, pp. 3269–3281.
[19] 14 Stat. p. 428, etc. 15 Stat. p. 14, etc.

*June 13, 1967* CONGRESSIONAL RECORD — HOUSE 15645

Arkansas, North Carolina, Louisiana, South Carolina, Alabama and Georgia.

These Reconstruction Acts of Congress and all acts and things unlawfully done thereunder were in violation of Article IV, Section 4 of the United States Constitution, which required the United States to guarantee every State in the Union a republican form of government. They violated Article I, Section 3, and Article V of the Constitution, which entitled every State in the Union to two Senators, because under provisions of these unlawful Acts of Congress, 10 States were deprived of having two Senators, or equal suffrage in the Senate.

7. The Secretary of State expressed doubt as to whether three-fourths of the required states had ratified the 14th Amendment, as shown by his Proclamation of July 20, 1868.[21] Promptly on July 21, 1868, a Joint Resolution[22] was adopted by the Senate and House of Representatives declaring that three-fourths of the several States of the Union had ratified the 14th Amendment. That resolution, however, included purported ratifications by the unlawful puppet Legislatures of 5 States, Arkansas, North Carolina, Louisiana, South Carolina and Alabama, which had previously rejected the 14th Amendment by action of their lawfully constituted Legislatures, as above shown. This Joint Resolution assumed to perform the function of the Secretary of State in whom Congress, by Act of April 20, 1818, had vested the function of issuing such proclamation declaring the ratification of Constitutional Amendments.

The Secretary of State bowed to the action of Congress and issued his Proclamation of July 28, 1868,[23] in which he stated that he was acting under authority of the Act of April 20, 1818, but pursuant to said Resolution of July 21, 1868. He listed three-fourths or so of the then 37 States as having ratified the 14th Amendment, including the purported ratification of the unlawful puppet Legislatures of the States of Arkansas, North Carolina, Louisiana, South Carolina and Alabama. Without said 5 unlawful purported ratifications there would have been only 25 states left to ratify out of 37 when a minimum of 28 states was required for ratification by three-fourths of the States of the Union.

The Joint Resolution of Congress and the resulting Proclamation of the Secretary of State also included purported ratifications by the States of Ohio and New Jersey, although the Proclamation recognized the fact that the Legislatures of said states, several months previously, had withdrawn their ratifications and effectively rejected the 14th Amendment in January, 1868, and April, 1868.

Therefore, deducting these two states from the purported ratifications of the 14th Amendment, only 23 State ratifications at most could be claimed; whereas the ratification of 28 States, or three-fourths of 37 States in the Union, were required to ratify the 14th Amendment.

From all of the above documented historic facts, it is inescapable that the 14th Amendment never was validly adopted as an article of the Constitution, that it has no legal effect, and it should be declared by the Courts to be unconstitutional, and therefore null, void and of no effect.

THE CONSTITUTION STRIKES THE 14TH AMENDMENT WITH NULLITY

The defenders of the 14th Amendment contend that the U.S. Supreme Court has finally decided upon its validity. Such is not the case.

In what is considered the leading case, Coleman v. Miller, 307 U.S. 448, 59 S. Ct. 972, the U.S. Supreme Court did not uphold the validity of the 14th Amendment.

[24] 15 Stat. p. 708.
[25] House Journal, 40th Congress, 2nd Sessn. p. 1126 etc.
[26] 15 Stat. p. 708.

In that case, the Court brushed aside constitutional questions as though they did not exist. For instance, the Court made the statement that:

"The legislatures of Georgia, North Carolina and South Carolina had rejected the amendment in November and December, 1866. New governments were erected in those States (and in others) under the direction of Congress. The new legislatures ratified the amendment, that of North Carolina on July 4, 1868, that of South Carolina on July 9, 1868, and that of Georgia on July 21, 1868."

And the Court gave no consideration to the fact that Georgia, North Carolina and South Carolina were three of the original states of the Union with valid and existing constitutions on an equal footing with the other original states and those later admitted into the Union.

