```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF GEORGIA
 2                       ATHENS DIVISION
                 _____
 3

 4   THE UNITED STATES OF AMERICA    :      3:20-cr-44(CAR)

 5            VS.                     :      August 16, 2021

 6   MARQUET ANTWAIN BURGESS MATTOX,  :      Athens, Georgia
     A/K/A MARQUET ANTWAIN BURGESS
 7   MATTOX EL, A/K/A MARQUET BURGESS :
     MATTOX, A/K/A ASIM ASHUNTA EL,
 8   A/K/A ASIM EL BEY,              :
                          Defendant
 9   _____

10                       JURY TRIAL

11                    VOLUME I OF III

12         BEFORE THE HONORABLE C. ASHLEY ROYAL,
              UNITED STATES COURT DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:      LYNDIE FREEMAN
                              US ATTORNEY'S OFFICE
16                            P.O. BOX 1702
                              MACON, GA 31201
17

18                            JESSICA KRAFT
                              150 M STREET, NE
19                            SUITE 400
                              WASHINGTON, DC 20002
20

21   FOR THE DEFENDANT:       PRO SE
                              MARQUET ANTWAIN BURGESS MATTOX
22   _____

23                    TAMMY W. DIROCCO, USCR
                           P.O. BOX 539
24                    MACON, GA 31202-0539
                         (478-752-3497)
25
```

1                        WITNESS INDEX

2                                                    PAGE

3   HANNAH NGUYEN

4         Direct Examination By Ms. Freeman .............121

5         Cross Examination By The Defendant ...........131

6         Redirect Examination Ms. Freeman .............136

7         Recross Examination By The Defendant ..........137

8   RENEE MCCLAIN

9         Direct Examination By Ms. Kraft ..............139

10        Cross Examination By The Defendant ...........170

11        Redirect Examination By Ms. Kraft ............180

12        Recross Examination By The Defendant  ........181

13  KEVIN KEITHLEY

14        Direct Examination By Ms. Freeman ............182

15        Cross Examination By The Defendant ...........189

16

17

18

19

20

21

22

23

24

25

```
 1                    GOVERNMENT'S EXHIBITS

 2   NUMBER                 DESCRIPTION              PAGE

 3   Gov. 2     Closing documents for sale of house .....118

 4   Gov. 5     Charter Communications Subscriber .......119

 5              Records

 6   Gov. 1     Photograph of house ....................123

 7   Gov. 3-1 through 3-32   -  Tax Returns ............143

 8   Gov. 3-33 through 3-69  -  Account Transcripts .....143

 9   Gov. 3-70 through 3-85  -  Printouts from IRS  .....143

10              Computer Data Base

11   Gov. 3-85 through 3-88  -  Refund Checks Issued ....143

12              by IRS

13   Gov. 4-1   Summary Chart of Forms ..................161

14   Gov. 4-2   Subset of Information ...................164

15   Gov. 16    Haverty's Furniture Records .............203

16   Gov. 17    UPS mailbox service agreement ..........204

17

18

19

20

21

22

23

24

25
```

1  August 16, 2021

2  9:00 a.m.

3  Athens, Georgia

4                    P R O C E E D I N G S

5  (Following proceeding held in small jury room in Athens,

6  Georgia at 9:40 a.m. before beginning of trial)

7            THE COURT:  Good morning, Mr. Mattox.

8            There are some matters that we need to deal with

9  before the trial begins and there are several matters that I

10  need to give Mr. Mattox the opportunity to object to you.

11  There are 404(b) related questions.  There are the question

12  about the scrivener's error versus the constructive amendment

13  question that we need to deal with.  That is Count 14.

14            So let's just start with a few things here.

15            I am going to tell the jury that Mr. Mattox has the

16  right to choose whether he represents himself or not, and he

17  has chosen in this case that he wants to represent himself.

18  And he also has the right to choose whether or not he wants to

19  testify.

20            Do you understand that Mr. Mattox?  Let me just

21  explain to you that you have the right to choose about whether

22  you want to testify in this trial or not.  That is completely

23  up to you.  You can choose not to testify.  You have a right

24  not to testify in the case, and if you don't testify that

25  can't be used against you.  If you do testify however, you

1   will open yourself up to the full opportunity for the

2   prosecutor to cross examine you.  So you can get on the

3   witness stand.  You can make a narrative statement about

4   whatever your defense is in this case.  That narrative

5   statement is subject to the Federal Rules of Evidence.  In

6   other words, you have to comply with the Federal Rules of

7   Evidence in what you say.  But you are authorized to testify.

8   If you don't want to testify you don't have to testify, as I

9   said, and I'll say again, that can't be used against you.

10          I will instruct the jury about that.  And so that is

11  up to you.  You don't have to make that decision right now.

12  I'm just advising you of your rights.

13          Do you have a question about that?

14          THE DEFENDANT:  Your Honor, I don't have a question

15  about that particularly.  I do have a motion for relief for a

16  final judgment order or proceeding that I would like to --

17          THE COURT:  You're going to have to speak up.  I'm

18  having some trouble hearing you.

19          THE DEFENDANT:  Your Honor, I do not have a question

20  about what you just spoke on particularly.

21          THE COURT:  Right.

22          THE DEFENDANT:  I said I do have a motion for relief

23  for a final judgment order or proceeding that I would like

24  to --

25          THE COURT:  Okay.  Well, let's come to that at the

```
 1   end.  Because I have a list of matters that we need to deal

 2   with and we will put that at the end.  Okay?

 3               THE DEFENDANT:  At the end of --

 4               THE COURT:  This hearing in here, before we get in

 5   there.

 6               Now, I'm going to ask you again today --

 7   Ms. Williams is here, she has been here, I think, at every

 8   hearing I have had, and here before you have refused her

 9   assistance.  And I'm asking you again today would you like for

10   her to be standby counsel for you and would you like her

11   assistance today?

12               THE DEFENDANT:  Your Honor, I respectfully decline.

13               THE COURT:  Okay.  Do you have a problem with me

14   releasing her at the end of the day?  If you're not going to

15   use her help?

16               THE DEFENDANT:  I do not have a problem with that,

17   Your Honor.

18               THE COURT:  Okay.  Well, we will see how the day

19   goes and let you get into this trial and see what it's going

20   to be like and then we may or may not release her.  But she is

21   there to help you and all you have to do is let me know.  But

22   once I release her then she is gone, so you won't be able to

23   avail yourself of her help.  So just keep that in mind.

24               There is no decision that needs to be made now about

25   that.  You've told me that you don't want her assistance and
```

1  so I understand that.

2         Now, there was a matter that was presented to me by

3  the government and it was a request that certain records that

4  are evidence in this case be admitted by certified -- by

5  certification, as opposed to requiring the witness to appear.

6         Now, I granted that motion with the proviso that I

7  will give you the opportunity to object to that if you have an

8  objection?

9         In other words, the witness would come and testify

10  that -- not specifically to what the documents say, but simply

11  the basis of why they should be admitted in terms of

12  record-keeping and so forth to satisfy the Federal Rules of

13  Evidence.

14         Do you have an objection to that?

15         THE DEFENDANT:  I think I would have an objection

16  because I would have a right to cross examine that particular

17  witness, correct?

18         THE COURT:  Well, you may have the right to cross

19  examine the witness but the thing is the Federal Rules and the

20  case law authorizes it to be done in this way.

21         So I will accept that as an objection and I will

22  overrule your objection.

23         I am, in this case, going to give a copy of the

24  Indictment to each juror because of the number of counts.  I

25  typically just send out one but I am going to send out a copy

```
 1    of the Indictment for each one of the jurors.
 2              Let me see what else we have here.
 3              MS. FREEMAN:  Your Honor, with respect to the
 4    Indictment that you will send with the jurors, will it be the
 5    redacted Indictment with regard to the forfeiture or the
 6    existing Indictment?
 7              THE COURT:  Well, that is one of the things on my
 8    list.  And, you know, I think I, once again, provisionally
 9    ruled that we could take that out and gave Mr. Mattox the
10    opportunity to object to that and this would be his first
11    opportunity.
12              I think you actually objected at the hearing, but
13    I'm not clear that you gave me a reason why you were
14    objecting.
15              In other words, there is forfeiture language in here
16    in the Indictment that she wants to take out.
17              Do you have an objection to that?
18              THE DEFENDANT:  I do have an objection, Your Honor.
19              THE COURT:  What's that?
20              THE DEFENDANT:  The objection is basically that
21    she -- excuse me.  Not she.  The Plaintiff is modifying the
22    actual original document.  And according to 31 U.S.C. 3113 if
23    I'm not mistaken (a)(2)(d), that particular document pretty
24    much once it's canceled by the Secretary of Treasury that
25    document has to be canceled.  Therefore, she is modifying a
```

1   document that has been canceled.

2            THE COURT:  Do you want to respond to that?

3            MS. FREEMAN:  Your Honor, Title 31 has no bearing on

4   the redaction of the Indictment.  The Secretary of the

5   Treasury has no relevance to any documents in the Indictment

6   other than the fact it's somewhat related to the IRS.

7            The forfeiture Count we are not intending to pursue

8   in a bifurcated proceeding or seek findings from it from the

9   jury.

10           It's within Your Honor's discretion to use the

11   redacted version if you would like.  However, if you would

12   like to leave it in, the government is also fine with it.  We

13   are going to discuss the house in terms of evidence in the

14   case.  We just are not planning to pursue the particularized

15   forfeiture at the end.

16           So the reason we asked for the redaction is just to

17   reduce confusion for the jury that they need to make any kind

18   of forfeiture finding.

19           THE COURT:  Right.  And that's the way I understood

20   it.  And so I'm going to overrule the objection on that.

21           Charts.  Now there are some charts.  Where are the

22   charts?

23           I want him to -- I want him to be able to take a

24   look at the charts.  So are they here or where are they?  Do

25   you have a --

1        MS. FREEMAN:  So, Your Honor, we have the summary

2   exhibit.  And all of these have been provided in advance to

3   the Defendant per your order --

4        THE COURT:  Okay.

5        MS. FREEMAN:  -- with the binders.  We did ship

6   those to Butts County.  I don't know what they let him bring

7   with him today.  But we have another paper set in these

8   binders if the Marshals are okay with us giving these to him.

9        THE DEFENDANT:  I have never seen them.

10        MS. FREEMAN:  Indexed in these binders we have all

11   of the exhibits that the government intends to tender.  The

12   first chart that we have is Exhibit 4-1, which is the summary

13   chart of Forms 1041.

14        THE COURT:  Do you want to take a look at that,

15   Mr. Mattox?

16        Show him where that is, please.

17        Now, the Rule of Evidence -- I think it's -- what is

18   it 1106 or 1006, basically says that I tell the jury that this

19   is not the evidence, that it is a shortened summary of the

20   evidence because the evidence is complex in this case.

21        I agree that the evidence is complex.  I agree that

22   the charts can be admitted, but I inform the jurors that the

23   real evidence is what has been admitted and not the chart

24   itself.  And I think that that is the way I'm supposed to do

25   that and that's the way I'm going to do that.

1           Do you have an objection to the charts?

2           THE DEFENDANT:  I have never seen the charts before

3     today.  If they were tendered to Butts County jail I --

4           THE COURT:  When is the first time you will use the

5     charts?

6           MS. KRAFT:  For exhibits 4-1 and 4-2, that would be

7     the second witness, Your Honor.  And then the 15-1 and 15-2

8     which are demonstratives, would be later in the --

9           THE COURT:  So we don't have to decide that right

10    now.  I'm going to give him the opportunity to take a look at

11    those and then we can deal with that.  I guess we will either

12    deal with it before the opening statement or before the

13    evidence is presented.  And then that will give him the

14    opportunity to review it and if he has any objections to it he

15    can object.

16          And there was an issue that you brought up at the

17    last hearing about Puerto Rico and certain documents that were

18    filed.

19          We went back and reviewed that.  I told you at that

20    time that I didn't think that was a defense to this case and I

21    still don't think it's a defense to the case.  But after

22    reviewing that I think that what you are purporting to tell us

23    is actually hearsay and not admissible under the Federal Rules

24    of Evidence.

25          So, what else?  Now 404(b) evidence.  I thank you

```
1    for your nice trial brief, that was helpful, but I was a

2    little bit unclear what you had in mind about these 404(b).

3    Because you stated that you were not necessarily sure whether

4    these were intrinsic or extrinsic evidence.  But the first of

5    these is a frivolous return penalties and it seems to me that

6    that's intrinsic evidence, if I understand correctly.  That

7    was part of the going on during the criminal scheme related to

8    the criminal scheme and that is not 404(b) evidence.

9              Do you agree with that?

10             MS. FREEMAN:  Yes, Your Honor.

11             THE COURT:  How about you?

12             MS. KRAFT:  Yes, Your Honor.

13             THE COURT:  Do you have an objection to that,

14   Mr. Mattox?

15             THE DEFENDANT:  I'm not exactly sure where you're

16   reading from right now.

17             THE COURT:  Well, I'm reading from my notes.  It was

18   raised in her brief.  She submitted a brief.

19             Did you get the brief.  You should have gotten the

20   brief.

21             THE DEFENDANT:  I did not.

22             THE COURT:  Once again, we will need to make that

23   available to him.

24             MS. FREEMAN:  Your Honor, I just want to make a

25   record at this time that we did put everything in expedited
```

1   mail, including every filing that we have filed with the

2   Court.

3           THE COURT:  All right.  Well, I think what we need

4   to do is we will give him your brief on that and he can take a

5   look at that.  I indicated what I'm inclined to do here with

6   that and we'll let him have the opportunity to object.

7           The next thing is the personal tax debt of

8   $68,082.12.  And the IRS is going to prove that that payment

9   of that personal tax debt was proceeds from the fraudulent

10  scheme.  Once again, to me that seems to be intrinsic

11  evidence.  But my question about that is how are you going to

12  show that the money was from the fraudulent tax scheme that

13  was used to pay this personal tax debt?

14          MS. FREEMAN:  Your Honor, several of the exhibits

15  that we intend to offer, that are part of the preadmitted

16  records from Wells Fargo Bank, will show payments to the IRS

17  in those amounts, this explains that.  And witnesses will

18  differentiate the fact that since part of what is alleged in

19  this scheme is that he did not pay the withholding that he

20  indicated on his tax returns, that those payments to the IRS,

21  that appear in the bank records, were not, in fact, that.

22  That they were payments for a personal tax debt of his own.

23          THE COURT:  Okay.  Well, if you can establish that

24  and that is not a 404(b) question.  That is just basic

25  admissibility question.

1              So if you can establish that then -- well, it's not

2     404(b) evidence.  So you just have to establish it and you can

3     object to that at the time the evidence is offered.

4              Mr. Mattox, do you have an objection to it at this

5     point?

6              THE DEFENDANT:  I have a question.

7              THE COURT:  Okay.

8              THE DEFENDANT:  What is permissible in this court in

9     regards to the procedures for objection.  Because I have

10    objected in another court and was held in contempt of court.

11    So I want to assure that I'm understanding the exact

12    procedures for objecting.

13             THE COURT:  Well, the procedures for objecting are

14    outlined in the Federal Rules of Evidence.  And I'm not clear

15    about what the previous -- what you're talking about in terms

16    of the previous court.  Are you talking about in Judge

17    Weigle's court?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Okay.  Well, what I tried to do is to go

20    through and see what issues were raised in the previous

21    hearings and to give you a ruling on those at the last

22    pretrial hearing we had.

23             We have had three or four of these so far.  So I'm

24    not sure exactly when I did what.

25             But I think that I explained either four or five

1    different propositions that were not admissible in this case.

2              I do not remember this coming up anywhere in a

3    previous hearing.  Maybe it did, I just don't remember it.

4              So you can make your objections at trial or you can

5    object now and perfect the record on that.

6              Number 3, no personal income tax return since 2003.

7    Now, I look at that *Threuf* (Phonetically) case -- I don't know

8    how you pronounce that, *Threuf* (Phonetically) case.  And the

9    *Threuf* (Phonetically) case allowed the fact that there were no

10   personal income tax returns.

11             But my question about that is that seems to me to be

12   extrinsic evidence.  I don't remember if it was admitted, but

13   I don't remember how the Court admitted it.

14             MS. FREEMAN:  Well, with regards to the personal tax

15   returns.  The reason we -- you know, we put it in our notice

16   out of an abundance of caution, but we believe it to be not an

17   actual wrong or crime that we're alleging.  So while it is not

18   part of the actual scheme in this case that he did not file

19   personal tax returns, it is relevant to show that --

20             THE COURT:  It's not a question of if it's relevant.

21   It's a question of whether it's 404(b) or not.  Because if

22   it's 404(b) I have to give the jury a charge telling them that

23   they can't assume from this that this is an attack on his

24   character and they can't assume from this attack on his

25   character that he acted, in this case, with the same bad

1    character but it can go to motive, preparation, opportunity,

2    so forth and so on.

3              So I'm trying to figure out whether I need to give

4    them that charge on item 3 of your 404(b) or not.  That's what

5    I need to know.

6              MS. FREEMAN:  Yes, Your Honor.  I think to answer

7    the heart of your question is extrinsic as opposed to

8    intrinsic.

9              THE COURT:  Right.

10             MS. FREEMAN:  But what we allege is that it is not a

11   crime wrong or bad act that requires a 404(b) character

12   admonition.

13             THE COURT:  So you don't think it's 404(b) evidence?

14             MS. FREEMAN:  No.  We just put it in there as an

15   abundance of caution.  In fact one or maybe even two witnesses

16   are going to explicitly explain that taxpayers do not have to

17   file a tax return for every year.  If they can have a certain

18   income level below which that's perfectly fine.

19             So we're not going to allege that he committed a

20   crime by failing to report taxes on certain years like that.

21             THE COURT:  So you're going to make that very clear

22   to the jury?

23             MS. FREEMAN:  Yes, Your Honor.

24             THE COURT:  Okay.  I'm going to get my law clerk to

25   look back over this case.

1          And then, 4, 31 false 1041 Forms and only 9 are part

2   of the wire counts.  And you're seeking to get this in under

3   *US versus Ford*, rose out of the same transaction, completes

4   the crime inextricably -- I mean, to me, this seems to be

5   scheme of modus operandi type information and therefore it

6   would be intrinsic evidence.

7          Is that the government's position?

8          MS. FREEMAN:  Yes, Your Honor.

9          THE COURT:  Now you will have the opportunity to

10  object to these.  I'm going let you read her brief and then

11  you can think about that.  But I will tell you that

12  preliminarily I'm going to admit all four of these and we will

13  go from there.

14          Okay.  What else?

15          THE DEFENDANT:  Excuse me, Your Honor.

16          THE COURT:  Yes.

17          THE DEFENDANT:  I wanted to assure that I'm asking

18  the question correctly.  If a person or individual is not

19  required to file a tax return because they don't have a

20  certain income level, they don't have income, then what would

21  be -- what's the reason for admitting or allowing?

22          THE COURT:  Do you want to respond to that?

23          MS. FREEMAN:  Your Honor, there will be some

24  discussion of the fact that he paid a personal tax debt,

25  that's the $68,000.  That is, in part, related to an earlier

1    tax return.  And the fact that he has not had income, a

2    certain number of these years, is relevant towards the fact

3    that these trusts were sham trusts and that they did not have

4    income.  And if they had that income then he would have been

5    required to report his income from those trusts and thus file

6    a tax return.

7                THE COURT:  I'm going to give this a little bit more

8    thought and we will go from there.

9                Now, is the issue of the scriveners error.  That is

10   Count 14, isn't it?

11               And then there is the question of whether this is a

12   scriveners error, whether this is a variance or whether this

13   is a construction amendment?

14               I guess my question is -- one of my questions is --

15   because this is not exactly clear to me about where this

16   stands.

17               My question is what should the Indictment have said

18   as opposed to what it says?

19               MS. FREEMAN:  Yes, Your Honor.  With regard to Count

20   14, the column heading is the only scriveners errors we are

21   discussing and it says "false withholding claimed".  In that

22   one tax return technically it is a "false payment claimed"

23   instead of the subtype of payment known as withholding.  They

24   are on adjacent lines in the tax return.  Because of that we

25   say that the column is technically slightly incorrect.

```
 1    However, we believe that this is cured by the conjunctive and

 2    disjunctive judge's instructions with regard to counts.

 3            Every one of these line item counts alleges three

 4    falsehoods and because of that any one of them may be found

 5    false in order for the count elements to be met.

 6            THE COURT:  So are you saying that the possible

 7    bases for conviction on Count 14 have not been expanded?  In

 8    other words, has it altered or broadened the possible bases

 9    for the conviction?  Does it allow the jury to shift the

10    theory for the essential elements of the crime?

11            MS. FREEMAN:  No, Your Honor.

12            THE COURT:  Why not?

13            MS. FREEMAN:  The essential elements of the crime

14    are that he is relying -- that he has submitted, in this case,

15    to the IRS tax returns containing false representations.

16            In this case there are multiple false

17    representations on this line, any one of which can be found

18    for the Count to be -- the elements to be met.

19            So it's not actually broader.  If anything we are

20    narrowing on that Count.

21            THE COURT:  Do you want to respond to that?

22            THE DEFENDANT:  I don't have a response at this

23    particular point.  You mentioned once I read her brief.

24            THE COURT:  Okay.  That will be fine.  That's fine.

25            Two agents in the courtroom.  It's very common for
```

1  me to allow one agent in the courtroom.  And two, I have done

2  that before.  That is somewhat unusual.  However, this

3  certainly is a very complex case.

4        So tell me why you need two?

5        MS. FREEMAN:  Your Honor, we intend one to be either

6  at or near counsel's table with us the entire time, that is

7  Special Agent Clark.  Special Agent Barutio also investigated

8  a separate part of the investigation.  So he did different

9  work than what Special Agent Clark did and that's why we would

10  like the ability to consult with each of them.

11        THE COURT:  All right.  Do you have an objection to

12  that?

13        THE DEFENDANT:  At this particular point I don't

14  have an objection to it, at this particular point.

15        THE COURT:  Well, I certainly think that makes sense

16  in light of the way you have described it.  So I will

17  tentatively allow that.

18        I will point out something that you are going to

19  read in the government's brief and I want to make sure that

20  this is clear to you.

21        My previous rulings in this case do not preclude you

22  from offering a good faith defense.

23        Now, I have ruled out one component of what might

24  have been that that we talked about last week with these

25  documents that you supposedly submitted to Puerto Rico.  But I

 1  just want to make that clear to you.

 2          Is there anything else from the government?  I

 3  haven't forgotten you Mr. Mattox.  We are coming back to what

 4  you started with.

 5          Anything else from the government?

 6          I've looked over your voir dire questions.  You

 7  know, I will probably ask most of them.  Some of them are

 8  repetitive, but we will get that cleared up.

 9          Do you have any voir dire questions, Mr. Mattox?

10          THE DEFENDANT:  I do not, Your Honor.

11          THE COURT:  Anything else from the government?  I've

12  tried to cover everything.

13          MS. FREEMAN:  Yes, Your Honor.  With regards to some

14  of the physical logistics in the courtroom.  How would you

15  like us to address movement in the courtroom?  Do you want us

16  to ask for permission to approach the witness?

17          THE COURT:  Well, I'm wondering if it might be

18  better just to question the witness from counsel table as

19  opposed to moving around the courtroom.  Because typically

20  where the podium is is right next to the jury box.  So let's

21  start out with that.

22          I don't run my court in a highly formal way.  So I

23  think, you know, just say I want to show the document to the

24  witness and that's fine.  You don't have to get my approval to

25  do that.  You just need to let me know what you are going to

1   do and I think that will be fine.

2          This is the first case that I have tried since the

3   Covid era.  And I know that other judges have tried other

4   cases in other courtrooms.  And I will talk to our clerk about

5   that and find out what he says.  The only thing I thought

6   about is when you do the opening statements where are you

7   going to be for that.  I don't want the jury to be concerned.

8   Some people may be concerned about social distancing.  I don't

9   want to press that too much.  And we may just move the podium

10  back a little bit.  But we will look at the configuration of

11  the courtroom.

12         This is actually not a particularly big courtroom

13  compared to the courtroom in Macon, Judge Treadwell's

14  courtroom, which is like a bowling alley.  But we will deal

15  with that after I figure that out.

16         MS. FREEMAN:  Your Honor, if it helps you decide, we

17  did a test last night.  The microphone connection on the small

18  movable lectern, not the large podium, but the small movable

19  one can reach a distance of approximately six feet from the

20  jury box.

21         THE COURT:  Okay.  That's good.  Let's do that then.

22  That's fine.

23         MS. FREEMAN:  With regard to side bars, Your Honor,

24  given that the Defendant has to be in the custody of the

25  Marshals how would you like to handle that?  Do you want us to

```
 1   approach the bench with the Marshal or do you want us to

 2   excuse the jury?

 3            THE COURT:  Let me talk to the Marshals about it.

 4   There are some judges that won't allow sidebar conferences.

 5   I'm not typically one of those but we may have to do that in

 6   this particular case.

 7            MS. FREEMAN:  With respect to exhibits.  Once we

 8   have gotten your ruling that it is admitted do you want us to

 9   ask for permission to publish or do we assume permission to

10   publish?

11            THE COURT:  I think you ought to ask for that, that

12   you want to publish it to the jury, and then that would be the

13   appropriate way to do that.

14            MS. FREEMAN:  Your Honor, what kind of recess or

15   break or schedule --

16            THE COURT:  We typically take a break around between

17   10 and 10:30, around 10:15.  We typically go to lunch shortly

18   before 12, and come back at 1:00.  And depending on how the

19   day goes I will have at least one afternoon break and maybe

20   two.  We typically leave at 5:00 o'clock.  You need to have a

21   witness ready to testify at all times.

22            MS. FREEMAN:  Noted, Your Honor.  With regards to

23   mask requirements for counsel and witnesses.  Do you have

24   preferences?

25            THE COURT:  Yes.  I want you to have the mask off
```

1   and the witnesses too because I can't -- we need to make sure

2   that everybody hears what you're saying and I'm very much

3   opposed to having a mask on a witness.  I think that makes it

4   harder for the jury to judge credibility and so forth.

5          MS. FREEMAN:  And Your Honor, none of our witnesses

6   have expressed any reluctance about testifying without a mask.

7   We did ask them.  But on the chance that someone comes in and

8   just based on proximity to people request a clear mask, are

9   those available from the court?

10          THE COURT:  I don't know the answer to that.

11          MS. FREEMAN:  Fair enough, Your Honor.

12          With regard to the preadmitted exhibits that you

13   granted the, I guess, preliminary admission on our plan was

14   to, after the jury is seated, at the very start of evidence,

15   move to bulk admit all of those into the case at that time.

16   Or would you like us to just consider them already admitted

17   now such that the witnesses can go ahead and refer to them.

18          THE COURT:  Well, maybe there has been a little bit

19   of misunderstanding here.  The authenticity of the documents

20   is what I thought we dealt with, not the admissibility of

21   them.  In other words, you still have to establish what they

22   are.

23          MS. FREEMAN:  Yes, Your Honor.  So at the beginning

24   of evidence then would you like us to present a proffer on

25   each exhibit so that you can make a ruling at that time so

1    that the witnesses may refer to them?

2              THE COURT:  Well, I think that is fine.

3              MS. FREEMAN:  With regards to jury strikes.

4              THE COURT:  Well, I would assume that some of these

5    exhibits are self identifying.  Do they have his name on them?

6              MS. FREEMAN:  Yes, Your Honor.  Some of them.

7              THE COURT:  All right.  Okay.  What else?

8              MS. FREEMAN:  With regard to jury strikes, will you

9    be doing alternating preemptory strikes?

10             THE COURT:  No.  We are going to double blind.  You

11   get yours and he gets his and we're going to go through it

12   that way.

13             MS. KRAFT:  Your Honor, in terms of logistics, do

14   you have a preference in terms of standing for objections?

15             THE COURT:  Keep your seat.

16             MS. KRAFT:  Keep your seat.  Okay.

17             THE COURT:  The problem is the acoustics in that

18   courtroom are very poor and when you stand up it's a nightmare

19   for my court reporter.  So just keep your seat.

20             MS. KRAFT:  Understood, Your Honor.  Do you have a

21   preference as to how to state objections?  Do you prefer

22   nonspeaking objections?

23             THE COURT:  Well, just say I object and tell me what

24   the objection is.  I'm not clear what you're asking me.