What constitutional right did Congress have to remove those state governments and their legislatures under unlawful military power set up by the unconstitutional "Reconstruction Acts," which had for their purpose, the destruction and removal of these legal state governments and the nullification of their Constitutions?

The fact that these three states and seven other Southern States had existing Constitutions, were recognized as states of the Union, again and again; had been divided into judicial districts for holding their district and circuit courts of the United States; had been called upon by Congress to act through their legislatures upon two Amendments, the 13th and 14th, and by their ratifications had actually made possible the adoption of the 13th Amendment; as well as their state governments having been re-established under Presidential Proclamations, as shown by President Andrew Johnson's Veto message and proclamations, were all brushed aside by the Court in Coleman by the statement that: "New governments were erected in those States (and in others) under the direction of Congress," and that these new legislatures ratified the Amendment.

The U.S. Supreme Court overlooked that it previously had held that at no time were those Southern States out of the Union. White v. Hart, 1871, 13 Wall. 646, 654.

In Coleman, the Court did not adjudicate upon the invalidity of the Acts of Congress, which set aside those state Constitutions and abolished their state legislatures,—the Court simply referred to the fact that their legally constituted legislatures had rejected the 14th Amendment and that the "new legislatures" had ratified the Amendment.

The Court overlooked the fact, too, that the State of Virginia was also one of the original states with its Constitution and Legislature in full operation under its civil government at the time.

The Court also ignored the fact that the other six Southern States, which were given the same treatment by Congress under the unconstitutional "Reconstruction Acts", all had legal constitutions and a republican form of government in each state, as was recognized by Congress by its admission of those states into the Union. The Court certainly must take judicial cognizance of the fact that before a new state is admitted by Congress into the Union, Congress enacts an Enabling Act to enable the inhabitants of the territory to adopt a Constitution to set up a republican form of government as a condition precedent to the admission of the state into the Union, and upon approval of such Constitution, Congress then passes the Act of Admission of such state.

All this was ignored and brushed aside by the Court in the Coleman case. However, in Coleman the Court inadvertently said this:

"Whenever official notice is received at the Department of State that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Secretary of State shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States."

In Hawke v. Smith, 1920, 253 U.S. 221, 40 S. Ct. 227, the U.S. Supreme Court unmistakably held:

"The fifth article is a grant of authority by the people to Congress. The determination of the method of ratification is the exercise of a national power specifically granted by the Constitution; that power is conferred upon Congress, and is limited to two methods, by action of the Legislatures of three-fourths of the states, or conventions in a like number of states. Dodge v. Woolsey, 18 How. 331, 348, 15 L. Ed. 401. The framers of the Constitution might have adopted a different method. Ratification might have been left to a vote of the people, or to some authority of government other than that selected. The language of the article is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed."

We submit that in none of the cases, in which the Court avoided the constitutional issues involved in the composition of the Congress which adopted the Joint Resolution for the 14th Amendment, did the Court pass upon the constitutionality of the Congress which purported to adopt the Joint Resolution for the 14th Amendment, with no Representatives and 23 Senators, in effect, forcibly ejected or denied their seats and their votes on the Joint Resolution proposing the Amendment, in order to pass the same by a two-thirds vote, as pointed out in the New Jersey Legislature Resolution on March 27, 1868.

The constitutional requirements set forth in Article V of the Constitution permit the Congress to propose amendments only whenever two-thirds of both houses shall deem it necessary,—that is, two-thirds of both houses as then constituted without forcible ejections.

Such a fragmentary Congress also violated the constitutional requirements of Article V that no state, without its consent, shall be deprived of its equal suffrage in the Senate.

There is no such thing as giving life to an amendment illegally proposed or never legally ratified by three-fourths of the states. There is no such thing as amendment by inches; no such thing as amendment by waiver; no such thing as amendment by acquiescence; and no such thing as amendment by any other means whatsoever except the means specified in Article V of the Constitution itself.

It does not suffice to say that there have been hundreds of cases decided under the 14th Amendment to supply the constitutional deficiencies in its proposal or ratification as required by Article V. If hundreds of litigants did not question the validity of the 14th Amendment, or questioned the same perfunctorily without submitting documentary proof of the facts of record which made its purported adoption unconstitutional, their failure cannot change the Constitution for the millions in America. The same thing is true of inches; the same thing is true of acquiescence; the same thing is true of ill considered court decisions.