25             MS. KRAFT:  Do you prefer that counsel not provide

1    further argument beyond objection/hearsay or objection/

2    relevance?

3              THE COURT:  Well, unless it's obvious to me you

4    probably ought to tell me what it is.  It's often obvious to

5    me what the objection is going to be.  If I feel like you need

6    to tell me what the objection is I will ask you what it is.

7              MS. KRAFT:  Okay.  Thank you, Your Honor.

8              We previously provided a trial binder to the

9    Defendant and to the Court.  And we did have some updates, as

10   I mentioned, on our trial brief to some of the exhibits.  We

11   provided them to the Court via e-mail and the Defendant has it

12   in his updated trial version.  But I do have paper copies if

13   the Court would like?

14             THE COURT:  For me or for him?

15             MS. KRAFT:  For both.  It is in his trial binder so

16   it is already updated.

17             THE COURT:  Yes, give that to him and to me.

18             MS. KRAFT:  So this is the updated exhibits already

19   present in the Defendant's trial binder.  I am providing him a

20   separate copy.  And I will tender ours as well to the Court.

21             And, then, additionally, last night the United

22   States filed its jury instructions request.  We do have paper

23   copies of that filing because we knew it wouldn't get mailed

24   to the Defendant in time.

25             THE COURT:  Yes.  Give him a copy of that.  And we

 1    will probably deal with the jury instructions maybe Tuesday

 2    afternoon after the jury goes home.  I don't make the jury sit

 3    back there while we talk about jury instructions.  I do that

 4    out of the jury's time.

 5              MS. KRAFT:  Okay.  And we have a copy for the Court

 6    as well, if you would like?

 7              THE COURT:  Okay.  What else?

 8              MS. FREEMAN:  Your Honor, with regards to masks what

 9    is the requirement for the Defendant?

10              THE COURT:  Same as you.

11              MS. FREEMAN:  So off?

12              THE COURT:  I do want you to understand that when

13    you are walking around this courtroom or courthouse you need

14    to have the mask on.  So that would mean coming in, that would

15    mean in a public area.  Not in the courtroom.  I think that is

16    fine.

17              But, I mean, I wore my mask in this morning, which I

18    don't usually do.  But I think that is the only fair way to do

19    that.

20              MS. FREEMAN:  And, Your Honor, we have one more

21    request, which given that the Defendant has had questions

22    about whether some of the Court's rulings or other pleadings

23    have gotten to him, we would ask the Court, if you are

24    amenable, to put on the record the terms of your order that

25    you -- wherein which you excluded certain content from his

1  defenses and assure it on the record that the Defendant

2  understands those and that if he has questions about what he

3  can and can't say that we attempt to address that now before

4  the jury is in the room.

5       THE COURT:  Well, I really thought that I had done

6  that.  I really thought that I made that clear at the last

7  hearing.  My law clerk is saying yes.

8       MS. FREEMAN:  We agree, Your Honor.

9       THE COURT:  I will take a look at that.

10      MS. FREEMAN:  And to clarify Your Honor's ruling,

11 and for the record with the presence of the Defendant, do

12 those exclusions as to his arguments apply to anything he

13 might say in voir dire and opening statements?

14      THE COURT:  Well, he's not going to have any

15 opportunity nor are you to say anything during voir dire.  So

16 I don't think that is going to be a problem.

17      I read what you said about that and I think the way

18 to deal with that is just with an objection as opposing to me

19 having him tell me and you what he wants to do.  I'm not

20 inclined to do that.

21      So you just have the opportunity to object like you

22 would any other witness.

23      Anything else?

24      MS. FREEMAN:  Nothing from the government, Your

25 Honor.

 1            THE COURT:  Mr. Mattox, what we're talking about,

 2   with not so much rulings as it was just dealing with the

 3   mechanics of how this trial is going to go, do you have any

 4   questions or objections about any of that?

 5            THE DEFENDANT:  At this point in regards to what the

 6   Plaintiff mentioned or stated I don't have any questions or

 7   objections in regards to what the Plaintiff mentioned.

 8            THE COURT:  Okay.  Good.

 9            And so you understand about the mask.  You can have

10   your mask just like you have it now -- I think that's fine --

11   while you are in the courtroom.  But when you are coming in

12   and out of the courtroom I think you need to have your mask

13   on.  It's the same for y'all, by the way.  And then you can

14   just pull it down when you sit down, that's fine or take it

15   off, that's fine.  So I think that will be okay.

16            But I will tell you, Mr. Mattox, that off and on I

17   have had some difficulty hearing you in some of these

18   hearings.  And my court reporter is shaking her head and she

19   has had the same problem.  So you do need to speak up to make

20   sure that we can hear what you are saying.

21            Now that covers everything that the prosecutor

22   wanted to cover.  And you had some motion that you mentioned

23   and so now we're going to deal with that.  Tell me what that

24   is?  I'm not clear about that.

25            THE DEFENDANT:  Your Honor, I have a motion for

```
 1   relief from a final judgment order or proceeding, please.

 2             THE COURT:  Is it written down?  Do you have it

 3   written down?

 4             THE DEFENDANT:  I have it written, Your Honor.  I

 5   would like to read it into the record and I would respectfully

 6   like to give it to the Marshals to give to the clerk.

 7   Hopefully to make a copy for the Plaintiff and a copy for me

 8   as well, please.

 9             THE COURT:  We are going to definitely make a copy

10   of it.  And we will get all that around.

11             And so what you can do is you can give it to

12   Ms. Paul, right here.  Ms. Paul will come get it when we are

13   finished with this hearing.  She will take it back and make

14   copies of it.  And then you will get your original back and

15   the prosecutor -- you keep referring to her as the plaintiff.

16   She is the prosecutor.  So you need to call her the prosecutor

17   and not the plaintiff.

18             THE DEFENDANT:  I apologize.

19             THE COURT:  This is a criminal case, not a civil

20   case.  And I think you have had some confusion about that in

21   the past.

22             So this is the Assistant U.S. Attorney.  These are

23   the prosecutors in this case.

24             So, anyway, do you want to read that?  Go ahead.

25             THE DEFENDANT:  Thank you, Your Honor.  One more
```

1    thing before we start.  Do you want me to bring it to --

2           THE COURT:  She's going to walk around there and get

3    it from you or -- Mr. Hanie, would you give that to him --

4    from him and give it to her.  That's the way we're going to

5    deal with that.

6           THE DEFENDANT:  Thank you, Your Honor.

7               "IN THE UNITED STATES DISTRICT COURT,

8               FOR THE MIDDLE DISTRICT OF GEORGIA, ATHENS

9               DIVISION.  UNITED STATES OF AMERICA VERSUS

10              MARQUET ANTWAIN BURGESS MATTOX, aka

11              MARQUET ANTWAIN BURGESS MATTOX EL, aka

12              MARQUET BURGESS MATTOX, aka ASIM ASHUNTA

13              EL, aka ASIM EL BEY, Defendant.

14              CASE NUMBER 3:20-CR-44CAR-CHW.

15               MOTION FOR RELIEF FROM A FINAL JUDGMENT

16              ORDER OR PROCEEDING.

17               I, being entitled to relief from a

18              final judgment order, or proceeding, under

19              28 USC Section 60(b)(6) for the cause,

20              3:20-CR-44CAR-CHW, and all the additional

21              case numbers to this matter identified as

22              follows:

23                  3:20-CR-44CAR1.  3:20-cr-44-001(CAR).

24              3:20-CR-44(CAR).  3:20-CR-44CAR.

25              3:20-cr-00044-CAR-CHW.

```
1              3:20-CR-044-CAR-CHW-1.  3:20-cr-44(CAR).

2              3:20-cr-44CAR.  And to include all

3              additional unknown case numbers

4              associated, et cetera.

5                   Motion this Court for relief and

6              state the following grounds.

7                             GROUNDS

8                   Reliant on 27, CFR 26.11 meanings and

9              terms, Secretary, 31 USC 3113 Accepting

10             Gifts.  31 USC 3101(b) Public debt limits.

11             18 USC 8, Obligations and other securities

12             of the United States.  26 USC 61(A)(11)

13             Gross income defined, income from

14             discharge of indebtedness.

15                  Please kindly note that collateral

16             and -- excuse me.  Please kindly note that

17             collateral and Guaranteed protection in

18             the form of a Full Faith and Credit

19             Guarantee, which is a Guarantee issued

20             from the United States Government, whose

21             principal and interest are guaranteed by

22             the United States Government, and a

23             guarantee to pay interest and principal on

24             debt, and a Guarantee for my protection

25             and benefit, was issued from the Secretary
```

1          of State of the United States, around July

2          2015, which is authenticated and signed by

3          the former Secretary of State, John Kerry;

4          and the Full Faith and Credit Guarantee,

5          was given to the Court on October 23,

6          2020 for my protection, in which the Court

7          confirmed on July 14, 2021, that the

8          documents have been made part of the

9          record; thus, confirming receipt.

10              Reliant on 27 CFR 26.11, meanings and

11          terms.

12              It confirms that Secretary is the

13          secretary of -- excuse me.  That Secretary

14          is that Secretary of Treasury of Puerto

15          Rico.

16              Reliant on 27 CFR 26.11, 31 USC 3113,

17          and 31 USC 3101(b).

18              Certified copies of the Full Faith

19          and Credit Guarantee, issued by the United

20          States Government, Guaranteeing my

21          protection and benefit, since July 2015,

22          were given to the Secretary of Treasury,

23          via Special Deposit, August 2015, and

24          approved via Ivan Corrabella Ortiz, via

25          Hilda Garcia, Supervisor, Secretary of

1          Treasury's Office, January 2016.

2               Reliant on 27 CFR 26.11, 31 USC 3113

3          and 31 USC 3101(b).

4               In Good Faith, Collateral i.e.

5          intangible personal property from the Full

6          Faith and Credit Guarantee in excess of

7          Five Billion (5,000,000,000) for a term of

8          Thirty (30) years, were given to the

9          Secretary of Treasury as gifts as

10         permitted via 31 USC 3113; between

11         October 2015 and August 30, 2020, for the

12         tax years 2015 through 2020, for the

13         Twelve (12) Trusts identified within the

14         Plaintiff's True Bill i.e. obligation of

15         the United States as per 18 USC 8.

16              Please kindly note, that the Full

17         Faith and Credit Guarantee and the

18         proceeds from the gifts given to the

19         Secretary of Treasury identified Supra,

20         Remain on deposit with the Secretary of

21         Treasury, have never been returned to me,

22         the Beneficiary, and the proceeds from the

23         gifts to the Secretary of Treasury, have

24         never been fully returned to the Twelve

25         (12) Trust identified within the

```
 1              Plaintiff's True Bill, which are

 2              completely verifiable via Hilda Garcia,

 3              Supervisor, Secretary of Treasury's

 4              office.

 5                   Also note, the Full Faith and Credit

 6              Guarantee given to the court for my

 7              protection on October 23, 2020, has never

 8              been returned to me either.

 9                   Much of the aforemention was

10              disclosed to the public officials

11              identified as the Internal Revenue Service

12              agents, etc., also identified as Jeron

13              Clark and Michael Buritio (sic) April 2019

14              and Susan Freeman and Patricia Crowe

15              around October 2019.

16                   Reliant on 27 CFR 26.11, 31 USC

17              3101(b) and 18 USC 8, the Full Faith and

18              Credit Guarantee issued by the United

19              States Government for my protection, i.e.

20              Guaranteeing my protection since

21              July 2015, and the gifts to the Secretary

22              of Treasury, that remain on deposit, all

23              predates the issuance of the Prosecutor's

24              True Bill i.e. obligation of the United

25              States as per 18 USC 8 and predates the
```

1          sworn affidavit by the public officials or

2          public officials who wrongfully caused the

3          issuance of the Prosecutor's True Bill, in

4          which the Prosecutor has been misled.

5              Reliant on 31 USC 3101(b), 31 USC

6          3113, 27 CFR 26.11, the Full Faith and

7          Credit Guarantee issued by the United

8          States Secretary of State, July 2015,

9          Guaranteeing my protection, and benefit,

10         and the gifts given to the Secretary of

11         Treasury, indemnifies more than

12         14,294,000,000,000 outstanding at one

13         time, since October 2015, which insures

14         and guarantees there is NEVER any injury

15         or loss to the Prosecutor, and insures and

16         guarantees there has NEVER been any loss

17         or harm to the Prosecutor in this matter

18         whatsoever.

19             Therefore, the Prosecutor, who is

20         also the issuer of the Full Faith and

21         Credit Guarantee, issued by the United

22         States Government, guaranteeing my

23         protection (word left out "and benefit")

24         since July 2015, has no standing, because

25         the Prosecutor has NEVER been injured by

1       it's own Full Faith and Credit Guarantee,

2       that's Guaranteeing my protection, and

3       that's held by the Secretary of Treasury

4       for my protection and benefit, therefore,

5       I, the Beneficiary of the Full Faith and

6       Credit Guarantee, Marquet Antwain Burgess

7       Mattox El, Am the only real party in

8       interest.

9           Reliant on 31 USC 3113(a)(2)(d) and

10      (e)(1)(A), which states (d) The Treasury

11      has an account into which money received

12      as gifts and proceeds from the sale or

13      redemption of gifts under this section

14      shall be deposited.

15          The Secretary shall use the money in

16      the account to pay at maturity or to

17      redeem or to buy before maturity, an

18      obligation of the Government included in

19      the public debt.  An obligation of the

20      Government that is paid, redeemed, or

21      bought with money from the account shall

22      be canceled and retired and may not be

23      reissued.

24          Money deposited into the account is

25      appropriated and maybe expended to carry

1          out this section.

2               (e)(1)  The Secretary Shall redeem a

3          direct obligation of the Government

4          bearing interest or sold on the discount

5          basis on receiving it when the obligation

6          is (A) given to the Government.

7               Reliant on 31 USC 3113(a)(2)(d) and

8          18 USC 8, "An obligation of the Government

9          that is paid, redeemed, or bought with

10         money from the account shall be canceled,

11         and retired and may not be reissued."

12              As prohibited by 31 USC

13         3113(a)(2)(d), LET IT BE KNOWN, that, the

14         Prosecutor's True Bill has been reissued

15         on Eight (8) separate occasions,

16         verifiable by the additional case numbers

17         identified as (word left out "follows"):

18              3:20-CR-44CAR1.  3:20-cr-44-001(CAR).

19         3:20-CR-44(CAR).  3:20-CR-44CAR.

20         3:20-cr-00044-CAR-CHW.

21         3:20-CR-044-CAR-CHW-1.  3:20--"

22         THE COURT:  Mr. Mattox, you don't have to run back

23    through all those.

24              THE DEFENDANT:  Thank you.

25              "In which the Prosecutor is

1          attempting to defraud the Secretary of
2          Treasury, by unlawfully receiving multiple
3          payments for the same obligation, i.e.
4          True Bill and attempting to hold me, the
5          Beneficiary, liable for the Prosecutor's
6          fraud, the Prosecutor's theft by
7          deception, and the Prosecutor's false
8          claims to the Secretary of Treasury.
9               LET IT (word left out "ALSO") BE
10         KNOWN, that the Prosecutor has altered and
11         modified the canceled True Bill from it's
12         original form, around July 14, 2021, and
13         the Prosecutor is attempting to reissue
14         the canceled True Bill for the Ninth
15         (9th), which is prohibited by the
16         Secretary of Treasurer as per 31 USC
17         3113(a)(2)(d), et cetera.  Again, "An
18         obligation of the Government that is paid,
19         redeemed, or bought with money from the
20         account shall be canceled and retired and
21         may not be reissued."
22              Reliant on 31 USC 3101(b) states "The
23         face amount of an obligation whose
24         principal and interest are guaranteed by
25         the United States Government (except

1   guaranteed obligations held by the

2   Secretary of Treasury) may not be more

3   than 14,294,000,000,000 outstanding at one

4   time..."

5     Reliant on 27 CFR 26.11, 31 USC

6   3101(b), 31 USC 3113(a)(2)(d) and

7   (e)(1)(A),

8     LET IT BE KNOWN, that, the Full Faith

9   and Credit Guarantee was issued by the

10   United States Secretary of State,

11   therefore, making the Full Faith and

12   Credit Guarantee a direct obligation of

13   the United States Government; whose

14   principal and interest are GUARANTEED by

15   the United States Government, and is

16   Guaranteeing my protection and benefit;

17   and due to the fact that the Full Faith

18   and Credit Guarantee was given to the

19   Secretary of Treasury, for my protection

20   and benefit, on October 2015, to be held

21   by the Secretary of Treasury, for my

22   protection and benefit, it caused a

23   deposit to be made into the account at the

24   Secretary of Treasury, for my benefit and

25   protection, in the amount more than

1          14,294,000,000,000 that was approved

2          January 2016, via Ivan Corrabella Ortiz,

3          via Hilda Garcia, Supervisor, Secretary of

4          Treasury's office.

5                Thus, confirming, I, Marquet Antwain

6          Burgess Mattox El, Am the Beneficiary, to

7          the Full Faith and Credit Guarantee, and

8          the account and proceeds on deposit with

9          the Secretary of Treasury, of more than

10         14,294,000,000,000 outstanding at one

11         time, since October 2015.

12               Therefore, the Prosecutor was misled.

13               Reliant on 18 USC 8.

14               It confirms that, all Bills etc,

15         drawn by or upon authorized offices of the

16         United States, and canceled United States

17         stamps are obligations of the United

18         States.

19               LET IT BE KNOWN, that the

20         Prosecutor's True Bill was drawn by or

21         upon two authorized offices of the United

22         States, i.e. drawn, i.e. drawer, i.e.

23         maker, i.e. issuer, i.e. signer.  In Which

24         the Prosecutor's True Bill was signed by

25         Lyndie M. Freemen, Assistant United States

```
 1            Attorney, and also signed by C. Auston

 2            (sic) Deputy Clerk, evidenced on page 8,

 3            of the Prosecutor's True Bill, signed on

 4            the 17th day of September A.D. 2020.

 5                 Thus, making the Prosecutor's True

 6            Bill and obligation of the United States

 7            as per 18 USC 8.

 8                 LET IT BE KNOWN, that, the

 9            Prosecutor's True Bill is bearing a

10            canceled one cent United States stamp,

11            also evidenced on page 8, of the

12            Prosecutor's True Bill, thus, additionally

13            making the Prosecutor's True Bill an

14            obligation of the United States as per 18

15            USC 8.

16                 Please note, Obligation, i.e. a duty

17            owed to another, a responsibility that

18            requires a person to act in a certain

19            manner, such as to perform a service or to

20            discharge a debt.

21                 Please note, Discharge, i.e., to

22            release, dismiss, free, E.g. to discharge

23            a person held on accusation of a crime is

24            to set him free to perform a duty.

25                 Please note, Dismiss, i.e. to
```

1    discharge or to discontinue a suit or

2    action.

3         Please note, True, i.e. accurate or

4    exact.

5         Please note, Bill, i.e. an amount of

6    money owed for goods supplied or services

7    rendered.  Set out in a printed or written

8    statement of charges.

9         Please note, Special Deposit, i.e.

10   consist of placing of specific kinds of

11   money or property into the possession of a

12   bank with an obligation of the bank to

13   return the identical thing deposited; the

14   depositor retains title.

15        Reliant on 18 USC 8, 31 USC

16   3113(a)(2)(d) and (e)(1)(A).

17        The Prosecutor's True Bill signed by

18   two authorized officers of the United

19   States and bearing a canceled one cent

20   United States stamp, and the Full Faith

21   and Credit Guarantee, i.e., Guaranteed

22   payment from the United States Government,

23   thus Guaranteeing my protection, were both

24   given to the court i.e., given to the

25   Government also for my protection, on

1       October 23, 2020.

2            And a "copy" of the Prosecutor's True

3       Bill, also bearing a canceled one cent

4       United States stamps, was given to the

5       court a second time on June 3, 2021, due

6       to the court's negligence in misplacing

7       the initial True Bill bearing the canceled

8       one cent United States stamp given to the

9       court on October 23, 2020.

10           LET IT BE KNOWN, that the Prosecutor

11      confirmed on the record June 3, 2021

12      receipt of the True Bill, and the

13      Prosecutor also confirmed on the record

14      June 3, 2021, the one cent United States

15      stamp on the True Bill that was given to

16      the court, identified in the record as

17      Defendant Exhibit 1.

18           Therefore, reliant on 27 CFR 26.11,

19      18 USC 8 and 31 USC 3113(a)(2)(d) and

20      (e)(1)(a).

21           The Secretary of Treasury redeemed

22      the Prosecutor's True Bill, i.e.

23      obligation of the United States (word left

24      out "Government") as per 18 USC 8 and 31

25      USC 3113(a)(2)(d), on October 23, 2020

1          nearly Ten (10) months ago, and the Full

2          Faith and Credit Guarantee, i.e.

3          Guaranteed payment from the United States

4          Government that's Guaranteeing my

5          protection, and that was given to the

6          court, served as payment to the Prosecutor

7          as per 31 USC 3113(a)(2)(d).

8              Please note, Redeemed, i.e.

9          discharged, compensated for, paid off,

10         gain possession in exchange for (word left

11         out "payment") cancel.

12             Reliant on 31 USC 3113(a)(2)(d) and

13         18 USC 8, again confirms, that "An

14         obligation of the Government that is paid,

15         redeemed, or bought with money from the

16         account, shall be canceled, and retired

17         and may not be reissued."

18             Thus confirming and validating that

19         the Prosecutor's True Bill was redeemed,

20         bought and canceled on October 23 (word

21         left out "2020") by the Secretary of

22         Treasury, for my protection and benefit as

23         per the instructions set forth by the

24         Secretary of Treasury via 31 USC

25         3113(a)(2)(d) etc., identified supra.

```
 1              Thus, also confirming and validating,
 2         this entire obligation was completely
 3         canceled by the Secretary of Treasury, on
 4         October 23, 2020 for my benefit and the
 5         Guaranteed protection as per the United
 6         States Government Full Faith and Credit
 7         Guarantee issued July, 2015, Guaranteeing
 8         my protection, as per 31 USC
 9         3113(a)(2)(d).
10              Thus, confirming, I have performed my
11         duty.
12              Reliant on 26 USC 61(A)(11), Gross
13         income define, states, quote "Except as
14         otherwise provided in this subtitle, gross
15         income from whatever source derived,
16         including (but not limited to) the
17         following items:"
18              (11) Income from the discharge of
19         indebtedness."
20              Reliant on 31 USC 3113(a)(2)(d) and
21         (e)(1)(a) and 26 USC 61(A)(11) confirms
22         that the Secretary of Treasury redeemed,
23         i.e. discharge, cancel of the Prosecutor's
24         True Bill that was given to the Government
25         on October 23, 2020, thus, caused a
```

```
 1              payment from the Secretary of Treasury,

 2              known as "income" from the discharge of

 3              indebtedness, i.e. redemption of the

 4              Prosecutor's True Bill, for my benefit,

 5              the Beneficiary.

 6                   Reliant on 31 USC 3101(a) and page 3

 7              and page 4 of the Prosecutor's True Bill,

 8              It confirms the declared value of i.e.

 9              redemption value of the True Bill as

10              $165,212,271.00 via page 3 of the True

11              Bill;

12                   Plus an additional declared value

13              i.e. redemption value of $2,892,192.74

14              (sic) via page 4 of the True Bill; Thus,

15              confirming a combined declared value i.e.

16              redemption value of the Prosecutor's True

17              Bill as $168,109,463.74.

18                   Reliant on 31 USC 3113(a)(2)(d) and

19              (e)(1)(a) and 18 USC 8 and 26 USC(A)(11),

20                   LET IT BE KNOWN, that, I rendered

21              services to the public officials

22              identified as the Prosecutor by

23              discharging of their obligation,

24              identified as a True Bill, i.e. obligation

25              of the United States as per 18 USC 8, that
```

1      was given to the Government on October

2      23, 2020, which caused "income", for my

3      benefit, the Beneficiary, and the

4      Prosecutor has yet to compensate me, the

5      Beneficiary, for the services rendered.

6            Therefore, the Prosecutor is indebted

7      to me, the Beneficiary, in the amount of

8      $168,109,463.74, plus interest since

9      October 23, 2020.

10           Therefore, the Prosecutor has no

11     standing.

12           LET IT BE KNOWN, that the

13     "Constructive Trust", which is a Trust

14     created by the Court; the Court is the

15     "Grantor," the Prosecutor is the "Trustee"

16     and I am the "Beneficiary."

17           LET IT ALSO BE KNOWN, that, the

18     "Cesqui que vie Trust of 1666", evidenced

19     by the third page of the Full Faith and

20     Credit Guarantee, that was issued by the

21     United States Government, Guaranteeing my

22     protection and benefit, since July 2015,

23     that was given to the Court for my

24     protection on October 23, 2020, which I

25     AM the Beneficiary of both Trusts, i.e.

1          the Constructive Trust and the Cesqui que

2          vie Trust, and both Trusts have been

3          collapsed via the redemption, i.e.

4          discharge, i.e. cancellation, i.e. payment

5          from the Secretary of Treasury for my

6          protection and benefit;

7               And the Prosecutor is attempting to

8          elaborately swindle i.e. steal multiple

9          payments from the Secretary of Treasury

10         through this unlawful preceding.

11              And the Prosecutor is attempting to

12         overthrow the United States Government's

13         Full Faith and Credit Guarantee, that is

14         guaranteeing my protection since July,

15         2015; (words added "that was given to the

16         court on October 23, 2020") thus (word

17         left out "Treason") waging war against the

18         United States on American soil,

19         dereliction of duty, (words added "thus

20         treason.")

21              And, the Plaintiff is wrongfully

22         attempting to punish me for following the

23         rules set forth by the Secretary of

24         Treasury, etc., explained Supra, via 31

25         USC 3113, 31 USC 3101(a) and (b), 18 USC 8

1        and 26 USC 61(A)(11); that governs giving

2        gifts to the Secretary of Treasury to be

3        used to Reduce the public debt, when

4        clearly, the Prosecutor (words left out

5        "public officials") identified as the

6        Plaintiff are the ones committing the

7        crimes in this matter including acts of

8        treason.  Thus, the Prosecutor was misled.

9             Reliant on the Cesqui que vie Act of

10       1666.

11            LET IT BE KNOWN, that, I am not lost

12       at sea; I am not lost beyond the sea, I am

13       not Surety for this obligation; I am not

14       the decedent; I am not dead, I am not

15       civiliter mortuus.

16            LET IT BE KNOWN, that I am the

17       Beneficiary, a flesh and blood living

18       being, in full life, living on the soil on

19       North America, i.e. Turtle Island.

20            Reliant on the 1731 Charter for the

21       State of Georgia, which confirms that King

22       George, III granted a charter to the State

23       of Georgia to be formed as a Trust and to

24       be governed by seventy (70) Trustees in

25       England.

1          LET IT BE KNOWN, that I am not the

2     Trustee for the State of Georgia Trust; I

3     am the Beneficiary, evidenced by

4     page Three (3) of the Full Faith and

5     Credit Guarantee; also evidenced by

6     page Two (2) of the Guarantee, which is

7     also a Full Faith and Credit Guarantee

8     issued by the State of Georgia and signed

9     by former Secretary of State, Brian Kemp,

10    July 2015, and also signed by former

11    Governor, Nathan Deal, July 2015, for my

12    protection and my benefit.

13          Thus, validating that I am the

14    Beneficiary, and the only real party in

15    interest.

16          LET IT BE KNOWN, that the Plaintiff

17    is not an heir, nor beneficiary heir, nor

18    qualified heir.  The Plaintiff is only a

19    Trustee.

20          It is well documented that the

21    Thirteen (13) colonies, including the

22    State of Georgia, band together to create

23    a union known today as the United States.

24          It is also documented that the United

25    States was converted to a Full profit

1        corporation and incorporated in

2        Jacksonville, Florida in 1925.

3             LET IT BE KNOWN, that I am not the

4        Trustee for either the United States nor

5        the State of Georgia Corporation Trust.  I

6        am the Beneficiary to the original Trust

7        identified Supra, that predates the United

8        States and predates the State of Georgia,

9        in which the public officials are the

10       Trustees.

11            Reliant on Queen Elizabeth's

12       Amendment to the Social Security Act of

13       1997, which confirms that, quote "If you

14       were born in the United States and you

15       retire in England, you can collect Social

16       Security as if you were born in England;

17       and if you were born in England and you

18       retire in the United States you can

19       collect Social Security as if you were

20       born in the United States."