To ascribe constitutional life to an alleged amendment which never came into being according to specific methods laid down in Article V cannot be done without doing violence to Article V itself. This is true, because the only question open to the courts is whether the alleged 14th Amendment became a part of the Constitution through a

method required by Article V. Anything beyond that which a court is called upon to hold in order to validate an amendment, would be equivalent to writing into Article V another mode of the amendment which has never been authorized by the people of the United States.

On this point, therefore, the question is, was the 14th Amendment proposed and ratified in accordance with Article V?

In answering this question, it is of no real moment that decisions have been rendered in which the parties did not contest or submit proper evidence, or the Court assumed that there was a 14th Amendment. If a statute never in fact passed by Congress, through some error of administration and printing got into the published reports of the statutes, and if under such supposed statute courts had levied punishment upon a number of persons charged under it, and if the error in the published volume was discovered, and the fact became known, that no such statute had ever passed in Congress, it is unthinkable that the Courts would continue to administer punishment in similar cases, on a non-existent statute because prior decisions had done so. If that be true as to a statute, we need only realize the greater truth when the principle is applied to the solemn question of the contents of the Constitution.

While the defects in this method of proposing and the subsequent method of computing "ratification" is belored elsewhere, it should be noted that the failure to comply with Article V began with the first action by Congress. The very Congress which proposed the alleged 14th Amendment under the first part of Article V was itself, at that very time, violating the last part as well as the first part of Article V of the Constitution. We shall see how this was done.

There is one, and only one, provision of the Constitution of the United States which is forever immutable—which can never be changed or expunged. The Courts cannot alter it; the executives cannot change it; the Congress cannot change it; the States themselves—even all the States in perfect concert—cannot amend it in any manner whatsoever, whether they act through conventions called for the purpose or through their legislatures. Not even the unanimous vote of every voter in the United States could amend this provision. It is a perpetual fixture in the Constitution, so perpetual and so fixed that if the people of the United States desired to change or exclude it, they would be compelled to abolish the Constitution and start afresh.

The unalterable provision is this: "that no State, without its consent, shall be deprived of its equal suffrage in the Senate."

A state, by its own consent, may waive this right of equal suffrage; but that is the only legal method by which a failure to accord this immutable right of equal suffrage in the Senate can be justified. Certainly not by forcible ejection and denial by a majority in Congress, as was done for the adoption of the Joint Resolution for the 14th Amendment.

Statements by the Court in the Coleman case that Congress was left in complete control of the mandatory process, and therefore it was a political affair for Congress to decide if an Amendment had been ratified, does not square with Article V of the Constitution which shows no intention to leave Congress in charge of deciding whether there has been a ratification. Even a Constitutionally recognized Congress is given but one volition in Article V, that is, to vote whether to propose an Amendment on its own initiative. The remaining steps by Congress are mandatory. If two-thirds of both houses shall deem it necessary, Congress shall propose amendments; if the Legislatures of two-thirds of the States make application, Congress shall call a convention. For the Court to give Congress any power beyond that to be found in Article V is to write the new material into Article V.

It would be inconceivable that the Congress of the United States could propose, compel submission to, and then give life to an invalid amendment by resolving that its effort had succeeded—regardless of compliance with the positive provisions of Article V.

It should need no further citations to sustain the proposition that neither the Joint Resolution proposing the 14th Amendment nor its ratification by the required three-fourths of the States in the Union were in compliance with the requirements of Article V of the Constitution.

When the mandatory provisions of the Constitution are violated, the Constitution itself strikes with nullity the Act that did violence to its provisions. Thus, the Constitution strikes with nullity the purported 14th Amendment.

The Courts, bound by oath to support the Constitution, should review all of the evidence herein submitted and measure the facts proving violations of the mandatory provisions of the Constitution with Article V, and finally render judgment declaring said purported Amendment never to have been adopted as required by the Constitution.

The Constitution makes it the sworn duty of the judges to uphold the Constitution which strikes with nullity the 14th Amendment.