21            This amendment by the Queen to the

22       Social Security Act of 1997, appears to

23       confirm that the State of Georgia and the

24       United States are still governed by a

25       Board of Trustees in England, authorized

1          by King George III, in 1731, in which, I

2          am the Beneficiary for the Trust, and the

3          public officials are the Trustees.

4               For your review, additional

5          confirmation of me being the Beneficiary,

6          is via the attached Certified Copy of the

7          name change degree via Fulton County,

8          Georgia, Clerk of Superior Court,

9          September 17, 2017, which confirms "That

10         the name of the Petitioner, Marquet

11         Antwain Burgess Mattox, shall be changed

12         to Marquet Antwain Burgess Mattox, El."

13              Thus, confirming (word left out

14         "evidencing") the Beneficiary identified

15         on page 3 of the Full Faith and Credit

16         Guarantee, issued (words left out "July

17         2015" - text added "by the United States

18         Government") guaranteeing my protection

19         and given to the Court on October 23,

20         2020.

21              Also for the record, the title "El",

22         E-L (spelling) is referenced in the Torah,

23         and is short for Elohim, i.e, God, i.e.

24         enlighten one; i.e. created in the image

25         and the likeness of God.

1        Reliant on 27 CFR 26.11, 31 USC

2        3113(a)(2)(d) and (e)(1)(A), 50 USC

3        4305(B)(2) and 12 USC 2 Section 95

4        (A)(b)(2).

5            LET IT BE KNOWN, that, the Secretary

6        of Treasury redemption i.e. discharge,

7        i.e. cancellation of this entire

8        obligation on October 23, 2020, entitled

9        me, the Beneficiary, to a Full acquittance

10       and discharge 297 days ago, for all

11       purposes of the obligation of the person

12       making the same; and not to be held liable

13       in any Court for or in respect to anything

14       done or omitted as per 50 USC 4305(B)(2).

15           Therefore, based upon the United

16       States Government's Full Faith and Credit

17       Guarantee, Guaranteeing my protection

18       since July 2015, that the public officials

19       in this matter have completely overthrown

20       since September 17, 2020, etc.;

21           And based upon the Secretary of

22       Treasury redemption i.e. cancelation of

23       this entire obligation 297 days ago, for

24       all purposes of the obligation; and not to

25       be held liable in any court for -- not to

1          be held liable in any court for or in

2          respect to anything done or omitted as per

3          50 USC 4305(B)(2);

4               Confirms that, this entire proceeding

5          and all criminal proceedings for this

6          entire matter from the onset have been

7          unlawful, prohibited, and acts of Treason;

8               And given the fact that the public

9          officials identified as the Prosecutor has

10         been indemnified for more than

11         14,294,000,000,000 outstanding at one

12         time, as per the United States Government,

13         Full Faith and Credit Guarantee,

14         Guaranteeing my protection since July,

15         2015.

16              Thus confirms, the Prosecutor has

17         never been injured in this matter; thus

18         confirming, the Prosecutor's claims are

19         wrong and unlawful; and any and all

20         documentation, etc., gathered for this

21         matter are unlawful, prohibited and in

22         violation to the 4th Amendment to the

23         United States Constitution, i.e. "The

24         right of the people to be secure in their

25         persons, houses, papers, and effects,

1              against unreasonable searches, and

2              seizures shall not be violated and no

3              warrant shall issue, but upon probable

4              cause supported by oath of affirmation and

5              particularly describing the place to be

6              searched and the people or things to be

7              seized."

8                   I.e. there was no warrant.

9                   Therefore, all questions asked of me

10             through this entire matter from the onset;

11             and all questions asked of me throughout

12             all proceeding have been unlawful and

13             prohibited by the 4th Amendment to the

14             United States Constitution; and via

15             threat, duress, and coercion through the

16             enforcements of shackles and chains, thus,

17             is a legal disability of contract.

18                  Thus abandonment of oath of office,

19             overthrowing the United States

20             Constitution, waging war against the

21             United States on American soil --"

22        THE COURT:  Mr. Mattox, let me stop you.  You have a

23   big pile of paper there.  Are you almost finished with your

24   motion or how much further do you have to go with that?

25        THE DEFENDANT:  I don't have much further to go,

1    Your Honor.

2            THE COURT:  Because we need to go in there and pick

3    the jury here pretty soon.  We don't want to keep them

4    waiting.

5            THE DEFENDANT:  Okay.  Could --

6            THE COURT:  And the government needs to have the

7    opportunity to take a look at that.

8            THE DEFENDANT:  Yes.

9            THE COURT:  I'm not going to require her to respond

10   now, but she needs the opportunity to take a look at that and

11   we will figure out a way to get that ruled on before we begin

12   the trial.

13           THE DEFENDANT:  Okay.  Could you give me --

14           THE COURT:  Yeah, if you are about finished go

15   ahead.

16           THE DEFENDANT:  Give me a moment please.

17               "Thus, abandonment of the oath of

18               office, overthrowing the United States

19               Constitution, waging war against the

20               United States on American soil,

21               dereliction of duty, thus treason.

22                   In addition, reliant on the 1731

23               United States Constitution, Article I,

24               Section 1 (sic) Clause 9 -- excuse me --

25               Clause 3.

```
1              No bill of Attainder or Ex Post Facto
2         Law shall be passed.
3              With that being said, LET IT BE
4         KNOWN, that, I, the Beneficiary, Marquet
5         Antwain Burgess Mattox EL have been
6         kidnapped, shackled, placed in a cage; a
7         victim of false imprisonment, deprivation
8         of liberties, denial of due process, a
9         victim of human trafficking; debt
10        servitude, i.e. slavery, slave trading,
11        cattle (text written "Chattle") slavery,
12        insider trading, held hostage, human
13        rights violations; and a victim of
14        trafficking in human cargo on Twelve (12)
15        separate occasions including today,
16        August 16, 2021, through the abuse of
17        power by public officials, masquerading as
18        debt collectors, with total disregard to
19        the Fair Debt Collection Practices Act;
20        public officials who have conspired and
21        abandoned their oath of office,
22        overthrowing the United States
23        Constitution, waging war against the
24        United States on American soil, which is a
25        complete dereliction of duty and treason;
```

1                    And, in violation to the United

2              States Government Full Faith and Credit

3              Guarantee, Guaranteeing my protection

4              since July 2015, that the public officials

5              have overthrown, waging war against the

6              United States on American soil."

7         To make this as quick as possible --

8              "LET IT BE KNOWN, the dates I have

9              been a victim of human trafficking,

10              trafficking in human cargo --"

11         THE COURT:  We're not going to go into that.

12         THE DEFENDANT:  Okay.

13         THE COURT:  That's not a part of this case.  Go

14    ahead.

15         THE DEFENDANT:  Bear with me for one second,

16    Your Honor.

17              "Reliant on the 1877 Georgia

18              Constitution as Ratified without

19              Subsequent Amendments, Article I, Bill of

20              Rights, Section I, paragraph (XXI) 21

21              states "There shall be no imprisonment for

22              debt."

23              Paragraph I, states, "All

24              governmental rights originate with the

25              people, is founded upon their will only,

```
 1              and instituted solely for the good of the

 2              whole.

 3                   Public officers are the Trustees and

 4              Servants of the people and, at all times,

 5              amendable to them."

 6         THE COURT:  All right.  We're going to stop there,

 7    Mr. Mattox.

 8              We're going to put your motion on the record, but we

 9    need to move along.  I had no idea that your motion was so

10    long.

11         THE DEFENDANT:  Could you --

12         THE COURT:  It will be -- you're saying the same

13    things over and over again, that's the problem.

14         THE DEFENDANT:  I didn't get an opportunity in

15    regards to the public officials that actually -- excuse me --

16    In regards to October 7th when I was denied due process and

17    seized without a warrant and I have been held without a

18    warrant.  There was not a warrant that actually particularly

19    described my name nor the areas to be searched.  I did not get

20    an opportunity to explain that part.

21              I did not get an opportunity to explain, as far as

22    the violation in regards to the Fourth Amendment for the --

23    there wasn't a warrant for --

24         THE COURT:  If you were going to file an objection

25    under the Fourth Amendment you should have done that before
```

today.  If you claimed that there was an illegal search or

seizure then that was a motion that you should have filed

before today.

THE DEFENDANT:  If I'm not mistaken, Your Honor, in

regards to this particular motion, it basically states that I

am entitled for relief for final judgment of an order

proceeding under 28 USC -- 28 USC Section 60(b)(6) for this

particular cause.

So even if it wasn't filed prior to today, this

particular rule gives me the opportunity to actually bring it

forth in the motion to say that there was not a warrant in

regards to --

THE COURT:  If your rights have been violated in

that regard and you want to file a claim then you can do that,

but that's not part of this case.  That is a separate civil

action.

THE DEFENDANT:  Okay.  Also could you let it be

known that on July 2015 the United States Government issued a

Full Faith and Credit Guarantee, Guaranteeing my protection

since July 2015 that was given to the court.  That actual

guarantee that I actually mentioned in the actual conclusion,

if you could actually allow me to at least read the

conclusion, that Full Faith and Credit Guarantee was given to

the Court on October 23.

THE COURT:  That would be Judge Weigle.

```
 1            THE DEFENDANT:  But the Full Faith and Credit

 2   Guarantee was issued by the United States Government

 3   Guaranteeing my --

 4            THE COURT:  Do you have a copy of that with you

 5   today?

 6            THE DEFENDANT:  The Full Faith and Credit Guarantee?

 7            THE COURT:  Yes.

 8            THE DEFENDANT:  It was given to the Court on October

 9   23rd.

10            THE COURT:  Do you have any documents?  The

11   government has offered documents.  Do you have any documents

12   that you want to admit into evidence today?

13            THE DEFENDANT:  Those particular documents I don't

14   have a copy of those documents with me today.  I could request

15   a copy of those.

16            THE COURT:  I thought we made a copy of all the

17   documents that he admitted.  Aren't they on record?  They're

18   on the record.

19            THE DEFENDANT:  The Full Faith and Credit Guarantee

20   issued by the United States Secretary of State I have not seen

21   a copy or I have not seen a copy issued to me from the Court.

22            And that Guarantee is Guaranteeing my protection by

23   the United States Government since 2015, which has been on

24   deposit with the Secretary of Treasury since October 2015.

25            And if you could allow me to at least read the
```

1   conclusion and the motion.  I didn't get a chance to read the

2   conclusion or the motion.

3           THE COURT:  Well, go ahead.

4           THE DEFENDANT:  Thank you, sir.

5           THE COURT:  Concisely.

6           THE DEFENDANT:  Okay.

7               "The rules were followed.  The Full

8               Faith and Credit Guarantee issued by the

9               United States Government -- issued by the

10              United States Secretary of State,

11              July 2015, Guaranteeing my protection was

12              given to the Secretary of Treasury on

13              October 2015, to be held for my protection

14              and benefit.  A deposit of more than

15              14,294,000,000,000 was made into the

16              account (words left out "for my benefit

17              was made by") at the Secretary of Treasury

18              and (text added "verifiable") and approved

19              by January 2016 via Hilda Garcia, (word

20              left out "Supervisor") Secretary of

21              Treasury's office.  Gifts were given --"

22          THE COURT:  That's the Puerto proposition that you

23   brought up to the Court earlier?

24          THE DEFENDANT:  Based upon 27 CFR that says that the

25   secretary -- yes.

1          THE COURT:  I though Garcia was someone you dealt

2  with in Puerto Rico?

3          THE DEFENDANT:  That is someone that, yes, is in

4  Puerto Rico.

5          THE COURT:  Right.  Go ahead.

6          THE DEFENDANT:

7              "Gifts were given to the Secretary of

8              Treasury to be used to reduce the public

9              debt in which the --"

10         THE COURT:  Okay.  You've told me that.

11         THE DEFENDANT:  Okay.

12             "-- in which the upside from the

13             gifts -- in which the upside from the

14             gifts to the Secretary of Treasury that

15             was returned back to the Trust, within the

16             Plaintiff's True Bill was stolen by the

17             public officials identified as the

18             Internal Revenue Service and or their

19             agents; and unaccounted for.

20             Being the Beneficiary of the account

21             via the Secretary of Treasury, (words left

22             out "identified Supra") I have been

23             entitled to the access of more than

24             14,294,000,000,000 --"

25         THE COURT:  You told me that.

```
1              THE DEFENDANT:  Bear with me for one second.
2                   "And being the Beneficiary, I have
3              been entitled to the ability to give gifts
4              to the Secretary of Treasury without being
5              accused of a crime and without being
6              seized and held against my will for
7              following the rules."
8              THE COURT:  You told me that.
9              THE DEFENDANT:  Okay.
10                  "And I have a right not to become a
11             victim of theft by --"
12             THE COURT:  You told me that.
13             THE DEFENDANT:  Okay.
14                  "Being the Beneficiary of the Full
15             Faith and Credit Guarantee issued by the
16             United States Government, I could have
17             never been a flight risk to this United
18             States Court --"
19             THE COURT:  Okay.  That's not an issue in the case.
20             THE DEFENDANT:  It was ruled --
21             THE COURT:  I ruled against you being released.  In
22     other words, I essentially affirmed what Judge Weigle said.
23                  That has nothing to do with this case at this point.
24             THE DEFENDANT:  In regards --
25             THE COURT:  Let me ask the government a question.
```

1   Do you have any of these documents that he referred to?

2          MS. FREEMAN:  Your Honor, I have been following

3   along with your order as regards to what he is saying.  He

4   appears to be quoting directly from and referring directly to

5   the Trust documents, which are subject to your ruling number 6

6   from document 51.  That appears to be what he is referring to.

7          So in violation of the Court's order he is arguing

8   about conveyances, the trust documents, including the

9   Secretary of State document, the indictment where he put a

10  stamp on it and sent it back to the United States and the

11  settlement of debt.

12         THE COURT:  Okay.  We're not going to deal with this

13  now.  We've got to get in there and get this jury picked.  I

14  don't want these people sitting around in there any longer

15  than they have to.  They are all in there potentially exposed

16  to Covid and I want to get in there and pick this jury and get

17  out of here.

18         Yes, sir.

19         THE DEFENDANT:  Do I get an opportunity -- because I

20  wasn't given an opportunity to finish.  "The United States has

21  guaranteed --

22         THE COURT:  Well, you kept saying the same thing

23  over and over again and that's why I cut you off because you

24  weren't telling me anything new.

25         So, we will deal with it.

```
 1     (Concluded hearing in small courtroom in Athens, Georgia to

 2   conduct voir dire in jury trial at 11:00 a.m.).

 3          CSO OFFICER:  All rise.

 4          THE COURT:  Thank you very much.  Ladies and

 5   gentlemen, this is the case of the United States versus

 6   Marquet Antwain Burgess Mattox.  And we're going to talk about

 7   that case just very briefly in a minute.

 8          But this begins that stage of the trial called voir

 9   dire or jury selection.  And the purpose of jury selection or

10   void dire examination is to enable the Court to determine

11   whether or not any prospective juror should be excused from

12   this case for cause and to enable counsel for the parties to

13   exercise their individual judgment with respect to peremptory

14   challenges.  That is challenges for which no reason need be

15   given for an attorney's decision to take a person off the jury

16   panel.

17     (Roll call at this time - not transcribed)

18          THE COURT:  This is a criminal case in which the

19   Defendant, who is seated here, is charged with nine counts of

20   wire fraud, 10 counts of false claims against the United

21   States Government and one count of theft of government funds.

22          More specifically, the Indictment alleges that the

23   Defendant submitted false tax forms to the Internal Revenue

24   Service and fraudulently claimed tax refunds of approximately

25   $165,212,271.00.
```

1          The Defendant has pled not guilty.  Keep in mind

2  that the fact that the Defendant has been indicted in this

3  case does not constitute any evidence of guilt nor should you

4  infer that the Defendant is guilty just because he has been

5  indicted.  The indictment is merely the manner in which the

6  charge is brought before the Court.

7   (Voir dire conducted and jury selected - not transcribed)

8          THE COURT:  Ladies and gentlemen, y'all have been

9  selected to serve as jurors in this case and that means that

10  everyone else in the courtroom can leave and you do not have

11  to come back.  Thank you very much for your service today.

12   (Perspective jurors dismissed)

13          Ladies and gentlemen, I'm going to let you be

14  excused now for lunch and when you come back Ms. Paul will

15  swear you in and then I will give you a preliminary

16  instruction on the law, and then we will follow the due course

17  of a criminal trial and the government has the burden of proof

18  and they will begin by presenting their witnesses.

19          We do have an opening statement, but as I will point

20  out to you, the opening statement is not evidence in the case.

21          So I'm going to -- I typically give a little bit

22  longer for lunch.  So I'm going to ask you to come back at

23  1:30.  There is one matter that the Court has to deal with.

24  So I'm going to ask you to come back at 1:30 and just take you

25  place in the jury room back there.  And please do not talk to

1    anyone about this case.

2         I'm sure that some of you might need to make some

3    arrangements about this afternoon because you weren't

4    expecting to be on the jury, which is one of the reasons I

5    give a little extra time.

6         I will tell you the way we run the court and that is

7    we start at 9:00 in the morning, which means you need to be in

8    the jury room at 9:00 o'clock.

9         And I typically take a break around 10 or 10:15 or

10   10:30.  And then we generally go to lunch around noon and

11   typically have an hour for lunch.

12        And then we'll either have one or two breaks in the

13   afternoon.  But I typically send my jurors home at 5:00

14   o'clock.

15        Now, let me tell you, if there is a witness on the

16   stand and one of the parties tell me that they can finish that

17   witness by 5:15 or 5:20 or 5:30 I might keep you that long.

18   Because sometimes witnesses are from out-of-state and it's

19   just a big inconvenience for them to have to come back.  So we

20   don't just drop dead at five.  Sometimes we have to go beyond

21   that, but I think it is important for you to at least have

22   some general idea about the way we run the court.

23        So with that I will let you go.  There are a number

24   of places to eat right around here.  Some of the places you

25   probably ought to tell them you are on a jury and you need to

1   get back because that's what we have to do sometimes.  But

2   with that I'm going to let you go.  Thank you very much.

3      (Jurors exit courtroom 12:11 p.m.)

4           THE COURT:  Do you need a copy of your motion, sir?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Let's give him a copy of his motion.

7   Give Ms. Freeman a copy.  And then in about 15 minutes I'm

8   going to come back in here and we'll talk about that, okay.  I

9   don't know if there is anything else we need to talk about at

10  this point, but we do need to talk about that.

11          CSO OFFICER:  All rise.

12     (Recess at 12:12 p.m.)

13     (Resume at 12:38 p.m.)

14          CSO OFFICER:  All rise.

15          THE COURT:  Mr. Mattox, I've looked over what you're

16  calling your private trust documents here.  One of them is

17  where you have assigned the True Bill.  One of them is a

18  document that is from the United States of America Department

19  of State and one of them is from the State of Georgia.

20          But what I'm not clear about is what you're

21  referring to when you are talking about the Private Trust

22  documents.  What is that?

23          THE DEFENDANT:  Your Honor, what I was referring to

24  as Private Trust documents, I was referring to the documents,

25  the United States Full Faith and Credit documents.  The Full

1   Faith and Credit document --

2           THE COURT:  Okay.  That's the one that John Kerry

3   signed?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  And "To all to whom these presents shall

6   come, Greetings:  I Certify That the document hereunto annexed

7   is under the Seal of the State of Georgia, and that such Seals

8   are entitled to Full Faith and Credit."

9           And so this document --

10          THE DEFENDANT:  It's a Full Faith and Credit

11  Guarantee from the United States Government guaranteeing my

12  protection if I'm ever in another country or if I'm traveling

13  and I'm kidnapped or I'm held hostage or there are damages

14  caused, the United States has indemnified --

15          THE COURT:  This document doesn't say anything like

16  that.  That doesn't say anything like that, not even remotely

17  close to that.  All this document does is certify the State

18  document.

19          THE DEFENDANT:  Certifies, with all due respect, the

20  Full Faith and Credit which is a guarantee.

21          THE COURT:  This is what we are going to do.  I want

22  to call this document D1, United States of America, Department

23  of State.  That will be D1.

24          D2 will be State of Georgia, and this, "To All whom

25  these Presents shall come -- Greeting, whose official

1  signature appears to the instrument of writing hereto annexed,

2  was at the time affixing the duly appointed..." -- so forth

3  and so on.

4          And so what is attached?  Because basically what D2

5  is is a certificate of what I'm going to call or certificates

6  what I'm going to call D3 State of Georgia Certificate of Live

7  Birth.  And this is your birth?

8          THE DEFENDANT:  It's evidencing the Trust and that

9  is what was given to me by --

10          THE COURT:  Well, there is not anything on here that

11  says anything about any Trust.  All this is is a basic State

12  of Georgia Certificate of Live Birth.  There's not anything in

13  this at all about that.

14          And all you have done here is to get a

15  certificate -- all you've done with that is is that you've

16  gotten the Secretary of State to certify this Birth

17  Certificate.  And I don't understand what that has any --

18  you're talking about all the legal implications of this but I

19  don't understand how there are any legal implications to any

20  of that in accord with what you're offering.

21          THE DEFENDANT:  This is a Certificated Security that

22  was actually given to the Secretary of Treasury.

23          THE COURT:  Where is that Certificate of Security?

24          THE DEFENDANT:  A Certificated Security -- I don't

25  have the documents.  I don't have the documents here.

1          But this particular document evidences the

2     document -- this is a Trust and it was actually conveyed to a

3     Trust and it actually held in Trust.

4          THE COURT:  What are you holding?

5          THE DEFENDANT:  I am holding the Full Faith and

6     Credit Guarantee.

7          THE COURT:  That's what I'm calling Defendant's

8     Exhibit Number 1, correct?  Signed by John Kerry?

9          THE DEFENDANT:  Yes.  That is the Full Faith and

10    Credit Guarantee.

11         THE COURT:  It's not a guarantee of anything other

12    than the certification of this document.

13         And again, you're trying to impose some legal

14    implications on this that are far beyond anything that appears

15    in the document.

16         What else do you have?  What other documents do you

17    have?

18         This is what was submitted to the Court.  And I'm

19    going to mark what you have submitted to the True Bill, I'm

20    calling that Defendant's Exhibit Number 4.

21         Did you keep up with that, Nora?

22         COURTROOM DEPUTY:  Yes, sir.

23         THE COURT:  Number 4 already has a stamp on it.

24         THE DEFENDANT:  Your Honor, when you look up the

25    information for the Full Faith and Credit it confirms that it

```
 1    is a actual guarantee.  So even though you're saying it's not
 2    a guarantee -- no disrespect, Your Honor.
 3              THE COURT:  It doesn't guarantee anything but the
 4    certification.
 5              All right, Ms. Freeman, what do you want to say
 6    about this?
 7              MS. FREEMAN:  Your Honor, it appears that all of
 8    these documents that you're referring to as Defendant's
 9    Exhibits 1 through 4 are part and parcel of the Trust
10    documents that were submitted to the Court before and what
11    Your Honor has already excluded from consideration in this
12    trial.
13              THE COURT:  Let me explain something to you about
14    this that I didn't understand when I made that earlier ruling.
15    I thought that this was done after he was indicted or at least
16    after all the crimes were perpetrated, allegedly perpetrated.
17              I did not realize that some of this, in fact, took
18    place before that time.  And so I think I called it
19    Defendant's Exhibit Number 1.  The date on that is 2015, which
20    would have been during the course of this criminal conduct,
21    the alleged criminal conduct.  So that puts a little bit
22    different light on it in my mind.
23              I had understood this as being the idea -- and I
24    expressed this -- that he was now -- he committed these
25    crimes, probably the way he would describe it, as he had this
```

1    indebtedness and he was going to pay the indebtedness off and

2    that would resolve the case against him.  And I explained to

3    him that this was a civil case or this was not a civil case,

4    it was a criminal case.

5            But I think that the fact that it was earlier -- the

6    problem here is -- it's a Supreme Court case that talks

7    about -- essentially the Supreme Court says you can have a

8    crazy idea but if you can convince the jury that you believed

9    it then the government hasn't proved this specific intent

10   required.

11           So I'm having to revisit this in light of my better

12   understanding of the facts than I had when we dealt with this

13   earlier.

14           So now what do you say?

15           MS. FREEMAN:  With regards to that, Your Honor, we

16   will still say -- especially with regard to the indictment

17   itself, that is definitely where he has affixed the stamp to

18   it and then sent it back to the government and claims it

19   cancels his debt, et cetera.

20           That is post offense conduct because it is

21   reflective on -- you know, it's the indictment in this case.

22           These other documents are not actually relevant to

23   any kind of foundational belief that has had a -- no

24   foundation has been laid, in other words, for the relevance of

25   these documents at this time.

```
1          THE COURT:  Well, do you see the problem that the
2    Supreme Court has offered -- imposed on this Court about the
3    fact that someone can have, essentially the way I understand
4    it, an irrational interpretation of the tax code that makes
5    them think that they are entitled to all the money that they
6    received and the government has to establish that that's not
7    really what they believed.  I mean, that's kind of the way to
8    look at this.
9          MS. FREEMAN:  Yes, Your Honor.  But in order to
10   admit evidence to that effect it still must be admitted under
11   the Rules of Evidence.  It still must meet the basic
12   standards.  He must lay the proper foundation authentication.
13         THE COURT:  Well, see, my take on this and my
14   concern about this, as I went through this, it kind of does
15   away with the Federal Rules of Evidence if somebody comes in
16   and says that they believe this, then, I'm not sure that it
17   even has to be admissible.  It's a bizarre thing.
18         I mean, if he believes that these documents that we
19   just talked about D1, 2, and 3 somehow have some or contained
20   some mechanism that sets up something for him so that he is
21   not responsible for this, it seems that they are admissible.
22   And it seems that your job then becomes showing how ridiculous
23   it is to believe that this has any such bearing on anything.
24         So I'm looking for some answers here on this.  So
25   what is your response to that?
```

1          MS. FREEMAN:  Well, Your Honor, as far as his

2    beliefs go, he can introduce evidence of his actual belief in

3    the form of his testimony as to what his beliefs are.  But he

4    cannot just submit any paper or documentary evidence without

5    laying a proper foundation as to how it is relevant to

6    elements of the offense.

7          THE COURT:  Well, and my point is that if he

8    believes that -- however ridiculous that belief is -- the

9    Supreme Court seems to be saying that he can, at least,

10   present that as a defense.  The question then becomes does

11   that authorize the document coming in?

12         MS. FREEMAN:  Your Honor, we would say it doesn't

13   unless he actually lays the foundation for the documents.

14          Part of the issue is that we cannot authenticate

15   that these documents, bearing whatever date they bear, are

16   what they purport to be, were created at the time he claims

17   they were created.  So they cannot actually be authenticated

18   unless he can produce evidence to do so with regards to his

19   beliefs.

20         THE COURT:  Your objection is not really going to

21   relevance, at this point, it's going into authentication?

22         MS. FREEMAN:  Additionally, yes, Your Honor, yes.

23         THE COURT:  Then I know under the hearsay rules

24   there are exceptions to government documents.

25         MS. FREEMAN:  Yes, Your Honor, if that foundation

1    could be laid.

2              THE COURT:  Okay.  I see your point.

3              Do you want to respond to that?

4              THE DEFENDANT:  Your Honor, the foundation has been

5    laid in the motion that was actually -- that was given.  The

6    motion hasn't --

7              THE COURT:  Motions don't lay foundations.

8    Witnesses do.

9              THE DEFENDANT:  Okay.  I follow you on that one,

10   Your Honor.

11             As far as the authentication, you have the

12   authenticated document with the authenticated seal from the

13   State of Georgia and from the United States on both of the

14   actual documents.

15             In addition, verifying with the Secretary of

16   Treasury, that these documents were given to the Secretary of

17   Treasury in 2015, which actually caused a deposit into the

18   Secretary of Treasury in 2015 in which gifts were given to the

19   Secretary of Treasury to be used to reduce the public debt.

20             THE COURT:  But you don't have any record of that,

21   any evidence of that whatsoever?