And, as Chief Justice Marshall pointed out for a unanimous Court in Marbury v. Madison (1 Cranch 136 @ 179):

"The framers of the constitution contemplated the instrument as a rule for the government of courts, as well as of the legislature."

* * * * *

"Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government?"

"If such be the real state of things, that is worse than solemn mockery; To prescribe, or to take, this oath, becomes equally a crime."

"Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that courts, as well as other departments, are bound by that instrument."

The federal courts actually refuse to hear argument on the invalidity of the 14th Amendment, even when the issue is presented squarely by the pleadings and the evidence as above.

Only an aroused public sentiment in favor of preserving the Constitution and our institutions and freedoms under constitutional government, and the future security of our country, will break the political barrier which now prevents judicial consideration of the unconstitutionality of the 14th amendment.

---

## THE MIDEAST CRISIS—NOT BACKWARD TO BELLIGERENCY BUT FORWARD TO PEACE

Mr. PRYOR. Mr. Speaker, I ask unanimous consent that the gentleman from New York [Mr. TENZER] may extend his remarks at this point in the RECORD and include extraneous matter.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arkansas?

There was no objection.

Mr. TENZER. Mr. Speaker, the distinguished Foreign Minister of the State of Israel, Abba Eban, in his address to the United Nations Security Council on June 6, 1967, set the theme for a lasting peace in the Middle East so much desired by all the peace-loving nations of the world. His address was entitled, "Not Backward to Belligerency but Forward to Peace."

On June 7, 1967, following the first United Nations resolution calling for a cease-fire in the Middle East, I stated to a distinguished group of Americans who visited me in Washington as follows:

I deem it most imperative that the terms of the agreement to follow the cease fire provide effective guarantees to the end that permanent peace may be established in the Middle East.

The interests of world peace would best be served if the terms provide:

1. For recognition of the validity of the sovereignty of the State of Israel by the U.A.R. and other Arab states.

2. A reaffirmation that the Gulf of Aqaba is an international waterway and will remain open for free passage to shipping of all nations through the Straits of Tiran;

3. An opening of the Suez Canal to shipping of all nations;

4. An ending of terrorism and border raids so that Israel may carry out its desire to live in peace with its neighbors;

5. For direct negotiations between Israel and her Arab neighbors for the resolution of other pending issues.

Indeed, it is within the province of the sovereign State of Israel to speak its mind on the terms of the agreement to follow the cease-fire—the terms which in its view will best insure permanent peace in the Middle East. We on the other hand take the opportunity to make suggestions which in our opinion will best secure the peace of the world—thereby also serving the best interests of the United States.

An elaboration of the five points suggested on June 7, 1966, is accordingly in order.

I. THE STATE OF ISRAEL A SOVEREIGN NATION

The State of Israel is a member of the United Nations—a full-fledged member of the family of nations. Though the integrity of her borders were guaranteed by the major powers—three times in 20 years—the State of Israel was obliged to go to war to put a stop to the violation of her boundary lines.

It is therefore basic to any plan for permanent peace in the Middle East that the sovereignty of the State of Israel be recognized by her neighbors. This fact cannot be questioned—this truth is and should not be negotiable because its support was underlined by the events of the past 10 days.

The foundation for a permanent peace in the Middle East must be the absolute and unqualified recognition by the Arab States of the right of the State of Israel to exist as a sovereign state among other sovereign states. When this foundation is laid, then Israel and her Arab neighbors can, through direct negotiations, begin to build the structure leading to permanent peace.

II. STRAIT OF TIRAN AN INTERNATIONAL WATERWAY

Since 1950, Egypt has repeatedly given assurances that the Strait of Tiran would remain open for "innocent passage

Pulaski Circuit County Clerk Arkansas
Real Estate Records Instrument # 2020002994
Notice of ... Bond # RE 134 466 505 US
Notice of ... Bond # RE 134 466 488 US
ALL RIGHTS RESERVED WITHOUT PREJUDICE
... *El-Bey*
U.C.C. 1-2..., ..., U.C.C. 1-103, U.C.C. 9-311