22             THE DEFENDANT:  Of which part, Your Honor?

23             THE COURT:  That you gave some money to somebody?

24             THE DEFENDANT:  In regards to the gifts being given?

25             THE COURT:  Right.

1          THE DEFENDANT:  There are quite a few assignments of

2     collateral that I don't have access to because I have been

3     detained.  I don't have access to those actual documents.

4          THE COURT:  Let me go back to where I started.

5          The only trust agreements that you have in Court are

6     the documents that are attached that I have identified as D1,

7     2, 3 and 4; is that correct?

8          THE DEFENDANT:  The Full Faith and Credit Guarantee

9     -- yeah, the Full Faith and Credit --

10          THE COURT:  We marked Defendant's 4, which is the

11     Indictment with this certification at the end of it.  What

12     does that have to do with this?

13          THE DEFENDANT:  Say that one more time, please,

14     Your Honor.

15          THE COURT:  Defendant's Exhibit 4.  Defendant's

16     Exhibit 4 which is -- the page here is the indictment, True

17     Bill, it's signed by Ms. Freeman and then written in blue is

18     "I hereby convey and assign this TRUE BILL and interest to and

19     for the account of the United States."

20          THE DEFENDANT:  Because it's per the United -- as

21     per the United States, Title 50 USC 4305, which you have ruled

22     out some of the verbiage of that particular title.  4305(b)(2)

23     basically states that any payment.

24          THE COURT:  Where is the payment?  Where is the

25     payment?

```
 1                THE DEFENDANT:  When you go to -- one second,
 2     Your Honor.
 3                THE COURT:  Where is the document?  The evidence of
 4     the payment?
 5                THE DEFENDANT:  The document or the evidence of the
 6     payment is the actual Full Faith and Credit that you're
 7     actually holding in your hand serves as the payment as per --
 8                THE COURT:  Meaning what I call Defendant's Exhibit
 9     Number 1 from the Department of State?
10                THE DEFENDANT:  It would serve as the payment
11     because as per Title 31 USC 3113(a)(2)(d) specifies that it
12     would basically serve as the payment.
13                THE COURT:  Anything else you want to say,
14     Ms. Freeman?
15                MS. FREEMAN:  No, Your Honor.
16                THE DEFENDANT:  One --
17                THE COURT:  Yes, go ahead.
18                THE DEFENDANT:  I didn't get an opportunity -- the
19     motion itself is only four paragraphs, it's not that long.  So
20     to finish the actual --
21                THE COURT:  Okay.  Go ahead.
22                THE DEFENDANT:  Thank you, Your Honor.
23                     "Reliant on the grounds set forth and
24                 reliant on the United States Government
25                 Full Faith and Credit Guarantee and
```

1    reliant on the 4th Amendment to the United

2    States Constitution, I motion this Court

3    to immediately and permanently vacate,

4    cease and desist all proceedings to this

5    matter, including all criminal proceedings

6    which were in error, wrong and unlawful

7    from the onset; in violation to the 4th

8    Amendment to the United States

9    Constitution; and in violation to the

10   United States Government Full Faith and

11   Credit Guarantee ... issued to me,

12   therefore, the proceedings are acts of

13   treason.

14        And for this Court to immediately and

15   permanently revoke the Detention Order,

16   today, August 16, 2021, which is in

17   violation to the 4th Amendment to the

18   United States Constitution; and in

19   violation to the United States

20   Government's Full Faith and Credit

21   Guarantee ... therefore, the detention

22   order is an act of treason, and the

23   detention order has been an act of treason

24   for the onset; and for this Court to set

25   me at liberty today August 16, 2021, free

1           from all delay, and grant relief for the

2           injuries caused.

3           And I do have the relief on the next page.

4           THE COURT:  Is that your motion?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  The motion is denied.

7           There is substantial evidence in this case for the

8    case to go forward.  And you talked about various matters that

9    have nothing to do with the case whatsoever.

10          But I think that this case can go forward and you

11   may have some defense to it, but it's certainly not sufficient

12   basis for this Court to dismiss the case at this time.

13          So be back at 1:30, please.

14          CSO OFFICER:  All rise.  This Honorable Court is in

15   recess until 1:30.

16     (Recess at 12:55 p.m.)

17     (Resume at 1:39 p.m.)

18          CSO OFFICER:  All rise.

19          THE COURT:  Ms. Freeman, is there anything else you

20   want to say about this issue?  About his defense?

21          MS. FREEMAN:  Not at this time, Your Honor, I guess

22   we will just reserve objections or as things are introduced.

23          THE COURT:  What did you want to say?

24          THE DEFENDANT:  Prior to exiting for lunch or going

25   to lunch I did not get a chance to thoroughly respond to a

1   question you asked and I would humbly ask if you can give me

2   an opportunity --

3         THE COURT:  What was the question?

4         THE DEFENDANT:  You asked where is the payment?  And

5   according to the rules for 50 USC 4305b(2) states any payment

6   or delivery serves as a -- shall be a full acquittance and

7   discharge.

8         And the rules also in 31 USC 3113(e)(A)(1) says that

9   the Secretary of Treasury shall redeem a direct obligation

10  once it is given to the government it redeems that is canceled

11  and discharged.  So I didn't get a chance to respond.

12        THE COURT:  That wasn't the question.  The question

13  was where is the evidence of that?  Where is the document?

14  And you don't have that document.

15        THE DEFENDANT:  I thought --

16        THE COURT:  I want to make a few observations here

17  about this or actually they are rulings more than

18  observations.

19        The government -- and I think this *Cheek versus US*

20  case which is a 1991 case and a very important case.  And the

21  Court describes here "That an element of the crime is

22  willfulness and it requires the government to prove that the

23  law imposed a duty on the Defendant.  The Defendant knew of

24  his duty and he voluntarily and intentionally violated the

25  duty."

1          And, so, that's the government's burden in this

2    particular case.

3          But it goes on to say, "But carrying this burden

4    requires negating a Defendant's claim of ignorance of the law

5    or a claim that because of misunderstanding the law he had a

6    good faith belief that he was not violating any of the

7    provisions of the tax laws."

8          And so that's -- I would imagine y'all have seen

9    this case before.

10          So -- "And knowledge and belief are characteristic

11    questions for the fact-finder.  (In this case the jury.)

12    Characterizing a particular belief is not objectively

13    reasonable, transforms inquiry into a legal one and would

14    prevent the jury from considering it."

15          That was the problem that the Trial Court made.  "It

16    would, of course, be proper to exclude evidence having no

17    relevance or probative value with respect to willfulness.  But

18    is not contrary to common sense, let alone impossible for the

19    Defendant to be ignorant of his duty based on irrational

20    belief that he has no duty and forbidding the jury to consider

21    evidence that might negate willfulness relays a serious

22    question under the Sixth Amendment jury trial provision."

23          So, I think that he is going to be able to testify.

24    To me it seems that the defense he's offering here is

25    characterized by two basic propositions.  He talks over and

1   over in his motion Full Faith and Credit Guarantee of his

2   protection, which he thinks this document, that has been

3   identified as D1 -- I think -- Yes, D1 -- is what affords that

4   to him.

5          But then he also has what I would characterize as

6   the double payment defense, which is what he was just talking

7   about and that is that he paid this money -- he says he paid

8   this money in and that should have canceled the debt.

9          There are various things that you said -- and I

10  didn't get to review it in its entirety but I got through a

11  lot of it -- that I'm not going to let you testify about.

12         How many times this case has been indicted.  I think

13  you said nine times.  I don't see the relevance of any of that

14  or how that goes to your understanding about what your duty

15  was under the tax laws.

16         The failure of the Court to release you from

17  detention.  That's not a part of this.

18         All the talk about slavery, treason, war against the

19  United States, kidnapping, human rights violations, that

20  doesn't have anything to do with this.

21         The Fourth Amendment violation that you allege don't

22  have anything to do with this.

23         So I'm precluding you from talking about any of

24  those.

25         Do you want to respond?

1          THE DEFENDANT:  Yes, Your Honor.  I would like to

2    object, please.

3          THE COURT:  Go ahead, I'm giving you the

4    opportunity.

5          THE DEFENDANT:  Thank you.

6          In regards to the human rights violation, as

7    mentioned in regards to the Fourth Amendment, there was never

8    a warrant -- there was never a warrant issued in regards to

9    stating my name or describing my name or a warrant.  There was

10   never a warrant issued at all before I was --

11         THE COURT:  This is something -- going forward in

12   this endeavor in which you filed these returns is what you

13   thought then.  It is not about what the government did with a

14   warrant.  That has nothing to do with this case.  I don't

15   understand how that has anything to do with this case nor does

16   it have anything to do with your name.

17         So, the fact that you may have been abused in any

18   number of ways, in terms of the way you were arrested or the

19   warrant for you, has nothing to do with this case as far as

20   your defense is concerned.  And for that matter any other

21   proposition that I know about.

22         And those are matters that you should have raised

23   before now.  So if there was something, there was an

24   unreasonable search and seizure you could have raised that

25   before, but that's typically to exclude evidence.  So I don't

1    understand how that really has anything to do with this.

2              So --

3              THE DEFENDANT:  Your Honor, I raise that on --

4    forgive me for getting you off, Your Honor.  I raised that on

5    July 14th and I mentioned to you -- I think it was on July

6    14th -- that there was never a warrant issued for me.  I was

7    never arrested and that I have been held for this particular

8    matter since October 2020.

9              THE COURT:  I'm ruling that out.  No more about

10   that.

11             This is about your understanding as the duties of

12   the taxpayer.  It does not have to do with the way you were

13   arrested.

14             What else do you want to say?

15             THE DEFENDANT:  Could you repeat the first -- there

16   was the very first thing that you was ruling out.

17             THE COURT:  What I said was, there seems to be two

18   major defenses that you have here.  One is Full Faith and

19   Credit Guarantee which was based in D1 and you talk about that

20   over and over again.  This is the protection that you think

21   you have afforded yourself from this -- the indictment.

22             And then the second one is your double payment

23   defense, that the debt should be canceled because of the money

24   that you supposedly paid in.

25             Those seem to be the heart of it.

1          THE DEFENDANT:  Well, Your Honor, with all due

2    respect, in regards to the debt being canceled I think there

3    are two different scenarios here.  There is one in regards to

4    the gifts that was given to the Secretary of Treasury.

5          THE COURT:  Wait just a minute.  I'm going to send

6    Ms. Paul back to tell the jury that we are dealing with an

7    issue and it will take a minute.  So go back and tell them

8    that.

9          Go ahead.

10          THE DEFENDANT:  Thank you.

11          There are two different situations in regards to --

12    or settling debt.  There is one in regards to the gifts that

13    was given to the Secretary of Treasury back in 2015.  And then

14    there is one in regards to the True Bill.  So there are two

15    totally different scenarios in regards to the True Bill.

16          The rule states once it is actually given to the

17    government -- the rule states that the actual True Bill is an

18    obligation of the government in regards to 18 USC 8.  It

19    establishes that the True Bill in and of itself, signed by two

20    authorized officers of the United States, that under 18 USC

21    obligations and other securities of the United States, that

22    the True Bill is an obligation of the United States.

23          Therefore --

24          THE COURT:  Okay, well that's part of the debt

25    cancel, the way I understand it.

1          THE DEFENDANT:  Say that one more time, please.

2          THE COURT:  That sounds like part of the debt

3   cancel.  Isn't that what you're saying?  That that canceled

4   the debt?

5          THE DEFENDANT:  It cancels -- it redeems the True

6   Bill.  Is what the rule says it redeems the True Bill.

7   Everything that was done redeems the True Bill, Your Honor.

8          THE COURT:  What does "redeem the True Bill" mean?

9          THE DEFENDANT:  Retired and canceled the True Bill.

10         THE COURT:  All right.  That's fine.

11         I understand now what you are saying.  I think that

12   probably comes under the debt cancel proposition.  That's just

13   another way that it was canceled.  I understand.

14         I told you what you are not supposed to testify

15   about that but I didn't say that you couldn't testify about

16   the True Bill canceling it.

17         THE DEFENDANT:  And that was part of what I did not

18   get a chance to explain to you earlier because of time

19   constraints.

20         THE COURT:  Right.

21         THE DEFENDANT:  So thank you for giving me the

22   opportunity to explain it.

23         But that was also part of the motion that was

24   actually being explained earlier because the rule says that

25   once it is given to the government it says delivered --

 1              THE COURT:  I'm not prohibiting you from testifying

 2      about that.  That's what I just said, okay.

 3              What else?

 4              THE DEFENDANT:  Thank you, Your Honor.

 5              I was going to say, but you ruled against the actual

 6      motion and that's what the motion is actually stating.

 7              THE COURT:  Okay.  We're not talking about the

 8      motion.  I've overruled the motion.

 9              What I'm doing now is I'm restricting what you can

10      say when you testify.

11              THE DEFENDANT:  Okay.  And, Your Honor, there were

12      two motions filed this morning.

13              THE COURT:  What were the two motions?  One of them

14      about releasing you from detention?  Was that the other one?

15              THE DEFENDANT:  And there was a second motion in

16      regards to a motion for discovery.

17              THE COURT:  Oh, motion for discovery.  Well, it's

18      too late for that.

19              All right.  I'm ready to bring the jury in.

20        (Jurors enter courtroom at 1:50 p.m.)

21              THE COURT:  When y'all come in from the jury room

22      the first one go all the way to the end, please, and that will

23      make it a lot easier for everybody.

24              COURTROOM DEPUTY:  Please stand and raise your right

25      hand.  Do you swear that you will well and truly try the

 1   issues joined in the Indictment and render a true verdict

 2   according to the law and evidence, so help you God?

 3        THE JUROR:  I do. (all responding)

 4        THE COURT:  Ladies and gentlemen, now that you've

 5   been sworn I need to explain some basic principles about a

 6   criminal trial and your duty as jurors.

 7        These are preliminary instructions and at the end of

 8   the trial I will give you more detailed instructions.  It will

 9   be your duty to decide what happened so you can determine

10   whether the Defendant is guilty or not guilty of the crimes

11   charged in the indictment.

12        At the end of the trial I will explain the law that

13   you must follow to reach your verdict.  You must follow the

14   law as I explain it to you, even if you do not agree with it.

15        You must decide this case solely based on the

16   evidence presented here in the courtroom.  Evidence can come

17   in many forms.  It can be testimony about what someone saw or

18   heard.  It can be an exhibit admitted into evidence.  It can

19   be someone's opinion.

20        Some evidence proves a fact indirectly such as a

21   witness saw wet grass outside and people walking into the

22   courthouse carrying wet umbrellas.  It allows the inference

23   it's raining outside.

24        Indirect evidence, sometimes called circumstantial

25   evidence, is simply a chain of circumstances that proves a

1    fact.

2           As far as the law is concerned, it makes no

3    difference whether evidence is direct or indirect.  You may

4    choose to believe or disbelieve either kind and to give every

5    piece of evidence whatever weight you think it deserves.

6           Now let me tell you what's not evidence.  There are

7    certain things that are not evidence and must not be

8    considered.  Statements and arguments of the lawyers and their

9    opening statements and closing arguments.  The lawyers will

10   discuss the case, but their remarks are not evidence.

11          The Defendant, in this case, has chosen to represent

12   himself in the case thus statements and arguments that he

13   makes while representing himself, such as the opening

14   statement and closing statement are not evidence.  But should

15   the Defendant choose to testify you may consider his testimony

16   as evidence.

17          The questions and objections of the lawyers are not

18   evidence.  You shouldn't try to infer something from what a

19   question was.  Only the witness's answers are evidence.  You

20   should not think that something is true just because the

21   lawyer's question suggests that it is.  For instance, if a

22   lawyer ask the question "You saw the Defendant hit his sister,

23   didn't you?"  That question is no evidence whatsoever of what

24   the witness saw or what the Defendant did unless the witness

25   agrees with it.

1          There are Rules of Evidence that control what can be

2   received into evidence.  When a lawyer asks a question or

3   offers an exhibit and a lawyer on the other side, or in this

4   case the Defendant, thinks that it's not permitted by the

5   Rules of Evidence the lawyer may object.  If I overrule the

6   objection then the question may be answered or the exhibit

7   received.  If I sustain the objection then the question cannot

8   be answered and the exhibit cannot be received.  Whenever I

9   sustain an objection to a question you must ignore the

10  question and not try to guess what the answer would have been.

11         Sometimes I may order that evidence be stricken and

12  that you disregard or ignore the evidence.  That means when

13  you are deciding the case you must not consider that evidence

14  that has been stricken.

15         Some evidence is admitted only for a limited

16  purpose.  When I instruct you that an item of evidence has

17  been admitted for a limited purpose you must consider it only

18  for that limited purpose and no other.

19         In reaching your verdict you may have to decide what

20  testimony to believe and what testimony not to believe.  You

21  may believe everything a witness says or part of it or none of

22  it.  In considering testimony of any witness you may take into

23  account the opportunity and ability of the witness to see or

24  hear or know the things testified to.  The witness's memory,

25  the witness's manner while testifying.  The witness's interest

in the outcome of a case and any bias or prejudice.  Whether

other evidence contradicted a witness's testimony.  The

reasonableness of the witness's testimony in light of all the

evidence and any other factors that bear on believability.

I will give you additional guidelines about

determining the credibility of the witness at the end of the

trial.

Now, this is a criminal case and there are three

basic rules about a criminal case that you must keep in mind.

First, the Defendant is presumed innocent until

proven guilty.  The Indictment against the Defendant brought

by the government is only an accusation and nothing more.  It

is not proof of guilt or anything else.  The Defendant

therefore starts out with a clean slate.

Second, the burden of proof is on the government

until the end of the case.  The Defendant has no burden to

prove his innocence or to present any evidence or to testify.

Since the Defendant has a right to remain silent and

may choose whether to testify you cannot legally put any

weight on a Defendant's choice not to testify.  It is not

evidence.

As I said earlier, the Defendant has chosen to

represent himself and declined the assistance of an attorney.

He has the right to do so and you cannot legally put any

weight on this decision.

1          Third, the government must prove the Defendant's

2   guilt beyond a reasonable doubt.  I will give you further

3   instructions on this point later, but bear in mind that the

4   level of proof required is high.

5          Our law requires jurors to follow certain

6   instructions regarding their personal conduct in order to help

7   insure a just and fair trial.  I'll now give you those

8   instructions.

9          First, do not talk either among yourselves or with

10  anyone else about anything related to the case.  You may tell

11  the people with whom you live and your employer that you are a

12  jury and give them information about when you'll be required

13  to be in court, but you may not discuss with them or anyone

14  else anything related to the case.

15         Do not at any time during the trial request, accept,

16  agree to accept or discuss with any person any type of payment

17  or benefit in return for supplying any information about the

18  trial.  You must promptly tell me about any incident you know

19  of involving an attempt by any person to improperly influence

20  you or any member of this jury.

21         Do not visit or view the premises or places where

22  the charged crime was allegedly committed.  And, of course, we

23  don't have that in this case, not that I know of any way.

24         Do not read, watch or listen to any accounts or

25  discussions related to the case which may be reported by

1   newspapers, television, radio, the Internet, or any other news

2   media.  I doubt if there will be such communications but you

3   must stay away from that.

4           Do not attempt to research any fact, issue or law

5   related to this case whether by discussion with others, by

6   library, internet research or by any other means or source.

7           In this age of instant electronic communication and

8   research, I want to emphasize that in addition to not talking

9   face-to-face with anyone about the case you must not

10  communicate with anyone about the case by any other means

11  including telephone, text message, email, Internet chat, chat

12  rooms, blogs, or social networking websites and apps such as

13  Facebook, Instagram, Snapchat, YouTube or Twitter.

14          You may not use any similar technology for social

15  media even if I have not specifically mentioned it here.

16          You must not provide any information about the case

17  to anyone by any means and that includes posting information

18  about the case or what you are doing in case on any device or

19  Internet site including blogs, chat rooms, social websites or

20  other means.

21          You must also not use Google or otherwise search for

22  information about the case or the law that applies to the

23  court or the people involved in the case, including the

24  Defendant, the witnesses, the lawyers or the judge.  It's

25  important that you understand why these rules exist and why

1    they are so important.  Our law does not permit jurors to talk

2    with anyone else about the case or to permit anyone to talk to

3    them about the case, but only jurors are authorized to render

4    a verdict.  Only you have been found to be fair and only you

5    have promised to be fair.  No one else is so qualified.

6            Our law also does not permit jurors to talk among

7    themselves about the case until the Court tells them to begin

8    deliberations because premature discussions can lead to a

9    premature final decision.

10           Our law also does not permit you to visit a place

11   discussed in the testimony.  First you can't be sure that the

12   place is in the same condition it was on that day.

13           Is that going to be an issue in this case in anyway?

14   No geography about any of this?

15           MS. FREEMAN:  No, Your Honor.

16           THE COURT:  Do you agree?

17           THE DEFENDANT:  (No response).

18           THE COURT:  These rules are designed to help

19   guarantee a fair trial and our law accordingly sets forth

20   serious consequences if the rules are not followed.

21           I trust that you understand and appreciate the

22   importance of following these rules and in accord with your

23   own promise and oath I know that you will do so.

24           Now, if you wish to take notes that's fine.  But

25   please keep them to yourself until you and your fellow jurors

1  go to the jury room to decide the case.  Do not let note

2  taking distract you so that you do not hear other answers by

3  witnesses.  When you leave the courtroom your notes should be

4  left in the jury room.  Whether or not you take notes you

5  should rely on your own memory of what was said.  Notes are to

6  assist your memory only.  They are not entitled to any greater

7  weight than your memory or impression about the testimony.

8          So the trial is going to begin now and I'm going to

9  give the opportunity to the government's attorney to make an

10  opening statement.  This should be an outline to help you

11  understand what the evidence is.  And then Mr. Mattox will

12  have the opportunity to give you an overview of his case.

13  Keep in mind that what they say is not evidence in this case.

14          And I'm going to limit both sides to 30 minutes for

15  the opening.

16          MS. KRAFT:  Thank you, Your Honor.  May I approach

17  the lectern?

18          THE COURT:  You may.

19          MS. KRAFT:  The Defendant lied to the IRS.  He did

20  it again, and again, and again.  The IRS caught onto it most

21  of the time.  But on four occasions the Defendant's

22  persistence paid off.  The IRS issued a refund.  Five million

23  dollars in total.

24          This case involves false tax returns filed for

25  various trusts.  The evidence will show that it began in

September 2016 when the Defendant filed two false tax

returns -- by filing two false tax returns for two trusts,

Kemahra Invest Trusts and the Burgess Mattox Bey Investment

Trust.  Neither trusts had any business activities.  They

didn't earn any income.  You will see that they didn't even

have a bank account yet, and the Defendant knew that.

     Nevertheless, the Defendant told the IRS that they

had earned income.  And he told the IRS that they had already

paid about half of that income to the IRS already through its

holdings on that income.  And he told the IRS that the trusts

were owed refunds because they had overpaid their tax

liability.

     You'll hear from IRS witness Renee McClain.  She

will walk you through the tax returns and IRS data.

     Ms. McClain will tell you that in truth the IRS had

received no payments.  But not realizing this the IRS issued

the refunds, over $9,000 to the Kemahra Investment Trust and

over 300,000 to the Burgess Mattox Bey Investment Trust.

     And having succeeded in his fraud the Defendant

tried again, and again, and again.  He filed more false tax

returns with the IRS signing them as Asim El Bey.

     He tried different tax years.  He tried different

trust names and he tried using different numbers.

     But he again, and again, claimed that the trusts had

earned income even though he knew the trusts had not.

1          He again claimed that the IRS had already received

2    payments when he knew that the IRS had not.  This time though

3    he sought higher refunds, $500,000, 3 million, 8 million.  But

4    the IRS didn't issue these refunds.

5          So the Defendant had to go back to the drawing

6    board, and you will see that he returned to what had worked

7    for him before.  Having received refunds on the first two

8    returns he decided to file them again, amend them, ask for

9    more.  It worked for one.  The IRS issued a second refund to

10   the Burgess Mattox Bey Investment Trust, this time for two and

11   a half million dollars.

12         And the Defendant kept trying.  And he filed that

13   same return for the Burgess Mattox Bey Investment Trust again.

14   The evidence will show that it was the Defendant, Marquet

15   Antwain Burgess Mattox, who filed these returns.

16         You will hear that the IRS captured IP addresses

17   when tax returns are filed electronically.  Now, an IP address

18   is like your computer's street address on the Internet.  The

19   IRS captures that information.

20         You will hear from Charter Communications that the

21   IP addresses were registered to the Defendant Marquet Mattox.

22         Additionally, the tax returns all claimed that the

23   trusts were located at the same address, which turns out to be

24   a UPS Store in Atlanta.

25         And you will see the Defendant opened a mailbox at

1    that UPS Store in Atlanta, Georgia.

2           You will see that the Defendant filed return, after

3    return, after return.

4           In total he sought over a hundred and sixty

5    five million dollars in refunds.  Because the Defendant tried

6    again, and again, and again, with different numbers and

7    different trusts he was able to take advantage of the trust

8    that the IRS places in taxpayers.

9           In total the IRS issued over five million dollars to

10   the Defendant's trusts.

11          You will see that the tax refunds were then

12   deposited into brand-new bank accounts that the Defendant

13   controlled.

14          And the evidence will show that it was the Defendant

15   who spent the money.

16          You will hear from Hannah Nguyen who sold the

17   Defendant a house for $600,000.

18          You will from Paule-Nathalie Clarke who worked at

19   Haverty's Furniture and who helped him furnish it.

20          You will also see that the Defendant bought a new

21   car, a Cadillac Escalade.

22          The evidence will show that the Defendant lied to

23   the IRS and tricked them out of millions.  He filed the

24   returns.  He knew they were false and he spent the money.

25          For this he has been charged with 20 counts for your

1   consideration.  Nine counts of wire fraud for electronically

2   submitting false tax returns.  Ten counts of false claims

3   against the United States government for these same tax

4   returns, as well as an additional one that he filed by mail.

5          And, finally, he's been charged with one count of

6   theft of government funds, the two refunds issued to the

7   Burgess Mattox Bey Investment Trust.

8          And after you have seen and heard all of the

9   evidence in this case the United States will have proven

10  beyond a reasonable doubt the Defendant is guilty on all

11  counts.

12          THE COURT:  Mr. Mattox, do you want to make an

13  opening statement?

14          THE DEFENDANT:  Yes.  May I approach, please?

15          THE COURT:  Do you want to come over here?

16          THE DEFENDANT:  Yes, sir.

17          Good afternoon.  To provide the people of the United

18  States with an opportunity to make gifts to the United States

19  Government to be used to reduce the public debt the Secretary

20  of Treasury may accept for the government -- may accept for

21  the government gifts of money made only on the conditions that

22  the gifts are used --

23          THE COURT:  Mr. Mattox, excuse me just a minute.

24  You're talking very fast and I can't hear you.

25          THE DEFENDANT:  I do apologize, Your Honor.  I'll

1   start over.

2           THE COURT:  Speak up, please.

3           THE DEFENDANT:  Can you all hear me?

4           To provide the people of the United States with an

5   opportunity to make gifts to the United States Government to

6   be used to reduce the public debt the Secretary of Treasury

7   may accept for the government a gift of money made only on the

8   condition that it be used to reduce the public debt.  An

9   obligation of the government included in the public debt made

10  only on the condition that the obligation is canceled and

11  retired and may not be issued.

12          Other intangible personal property made only on the

13  condition that the property is sold and the proceeds from the

14  sale used to reduce the public debt.

15          The Treasury has an account into which money

16  received as gifts and proceeds from the sale of redemption of

17  gifts under this section shall be deposited.  The Secretary

18  shall use the money in the account to pay at maturity or to

19  redeem or to buy before maturity an obligation of the

20  government included in the public debt.

21          An obligation of the government that is paid,

22  redeemed or bought with money from the account shall be

23  canceled, retired and may not be reissued.

24          Money deposited into the account is appropriated and

25  may be expended to carry out this section.  The Secretary

```
 1    shall redeem a direct obligation of the government bearing
 2    interest or sold on a discount basis on receiving it when the
 3    obligation is given to the government.
 4             Reliant on the rules set forth by the United States
 5    and the Secretary of Treasury, the rules were followed:  Gifts
 6    were given to the Secretary -- gifts were given to the
 7    Secretary of Treasury -- and I will do my best to explain this
 8    as possible -- gifts were given to the Secretary of Treasury
 9    to be used to reduce the public debt and collateral and
10    guaranteed protection in the form of a Full Faith and Credit,
11    which is a guarantee -- which is a guarantee issued by the
12    United States Government whose principal and interest are
13    guaranteed by the United States Government and guaranteed to
14    pay interest and principal on debt.
15             What's issued by the Secretary of State of the
16    United States around July 2015 and is authenticated and signed
17    by former Secretary of State, John Kerry.
18             The Full Faith and Credit Guarantee was given to the
19    Secretary of Treasury around August or October 2015.  The
20    Secretary of Treasury redeemed the direct obligation of the
21    Government.  The actual direct obligation of the Government is
22    an actual guarantee that was issued to me from the United
23    States Government, in which the Guarantee again was issued to
24    me in which I am the Beneficiary.
25             The Guarantee was delivered to the Secretary of
```

1   Treasury in which the Secretary of Treasury has had the

2   Guarantee on deposit since October 2015.

3          The Guarantee has never been returned back to me and

4   the Guarantee is still on deposit with the Secretary of

5   Treasury.

6          The face amount of an obligation issued under this

7   chapter and the face amount of an obligation whose principal

8   and interest are guaranteed by the United States Government

9   except Guaranteed obligations held by the Secretary of

10  Treasury may not be more than 14,294,000,000 outstanding at

11  one time.

12         This particular obligation that was actually issued

13  by the United States Secretary of State and this particular

14  obligation is a Guarantee from the United States Government to

15  pay principal and interest on debt and this particular

16  Guarantee was issued to me.

17         The Guarantee was delivered to the Secretary of

18  Treasury and upon delivering the Guarantee to the Secretary of

19  Treasury it caused a deposit into the Secretary of the

20  Treasury in the amount according to the United States law in

21  the amount of 14,294,000,000,000.  That is according to Title

22  31 USC 3101(b) again which states:

23              "The face of amount of an obligation

24              issued under this chapter and the face

25              amount of an obligation whose principal

1                     and interest are guaranteed by the United

2                     States Government (except guaranteed

3                     obligations held by the Secretary of

4                     Treasury) may not be more than

5                     14,294,000,000,000."

6                 This obligation is held by the United States

7     Treasury.

8                 Also, obligations and other securities of the United

9     States include all bonds, certificates of indebtedness,

10    National Bank Currency, Federal Reserve Notes, Federal Bank

11    Notes, coupons, United States Notes, Treasury Notes, gold

12    certificates, silver certificates, fractional notes,

13    certificates of deposits, bills, checks, drafts for money

14    drawn by two -- excuse me -- drafts for money drawn by two

15    authorized officers of the United States, stamps and other

16    representatives of value or whatever denomination issued under

17    the Act of Congress and canceled United States stamps.

18                 And that is giving you an outline in regards to what

19    the obligations are for the United States Government.

20                 As mentioned, the Guarantee issued by the United

21    States, Secretary of State and signed by John Kerry in 2015

22    which is a Full Faith and Credit Guarantee.

23                 There is a second page which is also a Full Faith

24    and Credit Guarantee that was actually issued by the State of

25    Georgia and signed in 2015 by the former Secretary of State,

1    Brian Kemp, who is now the governor, and signed also by Nathan

2    Deal, basically making me the Beneficiary of the Full Faith

3    and Credit Guarantee that is on deposit with the Secretary of

4    Treasury that has never been returned back to me, that

5    actually caused a deposit into the Secretary of Treasury;

6    therefore, there was funds already on deposit with the

7    Secretary of Treasury, based upon the guidelines and the rules

8    set forth by the Secretary of Treasury.

9              Bear with me, please.

10             And I would like to reiterate, again, please, kindly

11   note that collateral -- this is actual collateral.  This is a

12   form of collateral.  Intangible personal property -- but this

13   is a form of collateral -- guaranteed protection, a Full Faith

14   and Credit Guarantee that was issued from the United States

15   Government.  I wasn't the issuer.  The United States

16   government issued this particular guarantee to me in

17   July 2015.

18             Bear with me, please.

19             Also keep in mind that the Guarantee was issued to

20   me and the actual Prosecutor -- the actual guarantee was

21   issued to me by the United States Government and the

22   Prosecutor, who is also a part of the United States

23   Government, is claiming injury or claiming to have been

24   injured, in which the Prosecutor has never been injured

25   because the Prosecutor -- the Prosecutor has never been

1   injured by its own Full Faith and Credit Guarantee that has

2   actually been issued to me by the Secretary of Treasury.

3           And in addition to the actual Full Faith and Credit

4   Guarantee indemnifies from any and all loss up to

5   14,294,000,000,000.

6           And I've already explained as far as the face amount

7   of the actual obligation.

8           Bear with me, please.

9           Let it be known that the Full Faith and Credit

10  Guarantee was issued by the United States Secretary of State,

11  therefore making the Full Faith and Credit Guarantee a direct

12  obligation of the United States Government, whose principal

13  and interest are guaranteed by the United States Government

14  and is guaranteeing my protection and benefit.  And due to the

15  fact that the Full Faith and Credit guarantee was issued by

16  the Secretary of State of the United States for my protection

17  and benefit October -- was issued and given to the Secretary

18  of Treasury for my protection and benefit, October 2015, to be

19  held by the Secretary of Treasury, as already stated, it

20  caused the deposit to be made into the Secretary of Treasury

21  in the amount of 14,294,000,000,000 that was approved January

22  of 2016 by individuals at the Secretary of Treasury's office.

23          Please bear with me.  Please bear with me.

24          I would also like to mention, as I explained to you

25  in 18 USC as far as obligation and other securities of the

1   United States, it also confirms that all bills drawn by or by

2   or upon authorized offices of the United States and cancel

3   United States stamps or obligations of the United States.

4          Let it be known that the Prosecutor True Bill -- I

5   don't have a copy of it right now -- but the True Bill, which

6   is a bill that was actually drawn by two authorized officers

7   of the United States drawn -- basically drawn, drawer, maker,

8   issuer, signer.  It was signed by two authorized officers of

9   the United States, Lyndie M. Freeman and Assistance United

10  States Attorney -- who is the Assistant United States Attorney

11  and also signed by C. Alston, deputy clerk.  Evidenced on

12  page 8 of the Prosecutor's True Bill that was signed on

13  September 17th, 2020.  Thus making the Plaintiff's True Bill

14  and obligation of the United States as per 18 USC 8.

15         And being an obligation of the United States that

16  means that basically it is the United States' obligation to

17  actually settle it or to actually cancel or discharge the

18  obligation because it is an obligation of the United States.

19         An obligation is a duty owed to another, a

20  responsibility that requires a person to act in a certain

21  manner such as to perform a service or discharge a debt.

22         Discharge is to release, dismiss, free.  To

23  discharge a person held on accusations of a crime is to set

24  him free.  Dismiss is to discharge or discontinue.

25         Accurate means basically that it's exact.

1          A bill, an amount of money owed for goods supplied,

2   services rendered, set out in a printed or written statement

3   of charges and special deposit.

4          The actual Full Faith and Credit Guarantee that was

5   actually delivered to the Secretary of Treasury was delivered

6   via special deposit.

7          Special deposit consists of placing a specific kinds

8   of money or property in the possession of the bank with an

9   obligation of the bank to return the identical thing deposited

10  and the depositor retains title.

11         The actual Full Faith and Credit Guarantee was never

12  returned by the Secretary of Treasury.  It still remains on

13  deposit with the Secretary of Treasury for the purposes of

14  settling or discharging obligations or discharging debts.

15         Please bear with me.

16         Redeem.  Redeem is discharge, compensated for, paid

17  for, gain possession of in exchange for payment.

18         And as I mentioned to you, as per the Secretary of

19  Treasury, it states an obligation of the government that is

20  paid, redeemed or bought with money from the account shall be

21  canceled, retired and may not be reissued.  Money deposited

22  into the account is appropriated and may be expended to carry

23  out this section.  The Secretary shall redeem a direct

24  obligation of the Government bearing interest or sold on a

25  discount basis when the obligation is given to the Government.

1          So, therefore, with it being a direct obligation and

2   it is given to the Government, once it is given to the

3   Government it is actually discharged, it is actually canceled,

4   according to the actual rules.

5          Also reliant on 26 USC 61(a)(11) gross income

6   defined states:

7              "Except as otherwise provided in this

8              subtitle, gross income from whatever

9              source derived included but not limited to

10             the following items:  (11) income from the

11             discharge of indebtedness."

12         So basically it confirms that when debts are

13  discharged and debts are canceled it causes income.

14         So whatever the debts are that are actually given to

15  the Secretary of Treasury, whether it's a light bill, phone

16  bill, gas bill, et cetera, according to the rules and these

17  debts -- the debts that are obligations to the United States

18  causes income.

19         And that is according to the United States rules,

20  the United States guidelines, except as otherwise provided in

21  this subtitle.

22         Gross income, from whatever source derived, included

23  but not limited to the following items; income for the

24  discharge of indebtedness.  So, therefore, even though the

25  Prosecution was attempting to state that there was no income,

1    by discharging of debt causes income.

2            And to make the debt as an obligation of the United

3    States, the United States basically states that obligations

4    and other securities of the United States include all bonds,

5    certificates of indebtedness, National Bank currency, Federal

6    Reserve Notes, Federal Reserve Bank Notes, coupons, United

7    States Notes, Treasury Note, gold notes -- excuse me --

8    Treasury Note, gold certificates, canceled United States

9    stamps.

10           So canceled United States stamps are also

11   obligations of the United States.  So with a canceled United

12   States stamp the actual indebtedness or the actual debt

13   bearing a canceled United States stamp make the actual debt an

14   obligation of the United States in which the United States

15   confirmed to settle the debt.  And due to the fact that

16   actually a deposit was made prior to any debts being delivered

17   to the United States for settlement, then it causes income so

18   therefore for the trust that actually generated income there

19   was nothing -- the rules were followed.

20           So the rules were followed based upon the guidelines

21   set forth by the Secretary of Treasury and the debts were

22   settled including the Plaintiff's True Bill.  The Plaintiff

23   issued a True Bill in which some may refer to the True Bill as

24   an Indictment.

25           But in regards to the True Bill it confirms that the

1     declared value of the True Bill is $165,212,271 on page 3 of

2     the True Bill that also confirms an additional declared value

3     of $2,897,192.74 on page 4 of the True Bill.

4           The True Bill was actually given to the Government

5     as the guidelines state because the True Bill was signed by

6     two authorized officers of the United States in which the

7     guidelines -- or the guidelines says that it has to be signed

8     by two authorized officers, according to obligations and other

9     securities of the United States, which says that -- include

10    all bonds, certificates of indebtedness, et cetera, and drafts

11    for money drawn by two authorized officers of the United

12    States.

13          So the Prosecution's Indictment that was signed or

14    the True Bill -- because all bills are obligations of the

15    United States so their bill was signed by two authorized

16    officers of the United States making the actual bill an

17    obligation of the United States.

18          So being an obligation of the United States the

19    Secretary of Treasury states that the Secretary of Treasury

20    shall redeem a direct obligation bearing interest or sold on

21    the discount basis on receiving it when the obligation is

22    given to the Government.  Therefore, the obligation was given

23    back to the government.  So that obligation is a -- that

24    obligation has been canceled.  That obligation has been

25    discharged, according to the guidelines and the rules set

1  forth by the actual United States Treasury.

2        And the combined declared value in the Plaintiff's

3  True Bill of $168,109,463.74 has been canceled according to

4  the rules set forth by the Secretary of Treasury and also set

5  forth in regards to 26 USC 61(a)(11):

6            "Gross income defined except as

7            otherwise provided in this subtitle.

8            Gross income from whatever source derived

9            including but not limited to the

10           following:  The discharge of

11           indebtedness."

12        So the Plaintiff's True Bill which is in the amount

13 of $168,109,463.74 I render services to -- excuse me -- to the

14 public officials identified as the Plaintiff by discharging

15 their obligation, which is identified as a True Bill, which is

16 an obligation of the United States that was given to the

17 Government on October 23rd, 2020, which caused income, which

18 is additional income for my benefit, the Beneficiary, and the

19 Plaintiff has yet to compensate me, the Beneficiary, for

20 rendering service in discharging of their debt obligation and

21 attempting to -- attempting to punish me for following the

22 rules that are set forth in regards to giving gifts to the

23 Secretary of Treasury to be used to reduce the public debt.

24        Please bear with me.

25        The rules were followed, the Full Faith and Credit

1  Guarantee issued by the United States Secretary of State,

2  July 2015, guaranteeing my protection and benefit was given to

3  the Secretary of Treasury, October 2015, to be held by the

4  Secretary of Treasury for my protection and benefit.

5          A deposit, according to their guidelines, a deposit

6  of more than 14,294,000,000,000 was made into the account by

7  the Secretary of Treasury and approved January 2016.

8          Gifts were given to the Secretary of Treasury to be

9  used to reduce the public debt in regards to their guidelines

10 which basically says -- this is Title 31 USC 3113 Accepting

11 Gifts:

12              "To provide the people of the United

13              States with an opportunity to make gifts

14              to the United States Government to be used

15              to reduce the public debt, the Secretary

16              of Treasury may accept gifts -- may accept

17              gifts -- excuse me -- may accept for the

18              government gifts of money made on the

19              condition that it be used to reduce the

20              public debt.  An obligation of the

21              Government included in the public debt

22              made only on the condition that the

23              obligation be sold and canceled and

24              retired and may not be issued."

25              So there was a deposit made of the Guarantee from

the United States Secretary of State, which is a guarantee to pay principal and interest on debt.  It was delivered to the Secretary of Treasury.  It is still on deposit with the Secretary of Treasury.

So a deposit was made into an account at the Secretary of Treasury.  It was approved January of 2016. Gifts were given to the Secretary of Treasury to be used to reduce the public debt in which the upside, which is the overage, from the gifts given to the Secretary of Treasury that was returned back to the Trust, identified within the Plaintiff's True Bill, was stolen by the public officials identified as the Internal Revenue Service and their agents and unaccounted for.

There hasn't been an account in regard to all the funds that were actually seized by the Internal Revenue Service for following the rules or following the guidelines and basically stating that it was a crime to follow the rules.

So the rules were followed.  The Trusts were actually structured.  The Trusts were actually in place. Discharging debt, of course, generates the income for the Trusts.

So there was no debt discharged prior to the year 2015.  The debt was actually discharged, according to the rules and the guidelines, after the deposit was made into the bank, which the bank is the Treasury, the Secretary of

1    Treasury, is when the deposit was made.  And there was an

2    extremely large deposit made, according to the rules and

3    according to the actual guidelines set forth by the Secretary

4    of Treasury.

5            So you will see that the rules were followed and the

6    Prosecutor is attempting to punish me for following the rules

7    that were set forth by the Secretary of Treasury.

8            Thank you.

9            THE COURT:  Call your first witness.

10           MS. FREEMAN:  Your Honor, at this time, we have a

11   series of documents we would like to admit into the record so

12   that the witnesses may refer to them.

13           THE COURT:  Okay.  Go ahead.

14           MS. FREEMAN:  First, we would like to tender into

15   evidence Exhibit 2, the closing documents for the sale of a

16   house on Morgan Garner Drive, in Lilburn, Georgia.  The

17   certification under 803(6) and 902(11) having been provided

18   and preadmitted per your ruling under those grounds.

19           THE COURT:  All right.

20           Do you have any objection?

21           THE DEFENDANT:  Bear with me for one second, please,

22   Your Honor.

23           Yes, sir, I would have an objection, Your Honor,

24   because the actual securing of the property was based upon

25   income that was actually generated for the Trust from the

```
 1   discharge of indebtedness.  And the discharge of indebtedness
 2   was basically giving the gift to the Secretary of Treasury.
 3              So for the Prosecution to present an actual property
 4   that was actually secured by following the rules, yes, Your
 5   Honor, I would object.
 6              THE COURT:  Well, I'm overruling your objection.
 7   That's something the jury will have to decide.  I think it's
 8   relevant.
 9              Go ahead.
10                    (Government's Exhibit # 2 admitted.)
11              MS. FREEMAN:  Next, Your Honor, is Government
12   Exhibit 5, Charter Communication Subscriber records.
13   Certification 803(6), 902(11) provided to Defendant and
14   preadmitted under your order.
15              THE COURT:  Do you have any objection to that?
16              THE DEFENDANT:  Yes, I would have an objection to
17   it, Your Honor.  In regards to the Fourth Amendment to the
18   United States Constitution if there was not a warrant --
19              THE COURT:  I've ruled that out.  All right.
20              THE DEFENDANT:  I do apologize.
21              THE COURT:  That's noted.
22              THE DEFENDANT:  I was thinking that was in regards
23   to --
24              THE COURT:  The First Amendment issues are ruled
25   out.
```

```
 1              THE DEFENDANT:  You said the --

 2              THE COURT:  The Fourth Amendment, yeah, I'm sorry.

 3    The Fourth Amendment issues are ruled out.

 4              THE DEFENDANT:  I didn't realize that the entire --

 5              THE COURT:  Right, it does.

 6              THE DEFENDANT:  I understand.  Thank you, Your

 7    Honor.

 8              THE COURT:  That's admitted.

 9              MS. FREEMAN:  Thank you, Your Honor.

10                   (Government's Exhibit # 5 admitted.)

11              MS. FREEMAN:  Next we have Government's Exhibit 6,

12    7 -- well, let's start was 6 and 7 for now.  Those are Wells

13    Fargo Bank account records for the Kemahra Investment Trust

14    accounts ending 5797 and 2515, certifications provided and

15    preadmitted.

16              THE DEFENDANT:  I apologize, Your Honor, I'm

17    attempting to find the ink pen.

18              THE COURT:  Aren't those documents in the books?

19              MS. FREEMAN:  Yes, Your Honor.

20              For the benefit of the Defendant we can refer him to

21    the binders that are there in front of him.  They are tabbed

22    by exhibit number.

23              THE COURT:  How long is this going to take?

24              MS. FREEMAN:  Your Honor, we have maybe six more of

25    these to discuss.
```

 1            THE COURT:  So there's no reason to let the jury go

 2  out while we do this?  Is it going to take five minutes or 15?

 3            MS. FREEMAN:  I don't believe our portion of it

 4  would take more than five minutes.  With regards to his

 5  objections, I can't predict.

 6            THE COURT:  All right.  Go ahead.

 7            What's next?

 8            MS. FREEMAN:  Your Honor, are Government's Exhibit 6

 9  and 7 admitted?

10            THE COURT:  Remind me of what those are?

11            MS. FREEMAN:  Those are the Wells Fargo Bank records

12  for Kemahra Investment Trust.

13            THE COURT:  Do you have any objection to that?

14            THE DEFENDANT:  Just a second, Your Honor.  I do

15  have an objection, Your Honor, but we will continue to move

16  forward.

17            THE COURT:  I think in the interest of time what

18  we're going to do is I want you to call your first witness and

19  when you have a witness that's going to testify from one of

20  those documents then we will admit it at that time.

21            Okay?

22            MS. FREEMAN:  Yes, Your Honor.  We can do that.

23            THE COURT:  Then he can object that way.

24            I want to move this along.  So call your first

25  witness.

1            MS. FREEMAN:  The United States calls Hannah Nguyen.

2            THE COURT:  Ms. Freeman, let me tell you, if you

3    would like to stand at the podium I think that you can do

4    that.  And same for you Mr. Mattox.  There is a pretty good

5    barricade right there.  I think it will be okay.

6            So if you want to do that or you can do it from

7    counsel table, you can do it there, either way.  And same for

8    you Mr. Mattox.

9            MS. FREEMAN:  Thank you, Your Honor.

10           COURTROOM DEPUTY:  Do you swear that your testimony

11   will be the truth, the whole truth, and nothing but the truth,

12   so help you God?

13           THE WITNESS:  Yes, ma'am.

14           CSO OFFICER:  Spell and state both your first and

15   last name for the record.

16           THE WITNESS:  Hannah Nguyen, H-A-N-N-A-H,

17   N-G-U-Y-E-N (spelling).

18                         HANNAH NGUYEN

19           Whereupon, witness having been duly sworn,

20                       testified as follows:

21                       DIRECT EXAMINATION

22   BY MS. FREEMAN:

23   Q    Ms. Nguyen, what city do you currently reside in?

24   A    Snellville, Georgia.

25   Q    And what do you do for a living?

```
1   A     I buy and sell real estate.

2   Q     Do you also manage rentals?

3   A     Yes.

4   Q     Are these commercial or residential?

5   A     Residential.

6   Q     Are you familiar with an individual named Marquet Mattox?

7   A     Yes, I am.

8   Q     How did you first meet him?

9   A     He contacted my husband to rent a property of mine.

10  Q     And what was the address of that property?

11  A     1054 Morgan Garner Drive in Lilburn, Georgia, 30047.

12  Q     What year was that?

13  A     2017.

14  Q     And was that at the beginning or end of 2017?

15  A     It was more towards the end.

16  Q     Did you live nearby to that house on Morgan Garner Drive

17  when you rented it to the Defendant?

18  A     I'm sorry, can you repeat that.

19  Q     Sure.  Did you live nearby in that area at the time you

20  rented that house?

21  A     Yes, I did.

22  Q     Did you speak specifically to the Defendant about renting

23  the house?

24  A     Yes.

25            MS. FREEMAN:  Your Honor, permission to approach the
```

```
 1   witness with Government's Exhibit 1 for her to authenticate.

 2   It has been previously provided to the Defendant and has been

 3   marked as Exhibit 1.

 4   BY MS. FREEMAN:

 5   Q    Ms. Nguyen, do you recognize what is depicted in those

 6   photographs?

 7   A    Yes.

 8   Q    What is that?

 9   A    This is the 1054 Morgan Garner Drive house.

10   Q    Is that the house that you used to own?

11   A    Yes.

12   Q    Is that the house you rented to the Defendant?

13   A    Yes, it is.

14   Q    And is the photograph that you are looking at does it

15   depict it in the same or similar condition as when you rented

16   it to the Defendant?

17   A    Yes.

18        MS. FREEMAN:  Your Honor, at this time we move to

19   admit Government's Exhibit 1 and publish it if it is so

20   admitted?

21        THE COURT:  Any objection?

22        THE DEFENDANT:  No, Your Honor.

23        THE COURT:  Admitted.

24             (Government's Exhibit # 1 admitted.)

25        MS. FREEMAN:  Mr. Quintero, could you please publish
```

1    Government's Exhibit 1.

2    BY MS. FREEMAN:

3    Q    Ms. Nguyen, when did Marquet Mattox move into this house,

4    to your recollection?

5    A    Toward the end of 2017.

6    Q    In order to rent from you, you say you manage multiple of

7    these properties, do you ask someone for proof of income

8    before they sign a lease with you?

9    A    Yes.  Proof of income like paystubs.

10   Q    And did Mr. Mattox provide to you paystubs from some kind

11   of a job?

12   A    I don't recall, no.

13   Q    Did he show you any kind of documents regarding how he

14   makes his living?

15   A    He provided a tax return.

16   Q    What kind of tax return did he provide you?

17   A    I don't recall exactly.  I just know it was a tax return.

18   Q    Was it a tax return for him personally or for a business

19   or some other entity?

20   A    On the tax return it said it was a trust fund.

21   Q    A trust?

22   A    Yes.

23   Q    Do you recall anything about the amounts of money that

24   you saw on that tax return?

25   A    I don't know exactly the amount, but I know towards the

```
1    end of the tax return the first page there was an amount.

2    Q    There was an amount?

3    A    Yes.

4    Q    Do you remember if it was a small amount of money or a

5    large amount of money?

6    A    It was a large amount of money.

7    Q    What's a large amount of money to you?

8    A    I remember it was more than 20 million.

9    Q    More than $20 million?

10   A    Yes.

11   Q    So did you take him into a lease agreement, at this time,

12   to pay month to month or make some other kind of arrangement?

13   A    Normally it is a one year lease.  So that's what we had

14   signed, uh-huh, a one year lease.

15   Q    Did he pay your rent on a month to month basis or through

16   some other arrangement?

17   A    He paid a one year, a whole year.

18   Q    He paid a whole year at once?

19   A    Yes.

20   Q    Do you recall what the monthly rent was for that house at

21   the time?

22   A    It was 3,500 a month.

23   Q    When you rented him that house was it furnished or

24   unfurnished?

25              THE COURT:  Wait just a minute.  Sir?
```

1          THE DEFENDANT:  I attempted to object, Your Honor.

2          THE COURT:  What's the objection?

3          THE DEFENDANT:  Ms. Nguyen mentioned that she saw an

4   amount over 20 million, which is actually -- I would say

5   inaccurate.

6          THE COURT:  Wait just a minute.  If you have a

7   disagreement with what this witness says you can testify about

8   that if you decide that you want to testify.

9          THE DEFENDANT:  Or would I have the ability to cross

10  examine the witness?

11         THE COURT:  You certainly have the ability to cross

12  examine her.

13         THE DEFENDANT:  Thank you.

14         THE COURT:  Yes.  By all means.

15         THE DEFENDANT:  Thank you.

16         THE COURT:  Go ahead.

17  BY MS. FREEMAN:

18  Q    Ms. Nguyen, when you rented the house was it furnished or

19  unfurnished?

20  A    It was furnished.

21  Q    Do you recall what kind of a vehicle the Defendant drove

22  when you first met him?

23  A    I recall it was a minivan.

24  Q    I'm sorry, did you say a minivan?

25  A    Yes.

```
1    Q    Was it a brand new minivan or an older model?

2    A    It was an older model.

3    Q    Do you recall if he had any family members living with

4    him when he rented the house?

5    A    He told me he resided with his wife and kids, children.

6    Q    And how long did he end up renting this house from you?

7    A    A couple months.

8    Q    What happened after a couple months?

9    A    He offered to buy the house.

10   Q    And this was even after he had already paid a whole years

11   rent in advance?

12   A    Yes.

13   Q    Do you recall roughly what month it was that he offered

14   to buy the house?

15   A    I don't recall that.

16   Q    Did you end up actually selling him the house?

17   A    Yes.

18   Q    What was the sales price that you told him for the house?

19   A    600,000.

20   Q    And did he have a real estate agent, you know, do up

21   contracts with you or counter your offer?

22   A    No, he did not.

23   Q    So did you deal only then with the Defendant?

24   A    Yes.

25        MS. FREEMAN:  Your Honor, we would like to publish,
```

1    at this time, for the witness to refer to, what has been

2    admitted as Government's Exhibit 2, the closing documents for

3    Morgan Garner Drive?

4              THE COURT:  All right.

5              MS. FREEMAN:  Mr. Quintero.

6              THE COURT:  Do you have an objection to that?

7              THE DEFENDANT:  I don't see the document.

8              MS. FREEMAN:  Mr. Quintero, could you pull up page

9    -- is that 028939?

10   BY MS. FREEMAN:

11   Q    Ms. Nguyen, do you recognize these as part of the closing

12   documents for the sale of that house?

13   A    Yes.

14             MS. FREEMAN:  And Mr. Quintero, could you zoom in on

15   the signature section at the bottom of the page.

16   BY MS. FREEMAN:

17   Q    Ms. Nguyen, is that your signature on the left?

18   A    Yes, it is.

19   Q    And you were present at the closing for this house; is

20   that right?

21   A    Yes.

22   Q    Who signed the signature on the right?

23   A    Mr. Marquet -- so his first name is Marquet Mattox.

24   First name is Marquet and last is Mattox.

25   Q    And do you recall him signing these documents at the

```
 1   closing?

 2   A    Yes.

 3   Q    Do you see the individual that signed this document at

 4   the closing with you, the individual that purchased this

 5   house, in the courtroom today?

 6   A    Yes.

 7   Q    Could you please describe where he is sitting and what he

 8   is wearing?

 9   A    This is him right here.  He is wearing a suit and wearing

10   glasses.

11            MS. FREEMAN:  Let the record reflect that the

12   witness has identified the Defendant.

13            Mr. Quintero, can we pull up page 028956 and zoom in

14   on the picture there.

15            THE DEFENDANT:  I object.

16            THE COURT:  What's the basis for your objection?

17            THE DEFENDANT:  Excuse me.

18            THE COURT:  What is the basis of the objection?

19            THE DEFENDANT:  The objection is -- this actual

20   identification is actually being presented and I'm not

21   agreeing to it for one.

22            For two, the actual identification was updated.  So

23   the actual name on this actual identification is inaccurate,

24   for two.  So the information that is on this actual

25   identification that she is presenting or bringing forward is
```

1   actually inaccurate.

2            THE COURT:  Okay.  Well, you can testify about that

3   at trial.  What you just said is not evidence in the case.

4            If you want to testify that is entirely up to you,

5   but I'm going to overrule the objection.

6            THE DEFENDANT:  Okay.

7   BY MS. FREEMAN:

8   Q    Ms. Nguyen, do you recall how Mr. Mattox paid for the

9   house?  Was it with a mortgage or some other means of payment?

10  A    It was cash.

11  Q    He paid you $600,000 cash?

12  A    He paid with money orders.

13  Q    After you sold that house, where did you live?

14  A    I still lived in the same neighborhood.

15  Q    The same neighborhood as the Morgan Garner Drive house?

16  A    Yes.

17  Q    Now you mentioned a few minutes ago that he used to drive

18  an older minivan.  Did you see whether he, in fact, had gotten

19  a new vehicle at a later date?

20  A    When I drove by the house, because I lived closed by, I

21  did drive by and I did see a different car.

22  Q    And could you describe that car?  Do you know what kind

23  of car it was?

24  A    It was like a bigger car, a newer car.  I don't know the

25  brand exactly because I don't know much about cars.  But I

```
 1   know it was a different car.

 2   Q     Was it a truck, a car or an SUV?

 3   A     It was an SUV.

 4   Q     Do you remember if it was a light color or a dark color?

 5   A     It was a dark color, like a black.

 6   Q     Did it appear to be a new vehicle or an older vehicle?

 7   A     It was newer.  Newer than his other car, uh-huh.

 8          MS. FREEMAN:  We have no further questions for this

 9   witness.

10          THE COURT:  Your witness.

11                     CROSS EXAMINATION

12   BY THE DEFENDANT:

13   Q     Good afternoon.  Ms. Nguyen, you stated that you saw a

14   tax return of 20 million; is that accurate?

15   A     I don't recall exactly what line it was.  I just remember

16   that number because it was a large number.

17   Q     20 million?  Did you see 20 million?  Did you see

18   2 million?  Did you see 1?  Because 20 million --

19   A     It was more than 20 million.  That's what I said, uh-huh.

20   Q     So you saw a return for 20 million?

21   A     More than 20 million.

22   Q     And you also mentioned that in regards to wife and

23   children, did you ever see a wife and children?

24   A     I don't recall.

25   Q     Was there ever a contract for this particular property, a
```

```
 1    contract for --

 2    A    Rental contract?

 3    Q    A contract to purchase?  Was there ever a contract for

 4    this particular property that signified some type of amount

 5    that was owed or due to you, a contract?

 6    A    There was a lease contract, yes.

 7    Q    There was a lease agreement.  But you also mentioned that

 8    you sold the property, correct?

 9    A    Yes.

10    Q    So was there a contract to purchase the property at some

11    point?

12    A    It was a purchase and sale contract.

13    Q    So there was a contract.  And that contract signified

14    that there was an amount of money owed to you, correct, or am

15    I incorrect?

16    A    No, no money was owed, no.

17    Q    Well, for the contract?  You mentioned that there was a

18    contract?

19    A    Yes.

20    Q    So what was the amount of money that you were requesting

21    in the contract?

22    A    The amount requesting in the contract?

23    Q    Yes.  What was the amount that you were requesting to

24    sell the property for?

25    A    I don't recall that.
```

```
 1   Q    But you mentioned that you sold the property for 650,000?
 2   A    Yes.
 3   Q    So was that the amount that you was requesting or you
 4   don't remember the amount you were requesting?
 5   A    I don't recall the amount that was requested.
 6   Q    But you do recall that there was a contract?
 7   A    Yes.
 8   Q    So if there was a contract that means that -- if there
 9   was a contract and you stated that you was asking $650,000,
10   does that signify that there was debt owed to you, there was
11   money owed to you?  That there was money you needed to receive
12   or collect for the sale of the property or to sell the
13   property?
14   A    There was no money owed once again.
15   Q    But you're stating there was a contract?
16   A    Correct.
17   Q    So in order for you to be paid or compensated -- I think
18   there might be a slight barrier.  So I do apologize.
19   A    Okay.
20   Q    You stated that there was 650,000 cash paid to you.  Was
21   there 650,000 cash paid to you or was there an alternative
22   form of payment that was actually paid to a third party?
23   A    I don't recall.
24   Q    So was the 650,000 paid directly to you from me or was it
25   paid to you from someone else?  Who paid you the $650,000?
```

```
1    A    It was you.

2    Q    I gave you $650,000 or did someone else give you the

3    $650,000?  Did I hand you -- you said money orders.  Did I

4    hand you money orders?

5    A    Yes.

6    Q    For $650,000 -- or were the money orders deposited to

7    someone who held the actual money orders and that particular

8    individual or the attorney paid you?

9    A     Oh, oh, oh.  I see what you mean.  So yes, you

10   transferred the money to the attorney, closing attorney, who

11   handed it to us.

12   Q    So basically I didn't pay you $650,000 cash as you

13   stated?

14   A    Yes.  When the lady asked me that normally, I understand

15   as the buyer who paid the amount to me.  Yes, it was conducted

16   at the closing.  So obviously the closing attorney directly

17   transferred the money to me.

18   Q    And you also signified again that there was a -- you

19   specified that there was a contract.  There was a contract

20   that you was asking.

21   A    Okay.

22   Q    So if there was a contract that means that there was

23   money owed.  That 650,000 was identified in this contract to

24   be paid, that needed to be made $650,000.  So there was a debt

25   obligation that needed to be settled at some point.  Am I
```

```
 1   correct or am I incorrect?

 2   A    Yes.

 3   Q    So 650,000 of debt needed to be settled?

 4   A    I wouldn't say that's debt because that is just the

 5   agreed price.

 6   Q    That is the agreed price?

 7   A    But it wasn't due until closing.  So until closing that

 8   is what was due.  That is not a debt.

 9   Q    So someone was indebted to pay the $650,000, whether it

10   was me, whether it was a trust, whether it was a corporation?

11   Someone was required to pay the $650,000 that you were

12   requesting for the property?

13   A    Yes.

14   Q    So again that signifies that there was debt that was

15   owed?

16   A    If you look at it that way that could be a debt.  But

17   it's not a debt because it's just a promise to say to pay the

18   price.

19             THE DEFENDANT:  Okay.  I think that -- one second.

20   BY THE DEFENDANT:

21   Q    And the purchaser, the purchaser of property or the

22   purchaser of the house, was the purchaser me or was the

23   purchaser another entity or organization?  Was it me directly

24   the purchaser on the contract?  Was I on the contract as the

25   actual purchaser, as the actual buyer?
```

```
1   A    I don't recall exactly on the contract.

2            THE DEFENDANT:  Thank you.  And that is specified in

3   regards to the purchase and sale agreement.  The original

4   contract, which is not provided here, in which if I'm able to

5   say it, the original contract was delivered to the Secretary

6   of Treasury to discharge and settle the debt.

7            Thank you, Ms. Nguyen.

8            THE COURT:  Redirect.

9            MS. FREEMAN:  Yes, Your Honor, just briefly.

10                      REDIRECT EXAMINATION

11           MS. FREEMAN:  Mr. Quintero, can you please pull up

12   Government Exhibit 2, page 028937.  And can you zoom in on

13   blocks E and F specifically towards the top of that document.

14   BY MS. FREEMAN:

15  Q    Ms. Nguyen, when you say you received cash as part of the

16  purchase and sale of this property, does that mean that there

17  was no mortgage, but it was essentially what is known in real

18  estate terms as a cash offer?

19  A    Yes, ma'am.

20  Q    And does that mean you were paid all at once as opposed

21  to being paid through a bank or some other lender?

22  A    Yes, ma'am.

23  Q    Does that mean that there was, in fact, no mortgage on

24  this property?  That it was just bought outright?

25  A    Yes.
```

```
1    Q    And, to be clear, the person who was present at the

2    closing who signed this contract with you, who was that?

3    A    Mr. Marquet Mattox.

4    Q    And that's the Defendant in this courtroom?

5    A    Yes.

6              MS. FREEMAN:  No further questions.

7              THE COURT:  Recross?

8                        RECROSS EXAMINATION

9    BY THE DEFENDANT:

10   Q    Ms. Nguyen, you mentioned that there was a lease

11   agreement in place for this particular property, correct?

12   A    Yes.

13   Q    Do you remember the dates for the lease agreement?

14   A    I do not recall exactly what dates.

15   Q    And was that lease agreement a lease agreement or was

16   that a lease/sales purchase agreement?

17   A    It was just a lease agreement.

18   Q    And at some point there was a purchase agreement that was

19   actually structured?

20   A    Correct.

21   Q    So when you signed the actual contract to actually sell

22   the property, did you actually sell the property same day?

23   The same day you signed the contract did you close, did you

24   sale on the exact same day?

25   A    No.
```

```
1    Q    So was there a time, was there a week, was there a month,

2    were there several months between the time you signed the

3    contract and the date that you actually sold the property?

4    A    Yes.

5    Q    So that would signify that --

6              THE DEFENDANT:  There was enough time to actually

7    deliver the contract to the Treasury to settle the debt with

8    the funds already on deposit, Your Honor.  Thank you.

9              THE COURT:  Call your next witness.  Can we excuse

10   this witness?

11             MS. FREEMAN:  Your Honor, the government is fine

12   with her being excused.

13             THE COURT:  All right.  Thank you.

14             MS. KRAFT:  The government calls Renée McClain.

15             COURTROOM DEPUTY:  Do you swear that your testimony

16   will be the truth, the whole truth, and nothing but the truth,

17   so help you God?

18             THE WITNESS:  Yes, I do.

19             COURTROOM DEPUTY:  Please state and spell both your

20   first and last name for the record.

21             THE WITNESS:  My name is Renee McClain.  It's

22   R-E-N-E-E, M-C-C-L-A-I-N (spelling).

23                       RENEE MCCLAIN

24             Whereupon, witness having been duly sworn,

25                       testified as follows:
```

```
 1                      DIRECT EXAMINATION
 2   BY MS. KRAFT:
 3   Q    Thank you, Ms. McClain.  Where are you currently
 4   employed?
 5   A    I am currently employed at the Internal Revenue Service.
 6   Q    Is that an agency of the United States government?
 7   A    Yes, it is.
 8   Q    What is your current job title?
 9   A    My current job title is court witness coordinator.
10   Q    What are the duties and responsibilities of a court
11   witness coordinator?
12   A    So as a court witness coordinator I represent the
13   Commissioner of IRS and I -- as a custodian of records.
14   Q    How long have you been employed by the IRS?
15   A    A little over 10 years.
16   Q    And how long have you been in your current job title as
17   court witness coordinator?
18   A    A little over a year.
19   Q    Based on your training and experience, are you familiar
20   with how the IRS compiles and maintains the various records
21   that it receives?
22   A    Yes, I am.
23           MS. KRAFT:  Your Honor, may I approach witness?
24           THE COURT:  Uh-huh.
25           MS. KRAFT:  I'm now going to hand you what has been
```

1    pre-marked as Exhibit 3-1 through 3-88 which have been

2    previously provided to the Defendant and they are in binder

3    two of three.

4    BY MS. KRAFT:

5    Q    Ms. McClain, before coming to court today were you asked

6    to review these documents?

7    A    Yes, I was.

8    Q    Are exhibits 3-1 through 3-32 tax returns filed with the

9    IRS?

10   A    Yes.

11   Q    Are exhibits 3-33 through 3-69 account transcripts

12   maintained by the IRS?

13   A    Yes, it is.

14   Q    Are exhibits 3-70 through 3-84 printouts from IRS

15   computer databases?

16   A    Yes, it is.

17   Q    And are exhibits 3-85 through 3-88 refund checks issued

18   by the IRS?

19   A    Yes, it is.

20   Q    Are these records made and kept in the regular course of

21   the IRS's business activity?

22   A    Yes.

23   Q    Are the records made and stored by the IRS at or near the

24   time they were filed by the taxpayer or action was taken by

25   the IRS?

```
 1   A    Yes.

 2   Q    Is it the regular practice of the IRS to maintain these

 3   records?

 4   A    Yes, it is.

 5   Q    Do each of these exhibits that I've handed you have a

 6   blue cover sheet attached?

 7   A    Yes, it does.

 8   Q    Could you explain for the jury what the significance is

 9   of that?

10   A    So we call these a blue ribbon.  It symbolizes that it

11   was certified by me and a supervisor.

12   Q    I want to refer specifically to Exhibit 3-35 and 3-43,

13   which are two account transcripts.

14   A    Okay.

15   Q    3-35, as well as 3-43.

16   A    Okay.

17   Q    Did you have an opportunity to look at these documents

18   before coming to court today?

19   A    Yes, I did.

20   Q    And these have blue sheets attached, but have some

21   redactions; is that right?

22   A    That is true.

23   Q    Did you have an opportunity to compare these exhibits to

24   unredacted documents?

25   A    Yes, I did.
```

```
1   Q    Other than the redactions, are they true and accurate

2   copies of IRS's records?

3   A    Yes, they are.

4   Q    And are all of the other exhibits I've handed you true

5   and accurate copies of records maintained by the IRS?

6   A    Yes, they are.

7        MS. KRAFT:  Your Honor, the Government now moves to

8   admit Government's Exhibits 3-1 through 3-88.

9        THE COURT:  I think they are admitted for purposes

10  of authentication.  I don't know what the relevance is, you

11  haven't told me that.

12       MS. KRAFT:  Your Honor, I could proffer the

13  relevance at this time if you would prefer?

14       THE COURT:  That's fine.

15       MS. KRAFT:  So 3-1 through 3-32 are tax returns

16  filed for various trusts that make up what is alleged in the

17  Indictment as the scheme to defraud.  The Exhibits 3-33

18  through 3-69 are account transcripts.  This is a record of the

19  IRS receiving returns as well as actions taken by the IRS in

20  response to them.  It would show if a refund was issued and if

21  a return was received.  Those account transcripts are both for

22  the trusts that are the returns, as well as for Mr. Mattox

23  personally from tax years 2003 to 2020 for him personally.

24       Exhibits 3-70 through 3-85 are printouts from IRS

25  computer databases.  Those printouts show whether payments
```

1    were received by the IRS for the trusts as well as for

2    Mr. Mattox personally.

3              And then 3-85 through 3-88 are the four refund

4    checks issued by the IRS for the returns that are 3-1 through

5    3-32 that make up the scheme to defraud.

6              THE COURT:  Do you have any objection?

7              THE DEFENDANT:  I have questions for Ms. McClain?

8              THE COURT:  Well, I'll give you the opportunity to

9    cross examine her.

10             All right.  Does that have to do with the --

11             THE DEFENDANT:  I don't have any objections at this

12   point.  I apologize, Your Honor.

13             THE COURT:  Then they are admitted.

14                   (Government's Exhibit # 3-1 through 3-88

15                    admitted.)

16             THE COURT:  Go ahead.

17             MS. KRAFT:  Thank you, Your Honor.

18   BY MS. KRAFT:

19   Q    Ms. McClain, I want to start by having you explain a

20   little bit to the jury about tax return processing.  In what

21   forms did the IRS receive tax returns?

22   A    So the IRS receives tax returns as a paper return in the

23   mail or by electronics.

24   Q    If a taxpayer filed the tax return electronically where

25   does it go first?

1  A    So it is transmitted to the Martinsburg West Computing

2  Center which is located in West Virginia and if that is down

3  it will go to Memphis, Tennessee.

4  Q    So when a tax return is filed electronically from the

5  State of Georgia does it necessarily have to leave the state?

6  A    Yes, it would.

7  Q    And does that mean that Federal Tax Returns filed

8  electronically from the State of Georgia travel in interstate

9  commerce?

10  A    Yes, it does.

11  Q    What happens to a tax return once it's received by the

12  IRS?

13  A    So, if it's received electronically it would receive a

14  DLN number which we call a Document Locator Number.

15  Q    And what is a Document Locator Number?

16  A    So, a Document Locator Number is almost like a serial

17  number, each tax return receives one.

18  Q    Is that how the IRS keeps track of specific tax returns?

19  A    Yes, that is true.

20  Q    And after a return receives a Document Locator Number

21  what happens next?

22  A    So there is minor check for any math errors.  And if

23  there are no errors and it's a refund requested, a refund

24  would be issued or if there is a balance due a notice would be

25  sent to the taxpayer.

1   Q     And, when you say math errors, what do you mean?

2   A     Just like a calculation error.

3   Q     At that time is the IRS auditing the tax return?

4   A     No, they are not.

5   Q     So what does the IRS rely on when generating a refund or

6   a tax bill?

7   A     So the tax system is a trust based systems.  So the IRS

8   relies on the taxpayer to be true and honest.

9   Q     Let's walk through an example so you can help familiarize

10  the jury with the various sections of a tax return?

11  A     Okay.

12        MS. KRAFT:  Your Honor, at this time we'd ask that

13  Government's Exhibit 3-6, which was previously admitted, be

14  published to the jury.

15        Mr. Quintero, if we could turn to the next page,

16  page 29217.

17  BY MS. KRAFT:

18  Q     Ms. McClain, what is this document?

19  A     This is a Form 1041 which is a US Income Tax Return for

20  Estates and Trusts for 2015.

21  Q     Let's talk a little bit about how the IRS knows who and

22  where a tax return comes from.  Can you tell from this tax

23  form who the particular taxpayer is?

24  A     It's Burgess Mattox Bey Investment Trust.

25        MS. KRAFT:  And if we could zoom in on the top half

1    of this return.  Thank you.

2    BY MS. KRAFT:

3    Q    And then do you see next to the name of the taxpayer

4    where it says "Employer Identification Number"?

5    A    Yes, I do.

6    Q    What is that?

7    A    So an "Employer Identification Number" is a number issued

8    by IRS.  And we also call it an EIN number.

9    Q    Is that number unique to the entity?

10   A    Yes, it is.

11   Q    How would a trust get an EIN?

12   A    So a trust would have to apply through IRS to receive

13   that.

14   Q    When a trust applies what verification does the IRS do

15   into the validity of the trust before issuing an EIN?

16   A    None.

17   Q    And what tax year is this return for?

18   A    This is for 2015.

19          MS. KRAFT:  If we can zoom back out and then zoom

20   just to the number at the upper right-hand corner.

21   BY MS. KRAFT:

22   Q    Ms. McClain, what is the significance of this number?

23   A    So that is a DLN, a Document Locator Number.  It is

24   almost like a serial number.  Each tax returns receives a DLN.

25          MS. KRAFT:  Mr. Quintero, if we could go to

1   page 29224 of this exhibit.

2   BY MS. KRAFT:

3   Q    Ms. McClain, what is this?

4   A    This is a return tree summary.

5   Q    And what sort of information is captured on a return tree

6   summary?

7   A    So it captures like the IRS received date, the IP

8   address, the tax year, the names of the taxpayer.

9         MS. KRAFT:  Mr. Quintero, if we could zoom in on the

10  text a little bit.  Thank you.

11  BY MS. KRAFT:

12  Q    Ms. McClain, you mentioned the received date.  What day

13  did the IRS receive this return?

14  A    September 22nd, 2016.

15  Q    And where can you see that?

16  A    It is located right here.  (Pointing to document)

17  Q    I believe you also mentioned that the IRS captures IP

18  addresses?

19  A    Yes, that's correct.

20  Q    What IP address did the IRS capture here?

21  A    24.181.4.255.

22  Q    Can you indicate that on your screen as well?

23  A    Right here. (Pointing on document)

24  Q    Why does the IRS capture IP addresses?

25  A    It tells them where the information is being transmitted

1    from.

2    Q    Ms. McClain, does the IRS require tax returns to be

3    signed before filing?

4    A    Yes, they do.

5         MS. KRAFT:  Mr. Quintero, if we could turn to the

6    next page, page 29225.

7    BY MS. KRAFT:

8    Q    Ms. McClain, what is this document?

9    A    This is a Form 8453-FE, which is a U.S. Estate or Trust

10   Declaration for IRS e-file Return for 2015.

11   Q    And in layman terms, what does that mean?

12   A    It's a signature form.  It gives the IRS permission to

13   process the tax return.

14   Q    Who has to sign a Trust's tax return?

15   A    The fiduciary signs it.

16   Q    And what is a fiduciary?

17   A    It is a person that is taking legal responsibility for a

18   business or for a trust.

19   Q    Who is listed as the fiduciary on this return?

20   A    Asim El Bey.

21   Q    Does the IRS require any identifiers beyond the name of

22   the fiduciary on a return?

23   A    No, they do not.

24   Q    So, we've talked a little bit about how the IRS knows

25   where this tax return came from.  But let's talk a little bit

1    about what was claimed on it.

2             MS. KRAFT:  Mr. Quintero, if you could pull up

3    page 29218 of the return.  And if we can zoom in on the text.

4    BY MS. KRAFT:

5    Q    Ms. McClain, did the Trust claim that it was owed a

6    refund?

7    A    Yes, it did.

8    Q    Where do you see that?

9    A    On line 29 here.

10   Q    And how much did the Trust claim as a refund?

11   A    323,848.

12   Q    When should a taxpayer claim a refund?

13   A    When there are no taxes due and there is an overpayment,

14   the taxpayer usually claims a refund.

15   Q    Did this Trust claim to have already paid over money to

16   the IRS?

17   A    Yes, they did.

18   Q    Where do you see that?

19   A    Here on line 24e.

20   Q    And what kind of payment was that?

21   A    Federal income tax withheld.

22   Q    What are Federal income tax withholdings?

23   A    So those are the taxes -- it's income held or taxes that

24   was withheld from the income that is supposed to be applied to

25   taxes that are due at the end of the year.

1   Q     And how much did this Trust declare as Federal income tax

2   withholding?

3   A     2,440,000.

4   Q     And is that then carried down onto line 25 under total

5   payments?

6   A     Yes, it is.

7           MS. KRAFT:  We can take down this display.

8   BY MS. KRAFT:

9   Q     Ms. McClain, had the Burgess Mattox Bey Investment Trust

10  made any payments to the IRS?

11  A     No, they did not.

12  Q     How do you know?

13  A     During my research I looked to see if any payments were

14  made and no payments were made.

15          MS. KRAFT:  Your Honor, we ask that what's been

16  admitted as Government's Exhibit 3-72 be published to the

17  jury.

18          THE COURT:  Have I admitted that?

19          MS. KRAFT:  Yes.

20          THE COURT:  Okay.  Go ahead.

21  BY MS. KRAFT:

22  Q     Ms. McClain, what is this documents?

23  A     This is the blue-ribbon for the BMFOLP.

24  Q     And what is a BMFOLP?

25  A     So a BMFOLP is an IRS print that shows any payments that

1    were made to IRS or a business.

2    Q    And what entity is this for?

3    A    This is for Burgess Mattox Bey Investment TR, which is

4    for Trusts.

5    Q    And for what tax years?

6    A    This is for 2015 through 2016?

7         MS. KRAFT:  Mr. Quintero, if we could turn to the

8    next page.

9    BY MS. KRAFT:

10   Q    Ms. McClain, what does this document show?

11   A    It shows that no payments were made for this entity.

12        MS. KRAFT:  We can take this document down.

13   BY MS. KRAFT:

14   Q    Ms. McClain, did you check to see if anyone else had

15   claimed to make any payments to the IRS on behalf of the

16   Trust?

17   A    Yes, I did.

18   Q    And did you find that anyone had, in fact, made any

19   payments to the IRS?

20   A    I found no payments, no.

21   Q    So when the Burgess Mattox Bey Investment Trust claimed

22   on its return that it had withholdings paid over to the IRS,

23   was that true or false?

24   A    It was false.

25   Q    Was the Trust, in fact, owed a refund?

```
 1   A     No, they were not.

 2   Q     Despite this, did the IRS issue a refund?

 3   A     Yes, they did.

 4   Q     So even though the withholdings were false why did the

 5   IRS issue a refund?

 6   A     Because IRS relies on the taxpayer to be true and

 7   honest and when a refund is requested they believed that it

 8   was due.

 9   Q     Does the IRS verify that it has received payments before

10   issuing refunds?

11   A     No, they do not.

12   Q     Why not?

13   A     It would be impossible to verify all the information.

14         MS. KRAFT:  Your Honor, may I have permission to

15   publish Government's Exhibit 3-35 which has been admitted.

16         THE COURT:  Go ahead.  Is this a new incident, a new

17   part of the indictment?

18         MS. KRAFT:  Sorry, I --

19         THE COURT:  Are we moving to something new or is

20   this a continuation of this line of direct examination?

21         MS. KRAFT:  It's a continuation of this line of

22   direct examination.

23         THE COURT:  Go ahead.  We're going to take a break

24   when you finish with this.

25         MS. KRAFT:  Okay.
```

```
 1              THE COURT:  We'll let the jury go back there.
 2              MS. KRAFT:  Mr. Quintero, if we could turn to
 3   page 29321.
 4   BY MS. KRAFT:
 5   Q    Ms. McClain, what is this?
 6   A    This is an Account Transcript for 2015.
 7   Q    And for what entity?
 8   A    This is for Burgess Mattox Bey Investment TR, which is
 9   for Trust.
10   Q    What kind of information does an Account Transcript show?
11   A    So the Account Transcription shows information from the
12   tax return and it also shows any actions that were taken on
13   the account.
14              MS. KRAFT:  So if we can go to the next page,
15   Mr. Quintero and zoom in on the two lines at the top dated
16   11/14/2016.
17   BY MS. KRAFT:
18   Q    Ms. McClain, from this document, can you see whether the
19   IRS issued a refund to Burgess Mattox Bey Investment Trust?
20   A    Yes, they did.
21   Q    And what amount was that refund issued?
22   A    325,408.97.
23   Q    And do you see the line right above that?
24   A    Yes, I do.
25   Q    What does that indicate?
```

1  A    That interest was paid on the refund.

2  Q    When does the IRS owe a taxpayer interest?

3  A    So any time that you're due a refund and there is a delay

4  on the IRS end and the delay is over 45 days you will be paid

5  interest.

6        MS. KRAFT:  Your Honor, may we have permission to

7  publish Government's Exhibit 3-86, which has been admitted?

8        THE COURT:  Yes.

9        MS. KRAFT:  And Mr. Quintero, if you could pull up

10 Exhibit 3-86 page 29871.

11 BY MS. KRAFT:

12 Q    What is this, Ms. McClain?

13 A    This is a copy of a refund check issued by IRS.

14 Q    Is this check drawn on the United States Treasury?

15 A    Yes, it is.

16 Q    Is that an agency of the United States government?

17 A    Yes, it is.

18 Q    And what amount is this refund check?

19 A    325,408.97.

20 Q    Where did the IRS send this refund check?

21 A    2625 Piedmont Road Northeast S-T-E (spelling) Street,

22 Atlanta, Georgia 30324.

23 Q    And why that address?

24 A    That would be the address that's listed on the tax

25 return.

1          MS. KRAFT:  We can take that display down.

2          Your Honor, that completes this line of questioning.

3    I have additional questions for this witness.

4          THE COURT:  Okay.  Well, we're going to take a 15

5    minute break now.

6          So, go on back and relax, please, jurors.  Thank you

7    for your attention.  And we'll come back in about 15 minutes.

8          Are you going to be able to finish with this witness

9    today, you think?

10          MS. KRAFT:  I'm sorry.  I couldn't hear you,

11   Your Honor.

12          THE COURT:  Will you be able to finish with this

13   witness today?

14          MS. KRAFT:  Yes, Your Honor.

15          THE COURT:  Okay.  Thank you.

16     (Jurors exit courtroom 3:24 p.m.)

17          THE COURT:  Do you have another witness for this

18   afternoon after this witness?

19          MS. FREEMAN:  Yes, Your Honor.  We have a few more

20   witnesses.  The witness after this one is a shorter one,

21   probably about 15 minutes.

22          THE COURT:  Okay.  I'm not telling you the order in

23   which you need to call your witnesses, but it would be nice if

24   we can fit it in around 5:00.  So you can figure that in.

25          I assume that some of these witnesses are here for

```
 1    the week or close to that.
 2              So, okay, very good.  Thank you.
 3              MS. KRAFT:  Thank you, Your Honor.
 4              CSO OFFICER:  All rise.
 5       (Recess at 3:25 p.m.)
 6       (Resume at 3:30 p.m.)
 7              CSO OFFICER:  All rise.
 8              THE COURT:  Bring them in.
 9       (Jurors enter courtroom 3:41 p.m.)
10              THE COURT:  You may proceed.
11              MS. KRAFT:  Thank you, Your Honor.
12                   CONTINUED DIRECT EXAMINATION
13    BY MS. KRAFT:
14    Q    Ms. McClain, before we took a break we were walking
15    through one tax return for the Burgess Mattox Bey Investment
16    Trust for 2015; is that correct?
17    A    Yes.
18    Q    And did the Burgess Mattox Bey Investment Trust later
19    file another return for that same tax year?
20    A    Yes, they did.
21              MS. KRAFT:  Your Honor, we would ask for permission
22    to publish what's previously been admitted as Government's
23    Exhibit 3-7.
24              THE COURT:  Go ahead.
25              MS. KRAFT:  Mr. Quintero, if you could pull up 3-7
```

1   page 29197.  If we could zoom in the top portion of this.

2   BY MS. KRAFT:

3   Q    Ms. McClain, is this a tax return for the same entity

4   that we were just discussing, the Burgess Mattox Bey

5   Investment Trust?

6   A    Yes, it is.

7   Q    And is it an amended return?

8   A    Yes, it is.

9   Q    How can you tell?

10  A    The box for amended return is checked here.

11  Q    What, if anything, is a taxpayer required to do when

12  filing an amended Form 1041?

13  A    The taxpayer is required to check the box and also attach

14  a sheet explaining the changes that are being requested to be

15  made.

16        MS. KRAFT:  If we could zoom back out, Mr. Quintero.

17  BY MS. KRAFT:

18  Q    Was this tax return filed electronically or by paper?

19  A    This was filed by paper.

20  Q    How can you tell?

21  A    It has a received date stamped on it.

22        MS. KRAFT:  Mr. Quintero, if we could zoom in on

23  that stamp in the middle of the page.

24  BY MS. KRAFT:

25  Q    Ms. McClain, when was this tax return received by the

1    IRS?

2    A    November 7th, 2017.

3    Q    And you mentioned that the taxpayer would need to provide

4    an explanation of what changes were made.

5            MS. KRAFT:  Mr. Quintero, if we could turn to

6    page 29202.  And if we could zoom in on the text.

7    BY MS. KRAFT:

8    Q    Ms. McClain, what change did the Trust make on this

9    amended tax return?

10   A    The Federal Income taxes withheld was increased and the

11   refund amount requested was increased.

12   Q    How much did the Trust now report in Federal Income tax

13   withholdings?

14   A    4,881,000.

15   Q    And did this Trust have any Federal Income tax

16   withholdings that year?

17   A    No, they did not.

18   Q    Despite this, did the IRS issue another refund to the

19   Burgess Mattox Bey Investment Trust?

20   A    Yes, they did.

21           MS. KRAFT:  Your Honor, may we have permission to

22   publish Government's Exhibit 3-87.

23           THE COURT:  Okay.

24           MS. KRAFT:  Mr. Quintero, if you could pull up 3-87

25   page 29949.

```
1    ///

2    BY MS. KRAFT:

3    Q    What is this, Ms. McClain?

4    A    This is a copy of the IRS refund check.

5    Q    And in what amount?

6    A    This is for --

7         MS. KRAFT:  Mr. Quintero, if we could zoom in on the

8    number.

9    BY MS. KRAFT:

10   A    THE WITNESS:  2,571,783.77.

11   Q    If the IRS had known that the Trust did not have any

12   Federal Income tax withholdings would it have issued this

13   refund?

14   A    No, it would not have.

15   Q    So why did the IRS issue the refund?

16   A    Again, the IRS relied on the taxpayer to tell the truth.

17   They trusted the taxpayer.

18        MS. KRAFT:  We can take the displays down.

19   BY MS. KRAFT:

20   Q    Now that we have talked through a couple of the tax

21   returns I would like to talk about the others a little bit

22   more generally with you.

23        MS. KRAFT:  Ms. Paul, if we can change the display

24   to be just counsel and witness.

25        THE COURT:  I'm sorry.  I didn't understand that.
```

1          MS. KRAFT:  Just showing an electronic version of an

2     exhibit, what's been marked, just to the counsel and the

3     witness, Your Honor, at this time.  It has not been admitted

4     yet.

5          THE COURT:  I see.  Okay.

6          MS. KRAFT:  Mr. Quintero, if you could pull up

7     what's been marked for identification as Government's

8     Exhibit 4-1.

9     BY MS. KRAFT:

10    Q    Can you see that, Ms. McClain?

11    A    Yes, I can.

12    Q    And is this a spreadsheet summarizing tax returns and IRS

13    data?

14    A    Yes, it is.

15    Q    Before coming to court today had you seen this

16    spreadsheet?

17    A    Yes, I had.

18    Q    Did you have chance to review its contents?

19    A    Yes, I did.

20    Q    Did you compare its contents with original files

21    maintained by the IRS?

22    A    Yes, I did.

23    Q    Is this spreadsheet a fair and accurate summary of the

24    underlying files?

25    A    Yes, it is.

 1          MS. KRAFT:  Your Honor, at this time, the Government

 2   moves to admit what's been marked for identification as

 3   Government's Exhibit 4-1 into evidence under Federal Rule of

 4   Evidence 1006?

 5          THE COURT:  Do you have any objections?

 6          THE DEFENDANT:  I can barely see it.

 7          MS. KRAFT:  There is a second page as well.  It's in

 8   your binder, Mr. Mattox.

 9          THE DEFENDANT:  It's where in the binder?

10          MS. KRAFT:  It's in binder 1 of 3, under Tab 4.

11          THE DEFENDANT:  Okay.

12          THE COURT:  It's admitted.

13               (Government's Exhibit # 4-1 admitted.)

14          MS. KRAFT:  Thank you, Your Honor.  And may I have

15   permission to publish it to the jury?

16          THE COURT:  Yes, but first let me tell the jury.

17          Ladies and gentlemen -- well, actually go ahead and

18   put it up there.

19          Ladies and gentlemen, you're going to see that this

20   document is called a summary, and you heard the witness

21   testify that the summary was made up of a review of underlying

22   documents.  The underlying documents are the evidence in this

23   case, not the summary.  And so you get to decide how much

24   weight to give to the summary.

25          So, I'm admitting that into evidence with that

```
 1   proviso for you to understand that.

 2           Go ahead.

 3           MS. KRAFT:  Thank you, Your Honor.

 4   BY MS. KRAFT:

 5   Q    Ms. McClain, let's walk through this spreadsheet.  Do the

 6   rows in the spreadsheet represent different tax returns?

 7   A    Yes, they do.

 8   Q    And can you walk the jury through the columns of this

 9   spreadsheet?

10   A    So it lists the dates that the tax returns was received

11   by IRS, the tax years.  It also lists the entities.  The last

12   four of the DLN which is the Document Locator Number.  The IP

13   address if it was electronic.  If it was mailed it is listed

14   as mailed.  The total income that was claimed on the tax

15   return.  The total payments that was claimed on the return.

16   Any payments that was received by IRS.  The refunds that was

17   claimed on the return and also any refunds that was issued.

18   Q    Let's focus on the column called "Payments Received by

19   IRS."  Did any of these Trusts make any payments to the IRS?

20   A    No, they did not.

21   Q    Did anyone else make any payments on behalf of these

22   Trusts to the IRS?

23   A    No, they did not.

24   Q    So when these Trusts claimed to have already paid money

25   for their taxes on their tax returns was that true or false?
```

```
1   A    It was false.
2           MS. KRAFT:  If we can turn to the second page of
3   this exhibit, Mr. Quintero.
4   BY MS. KRAFT:
5   Q    Ms. McClain, what was the total amount of refunds claimed
6   on these returns?
7   A    The total amount claimed was $165,212,271.
8   Q    And out of that $165,000,000 in refunds claimed how much
9   did the IRS actually pay out?
10  A    5,013,892.32.
11          MS. KRAFT:  If we can take the display down.  And
12  Ms. Paul, again, I have something to show only to the witness
13  and counsel.
14  BY MS. KRAFT:
15  Q    Ms. McClain, let's talk about a subset of these returns
16  pertaining to the specific charges in this case.
17          MS. KRAFT:  Mr. Quintero, if you could pull up
18  what's been marked for identification as Exhibit 4-2, which is
19  a demonstrative aid.  It has been provided to the Defendant in
20  his trial binder as well.
21  BY MS. KRAFT:
22  Q    Ms. McClain, is this a subset of the information in
23  Exhibit 4-1 that we were just looking at?
24  A    Yes, it is.
25  Q    And do you believe that it would be helpful for you in
```

1  your testimony today?

2  A    Yes, I do.

3       MS. KRAFT:  Your Honor, may we have permission to

4  publish this to the jury as a demonstrative exhibit?

5       THE COURT:  I'm just a little bit confused here.  Is

6  this something different?  Is this something different from

7  the summary you just submitted; is that right?

8       MS. KRAFT:  It is a subset of the rows on there.

9  There is an additional column on the left.

10       THE COURT:  Well, subset is what I'm not

11  understanding.

12       MS. KRAFT:  Okay.  So the information in the columns

13  after the first column are the same information contained in

14  Exhibit 4-1.  It is not every return that was listed in 4-1,

15  only the returns that were specifically charged in the

16  Indictment.

17       THE COURT:  Do you have an objection to this

18  summary?

19       THE DEFENDANT:  I do not have an objection,

20  Your Honor.

21       THE COURT:  Okay.  So it's admitted.

22              (Government's Exhibit # 4-2 admitted.)

23       THE COURT:  And what I said about the previous

24  summary goes for this summary too, all right.

25       So, go ahead.

 1          MS. KRAFT:  Thank you, Your Honor.  May we publish

 2    it to the jury?

 3          THE COURT:  Yes.

 4          MS. KRAFT:  Thank you.

 5    BY MS. KRAFT:

 6    Q    Ms. McClain, for the jurors who are following along, is

 7    the first column pointing to the Counts charged in this case?

 8    A    Yes, it is.

 9    Q    And for the other columns, did you compare that

10    information against IRS records?

11    A    Yes, I did.

12    Q    If we can start with the Burgess Mattox Bey Investment

13    Trusts.

14          MS. KRAFT:  Mr. Quintero, if you can zoom in on the

15    rows for counts 2, 11, 20, 6 and 16, and 8 and 18.

16    BY MS. KRAFT:

17    Q    Now, Ms. McClain, these first two rows that refer to

18    Counts 2, 11 and 20.  Those were the two tax returns that we

19    looked at earlier today; is that correct?

20    A    Yes, it is.

21    Q    And did Burgess Mattox Bey Investment Trust file more

22    returns?

23    A    Yes, they did.

24    Q    When?

25    A    There is another one that was received November 18, 2017.

```
 1   There is another one for August 10th, 2018.

 2   Q    How were these returns filed?

 3   A    They both were electronic.

 4   Q    And on these returns did Burgess Mattox Bey Investment

 5   Trust claim to have made payments to the IRS?

 6   A    Yes, they did.

 7   Q    And did they actually make any payments?

 8   A    No payments were made, no.

 9   Q    Did anyone else make any payments on the behalf of

10   Burgess Mattox Bey Investment Trust?

11   A    No, they did not.  No payments were made.

12        MS. KRAFT:  Mr. Quintero, if we could now zoom in on

13   the Kemahra Investment Trust, which are the four rows for

14   Counts 1, 10, 3 and 13, 7 and 17, 9 and 19.

15   BY MS. KRAFT:

16   Q    Ms. McClain, did you also review these four tax returns?

17   A    Yes, I did.

18   Q    And when were these tax returns filed?

19   A    One was filed September 10th, 2016, March 2nd, 2017.

20   There's another one for November 18th, 2017 and August

21   10th of 2018.

22   Q    How were these returns filed?

23   A    They were electronic.

24   Q    And did Kemahra Investment Trust make any payments to the

25   IRS?
```

1   A     No, they did not.

2   Q     Did anyone else make any payments to the IRS on behalf of

3   Kemahra Investment Trust?

4   A     No, they did not.

5           MS. KRAFT:  And finally if we can zoom in on the

6   last few rows for counts 12, 4 and 14, 5 and 15 for Burgess

7   Mattox Bey Trust.

8   BY MS. KRAFT:

9   Q     Ms. McClain, did you review these three tax returns?

10  A     Yes, I did.

11  Q     And when were they filed?

12  A     One was received January 13th, 2017, another for

13  September 22nd, 2017 and November 17th, 2017.

14  Q     And did Burgess Mattox Bey Trust claim to have already

15  made payments to the IRS?

16  A     Yes, they did.

17  Q     And did it, in fact, make any payments?

18  A     There were no payments made.

19  Q     Did anyone else make any payments to the IRS on behalf of

20  Burgess Mattox Bey Trust?

21  A     No.

22  Q     So for all of the Trusts that are listed in Exhibit 4-2,

23  were these Trusts entitled to the refunds that they claimed?

24  A     No, they were not.

25  Q     And did the IRS stop some of the refunds from being

```
 1   issued?

 2   A     Yes.

 3             MS. KRAFT:  We can take this display down.

 4   BY MS. KRAFT:

 5   Q     Let's talk a little bit about how that happens.  Are you

 6   familiar with the IRS's filters?

 7   A     Yes, I am.

 8   Q     And just generally what are they?

 9   A     So IRS checks the -- in this case with a trust they would

10   check the first four letters of the entities name with the EIN

11   number, which is the Employer Identification Number.

12         They will also check for some errors and if there's

13   anything that looks out of the norm they would check for that

14   too.

15   Q     And what is the IRS trying to catch with its filters?

16   A     They are trying to catch tax returns that are fraudulent.

17   Q     Does the IRS change its filters over time?

18   A     Yes, they do.

19   Q     And why would they do that?

20   A     The IRS wants to protect the taxpayer so they try to keep

21   up with the changes that are happening.

22   Q     Despite that, does the IRS catch every false return that

23   is filed?

24   A     No, it would be impossible.

25   Q     Approximately how many returns does the IRS receive every
```

1    year?

2    A     The IRS receives about 240.2 million a year.

3    Q     And does the IRS have capacity to audit every single tax

4    return?

5    A     No, they do not.

6    Q     So what does the IRS rely on in processing tax returns?

7    A     Again, the tax system is a trust based system.  So the

8    IRS is relying on the taxpayer to be honest and true.

9              MS. KRAFT:  Your Honor, we ask that what has been

10   admitted as Government's Exhibit 3-67 be published to the

11   jury.

12             THE COURT:  What is that?

13             MS. KRAFT:  It is an account transcript for an

14   entity of Kamahra Investment Trust.

15             THE COURT:  Go ahead.

16             MS. KRAFT:  Thank you.

17             Mr. Quintero, that's Exhibit 3-67.  And if we could

18   turn to page 29444.

19   BY MS. KRAFT:

20   Q     Ms. McClain, what is this?

21   A     This is an account transcript for 2016 in reference to a

22   civil penalty.

23   Q     And for what entity?

24   A     This is for Kemahra Investment TR, which is for Trust.

25   Q     And what tax year?

```
 1   A     2016.
 2              MS. KRAFT:  Mr. Quintero, if we could zoom in on the
 3   bottom portion.  That's it.  The bottom third of the exhibit.
 4   BY MS. KRAFT:
 5   Q     Ms. McClain, what does this show?
 6   A     It shows there was a penalty for a frivolous tax return.
 7   Q     And what was the date of that penalty?
 8   A     April 23rd, 2018.
 9   Q     Does the IRS describe every incorrect return as
10   frivolous?
11   A     No, they do not.
12   Q     What qualifies something as frivolous?
13   A     If it has no legal basis IRS will qualify as frivolous.
14   Q     And even after April 23rd, 2018, did the IRS receive
15   another false tax return for Kemahra Investment Trust?
16   A     Yes, they did.
17              MS. KRAFT:  No further questions.
18              THE COURT:  Your witness.
19              THE DEFENDANT:  Thank you, Your Honor.  May I
20   approach?
21              THE COURT:  Well, yeah, go ahead.
22              THE DEFENDANT:  Thank you.
23                          CROSS EXAMINATION
24   BY THE DEFENDANT:
25   Q     So Ms. McClain, is the Internal Revenue Service and the
```

```
1    Secretary of Treasury one in the same?

2    A    Yes.

3    Q    So the Secretary of Treasury's office and the IRS are the

4    same entity?  There is no difference between the two entities?

5    A    I'm going to say I don't know.  I don't know the answer

6    to that question.  I apologize.

7    Q    So is it possible that the Secretary of Treasury could be

8    different than the Internal Revenue Service?

9    A    I don't know.  It's possible, I guess.

10   Q    So you're saying there is a possibility?

11   A    Yes.

12   Q    So you're saying there's a possibility that the Secretary

13   of Treasury is different from the Internal Revenue Service?

14   A    I'm telling you I do not know.

15   Q    No, I'm asking.  You're saying there is a possibility?

16   It's just a yes or no question.  Is there a possibility?

17   A    Yes, there is a possibility.

18   Q    Thank you.  Bear with me, please.

19        So if there is a possibility then is it possible that --

20   you mentioned that you don't know if there is a -- if there is

21   a possibility, then is it possible that you wouldn't know the

22   difference between the two or between the two locations,

23   between the Secretary of Treasury and the Internal Revenue

24   Service?

25   A    I apologize.  My position requires me to know IRS
```

1   information.  With that I do not know.

2   Q    Okay.  If gifts, according to Title 31, USC 3113, to

3   provide the people of the United States with gifts -- excuse

4   me -- to provide the people of the United States with an

5   opportunity to make gifts to the United States government to

6   be used to reduce the public debt, the Secretary of Treasury

7   may accept, for the government, a gift of money made on the

8   condition that it is sold and used to reduce the public debt,

9   an obligation of the government included in the public debt

10  made only on the condition that the obligation is canceled and

11  retired and may not be reissued.

12       Intangible personal property made only on the condition

13  that the property is sold and the proceeds from the sale used

14  to produce --

15            MS. KRAFT:  Objection, Your Honor.  Is there a

16  question?

17            THE DEFENDANT:  Yes, there is a question.  I want to

18  know --

19            THE COURT:  Well, it's gotten very complicated for

20  this witness to be able to answer something like that.

21            THE DEFENDANT:  Okay.  I apologize.

22            THE COURT:  So if you can break it down that's fine.

23  I'm not telling you you can't inquire about this.

24            THE DEFENDANT:  Okay.

25            THE COURT:  But I'm not sure that she's qualified to

1    give a legal conclusion, which is what it sounds like you may

2    be doing.

3               So, I don't know.  It's unclear about what you're

4    trying to do, to the Court.

5               THE DEFENDANT:  Well, I want to know that if gifts

6    are given to the Secretary of Treasury, according to the

7    rules, if gifts are given to the Secretary of Treasury does

8    the --

9               THE COURT:  That sounds like a good question right

10   there.  Can you answer that.

11              THE WITNESS:  Could you repeat the question.

12   BY THE DEFENDANT:

13   Q    If gifts are given to the Secretary of Treasury does the

14   Internal Revenue Service -- are they privy to gifts given to

15   the Secretary of Treasury?

16   A    That I do not know.

17   Q    Bear with me, please.  In regards to the Trust that you

18   referenced on the screen, is it possible that gifts or a

19   deposit could have been made to the Secretary of Treasury and

20   the Internal Revenue Service wasn't privy to a gift that was

21   given to the Secretary of Treasury?

22   A    I researched IRS records and there were no payments made

23   for that Trust to the IRS.  I don't know if any payments were

24   made to any other agencies.

25   Q    So it's possible that a gift could have been given to the

1    Secretary of Treasury, and according to the rules that says a

2    gift can be given to the Secretary of Treasury to be used to

3    reduce the debt; and that the gift given to the Secretary of

4    Treasury shall be sold and the money or the proceeds from the

5    gift given to the Secretary of Treasury will be used.

6         So is it possible that a gift was given to the Secretary

7    of Treasury but on your end in the Internal Revenue Service

8    you wasn't privy to what took place with the Secretary of

9    Treasury?

10        THE COURT:  Let me explain something to you about

11   the Federal Rules of Evidence.  Federal Rule 401 requires

12   evidence to be relevant.  To be relevant is has to be

13   probable.  You're talking about a mere possibility here.  I'm

14   not clear about how a mere possibility is admissible.

15        THE DEFENDANT:  Your Honor, what I'm wanting to know

16   is if there is a gift given to the Secretary of Treasury is it

17   possible -- if there was a gift given to the Secretary of

18   Treasurer but she doesn't have clarity on whether or not the

19   Secretary of Treasury and the Internal Revenue Service are two

20   totally different entities, is it possible that a gift could

21   have been given to the Secretary of Treasury that she didn't

22   see or didn't have privy or knowledge to.

23        THE COURT:  And the possibility of that is not a

24   sufficient basis for that question for her to respond.  That's

25   what I'm saying, just a possibility, that's what you're

```
 1    talking about.

 2              THE DEFENDANT:  Okay.  Bear with me, please.

 3              I would like to ask this question.

 4    BY THE DEFENDANT:

 5    Q    If gifts were given to the Secretary of Treasury, who

 6    could answer the question in regards to -- and you may not

 7    have the answer to that question, but I would like to ask --

 8    who could give the answer to whether or not the Secretary of

 9    Treasury received the gifts?  If you're not able to answer the

10    question --

11              MS. KRAFT:  Objection, Your Honor, calls for

12    speculation.

13              THE COURT:  Well, she may know the answer to that.

14    It may not be speculate -- she's not authorized to speculate

15    in her answer, but I'm going to overrule the objection.  If

16    she can answer it, she can answer it.

17              THE WITNESS:  I don't know the answer to that

18    question.

19              THE COURT:  Okay.

20    BY THE DEFENDANT:

21    Q    If gifts given to the Secretary of Treasury or received

22    by the Secretary of Treasury and sold, do you know what

23    happens to the money or the proceeds from the sale of the

24    gifts?

25    A    No.  I only know IRS information.
```

1   Q    Okay.  Are you familiar with the difference between

2   tangible property and intangible property?

3   A    A little bit, yes.

4   Q    So if intangible property is given to the Secretary of

5   Treasury --

6           MS. KRAFT:  Objection, Your Honor, it calls for

7   speculation.

8           THE COURT:  And she's already told you several times

9   that she works for the IRS and she really doesn't know about

10  the Secretary of Treasury.

11          THE DEFENDANT:  My point, Your Honor, is that the

12  Secretary of Treasury and the Internal Revenue Service are two

13  totally different locations or two totally different entities.

14          THE COURT:  You're testifying now.

15          THE DEFENDANT:  Okay.  I apologize.

16          THE COURT:  You are not authorized to testify.  If

17  you have a basis for the question tell me what it is.  But in

18  order to have a witness testify a proper foundation has to be

19  laid in court and the proper foundation is the reason to

20  believe that the witness knows what the witness is talking

21  about.

22          And, so, I think that based on the cross examination

23  so far you can ask her whatever you want to about the IRS.

24  But you are saying that these are two separate entities and

25  you are asking her about something that she's already told you

1    she doesn't know about.  There may be something else you could

2    ask her about that, but I'm not clear what it would be.

3              THE DEFENDANT:  Well, with all due respect, Your

4    Honor, she mentioned that she is not sure if the two entities

5    are different or the same.  And my basis for the questions

6    were if there were gifts given, according to the rules, is it

7    possible that the gifts were given and may have been

8    overlooked or a certain department didn't have privy to the

9    gifts that were given?

10             THE COURT:  Now you've gone back to another problem.

11   Now you're asking about a mere possibility.  And so you're not

12   authorized to ask about that.  The jury has to travel on

13   probabilities.

14             THE DEFENDANT:  One second, Your Honor.

15   BY THE DEFENDANT:

16   Q    Ms. McClain, can you tell me when are entities

17   permitted -- and you could've answered this already.  When are

18   entities permitted to file a amended return?

19   A    You said when are they permitted to?

20   Q    Yes.  When are they permitted -- what are the guidelines

21   for an amended return to be submitted or completed?

22   A    Usually a taxpayer files an amended return when they are

23   asking for changes to be made.  Is that what you're asking?

24   Q    So, if there is an increase in income or if there is an

25   increase in gifts, would that be considered a change, a

1    permissible change to a return?

2    A    If a taxpayer wanted to make changes to the tax return

3    they would file an amended return.

4    Q    Well, what I'm asking is if there was an increase in

5    income for the entity -- if the entity had an increase in

6    income or if the entity had an increase of whether it was

7    discharging debt, which is considered income, or whether it

8    was giving gifts, is that permissible to then file an amended

9    return because there is an increase in income?

10   A    If those are changes that the taxpayer would like to make

11   they could file an amended return.

12   Q    To reflect the increase or gifts or the increase of

13   income for the actual Trust?

14   A    Correct.

15   Q    Bear with me, please.  Can you tell me what is the

16   definition in regards to the Internal Revenue Service for

17   income?

18   A    The monies that were received during the year could be

19   income.

20   Q    So is income only under the term of -- okay, let me ask

21   it this way.  You said money received.  In regards to the

22   Internal Revenue Service what is the definition for money

23   received?

24   A    I don't have a textbook definition for you, I'm sorry.

25   Q    Let me ask it this way.  Could a gift be considered

179

```
1   money?
2   A    I don't know.  I am a custodial record -- so I can tell
3   you what was submitted to IRS and the forms and things that we
4   had.  You're asking me tax questions that I don't really know.
5   Q    I apologize.  In regards to line 24 that was actually
6   placed on the screen.  And I don't have it over here with me.
7   But in regards to withholdings, can you tell me the Internal
8   Revenue Service definition for withholding?
9   A    So Federal Income tax withholdings are income that are
10  withheld from the income -- I mean, that is supposed to be for
11  taxes that are due at the end of the year.
12  Q    Can you repeat that one more time, please?
13  A    So it is income that is withheld for a payment for your
14  taxes.
15  Q    Income that is withheld for payment of taxes?
16  A    Yes.
17  Q    So if -- bear with me, please.
18       So if income that is withheld for the payment of taxes is
19  there a possibility an entity could actually withhold more
20  than what is actually owed or due for the taxes?
21  A    It's possible.
22  Q    And if the amount that is withheld is more than the
23  taxes, what is that considered with the Internal Revenue
24  Service?
25  A    If it is more than the taxes that are due it is
```

```
 1    considered an overpayment.

 2    Q     So that would be considered an overage?

 3    A     I'm going to call it an overpayment.  If you would like

 4    to call it --

 5    Q     Okay.

 6    A     Sorry.

 7              THE DEFENDANT:  I think that would be all the

 8    questions.  Thank you, Ms. McClain.

 9              THE COURT:  Redirect?

10              MS. KRAFT:  Yes, Your Honor.

11                        REDIRECT EXAMINATION

12    BY MS. KRAFT:

13    Q     Ms. McClain, I think you just explained that an

14    overpayment is if the holdings are more than the tax

15    liability; is that fair?

16    A     Yes.

17    Q     And you reviewed the Trust on the previous exhibits that

18    we looked at for Exhibit 4-1, the spreadsheet, correct?

19    A     Yes, I did.

20    Q     And did any of those Trusts actually have an overpayment?

21    A     No.

22    Q     And were any of them owed a refund?

23    A     No, they were not.

24    Q     You checked IRS records, correct, to see if payments had

25    been made to the IRS?
```

```
1    A    Yes, I did.

2    Q    And had any payments been made?

3    A    No.

4    Q    In terms of what had been paid to IRS to get a refund,

5    does it matter if someone else has received anything or does

6    it only matter what the IRS has received?

7    A    It only matters if IRS has received the money.

8    Q    And, again, did the IRS receive anything for any of the

9    Trusts?

10   A    No, it did not.

11        MS. KRAFT:  Nothing further.

12        THE COURT:  Recross?

13                    RECROSS EXAMINATION

14   BY THE DEFENDANT:

15   Q    In regards to the Internal Revenue Service, discharge of

16   debt or cancellation of debt, is that considered income?

17   A    Again you're asking me tax questions that I don't know.

18   Q    I'm not sure if you are able to answer this next

19   question, but I would like to ask.  Is the Secretary of

20   Treasury over the Internal Revenue Service?

21   A    I don't know.

22   Q    Bear with me, please.

23        THE DEFENDANT:  I would like to make a statement,

24   Your Honor, but I don't want it to appear as testifying.

25        MS. KRAFT:  Objection, Your Honor, testifying.
```

1              THE COURT:  You can't make a statement.  You can

2    testify if you choose to do so but you can't make a statement.

3              This is an examination -- direct and cross

4    examination.  That's what this is.

5              THE DEFENDANT:  One second, please.  I think that

6    may be all the questions for Ms. McClain.  Thank you.

7              THE COURT:  All right.  Call your next witness.  Can

8    we excuse this witness?

9              MS. KRAFT:  Yes, Your Honor, this witness may be

10   excused.

11             THE COURT:  Thank you.

12             MS. FREEMAN:  The United States calls Kevin

13   Keithley.

14             COURTROOM DEPUTY:  Do you swear that your testimony

15   will be the truth, the whole truth, and nothing but the truth,

16   so help you God?

17             THE WITNESS:  I do.

18             COURTROOM DEPUTY:  Please state and spell both your

19   first and last name for the record.

20             THE WITNESS:  Kevin Keithley.  K-E-V-I-N,

21   K-E-I-T-H-L-E-Y (spelling).

22                        KEVIN KEITHLEY

23             Whereupon, witness having been duly sworn,

24                     testified as follows:

25                      DIRECT EXAMINATION

BY MS. FREEMAN:

Q     Thank you for coming today, Mr. Keithley.  Could you please tell us where you are currently employed?

A     I am a senior manager with Charter Communications in Simpsonville, South Carolina.

Q     And what, in general, does Charter Communications do?

A     We are a communications company that provides internet service, cable service and mobile phone service.

Q     So you said you were a senior manager there.  What does your job entail on a day to day basis?

A     I am the senior manager for corporate physical security. So what I do has to do with the physical security of all of our buildings.  We have several facilities across the South region which I'm in charge of and that includes the security and safety of all our employees as well, which at times involves investigations of threats made to them or employee misconduct matters.

Q     And does your job also entail regular coordination with law enforcement?

A     Pretty much on a daily basis.  That's part of my job too is to liaison with law enforcement to coordinate different investigations that they are working on and sometimes incidents that happen to our employees we need their assistance as well.  So we coordinate that with them on pretty much a daily basis.

1    Q    Does Charter Spectrum regularly get subpoenas from law

2    enforcement for information?

3    A    Every day.  It's very routine.  In the normal course of

4    business, Charter is subpoenaed for records that we have of

5    our existing customers.

6    Q    And what kinds of things do law enforcement subpoenas

7    usually ask Charter for?

8    A    It could be a subscriber name for a particular account.

9    It could be requesting who is assigned a particular IP

10   address.  It could be the e-mails assigned to a particular

11   customer.  There are a lot of things that come into play, but

12   specifics about the particular customer are common.

13   Q    Now you mentioned something called an IP address.  Could

14   you explain, for members of the jury who may not be familiar,

15   what an IP address is?

16   A    Sure.  An IP address -- IP stands for Internet Protocol.

17   It's a unique identifier assigned to devices that access the

18   Internet.

19        So those IP addresses are required for devices to access

20   the Internet.  And basically it's a way for the Internet to

21   recognize the device so data can be transmitted back and

22   forth.

23        Very similarly to a vehicle VIN number or the address of

24   your house.  An IP address is a digital address associated to

25   a device connected to the Internet.

1    Q     And, as a course of its regular day-to-day business, are

2    the networks of Charter utilized to track and maintain these

3    IP addresses as instrumentalities in interstate commerce?

4    A     That's correct, yes.

5    Q     Do you regularly provide records of IP addresses to law

6    enforcement in order for them to figure out who sent

7    particular Internet traffic?

8    A     Very common.  After law enforcement subpoenas that

9    information and we have a -- within Charter we have a Law

10   Enforcement Response Operations Center.  They coordinate the

11   collection of the records.  They will actually search our

12   database for the records that we have that are stored

13   historically and then put together the return for that

14   particular request.

15   Q     And are you aware that Charter produced records in

16   response to a law enforcement subpoena in 2019 regarding a

17   couple IP addresses from here in the Middle District of

18   Georgia?

19   A     Yes, I am.

20           MS. FREEMAN:  Your Honor, permission to publish what

21   has been admitted as Government's Exhibit 5.

22           THE COURT:  Go ahead.

23           MS. FREEMAN:  Mr. Quintero, let's pull up Exhibit 5,

24   page 28666 and let's zoom in on the table portion of that

25   page.

1    ///

2    BY MS. FREEMAN:

3    Q    Mr. Keithley, tell us what we're looking at here?

4    A    So this is part of a return that Charter would prepare in

5    response to the subpoena.  And if you read -- going from the

6    top you have the target details.  So there are two different

7    IP addresses there, both start with 24.181.

8         The first one is on September 10th of 2016, 6:01 p.m.

9    with a -- the GNT is a universal time zone code there.

10        And then the second one is also an IP address for

11   September 22nd of '16 at 9:48 a.m.

12        So what this page really is showing is who the IP

13   addresses are assigned to within Charter records.

14        So on this particular page you will see, obviously, the

15   two IP addresses at the top and then below there, kind of in

16   the middle of the page, you will see a number that starts out

17   8783 and ends 3074.  That's the Charter account number

18   assigned to the subscriber.  The subscriber is Marquet Mattox

19   at 155 Carriage Court in Athens, Georgia.

20   Q    And, Mr. Keithley, if Charter had assigned this address

21   to more than one person on this date would you see that in

22   this record?

23   A    Yes.  It's only assigned to that particular subscriber.

24   In fact, if you look at the information under the blue header,

25   kind of the second column down, it will start and an end date.

1   And you can see that 2015-12-4 at 8:09 and ends on 2016-11-22

2   at 19:02.  Basically what that means is are these two IP

3   addresses are only assigned to this subscriber during that

4   timeframe.

5       So from December 4th of 2015 to November 22nd of '16

6   those two IP addresses at the top are assigned to the customer

7   with the last name of Mattox during that timeframe.

8   Q    And this address here of 155 Carriage Court in Athens,

9   Georgia, are subscribers required to register their actual

10  physical address when they subscribe to Charter Internet for

11  the service location?

12  A    They are, correct.  They are asked to submit their

13  address and other information, including some contact e-mails

14  for purposes of following up, if needed.

15  Q    So, in essence, is what this record is saying is that the

16  customer would have had to be at this address for this Modem

17  MAC and this IP address to register on this record?

18  A    That's correct.  It's only assigned to that subscriber at

19  that address.

20  Q    Now, can more than one IP address be associated with the

21  same customer account at a time?

22  A    Yes, it could be.

23  Q    And how does that happen?

24  A    It depends on where their location is.  Like, for

25  instance, if they are in their residence it could be one IP

```
 1   address.  If they are at a different location it could be a
 2   different IP address.
 3   Q    Now, I believe you referred earlier to that fact that an
 4   IP address is assigned individually to a device.
 5        So if a subscriber has more than one computer or a
 6   computer and an iPhone or something, would those register as
 7   different addresses?
 8   A    It just depends on where they are located.  If they are
 9   in the same -- like, for instance, if they are in the same
10   residence they are probably going to be the same because the
11   IP normally hits back to the router that's in the home.  But
12   if the connection is away from there it could be a different
13   IP address.
14        MS. FREEMAN:  Mr. Quintero, let's pull up
15   page 28667.  And if we zoom in on this table as well.
16   BY MS. FREEMAN:
17   Q    Mr. Keithley, similarly with this IP address at the very
18   top where it says target details.  Who is the only customer
19   assigned this IP address at this date and time on 3-2, 2017?
20   A    The same as the first one, Marquet Mattox at 155 Carriage
21   Court in Athens, Georgia.
22        MS. FREEMAN:  Mr. Quintero, let's pull up
23   page 28668.  And if we could zoom in on just the top two areas
24   there.
25
```

1  BY MS. FREEMAN:

2  Q    Mr. Keithley, what is the IP address that law enforcement

3  would have requested for these dates on November 18, 2017?

4  A    It's the address in the target details at the top of the

5  page as 71.86.96.61.  And there were four different timestamps

6  requested; 11:32, 4:02, 6:32 and 4:52 p.m.

7       Again all are assigned to Marquet Mattox at 155 Carriage

8  Court, Athens, Georgia.

9            MS. FREEMAN:  And Mr. Quintero, can you, please, do

10  a side by side of the Target Details and subscriber info

11  blocks on page 668 and 666.   Sorry that should be page 28668.

12  BY MS. FREEMAN:

13  Q    Mr. Keithley, according to Charter's records here, who is

14  the only subscriber using Charter's Internet for these IP

15  addresses on these dates?

16  A    Marquet Mattox, 155 Carriage Court, Athens, Georgia.

17            MS. FREEMAN:  No further questions.

18            THE COURT:  Your witness.

19                      CROSS EXAMINATION

20  BY THE DEFENDANT:

21  Q    Mr. Keithley, being a Senior Management in Security with

22  Charter Communication, in regards to the account that you were

23  just referencing, for a previous account with Charter

24  Communications, to your knowledge, or that you are aware of,

25  was there any criminal activity on that account?

```
1    A    What account -- you're talking to the account we just
2    witnessed, we just observed?
3    Q    Yes.
4    A    I can't testify to that.  I can only testify to what I
5    discussed earlier.
6    Q    And you could have answered this already and I apologize
7    if it sounds redundant.  Being, as far as management and
8    security, do you monitor any possible criminal activities
9    through the Internet Service of Charter?
10   A    No.  That is not part of my job role.  My job is
11   corporate security and we handle the safety and security of
12   our employees and our facilities.
13   Q    So basically you're just here today just to validate that
14   there was an account that existed but as far as whatever took
15   place on the account you're not sure?
16   A    I am here today as a custodian of records, testifying
17   that those are Charter records.  That's correct.
18   Q    Can you answer this question.  In regards to -- is there
19   someone else in Charter that has the delegation of authority
20   to review an account to see if there was any criminal activity
21   on an account?
22   A    No, that's not part of what Charter does.  Charter
23   maintains records, but Charter does not do the investigation.
24   That's what law enforcement does.
25             THE DEFENDANT:  Thank you.
```

```
 1            THE COURT:  Redirect?

 2            MS. FREEMAN:  No, Your Honor.

 3            THE COURT:  What about your next witness.

 4            MS. FREEMAN:  Your Honor, that next witness will be

 5   fairly lengthy, we believe.  I don't know that we would get to

 6   everything that witness will testify to in the next 20 minutes

 7   for sure.

 8            THE COURT:  Okay.  Well, ladies and gentlemen, I

 9   think I'm going to let you go home.  You know, you thought you

10   might be on this jury but you didn't know for sure until you

11   were chosen.  So some of you may have something you need to

12   do.

13            So I'm going to let you go ahead and go home today

14   at basically 4:30.  Don't count on that again.  I'm going to

15   let you go home and be back at 9:00.

16            Now, let me tell you, it's been reported to me -- I

17   haven't checked recently -- that the weather is really going

18   to be bad tomorrow.  So I want you to be careful when you come

19   in.  You might want to leave a little bit earlier.  We need

20   you here.  And if we have everybody here but one of you then

21   we can't start these proceedings.  The longer we delay with

22   that, the longer it takes to get this trial over with.

23            So, I want you to think about your fellow jurors and

24   all the other people in this courtroom and please be in the

25   jury room by 9:00 o'clock.
```

1          Now, I do want to tell you something about this

2   case.  As you've probably already figured out this is a fairly

3   complicated case, technical case I might call it.  And I want

4   you to understand that I had two or three, maybe even four

5   hearings, including one this morning, trying to deal with some

6   of the legal issues in the case.  And there will be occasions

7   when I'm going to have to let you sit back there while I try

8   to deal with some of these legal issues.  I try to take care

9   of as much of that as I possibly could before you got here but

10  there could be other issues.

11         So you just need to be patient.  If you're sitting

12  back there wondering why we're not doing anything it's because

13  I'm having to deal with some legal question that I have to

14  answer.  Okay?

15         So you are excused.  Be very careful driving home

16  and we will see you in the morning.

17    (Jurors exit courtroom 4:36 PM)

18         THE COURT:  Do you want to let this witness get back

19  to South Carolina?

20         MS. FREEMAN:  Yes, Your Honor.

21         THE COURT:  You are excused, sir.  Thank you very

22  much.

23         You wanted to say something, Ms. Freeman?

24         MS. FREEMAN:  Your Honor, I was just going to say

25  this next witness is going to discuss some of the bank

 1   records.  So this might be a good opportunity to address the

 2   admission of those bank records that we tendered the

 3   certifications for.

 4           THE COURT:  Okay.  I think that's a good idea.

 5           But first let me bring this up.  Ms. Williams is

 6   still seated back there.  She has been at all these hearings.

 7   You have repeatedly expressed no desire to use her.  In fact,

 8   you have insisted that you not use her.  And if you don't plan

 9   to use her then I would like to relieve her from this duty of

10   being here and sitting and listening, because up to this

11   point, after multiple hearings, she hasn't done anything yet

12   because you haven't called on her.

13           But I am certainly willing to keep her here if you

14   think that the time might come when you want to talk to her.

15   But if you are insisting that you are not, then, I would like

16   to let her go.  Is that agreeable with you?

17           THE DEFENDANT:  That is agreeable to let her go.

18           THE COURT:  Okay.  I do think that there is some

19   enhanced risk -- this is not normal jury trials days.  I mean,

20   there is some enhanced risk of being in this courthouse and

21   this courtroom mixing with a variety of people.  So there is

22   some additional risk here that I don't want her to have to

23   incur if you are not going to use her.

24           So, having said it's okay, I'm going to let her go

25   with the thanks of the Court.

1              Drive carefully.

2              THE DEFENDANT:  Thank you, Your Honor.

3              MS. WILLIAMS:  Thank you, Your Honor.

4              THE COURT:  Let's talk about the bank records.

5              MS. FREEMAN:  Yes, Your Honor.

6              So I'm referring to Exhibits 6, 7, 8-1, 8-2, 8-3, 9,

7     10, 11 and 12.

8              THE COURT:  And all those are bank records?

9              MS. FREEMAN:  All of those are bank records from

10    Wells Fargo.  They've all been previously provided to the

11    defense and they were all subject to the certifications that

12    were part of our exhibit on the motion to preadmit.

13             THE COURT:  Do you have any objection to those bank

14    records being admitted?

15             THE DEFENDANT:  I do have an objection to the bank

16    records being admitted, but you have already overruled.

17             THE COURT:  What is that objection?

18             THE DEFENDANT:  Your Honor, I have been deprived of

19    liberty in regards to the Fourth Amendment that actually is

20    afforded me by the Constitution.  I've been --

21             THE COURT:  Well, the proper course to follow with

22    the Fourth Amendment objection is to file a motion to exclude

23    whatever the evidence is and you didn't file that in this

24    court.

25             And so now you are trying to raise that and quite

1  often the circumstances, I guess -- not quite often, but every

2  time the government has the opportunity to present evidence

3  about how and what they did and why they did it and what was

4  the basis for it and was it reasonable, and, you know, now I

5  don't know whether they are in a position to do that or not.

6  But it certainly was not something that the government

7  contemplated or that I contemplated that you were going to

8  have some kind of Fourth Amendment objection to certain

9  documents.

10          I assume that you got these pursuant to a subpoena?

11  How did you get the documents?

12          MS. FREEMAN:  Yes, Your Honor.  There was no Fourth

13  Amendment process.  It was all gotten through Grand Jury

14  subpoenas.

15          THE COURT:  Okay.

16          THE DEFENDANT:  Even if it was secured through a

17  Grand Jury subpoena that is not one in the same as the Fourth

18  Amendment, which basically says that there must be a warrant.

19          THE COURT:  Do you want to respond to that?

20          MS. FREEMAN:  Your Honor, warrants are not relevant

21  to these records in any way.

22          THE COURT:  Say that again.

23          MS. FREEMAN:  Your Honor, warrants are not relevant

24  to these records in any way.  They are just bank records.

25  They are certified by affidavit, by record's custodians, they

1   are essentially machine printouts that Wells Fargo attested

2   are accurate.

3            THE COURT:  I'm going to overrule the objection.

4            THE DEFENDANT:  Okay.  Your Honor, in regards to a

5   motion, basically states that I can actually file an oral

6   motion.  So if I'm motioning the Court to restore or to -- the

7   Court has deprived me of the Fourth Amendment.

8            So I'm motioning to the Court to restore, not to

9   deprive me of what was taken in regards to the Fourth

10  Amendment.

11           THE COURT:  Nothing was taken from you.  There were

12  bank records that came from the bank.  That was not taken from

13  you.

14           THE DEFENDANT:  The right or the ability to use the

15  Fourth Amendment has been -- I have been deprived of the right

16  to use the Fourth Amendment.  That was taken, sir.

17           THE COURT:  Well, I have never heard of a situation

18  in which the Fourth Amendment applied to a Grand Jury

19  subpoena.

20           So, once again, I'm going to overrule the objection.

21  It's kind of a very unusual objection.

22           THE DEFENDANT:  Can I read the Fourth Amendment?

23           THE COURT:  I know what the Fourth Amendment says.

24           THE DEFENDANT:  I wasn't attempting to insult your

25  intelligence.

 1          THE COURT:  I understand that.  I understand that.

 2   I work with the Fourth Amendment a lot so I do know want it

 3   says.

 4          THE DEFENDANT:  So am I -- so you're saying you've

 5   overruled and I don't have the right to use the Fourth

 6   Amendment?

 7          THE COURT:  No.  You have a right to appeal my

 8   ruling on that.  You have the right to appeal my ruling on

 9   that.

10          THE DEFENDANT:  And, also, through a motion would

11   also be a form of requesting or requesting relief.

12          THE COURT:  Well, there is -- motions are something

13   that are commonly done before trial to deal with issues that

14   have an impact on the trial.  And an objection at court

15   typically deals with something that is a broad generality,

16   deals with the evidence.  And either one of those -- you have

17   objected in two different ways now, based on what you are

18   telling me, to my ruling on Fourth Amendment illegal seizure

19   of your bank records and perhaps some other things too, for

20   that matter.

21          Was there any seizure from his house?  Was anything

22   seized from his house?

23          MS. FREEMAN:  No physical evidence was seized from

24   his house, Your Honor, if that's what you're asking.

25          THE COURT:  No what?

1          MS. FREEMAN:  No physical evidence was seized from

2    his house if that's what you're asking.

3          THE COURT:  Yes.  Or what about his car or any of

4    that?

5          MS. FREEMAN:  There was only civil process related

6    to his vehicle which was taken by the IRS as proceeds of

7    fraudulent payments.  But there was no criminal search and

8    seizure.  There was no criminal warrant when it came to the

9    car, the house or any physical possession of his.

10         THE COURT:  Okay.  All right.  That's what I

11   thought.

12         THE DEFENDANT:  There was no warrant at all in

13   regards to the seizure of the automobile.  There was no

14   warrant --

15         THE COURT:  You don't need a warrant.  It was a

16   civil forfeiture.  You have people who -- it was people -- to

17   give you an idea.  When people can't pay for their cars the

18   creditor goes out and picks up their car because of the

19   failure to pay.  You don't need a warrant for that.

20         So what else?

21         THE DEFENDANT:  Are you speaking to the Prosecutor

22   when you say what else?

23         THE COURT:  No.  I'm asking you what else?

24         THE DEFENDANT:  You mentioned that I have a right to

25   an appeal.  But also, if I'm not mistaken, in a motion for

1   relief from an order would be permissible or admissible

2   according to 28 USC Section 60(b)(6), correct?

3            THE COURT:  Well, I don't know what that says.  But

4   there is not any difference in this Court for purposes of what

5   is evidence being admitted under the Federal Rules of

6   Evidence.

7            And you have yet to convince me at all that the

8   Fourth Amendment has anything to do with these bank records.

9            So there's not any difference from my purposes

10  whether it's a motion or not a motion.

11           I mean your filing an -- or you stating an

12  objection, it's the same thing as far as I'm concerned.

13           There's no magic about a motion.  There's nothing

14  that changes the fact that there's a motion that nothing

15  changes or transforms something that is more powerful and that

16  the Court -- yet therefore -- has to rule in your favor on

17  that.  I don't know how to explain this to you beyond what I

18  just said.

19           THE DEFENDANT:  Even if the bank records are

20  permissible.  I'm actually looking at or speaking of the

21  entire process of being denied the opportunity to use the

22  Fourth Amendment.

23           THE COURT:  You have yet to tell me anything about

24  the Fourth Amendment that makes me believe that it applies in

25  this case.

1          And so we're talking about bank records now.  I

2    don't know what -- we're not talking about -- we're not

3    talking about any illegal searches.  That's already been

4    confirmed by the Prosecutor.

5          And so there could be an illegal seizure, which I

6    think is what you are talking about here.  But the reality is

7    you have been indicted by the Grand Jury and pursuant to that

8    Indictment you were arrested and you were incarcerated and

9    that is standard practice.  There's not anything unusual about

10   that.  That's what happens to people who get indicted and are

11   brought into court.

12         And you were arraigned by Judge Weigle.  You had a

13   preliminary hearing, I suppose.  I mean, am I missing

14   something about this, Ms. Freeman?

15         MS. FREEMAN:  No, Your Honor.

16         THE DEFENDANT:  I was requested to appear to answer

17   questions.  I was held in regards to contempt of court.  And

18   then there was a detention order, but as far as an arrest or

19   warrant that never took place -- an arrest or warrant, et

20   cetera, that never took place.

21         THE COURT:  Well, how did you get brought into

22   custody?

23         THE DEFENDANT:  Contempt of court.

24         THE COURT:  You were brought into court.  How did

25   you get brought into court?  You found out you were indicted

1    and you came in?

2              THE DEFENDANT:  No.  A summons to answer questions.

3              THE COURT:  Did he appear before the Grand Jury?

4    I'm unclear about what's going on.  What is he talking about?

5              MS. FREEMAN:  Your Honor, I believe he's saying that

6    because we issued him a summons to voluntarily appear for his

7    initial appearance and arraignment that he hasn't actually

8    been arrested.  But he was arrested after being held in

9    contempt, and then he was detained pending trial in the case

10   in which he was indicted.

11             THE COURT:  Is what she said correct?  Because

12   that's what it sounds like you are saying.

13             THE DEFENDANT:  As far as the Miranda rights, et

14   cetera, me physically being arrested.  I wasn't physically

15   arrested.  I was detained.

16             THE COURT:  Well, that is the same thing, sir.

17             All right.  No more about the Fourth Amendment.

18             What else?

19             Do you have any other documents you want to talk

20   about?

21             MS. FREEMAN:  Your Honor, there are other documents.

22   We could talk about the preadmission at this time to save

23   delay with the jury tomorrow.

24             THE COURT:  Yes, go ahead.

25             MS. FREEMAN:  So with respect to Exhibit 13.  These

```
 1   are records from Classic Cadillac related to the purchase of a
 2   2018 Cadillac Escalade obtained by Grand Jury subpoena, part
 3   of the exhibits with certifications that we submitted for
 4   preadmission under 803(6), 902(11).
 5              THE COURT:  Do you have any objection to records
 6   related to the purchase of a Cadillac?
 7              THE DEFENDANT:  With all due respect, Your Honor --
 8   I object, Your Honor.
 9              THE COURT:  Okay.  But you have to tell me the basis
10   of the objection.  It's not sufficient for you just to say you
11   object.  I can't guess at what your objection is.
12              THE DEFENDANT:  But if I object and I tell you the
13   basis and you overrule the objection then it continues to move
14   forward, correct?
15              THE COURT:  Well, I mean, if it's something that
16   I've already told you is not a part of the case then that will
17   be correct.  If it's something other than what I've told you
18   is not a part of the case then we can talk about it.
19              THE DEFENDANT:  I mean, Your Honor --
20              THE COURT:  I'm going to admit that.  What's next?
21              MS. FREEMAN:  Yes, Your Honor, Exhibit 16, these are
22   also precertified records from Haverty's Furniture Company
23   related to purchases made by Marquet Burgess Mattox El.
24              THE COURT:  So, I assume, that this is relevant to
25   show how he used the money?
```

1          MS. FREEMAN:  Yes, Your Honor.

2          THE COURT:  So it certainly seems to be relevant,

3     assuming you can attach it to the money and I'm going to give

4     you the benefit of the doubt on that.

5          Do you have any objection to this, the Haverty's

6     Furniture records?

7          THE DEFENDANT:  Is there a copy of the document

8     within one of these binders?

9          MS. FREEMAN:  The Defendant has been provided a copy

10    in discovery some months ago but also has received a paper

11    copy with him there under Exhibit 16.  That should be binder

12    1.

13         THE COURT:  Is it quicker to put it on the screen?

14         MS. FREEMAN:  We could.  Mr. Quintero, can you pull

15    up Exhibit 16.

16         THE DEFENDANT:  Your Honor, if any of the binders

17    were sent to the Butts County jail I never received them.

18         THE COURT:  We are going to put it up here.  We're

19    going to put it up so you can take a look at it.

20         Do you have an objection to that document?

21         THE DEFENDANT:  I don't have an objection to that

22    document.

23         THE COURT:  Admitted.

24              (Government's Exhibit # 16 admitted.)

25         THE COURT:  What's next?

1          MS. FREEMAN:  Exhibit 17, which are also

2    precertified records from the UPS Store including a mailbox

3    service agreement which was also certified.

4          THE COURT:  Do you want to show that to him.

5          MS. FREEMAN:  Mr. Quintero, can you pull up

6    Exhibit 17.  And Mr. Mattox it's also in binder number 1 at

7    tab 17 in front of you.

8          THE COURT:  Do you have any objection to that?

9          THE DEFENDANT:  I do not have an objection to that.

10         MS. FREEMAN:  Just to be clear, Your Honor, I want

11   to make sure that Mr. Mattox understands that there is more

12   than one page in this document.

13         THE COURT:  Do you want to see the rest of it,

14   Mr. Mattox?

15         THE DEFENDANT:  Yes, please.  (Reviewing documents).

16   Okay.

17         THE COURT:  Do you want to object to that?

18         THE DEFENDANT:  No objection, Your Honor.

19         THE COURT:  Admitted.

20               (Government's Exhibit # 17 admitted.)

21         THE COURT:  Now, let me point out something to you

22   so you will make sure you're ready to do this.  After I charge

23   the jury and they go out you have to get with Ms. Paul and

24   make sure that everything that's been admitted goes out and

25   that nothing that has not been admitted doesn't go out.  Okay?

 1           MS. FREEMAN:  Yes, Your Honor.

 2           THE COURT:  You have to keep up with that.

 3  Sometimes we have lawyers who think they admitted something

 4  and they didn't and so it's not admitted until I say it is.

 5           MS. FREEMAN:  Yes, Your Honor.  And to help ensure

 6  that, we are keeping track as we admit and I have also given

 7  Ms. Nora a copy of this same list so that she can check my

 8  work as well.

 9           THE COURT:  Okay.  And your four exhibits, 1 through

10  4, the way I've marked them, they are going out.  So you don't

11  have to worry about those four.  They are right down there.

12  I've take care of that for you.

13           All right.  What else?

14           MS. FREEMAN:  Your Honor, those are all the exhibits

15  we intend to enter other than a couple that we will do live

16  with witnesses because they require their authentication.

17           THE COURT:  Okay.  Anything further we need to talk

18  about?

19           MS. FREEMAN:  Not at this time, Your Honor.

20           THE COURT:  Mr. Mattox?

21           THE DEFENDANT:  No, sir.

22           THE COURT:  Okay.  Very good.  We will see you in

23  the morning.  Thank you.

24                    (Proceedings concluded at 4:58 p.m.)

25                         END OF RECORD

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Tammy W. DiRocco, Federal Official Court Reporter,

4     in and for the United States District Court for the Middle

5     District of Georgia, do hereby certify that pursuant to

6     Section 753, Title 28, United States Code, that the foregoing

7     is a true and correct transcript of the stenographically

8     reported proceedings held in the above-entitled matter and

9     that the transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12                            Dated this 26th day of October, 2022

13

14

15                         _____

                           Tammy W. DiRocco CCR, CVR
16                         Federal Official Court Reporter

17

18

19

20

21

22

23

24

25