<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF GEORGIA
 2                          ATHENS DIVISION
                   _____
 3

 4   THE UNITED STATES OF AMERICA      :        3:20-cr-44(CAR)

 5           VS.                       :        August 17, 2021

 6   MARQUET ANTWAIN BURGESS MATTOX,   :        Athens, Georgia
     A/K/A MARQUET ANTWAIN BURGESS
 7   MATTOX EL, A/K/A MARQUET BURGESS  :
     MATTOX, A/K/A ASIM ASHUNTA EL,
 8   A/K/A ASIM EL BEY,                :
                      Defendant
 9   _____

10                            JURY TRIAL

11                       VOLUME II OF III

12          BEFORE THE HONORABLE C. ASHLEY ROYAL,
              UNITED STATES COURT DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:      LYNDIE FREEMAN
                              US ATTORNEY'S OFFICE
16                            P.O. BOX 1702
                              MACON, GA 31201
17

18                            JESSICA KRAFT
                              150 M STREET, NE
19                            SUITE 400
                              WASHINGTON, DC 20002
20

21   FOR THE DEFENDANT:       PRO SE
                              MARQUET ANTWAIN BURGESS MATTOX
22   _____

23                      TAMMY W. DIROCCO, USCR
                            P.O. BOX 539
24                      MACON, GA 31202-0539
                           (478-752-3497)
25
</pre>

1                          <u>WITNESS INDEX</u>

2                                                      <u>PAGE</u>

3    SUSAN FREEMAN

4          Direct Examination By Ms. Freeman ...............9

5          Cross Examination By The Defendant .............23

6          Redirect Examination By Ms. Freeman ............40

7          Recross Examination By The Defendant ...........44

8          Continued Recross Examination By The Defendant .51

9    PAULE-NATHALIE CLARKE

10         Direct Examination By Ms. Kraft ................57

11         Cross Examination By The Defendant .............64

12         Redirect Examination By Ms. Kraft ..............71

13         Recross Examination By The Defendant ...........71

14    JERON CLARK

15         Direct Examination By Ms. Freeman ..............73

16         Cross Examination By The Defendant  ...........124

17         Redirect Examination By Ms. Freeman ...........132

18         Recross Examination By The Defendant ..........133

19   JERON CLARK

20         Direct Examination By The Defendant  ..........143

21         Cross Examination By Ms. Freeman  .............153

22         Redirect Examination By The Defendant .........154

23

24

25

```
 1                      GOVERNMENT'S EXHIBITS

 2    NUMBER                    DESCRIPTION                  PAGE

 3    Gov. 14    Photo of Cadillac Escalade ...............20

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   August 17, 2021
 2   9:00 a.m.
 3   Athens, Georgia
 4                    P R O C E E D I N G S
 5           CSO OFFICER:  All rise.  This court is now in
 6   session.  Please be seated and come to order.
 7           THE COURT:  Good morning.
 8           ATTORNEYS COLLECTIVELY:  Good morning.
 9           THE COURT:  Do you have a few matters for the Court
10   this morning?  Did you have some questions for me?
11           THE DEFENDANT:  Yes, sir.  Good morning.  How are
12   you?
13           THE COURT:  I'm fine.  Take your mask down, please.
14           THE DEFENDANT:  I wanted to know -- there are some
15   things that I would like to publish as well to the jury.  Do I
16   give those to you?  Do I give those to the clerk?
17           THE COURT:  Well, this is the way this goes.  The
18   government is presenting their case.  When the government
19   finishes presenting their case then you can present your case,
20   and that would involve offering evidence, and then I'll rule
21   on it.
22           So now is not the appropriate time for that.
23           THE DEFENDANT:  Okay.
24           THE COURT:  But there will be an appropriate time
25   for it.
```

```
 1              THE DEFENDANT:  Okay.  I do have a new motion for
 2   relief from a final judgment order or proceeding that I would
 3   like to read into the record, please.  It is extremely short
 4   and I respectfully would ask if you could give me that --
 5              THE COURT:  Well, it's not the time for you to make
 6   that motion.  So we will give you the opportunity to make it
 7   at the appropriate time.  You can make that motion at the time
 8   the government concludes their case.
 9              Another motion to dismiss, is that what it is?
10              THE DEFENDANT:  It's a motion for relief, yes.
11              THE COURT:  Let me see what you have there.
12              THE DEFENDANT:  (Document produced).
13              THE COURT:  Well, you're asking for a final judgment
14   and what we are going to do is I will let you make this motion
15   when the government's case is over.
16              Have you given her a copy of it?
17              THE DEFENDANT:  I haven't given her a copy.  I
18   didn't have a copy, but I was asking for a relief from an
19   order.  There was an order given on yesterday, a verbal order
20   given on yesterday, so I was making a relief in regards to
21   that.
22              THE COURT:  Let me have it back.  I'm going to let
23   you make this.  You can make your motion at the end of the
24   government's case.  We want to make sure the government has
25   the opportunity to look at it.
```

1              Does he have that back?

2              COURTROOM DEPUTY:  Yes, sir.

3              THE COURT:  Make a copy of it.

4              Did you have something else?

5              THE DEFENDANT:  Yes, sir.

6              I just received documents in the mail last night

7    from the government that I did not have an opportunity to

8    review before the case because it didn't come before the start

9    of the trial.

10             And one of the documents is the government's brief

11   in regards to the things that they would use or things that

12   would be presented.  And one of the things that I did not get

13   the opportunity to object to was in regards to certain

14   witnesses being present throughout the actual trial, such as

15   the agents, which put me at a disadvantage because those

16   particular agents or those particular witnesses are able to

17   sit into the actual trial and hear testimony from others and

18   able to use some of the information that they hear.

19             THE COURT:  I dealt with that.  That was one of the

20   motions made by the government at the beginning of the trial

21   and it was the request to have two agents at counsel table or

22   available during the trial of the case.  She explained to me

23   why she needed two.  The explanation was that the two agents

24   had done different parts of this investigation.

25             And so I don't remember whether you objected or not,

```
 1    but it was dealt with in the court and I found that it was

 2    appropriate, under the circumstances, for them to be relieved

 3    from the sequestration of the witnesses.  All the other

 4    witnesses have been sequestered.

 5          So I overrule your motion on that or your objection,

 6    whatever it is.

 7          What else?

 8          THE DEFENDANT:  Everything else -- that would be

 9    pretty much it, Your Honor.  Thank you.

10          THE COURT:  Are we ready to bring the jury in?

11    Ms. Freeman, anything from you?

12          MS. FREEMAN:  No, Your Honor.

13          THE DEFENDANT:  There were two motions presented on

14    yesterday.  So would I have the opportunity to present both of

15    the motions?

16          THE COURT:  Yes, you will.  I'm going to give you

17    whatever opportunities you need, I'm going to give them to

18    you.

19      (Jurors enter courtroom 9:12 a.m.).

20          THE COURT:  Good morning, ladies and gentlemen, and

21    thank you for braving the weather to get here.  I know it was

22    bad and I appreciate that very much.  I'm glad you made it

23    safely.

24          We're going to run court a little bit differently

25    today and that's because of the weather.  What I'm going to do
```

1  is have lunch brought in for you today so you won't have to go

2  out in this terrible rain.  We don't do that.  I mean, in 20

3  years I think I might have done that once, but we are going to

4  do it today because of all the rain.

5        And you may have already gotten a little sheet and

6  so you can give that back to her at the break and then she

7  will order it.

8        And then what we're going to do -- we'll do the

9  typical break time of around noon and then you will have your

10  food, and what we're going to do is that when you are ready to

11  start the trial again we are going to start the trial again.

12  So it's not just going to be from 12 to 1.  If we get the food

13  in at 12:00 and if y'all are ready to start back at 12:30 then

14  that's what we're going to do.  And we will just move this

15  case along.

16        Do y'all understand that?

17        THE JUROR:  (Shaking heads affirmatively).

18        THE COURT:  To accommodate y'all and to protect

19  y'all.  The weather is going to be clear tomorrow, I think, so

20  you will have to find your own lunch tomorrow.  But that's the

21  way we're going to do it today.

22        Are you ready to proceed, Ms. Freeman?

23        MS. FREEMAN:  Yes, Your Honor.

24        THE COURT:  Let's go.

25        MS. FREEMAN:  The United States calls Revenue

```
 1  Officer Susan Freeman.
 2          COURTROOM DEPUTY:  Do you swear that your testimony
 3  will be the truth, the whole truth, and nothing but the truth,
 4  so help you God?
 5          THE WITNESS:  Yes.
 6          COURTROOM DEPUTY:  Please state and spell both your
 7  first and last name for the record.
 8          THE WITNESS:  Susan, S-U-S-A-N, Freeman,
 9  F-R-E-E-M-A-N (Spelling).
10                          SUSAN FREEMAN
11          Whereupon, witness having been duly sworn,
12                     testified as follows:
13                     DIRECT EXAMINATION
14  BY MS. FREEMAN:
15  Q    Ms. Freeman, where do you work?
16  A    I work with the Internal Revenue Service in Atlanta,
17  Georgia.
18  Q    And what is your job title?
19  A    Revenue Officer.
20  Q    Tell us what does a revenue officer do?
21  A    Well, we try to educate taxpayers on filing tax returns
22  and coming in compliance with paying their taxes, and when
23  they do not then we can take collection action.
24  Q    And does your job involve a lot of following the money?
25  A    I'm sorry.
```

1   Q    Does your job involve a lot of following the money?

2   A    Yes, it does.

3   Q    And is it because taxpayers often have obtained funds

4   that they shouldn't have obtained when you're talking to them?

5   A    Yes.

6   Q    What are some of your specialties as a revenue officer

7   that you have developed over the years?

8   A    Refund schemes.

9   Q    By the way, how long have you been a revenue officer?

10   A    Since mid-2006.

11   Q    So if you have a specialty in refund schemes, for members

12   of the jury who may not be familiar with all the IRS lingo,

13   what is a refund scheme?

14   A    It's when taxpayers file fraudulent returns with

15   information in order to obtain a refund that they should not

16   be getting.  In other words, steal from the government.

17   Q    So what kind of things do taxpayers fake up on a tax

18   return in order to get themselves a fraudulent refund?

19   A    They might inflate income to try to legitimize the

20   return.  They may file false credits, withholding and that

21   kind of thing, deductions.

22   Q    How does falsifying withholding on a tax return

23   constitute part of a refund scheme?

24   A    Well, if that withholding was never paid into the

25   government then they get a refund that they are not entitled

1    to.

2    Q    Okay.  So, let's explain a little bit more of some of the

3    IRS terminology.  What exactly is a tax refund?

4    A    It's money that is paid to a taxpayer when they have paid

5    more than what they owe.

6    Q    And is that where the withholding comes in, because they

7    are essentially stating withholding that they have paid money

8    to the IRS?

9    A    That is correct.

10   Q    Approximately how many of these refund schemes do you

11   feel like you have investigated over the years?

12   A    Maybe a thousand.

13   Q    And do they all have, in your experience, fairly similar

14   characteristics?

15   A    Yes.

16   Q    What is the ultimate goal of every refund scheme?

17   A    Well, if we don't stop the refund scheme before the

18   refund goes out then we try to recover the money once it has

19   gone out.  And we try to determine why they filed this

20   fraudulent return.  We try to get them into compliance at the

21   same time.

22   Q    So that is your investigative goal with the refund

23   scheme; is that right?

24   A    Yes.

25   Q    What is the taxpayer's goal, ultimately, with a refund

```
1    scheme?  What are they trying to do?
2    A    They are trying to get money from the government that
3    they should not be getting.  That is money that they are not
4    entitled to.
5    Q    Revenue Officer Freeman, are you familiar with an
6    individual named Marquet Mattox?
7    A    Yes.
8    Q    How did you first become familiar with him?
9    A    Well, with some refund schemes that he filed, and I met
10   him in February 19th, 2019.
11   Q    So let's talk about how you got that case.  You said
12   there was a refund scheme.  Tell us what the referral was that
13   you received?
14   A    The initial case was Kemahra Investment Trust, that he
15   had received approximately $10,000.  And in the investigation
16   we found that he had another trust that he received over
17   $2 million and that was the Burgess Mattox Bey Investment
18   Trust.
19   Q    Did you find any more trusts that were linked to the
20   Defendant in the course of investigating this refund scheme?
21   A    We found approximately 30 trusts.  He did not attempt
22   refund schemes on all of them, but there were approximately 22
23   attempted refund schemes, three of which he was successful.
24   Q    And by three of which, do you mean, with three specific
25   trusts?
```

```
1    A    The Kemahra Investment Trust, the Burgess Mattox Bey
2    Investment Trust and Marshana El Investment Trust.
3    Q    So let's talk about what investigative steps you used to
4    link these trusts together.  How did you decide they were
5    linked to the Defendant?
6    A    Well, they had the same trustee name.  The checks were
7    signed by the same person.  They all had a similar address.
8    Some of them had similar names.
9    Q    What kind of address did they have in common?
10   A    A UPS Store.
11   Q    And was that in common across the trusts that you
12   investigated?
13   A    Yes.
14   Q    So what other kind of things did they have in common?
15   A    They had inflated income for interest income.  They had
16   inflated withholdings.  Some of the withholding was the same
17   amount as the income.  The bank records show that they were
18   not used for any legitimate purpose and, in fact, there was no
19   income deposited in any bank account.  It was --
20   Q    Let's break that down a little bit.  You have a couple
21   different subjects there.
22        So let's start with the first bit.  You talked about that
23   there were 22 trusts that were all kind of linked together.
24   Why is that suspicious?
25   A    Generally nobody has that many trusts, in general,
```

1    especially trying to obtain refunds of tens of millions of

2    dollars.

3    Q    And is that a common pattern that you saw across these

4    trusts you examined?

5    A    Yes.

6    Q    Now, what is the name of the form that he was using to

7    claim or try to claim these refunds?

8    A    Form 1041.

9    Q    And what is the name of that form in IRS systems?

10   A    The Estate Trust Fund return.

11   Q    It's a tax return?

12   A    Yes.

13   Q    So what about the names of the trusts.  Do you recall

14   anything significant about them?

15   A    A lot of the names were similar.  So it would be like the

16   Burgess Mattox Bey Investment Trust, Burgess Mattox Trust, and

17   that sort of thing and variations on the names.

18   Q    Did the trusts have any names in common associated with

19   the Defendant?

20   A    Yes, they had the same Trustee.  The same person was

21   signing the returns.  Mr. Mattox's Social Security number was

22   associated with most of the trusts.

23   Q    So you saw his personal Social Security number in IRS

24   records associated with these trusts?

25   A    Yes.

```
1   Q    Does the IRS have a special term for these kind of trusts
2   that you have observed?
3   A    We call them a sham trust.
4   Q    Why do you call them a sham trust?
5   A    Because they were not set up for any legitimate business
6   reason.  They were used for personal use to obtain money from
7   the government that they were not entitled to.  In other
8   words, steal from the government.
9   Q    And from your estimation, approximately how much in
10  fraudulent refunds did Mr. Mattox obtain?
11  A    Over $5 million.
12  Q    Now, I believe a minute ago you mentioned how you looked
13  at some bank records.  Do you recall what bank you obtained
14  bank records from?
15  A    Wells Fargo.
16  Q    What were you trying to find out when you looked at these
17  bank records?
18  A    Well, I was trying to find out who had signature
19  authority and was writing the checks.  I was trying to
20  determine could we recover the money.  How was the money
21  spent.
22  Q    Why is it important how the money was spent?
23  A    Well, because we have to determine whether it was for
24  personal use or if there was any business use.
25  Q    So looking at these bank records are these in the name of
```

1    the trusts?

2    A    I'm sorry.

3    Q    Are these bank records in the name of the trusts?

4    A    Yes.

5    Q    Did you see any legitimate business activity in these

6    trusts records?

7    A    Oh no, no.

8    Q    What did you see over all was being done with the money?

9    A    For personal use like going to restaurants, the gym.  He

10   bought a house.

11   Q    Let's talk about that house.  What did you see about a

12   house in the bank records?

13   A    He purchased a house that he resides in for $600,000.

14        MS. FREEMAN:  Mr. Quintero, could you please pull up

15   previously admitted and published Exhibit 1, just the first

16   page.

17   BY MS. FREEMAN:

18   Q    Ms. Freeman, is this the house you're talking about?

19   A    Yes.

20   Q    Do you recall roughly the address of it?

21   A    It was at Morgan Garner Drive in Lilburn, Georgia.

22   Q    Whose house is this?

23   A    Mr. Mattox.

24   Q    Now, did he put it in his personal name or in the name of

25   one of his trusts?

1   A      In one of the trusts.

2   Q      Now, how do you personally know, if it's in the name of a

3   trust, that this is Mr. Mattox's house?

4   A      Well, he was there when I went to his home in

5   February 2019 to deliver some paperwork and I also observed

6   him there in September 2019.

7   Q      All right.  Let's talk about that first time you

8   encountered him at this house in February of 2019.  I believe

9   you said you were serving him with paperwork.  Did he answer

10  the door?

11  A      He answered the door.

12  Q      What did he say?

13  A      Well, I asked if he was Burgess Mattox -- well, I asked

14  if he was Burgess Maddox and he corrected my pronunciation to

15  it was Mattox, but initially he denied that he was Mr. Mattox.

16  Q      So he denied he was Mr. Mattox but he corrected the

17  pronunciation of his name; is that right?

18  A      That is correct.

19  Q      Did you believe that he was not, in fact, Mr. Mattox?

20  A      I did not believe that, no.

21  Q      Did you identify yourself as being a revenue officer with

22  the Internal Revenue Service?

23  A      I did.

24  Q      Did he express surprise that the IRS was there to visit

25  him at his house?

```
1    A    He didn't seem surprised.

2    Q    Did he deny being involved with the trusts that you

3    mentioned on the paperwork?

4    A    No, he did not.

5    Q    Is the man that you have identified as Marquet Mattox is

6    he in the courtroom today?

7    A    Yes, he is.

8    Q    Could you, please, describe where he is sitting and what

9    he is wearing?

10   A    Well, he is over there by that other monitor that is

11   showing his house.  He has a cap on and a mask.  It looks like

12   a blue shirt and suit.

13           MS. FREEMAN:  Let the record reflect the witness has

14   identified the Defendant.

15   BY MS. FREEMAN:

16   Q    Ms. Freeman, you said you served him paperwork in 2019,

17   February.  Did you speak to him again?

18   A    Yes, I did.

19   Q    When was the next time that you talked to him?

20   A    I think it was about eight days later, he had called, and

21   he identified himself as Mr. El.  But he did admit that he was

22   the one that answered the door when I had come there a few

23   days earlier.

24   Q    So the individual had called -- had referred to being

25   Mr. Mattox before, but now calls himself Mr. El when he calls
```

```
 1   you on the phone?

 2   A     Yes.

 3   Q     What did you talk about on the phone?

 4   A     Well, we talked about the paperwork that I had delivered

 5   and he also mentioned that he had some trustees.

 6   Q     Did Mr. El mention whether he was a trustee of a trust?

 7   A     I don't recall him saying that.

 8   Q     But was he, in fact, calling you about paperwork

 9   regarding a specific trust?

10   A     Yes, the Burgess Mattox Bey Investment Trust.

11            MS. FREEMAN:  And Ms. Paul, could you please display

12   to just the witness and counsel.

13            And Mr. Quintero, could you please pull up

14   Exhibit 14, a side-by-side of both pages together.

15   BY MS. FREEMAN:

16   Q     Ms. Freeman, do you see that image on your monitor?

17   A     Yes.

18   Q     Do you recognize what this is?

19   A     I do.  That is -- he purchased, out of those funds, a

20   Cadillac Escalade for $120,000.

21   Q     Now, do these photos that you're looking at here

22   faithfully depict the vehicle in the same or similar condition

23   as when you last saw it?

24   A     Yes.

25            MS. FREEMAN:  Your Honor, we tender Exhibit 14 into
```

```
 1   evidence.
 2              THE COURT:  Do you have an objection?
 3              THE DEFENDANT:  No, I don't have an objection.
 4              THE COURT:  Admitted.
 5                      (Government's Exhibit # 14 admitted.)
 6              MS. FREEMAN:  Permission to publish?
 7              THE COURT:  Go ahead.
 8              MS. FREEMAN:  Ms. Paul, if you would mind
 9   publishing.
10   BY MS. FREEMAN:
11   Q    Ms. Freeman, did you, in fact, trace the funds yourself
12   for the purchase of this vehicle?
13   A    Yes, I did.
14   Q    Where did that money come from?
15   A    It came from the refund scheme that he -- from the refund
16   money that he had gotten from Burgess Mattox Bey Investment
17   Trust.
18   Q    Now, in the bank accounts for that same trust that paid
19   for this vehicle, did you see any withholding whatsoever paid
20   to the IRS?
21   A    No.
22   Q    Did you see some money going to the IRS?
23   A    He paid 65 to $70,000 towards a personal liability under
24   his Social Security number for tax year 2003.
25   Q    What does a personal liability mean in contrast to a
```

1  trust liability?

2  A    Well, it's from a 1040, which is a personal tax return.

3  And he had a tax liability that he had not paid.

4  Q    So that was for him personally and not for the trust; is

5  that right?

6  A    That's correct.

7  Q    And did you trace out where that money came from that he

8  paid to the IRS?

9  A    Yes.  That came from the refund scheme money.

10  Q    So it also came from the IRS?

11  A    Yes.

12  Q    Now, to be clear, because I believe you mentioned that it

13  was from unpaid taxes, from what year was it?

14  A    2003.

15  Q    And was that from a failure to file a tax return?

16  A    Well, he had failed to file a return and the IRS had

17  filed one on his behalf under 6020B.  He had not filed a

18  return since 2001.

19  Q    Now under the rules of the IRS and the tax code, is it

20  required for every taxpayer to file a tax return every year no

21  matter what their income?

22  A    In general.  It depends on the income and the amount of

23  income and the type of income.

24  Q    So it's not necessarily required of everyone, every tax

25  year?

1   A     That is correct.

2   Q     But in this case he did have a personal tax liability

3   of -- how much was it?

4   A     Well, with penalties and interest I think it ended up --

5   tax penalties and interest it ended up being about 65,

6   $70,000.

7   Q     Now, did you notice any other particular spending of note

8   or transactions of note in those same bank records?

9   A     Well, he also purchased about over a hundred thousand

10  dollars from Haverty's, which is a furniture store.  He bought

11  electronics.  Several trips where he bought airline tickets.

12  He went to places like Miami, Disney.  He bought some tickets

13  for Mary J. Blige.  He bought some -- also it looks like some

14  items at a Rolex store and it looks like some items from a

15  jewelry store.  Various clothing stores and things from Prada

16  and Louis Vuitton.

17  Q     So from your examination of the bank records in this

18  case, where the money came from the IRS, who controlled the

19  money for the refund scheme?

20  A     Mr. Mattox.

21  Q     Who benefited from the false tax returns costing the

22  United States government $5 million?

23  A     Mr. Mattox.

24        MS. FREEMAN:  No further questions.

25        THE COURT:  Your witness, sir.

CROSS EXAMINATION

BY THE DEFENDANT:

Q    Good morning, Ms. Freeman.

A    Hello.  Good morning.

Q    Ms. Freeman, can you once again explain your job position as a revenue officer with the Internal Revenue Service?

A    Yes.  My job is to help educate taxpayers in their filing and payment of taxes.  And as a revenue officer if they do not then I can take collection action.

Q    Ms. Freeman, you identified me as the Defendant.  So did you and I ever have a conversation in regards to you educating me in regards to filing tax returns or bringing a trust or business current that possibly could have been in default or behind?  Did you and I have a conversation -- you said that's what you do, you educate and then you go and you do another step.

A    I educated you about the returns that you had filed, the form 1041's were not legitimate returns.

Q    Were there any education prior to you taking actions in regards to seizure, recovery, et cetera?  Was there any education from you?

A    When I asked you to return the money you did not turn over the money.  Then we had to take immediate collection action to try to return -- to recover the money before all the funds were dissipated.

1    Q    Is there any such thing as due process?

2    A    Yes.

3    Q    And can you help me to understand exactly what is the due

4    process with your --

5    A    Well, I think you might be referring to collection due

6    process.  It means that you have the right to appeal.

7    Q    Was there ever an appeal filed in regards to --

8    A    You did file an appeal.

9    Q    And what was the result of the appeal?

10   A    It is still pending with Appeals, but they did not object

11   to the IRS taking collection action.

12   Q    But was there any written communication or was there any

13   type of communication from Appeals confirming that you could

14   take actions during the process of an appeal?

15   A    They gave the IRS permission to take collection action

16   and yes, we had written confirmation that we could do that.

17   They did not object.

18   Q    And when you say "they" are you able to identify "they"?

19   A    It would have been the Appeals Department.

20   Q    And you're saying that's verifiable?  What you're stating

21   is that verifiable in writing?

22   A    It is verifiable.

23   Q    Can you tell me the difference between the Internal

24   Revenue Service and the Secretary of Treasury?

25   A    Well, the Internal Revenue Service is a department of the

1  Secretary of Treasury.

2  Q    Are they one in the same?

3  A    No.  They are a department of.

4  Q    So the Secretary of Treasury would be totally different

5  than the Internal Revenue Service?

6  A    In a sense.  But they are a department of the U.S.

7  Treasury.

8  Q    I hear you're saying they are a department of, but I'm

9  not clear in regards to whether or not they are two different

10 entities or does one own the other, is one superior to the

11 other, is one subordinate to the other?

12 A    The Internal Revenue Service is answerable to the U.S.

13 Treasury Department.

14 Q    So is the Secretary of Treasury over the Internal Revenue

15 Service?

16 A    Yes.

17 Q    Are you familiar with the term or the rule giving gifts

18 to the -- and I will read it for you.  "To provide the

19 people -- this is the United States Rule or United States Code

20 which is Title 31 U.S.C. 3113.

21             "To provide the people of the United

22         States with an opportunity to make gifts

23         to the United States government to be used

24         to reduce the public debt, the Secretary

25         of Treasury may accept for the government

```
1              a gift of money made on the condition that

2              it be used to reduce the public debt".

3         In regards to gifts given to the Secretary of

4  Treasury would that be the same as giving to the Internal

5  Revenue Service?

6  A    I'm not familiar with what you're talking about.  I have

7  no familiarity with that.

8  Q    You mentioned or you stated that there was no income,

9  there was inflated income, there was inflated withholdings.

10        So what I'm attempting to clarify is, if a gift was given

11 to the Secretary of Treasury could you see that in the screen

12 or the database of the Internal Revenue Service?

13 A    The U.S. Treasury Department does not accept gifts.

14 Q    But the Rules says or the Rule says.

15             "To provide the people of the United

16             States with an opportunity to make gifts

17             to the United States government to be used

18             to reduce the public debt, the Secretary

19             of Treasury may -- the Secretary of

20             Treasury may accept for the government a

21             gift...

22         MS. FREEMAN:  Objection, Your Honor.  He's

23 testifying.

24         THE COURT:  Well, I think he is cross examining the

25 witness here and I'm going to allow him to do that.  I'm going
```

1    to overrule your objection.

2              THE DEFENDANT:  Thank you.

3    BY THE DEFENDANT:

4    A    THE WITNESS:  I don't know what that legally means.

5    Q    Well, I'm only reading to you from --

6    A    I do not know what it legally means.

7    Q    Well, it states --

8              THE COURT:  Now, you are testifying.  She told you

9    that she doesn't know what that means.  So now you need to

10   move to your next question.

11             THE DEFENDANT:  Bear with me for one second, Your

12   Honor.

13   BY THE DEFENDANT:

14   Q    You're stating that the Secretary of Treasury does not

15   accept gifts; is that correct?

16   A    They do not accept gifts, but I'm not sure the relevance

17   of your question.

18   Q    Well, I'm wanting to know if -- if you're saying that the

19   Secretary of Treasury does not accept gifts but the United

20   States law says that they do accept gifts would that be kind

21   of a contradiction?

22             MS. FREEMAN:  Objection, Your Honor, it calls for

23   speculation.

24             THE COURT:  She's already testified what her opinion

25   is about gifts and that she has made it very clear what she

1    says about that.  And so I'm going to sustain the objection.

2              THE DEFENDANT:  Well, Your Honor, I'm not testifying

3    but I'm trying to gain clarity in regards to one aspect of --

4    it's being said that the Treasury doesn't accept gifts but the

5    law says that the Treasury does.

6              And being a revenue agent --

7              THE COURT:  Well, we don't know what the law says

8    and as a consequence of that she doesn't know what the law

9    says.  And she has told you what she knows about this issue.

10             THE DEFENDANT:  Okay.

11   BY THE DEFENDANT:

12   Q    I don't remember the response to your question and I know

13   you just answered it and please forgive me.

14        In regards to -- whether it's gifts, whether it's money,

15   et cetera, given to the Secretary of Treasury or to the

16   Treasury, can the IRS see what is given to the Treasury?

17   A    If they can I'm not aware of it.  Not in my capacity, I

18   cannot see that.

19   Q    You mentioned that the trust had inflated income, false

20   withholdings, et cetera.  So you also mentioned that if

21   anything was given to the Treasury you couldn't see it.

22        So is it possible that there could have been an overlook

23   or possibly that you didn't see what was on another system or

24   you didn't see what was in the Secretary of Treasury system --

25             THE COURT:  Now, sir, you've gone back to the

possible question and I've told you that Rule 401 requires the

evidence to be probable.  That's what makes something

relevant.  It makes it more likely than not.  That is the

fundamental proposition of the Rule --

BY THE DEFENDANT:

Q     Can you tell me if -- does the Internal Revenue Service

issue refunds or does the Treasury issue refunds?

A     The Internal Revenue Service issues refunds.

Q     So on the checks that go out those come from the Internal

Revenue Service or does --

A     As a part of the U.S. Treasury Department.  So if you get

a check from the IRS it might have U.S. Treasury Department on

it.

Q     Do all refund checks come from the Internal Revenue

Service or --

A     If it's in regards to tax returns.

Q     You're saying all -- does the Treasury issue any refunds?

A     Directly, no.  It directly comes from the Internal

Revenue Service.

Q     So who approves the refund?

A     The refunds are issued based on returns that are filed

and it's contingent -- it's dependent on people filing

accurate and honest returns.  So that can be --

Q     I'm asking who approves it?

A     It's not --

```
 1   Q     Does the Treasury --
 2             THE COURT:  Don't interrupt the witness.
 3   BY THE DEFENDANT:
 4   Q     Forgive me.
 5   A     It's not necessarily approved.  Most of that goes through
 6   the computer system and the computer system sometimes does not
 7   recognize refunds -- refund schemes.  Sometimes it's caught
 8   after the money has already gone out.  And if they are
 9   manually issued that -- you know, sometimes they are manually
10   issued and that can be a matter of training.  It just depends
11   on what the situation is.
12   Q     You also mentioned that there was a personal Social
13   Security number linked to several trusts.  Can you identify
14   those trusts that have a personal social linked to them?
15   A     I don't remember right off hand what they are.  There
16   were approximately 30 trusts.  I don't remember every single
17   one of them.
18   Q     Are you able to, if need be, access the documents that
19   have a personal social attached to a trust?
20   A     I could, yes.
21   Q     You could?
22   A     If you had the documents in front of me I could identify
23   it.
24   Q     But if you recall back, as a witness, and requested -- or
25   subpoenaed and requested to bring those forms showing that
```

```
 1   there is a personal social linked to -- you said there was my

 2   personal social linked to --

 3   A    To some of the trusts, yes.

 4   Q    You could bring those trust showing --

 5   A    Can I bring those trusts?

 6   Q    Excuse me.  Bring the documentation.  I apologize for

 7   misspeaking.

 8   A    I could.

 9   Q    You mentioned that there were -- as far as funds that

10   were utilized -- yeah, that were utilized, that they were used

11   for various reasons.  What are the -- do you know the

12   permissible reasons for funds to be utilized for trust?

13   A    I'm not understanding your question.

14   Q    Is it permissible for a trust to pay for a meal?

15   A    I think it would depend on the circumstances.  If it were

16   for business use usually that would be something the -- and I

17   don't know the specifics.  I would have to know the specifics.

18   But if you are specifically talking about your returns and the

19   money that you received, the trust itself did not have any

20   income.  There were no bank accounts showing income from the

21   trust.  The only money that was in the bank accounts was the

22   refund scheme money.

23   Q    Can you tell me what is a 1099-C with the Internal

24   Revenue Service?

25   A    Right off hand, I do not know.
```

```
1    Q    Are you familiar with cancellation of debt with the

2    Internal Revenue Service?

3    A    Somewhat.

4    Q    Is cancellation of debt considered income?

5    A    It can be in the sense that if a company was not able

6    to -- if they had to cancel a debt because they were not

7    getting paid then they can issue a 1099-C to show it as income

8    for either an individual or a business.

9    Q    So if myself or a trust borrowed money from someone or an

10   entity, or if someone borrowed money from myself or the trust,

11   and the trust or myself wasn't repaid and the trust canceled

12   the debt, is that considered income?

13   A    It can be considered income if the transactions that you

14   are talking about are legitimate.  But you have to have a

15   basis for it and there has to be actual -- some type of

16   transactions to back it up.

17   Q    You mentioned that in regards to you meeting me I denied

18   being Mattox.

19        Was it explained to you that there was a name correction

20   or name change?

21   A    Could you repeat that question.

22   Q    You mentioned that when you met me that I denied being

23   Mattox.  I asked was it ever explained to you or was it ever

24   mentioned to you that there was a name change?

25   A    I believe that the only time that you told me you had a
```

 1   name change was in December of 2019.

 2   Q    Are you 100 percent sure or is that a guess or

 3   speculation?

 4   A    That is the only time that I recall.

 5   Q    So it is possible that it could've been mentioned prior

 6   to?

 7   A    It could've been, but that's the only time that I recall.

 8   Q    When it was explained to you exactly who I am did you

 9   take the initiative to say, "I know exactly who you are"?

10   A    Did I take the initiative to say I know exactly who you

11   are?

12   Q    Yes.

13   A    No.  That's not something normally a person would ask, I

14   don't think.  I don't know any reason why I would ask -- say

15   something like that.

16   Q    Let me ask the question again.  When I attempted to --

17   you said I denied being Mattox.  When I attempted to explain

18   who I am did you take the initiative to say, "I know exactly

19   who you are?"

20            MS. FREEMAN:  Objection, asked and answered.

21            THE COURT:  Well, I'm going to let her answer the

22   question.  I'm going to overrule the objection.

23   BY THE DEFENDANT:

24   A    THE WITNESS:  If you're talking about on our first

25   encounter you denied that you were Mr. Mattox.  I'm not going

1    to question that at that -- I did not question that at the

2    time.

3        However, a few days later, you did admit that you were

4    the same person that I talked to, that you were Mr. Mattox but

5    you were calling yourself Mr. El.

6    Q    If there is a name change -- if there is a name change

7    and the name change is to Burgess Mattox El would I have the

8    right to say you are in error here, but this is what the name

9    is, because there is a name change in place?

10   A    You would have that right, certainly.

11   Q    Did you ever receive copies of the certified name change

12   decree?

13   A    I don't recall receiving any of those type of documents.

14   Q    You also mentioned that there was a automobile that you

15   are familiar with.  An automobile that you identified as -- an

16   automobile that was purchased using funds from a trust.  Does

17   a trust have the ability or have the -- is it permissible for

18   a trust to purchase an automobile?

19   A    I would imagine it is permissible for a legitimate trust

20   to purchase an automobile under legitimate circumstances.

21   Q    But is it permissible for a trust?

22   A    It is permissible for a trust that is legitimate to

23   purchase a vehicle under legitimate circumstances.

24   Q    And the automobile that you identified as a -- that was

25   shown on the screen, where is that automobile today?

1    A    Someone has purchased it and I do not know where it is or

2    who purchased it.

3    Q    So how did that come about?

4    A    Because the IRS seized that vehicle in order to.

5         Recover some of the funds that were given out in the

6    refund scheme.

7    Q    And how did that come about in regards to the Internal

8    Revenue Service seizing?

9    A    How did it come about?

10   Q    Yes.

11   A    I'm not sure what you mean by that question.  It came

12   about by having it towed by a tow truck, giving you the

13   paperwork telling you that the vehicle was seized.

14   Q    But prior to being towed by a tow truck, what were the

15   actual methods of seizing the automobile?

16   A    I'm sorry?

17   Q    What were the methods utilized in seizing the automobile?

18   A    Well, we already had provided you with a Notice of Intent

19   to Levy.  We already had a levy in place, a lien in place, a

20   Notice of Federal Tax Lien in place, and I secured a writ to

21   be able to access the vehicle from your home.

22   Q    And receiving a writ, what does that give you permission

23   to do?

24   A    It gives us permission to enter the premises to seize the

25   vehicle.

Q     Is that by any means necessary?

A     It gives us permission.  Of course, it's not by any means

necessary.  But we could have gotten a locksmith, if

necessary.

Q     So appearing at the property with full body armor and

multiple guns, is that permissible to seize an automobile?

A     In certain circumstances, yes, it is.

Q     Could you help me to understand that one?

A     Well, I secured an armed escort because you have been

uncooperative in turning over the money and because there were

indications that you had a prior criminal history, and that

was for our safety for the persons seizing the vehicle.  It

was for our safety.

Q     Now, you said there was uncooperation in regards to

turning over the money.  If you mentioned that you seized the

money, could money be turned over that you've already seized?

A     What are you asking?

Q     You said I was uncooperative in turning over --

A     You were uncooperative in turning over the money.

Q     But you also mentioned that you seized -- that there was

a method and you seized funds, you seized money.  So could a

person turn over something that's already been seized?

A     It depends on what person you're talking about.

Q     So, if -- you're saying that I was uncooperative in

turning over money.  But you've already seized the money.  How

1    could I turn over or give you something that you have already

2    seized or taken?

3    A    Well, you didn't voluntarily turn over any money before

4    the seizure.  That is why the seizure was taking place and

5    that's why it was executed.

6    Q    Was the seizure the same day of communicating with you or

7    was there any lapse in time?

8    A    (No response).

9    Q    So you said we met, I think, in February?

10   A    Right.  And on that very day I advised you that the

11   Internal Revenue Service will issue levies or do whatever it

12   takes to recover the funds that you had received in the refund

13   scheme.

14   Q    But I'm asking, did you seize money the same day?

15   A    We issued a levy to the bank.

16   Q    Same day?

17   A    Same day.

18   Q    But you also mentioned that there was an appeals process

19   in regards to due process.  Was that due process denied in

20   regards to seizure and levying and taking funds?

21   A    It was not denied.  You were given appeal rights at the

22   same time.  You were not given appeal rights ahead of time

23   because we were concerned about the money dissipating.  And in

24   that case it's called a jeopardy levy.  We get permission to

25   do that to do a jeopardy levy.  It is approved by area counsel

1    and the territory manager.

2    Q    You also mentioned something about -- if I'm not

3    mistaken -- a personal tax return report.  A personal tax

4    return that was filed by the Internal Revenue Service in 2001.

5    You mentioned, if I'm not mistaken, that there were no

6    personal taxes filed since 2001.

7         If an individual is unemployed, or is a student, and

8    their income is minimum are they required to file a tax

9    return?

10   A    A person is required to file a tax return if -- depending

11   on the type of income and how much that income is.

12        So for tax year 2003, the IRS filed a tax return for you

13   based on the information that was submitted to the Internal

14   Revenue Service of income.

15   Q    So from 2003 until any other date, was there income shown

16   or was there income gained personally?

17   A    There was no income from 2004 through 2020 that I am

18   aware of that was submitted to the Internal Revenue Service.

19   That does not mean you did not have income.  It just means

20   that it was not submitted to the Internal Revenue Service

21   showing that you had income.

22   Q    So wouldn't a W-2 or some corporation or company be

23   required to collect withholdings to report to the Internal

24   Revenue Service?

25   A    They -- if you had a wage income, yes, they are required

1  to report it.  Do they always report it?  No.
2  Q    So if you're saying that you didn't see from 2004 to 2020
3  income, if myself or any other person did not have income or
4  there was no income reported for those years, is a person
5  required to file a tax return if they didn't have income,
6  personal income?
7  A    If they did not have personal income they are not
8  required to file.  But just -- again, if they -- the IRS does
9  not always know what income that you have.
10      Now, your personal tax returns, or what you were required
11 to file, were not my main focus.  But to my knowledge there
12 was no income reported to the Internal Revenue Service of your
13 income.  But you can have income that is not reported to the
14 Internal Revenue Service.
15 Q    If a person doesn't have income and is not reported -- or
16 they don't have income and they don't file a tax return
17 because they don't have income, is it a crime that they didn't
18 file a personal tax return if they didn't have income?
19 A    No.  It's not a crime.
20 Q    So if I didn't file a personal tax return -- a personal
21 tax return between 2004 and 2020 because there was no personal
22 income, I'm taking it that I didn't commit a crime by not
23 filing a personal tax return?
24 A    No, you have not committed a crime.
25 Q    Please bear with me.

1          THE DEFENDANT:  I think that will be all the

2   questions.  Thank you for your time.

3          THE COURT:   Redirect?

4          MS. FREEMAN:  Yes, Your Honor.

5                    REDIRECT EXAMINATION

6   BY MS. FREEMAN:

7   Q    Ms. Freeman, the Defendant asked you, somewhat at length,

8   about conversations you had with him educating him about

9   Jeopardy Levies and IRS procedures.

10          In that conversation in February of 2019, did you fully

11   explain why he owed the IRS millions of dollars?

12   A    Yes.

13   Q    Did he express surprise that he owed the IRS millions of

14   dollars?

15   A    No.

16   Q    Did you then demand that he repay the money he had taken

17   from the IRS wrongfully?

18   A    Yes.

19   Q    Did he refuse to pay that money back?

20   A    Yes, he refused.

21   Q    Is that why the same day levy was put on the Wells Fargo

22   Bank account?

23   A    Yes.

24   Q    In fact, did you ask him about speaking to the trustee so

25   you could get more information about these trusts on that day?

```
1    A     Yes.

2    Q     And did you ask him who the trustees were?

3    A     Yes.

4    Q     What did he say?

5    A     He refused to provide their names.

6    Q     So he refused to even provide the names of the trustees

7    you could talk to about the levy?

8    A     Yes.

9    Q     And did you have a conversation with him, on a later

10   date, about the settlement of debt and how that applies to IRS

11   tax obligations?

12   A     Well, yes.  He was saying that he had turned in or

13   submitted a settlement of debt or guaranteed bonds and I told

14   him those were not legitimate tender, they were not sanctioned

15   by the government and they were not negotiable tender.

16   Q     Did you tell him they were worth no money?

17   A     They were not worth any money.

18   Q     And when was this roughly, this conversation where you

19   told him this whole guarantee bond, settle the debt, was

20   worthless?  When was that?

21   A     I think there was one conversation in February and then

22   there might have been another one in May.  I'm not sure.

23   Q     So you've told him more than once --

24   A     Yes.

25   Q     -- that all of this is not legitimate?
```

```
1    A    Yes.

2    Q    Now, he asked you about the Secretary of the Treasury a

3    couple times.  If a person, a taxpayer, gives a gift to any

4    person, whether it's the Secretary of the Treasury or the

5    President or anyone on the planet, is that the same thing as

6    withholding?

7    A    No.

8    Q    Does giving a gift to literally anyone belong reported as

9    withholding on the trust tax return?

10   A    I'm sorry, could you repeat that.

11   Q    Does giving a gift to literally anyone, should that be

12   reported as withholding --

13   A    No.

14   Q    -- on a 1041 tax return for a trust?

15   A    No.

16   Q    So if a tax return says that it reports $71 million in

17   withholding and then that taxpayer comes around and talks to

18   you and said, but I gave a gift to the Secretary of the

19   Treasury, does that have any bearing on that tax return?

20   A    No.

21   Q    Does that make a false return suddenly true?

22   A    Yes.

23   Q    Does that make a false return suddenly a true and

24   accurate return?

25   A    Oh, no.  It's not an accurate return.
```

```
 1   Q     If someone is earning only fraudulent scheme funds as
 2   their income and they don't report themselves to the IRS in
 3   getting that fraudulent scheme money, would the IRS know that
 4   they're getting that income necessarily?
 5   A     Well, if they received that money illegitimately they
 6   need to return that money but -- and it's income that they
 7   received illegitimately.
 8   Q     So is it your obligation, as a taxpayer, to report your
 9   income no matter where it comes from?
10   A     Yes.
11   Q     But does the IRS automatically know where you get all
12   your money?
13   A     No.
14   Q     So if you are, in effect, stealing money from some
15   source, may be through an alias, does the IRS automatically
16   know that you have that income to report?
17   A     Not necessarily, no.
18   Q     Have you, in fact, told the Defendant Marquet Mattox,
19   that these arguments about guarantees to settle the debt and
20   giving gifts to the Secretary of the Treasury are, in fact,
21   frivolous?
22   A     Yes, I have.
23   Q     And have you told him that multiple times?
24   A     Yes.
25   Q     Had he persisted, nevertheless, with his frivolous
```

1   arguments with you?

2   A    Yes.

3        MS. FREEMAN:  No further questions.

4        THE COURT:  Recross?

5                    RECROSS EXAMINATION

6   BY THE DEFENDANT:

7   Q    Ms. Freeman, you mentioned just a moment ago that in

8   regards to giving gifts and -- that certain things were

9   considered frivolous.  But earlier you also mentioned that

10  you're not familiar with giving gifts or you're not familiar

11  with the Secretary of Treasury accepting gifts or you're not

12  familiar with --

13  A    I wasn't familiar with the statement that you were

14  reading.  I was not familiar with it.  But there is a -- if

15  you go to the IRS website there is a list of 60 plus pages of

16  frivolous tax arguments, if you wish to take a look at those.

17  Q    But you also mentioned that the Internal Revenue Service

18  and the Treasury basically are not one in the same.  They are

19  two different --

20  A    Well, the Internal Revenue Service is a department of the

21  U.S. Treasury Department.

22  Q    Correct, I got that part.  So is it possible that if

23  you're not familiar with --

24        THE COURT:  Let's don't go back to the possibility

25  questions, please.

1          THE DEFENDANT:  Okay.

2    BY THE DEFENDANT:

3    Q    Ms. Freeman, are you familiar with all the guidelines

4    that are permissible with the Secretary of Treasury in regards

5    to whether they are bonds or gifts or receipt of money?

6    A    Not every one of them, no.

7    Q    You explained that you requested funds and you also

8    explained that I refused to return funds.  Can you explain

9    that?

10   A    You refused to return the refund scheme money that you

11   had received.

12   Q    Now when did you and I have a conversation?  Do you

13   remember the date of the first conversation?

14   A    The first conversation was February 19, 2019.

15   Q    And did I refuse to return any funds that you said you

16   requested on February 19?

17   A    That is correct.

18   Q    Can you tell me how was that refusal?

19   A    Well, when I asked for the funds to be returned you

20   denied that you were Mr. Mattox and that you said you would

21   have the trustees contact me.

22   Q    But you are saying I refused to return.  So was there any

23   questions such as well -- well, was there any direct

24   statements of or refusal that I'm not going to give you any

25   funds or I'm not going to return anything back to you?

1   A    You did not acknowledge that you would turn the funds

2   over.

3   Q    Say that one more time, please.

4   A    You did not acknowledge that you would return the funds.

5   You said that you would have your trustees contact me and I

6   took that as a refusal.

7   Q    Is that an assumption or --

8   A    That was my understanding.

9   Q    So there was no direct refusal that I'm not going to give

10  anything back to you prior to -- even though you said it was

11  on the same day -- there was no direct refusal that I'm not

12  going to return anything back to you prior to you seizing

13  funds, correct?

14  A    When you spoke to me a few days later you had said that

15  you had submitted bonds and I told you that those bonds were

16  not legitimate tender.

17  Q    But the question that I'm asking is -- the date that we

18  spoke -- and there was no direct refusal that I'm not going to

19  give you anything back.  I'm not going to return anything

20  back.

21       So if that date was February 19th that we spoke and I'm

22  going to have someone to give you a call -- so, again, did you

23  go and immediately take funds, seize funds that same day?

24  A    We did.  And if you had willingly been wanting to return

25  the funds to the Internal Revenue Service we could have

1   released the levy, if you were willing to go to the bank and

2   secure a cashier's check for those funds.

3   Q    You also mentioned that in regards to -- in regards to

4   bonds not being permissible to the Internal Revenue Service

5   were there any bonds submitted to the Internal Revenue

6   Service?

7   A    You said that you had submitted some bonds to Puerto

8   Rico, Washington, DC.

9   Q    But what I'm asking is, was there any submitted to the

10  Internal Revenue Service?

11  A    You said that they were submitted to the Internal Revenue

12  Service.  I believe you named some -- you might have even

13  named some people that you -- I think you said -- worked for

14  the Internal Revenue Service or the U.S. or Treasury

15  Department, I believe.

16  Q    So you believe that -- it's the Internal Revenue Service,

17  for clarity, is it the Internal Revenue Service or is it the

18  Treasury?

19  A    I don't recall if you said Internal Revenue Service or

20  Treasury.  But the bonds that you were referring to were not

21  legitimate.  They were not sanctioned by the U.S. Treasury

22  Department.

23  Q    You said something about Puerto Rico.  Is the Treasury or

24  the Internal Revenue Service in Puerto Rico?

25  A    You said you sent them to Puerto Rico.  And you named a

1   couple persons.  I don't know who the persons were.

2   Q    So you're not familiar with any Treasury, Internal

3   Revenue Service, anything about Puerto Rico, I said --

4   A    I don't know what Puerto Rico does.

5   Q    You are not sure?

6   A    I do not know what Puerto Rico does.

7   Q    Okay.  And when you mentioned that -- you stated that

8   bonds were not permissible.  After that conversation, was

9   there any returns filed after that conversation when you

10  stated that bonds are not permissible?

11  A    Were there any?

12  Q    Any returns filed?

13  A    What kind of returns are you talking about?

14  Q    So, for an example, on February 19th you mentioned that

15  these bonds are not permissible to the Internal Revenue

16  Service.  So on that date, February 19th, that you mentioned

17  that these bonds were not permissible, was there a tax return

18  filed in regards to an overage, after that particular

19  conversation?

20  A    I'm not aware of you filing any returns after that

21  conversation.

22  Q    So basically -- so once you said that these are not

23  permissible, even though -- bear with me for a minute.

24       Let me ask this question.

25       Did I receive any personal funds from the Internal

1   Revenue Service or the Treasury?

2   A    You received funds that were payable to the trust that

3   you used for personal use.  You had sole signature authority

4   over the bank accounts.  You used those for personal use.

5        So was the money issued to you directly?  No.  It was

6   issued to the trust, but you took the money from that refund

7   scheme and you used it for personal use.

8   Q    So when utilizing funds from a trust, whether it's the

9   trustee or whether it's the beneficiary of a trust, does the

10  trustee or the beneficiary have the ability to use funds in a

11  trust?

12  A    The trustee is not supposed to use funds from the trust

13  for personal use.  It's supposed to have legitimate business

14  use.  And it was not used for any legitimate business use.

15       And the funds that you had were not business income.  It

16  was money that you received from a refund scheme that was

17  based on income and withholdings.  Income that was never

18  legitimate, it never happened, and it was based on withholding

19  that was never paid over to the Internal Revenue Service.

20  Q    But earlier you stated that cancellation of debt could

21  consist or -- consist of income, but you're also saying there

22  was no income?

23  A    Well, the income that you had on the returns was interest

24  income and it was astronomical.

25       If you are talking about cancellation of debt, it has to

```
 1   have a legitimate basis before you cancel the debt.  And there
 2   was no legitimate basis on that cancellation of debt.
 3   Q    Does the beneficiary of a trust have the ability to use
 4   funds in a trust?
 5   A    It depends on the type of trust.
 6   Q    Do you know what's permissible for a beneficiary to use
 7   funds in a trust?
 8   A    Not everything, no.
 9   Q    So you're saying that funds were used for personal
10   reasons or personal expenses, but you're not sure what's
11   permissible for -- what is permissible --
12   A    In the returns that you filed those were not legitimate
13   returns.  They were not based on anything in reality.
14   Q    Okay.  In regards to a trust, the structure in --
15            THE COURT:  We're going to stop now.  We're going to
16   take our morning break.
17            So we'll take about a 15 minute break.  Y'all go
18   back and relax.
19     (Jurors leave courtroom at 10:21 a.m.).
20            THE COURT:  We'll be back in about 15 minutes.
21            CSO OFFICER:  All rise.
22     (Resume at 10:41 a.m.)
23            CSO OFFICER:  All rise.
24            THE COURT:  Do you have any more questions of this
25   witness?
```

1          THE DEFENDANT:  Yes, sir, I do.

2          THE COURT:  How long do you think it will take?

3          THE DEFENDANT:  Seven or eight minutes.

4          THE COURT:  I'm not trying to restrict you.

5          THE DEFENDANT:  So if it took nine to 10.

6          THE COURT:  Go ahead.

7               CONTINUED RECROSS EXAMINATION

8    BY THE DEFENDANT:

9    Q    Ms. Freeman, does the Treasury and the Internal Revenue

10   Service have the same rules, same guidelines?

11   A    Well, there are different departments in the U.S.

12   Treasury.  So each department would have their own guidelines,

13   which are regulated by the or sanctioned by the U.S. Treasury

14   Department.

15   Q    Can you tell me one more time, and I apologize, you

16   worked with the Internal Revenue Service since, I think you

17   said, 2006?

18   A    No.  I started working with the Internal Revenue Service

19   in January of 1993.  I have been a revenue officer since

20   mid-2006.

21   Q    Have you ever been to the Treasury?

22   A    Have I ever been to the U.S. Treasury Department?

23   Q    Have you ever been to the Treasury?

24   A    In Washington?  No.

25   Q    Do they have other locations than Washington?

```
1    A    I don't know.
2    Q    Can you tell me the rules -- can you tell me the rules
3    for intangible personal property for the Treasury?
4    A    Intangible personal property?
5    Q    Yes.
6             THE COURT:  The Treasury Department or the IRS?
7             THE DEFENDANT:  The Treasury Department.
8    BY THE DEFENDANT:
9    A    THE WITNESS:  I don't know what the Treasury Department's
10   regulations are.
11   Q    Can you tell me the Internal Revenue Service rules for
12   intangible personal property?
13   A    I think it would depend on what you are talking about.  I
14   don't know what you are referring to.
15   Q    Does the Internal Revenue Service accept intangible
16   personal property?
17   A    I don't know what kind of intangible property you're
18   talking about?  What kind of intangible property are you
19   referring to?
20   Q    Are you familiar with just intangible?
21   A    Yes.  I'm familiar with intangible.
22   Q    Intangible personal property would be -- I don't want to
23   testify.
24             THE DEFENDANT:  I'm not sure how to answer that
25   question, Your Honor.
```

1          THE COURT:  Well, I think you can explain to the

2   witness.  I mean, she doesn't understand the question.

3   BY THE DEFENDANT:

4   Q    Intangible personal property consist of estates, consist

5   of trademarks, consist of copyrights?

6   A    Estates are not intangible property.  Now, copyrights and

7   patents and that kind of thing are intangible property.  But

8   estates themselves are not intangible property.

9   Q    But you also mentioned --

10  A    Now what's in an estate may be intangible property.

11  Q    So the items inside of an estate could be considered

12  intangible.  Is that what you're saying?

13  A    Could be.

14  Q    You mentioned something about bonds being sent to various

15  locations.  And I think you also mentioned that you weren't

16  sure if bonds were sent to the Internal Revenue Service?

17  A    I don't know where they were sent.

18  Q    You mentioned something about Puerto Rico and you

19  mentioned other locations?

20  A    You had mentioned that you had sent the bonds to those

21  locations.  Where you sent them?  I do not know.

22  Q    Now are you familiar with the United States meanings and

23  terms and definitions for secretary?

24  A    There are various definitions of secretary.

25  Q    Secretary of Treasury?

1   A    It's a Department of the U.S. government.

2   Q    Now, I know you're saying it's a Department of the U.S.

3   government and there are various terms for secretary or

4   Secretary of Treasury.

5        In one meanings and terms it states that the Secretary of

6   Treasury is the Secretary of Treasury in Puerto Rico.  Is that

7   true?

8   A    I don't know of any Secretary of Treasury in Puerto Rico

9   unless it's Puerto Rico's Secretary of Treasury.

10  Q    Does that mean that you are not familiar with another

11  location or does that mean that it doesn't exist?

12  A    I don't know of any other location.  It's operated out of

13  Washington, DC.  Now if they have other physical locations for

14  their offices I do not know where those offices are.

15  Q    So, if the guidelines -- excuse me.  You stated that

16  bonds -- You stated that I mentioned that bonds were sent to

17  Puerto Rico.  And if the guidelines or the rules state that

18  Puerto Rico -- the Secretary of Treasury is the Secretary of

19  Treasury in Puerto Rico and the guidelines say that Puerto

20  Rico accepts intangible personal property --

21            THE COURT:  Mr. Mattox, let me explain something to

22  you.

23            The scope of cross examination is limited to the

24  direct examination, the issues raised in direct examination or

25  the credibility of the witness.  I don't recall this

```
1    prosecutor saying anything about the Treasury or Puerto Rico.
2    You have brought that up.  So you have now departed from
3    dealing with the issues that were raised on direct.
4           You have the opportunity, when it's your turn to
5    present your case, to deal with those things.  But you have
6    gone beyond the scope of the direct cross examination and
7    you've been going along that way for a while.  And so I'm
8    going to tell you to stop on that topic.
9           THE DEFENDANT:  Okay, Your Honor.  I completely
10   understand and I would like to -- if you would let me respond
11   to the statement that you made.
12          THE COURT:  Go ahead.  I'm happy to hear from you.
13          THE DEFENDANT:  I only mentioned it because that's
14   what the witness stated.  I didn't initially bring that forth.
15          THE COURT:  You brought this up from the very
16   beginning trying to find out about the Secretary of the
17   Treasury.  And you have tracked along this now for a long
18   time.  And now you have gone to the Secretary of Treasury in
19   Puerto Rico, and so you are beyond the scope of the direct
20   examination.
21          THE DEFENDANT:  Your Honor, with all due respect,
22   the witness mentioned that there were various bonds sent and
23   she mentioned that bonds were sent to various locations.
24          THE COURT:  That's because you brought it up.  She
25   never said a word about any bonds.
```

1              I've let you go on this now for quite some time but

2      now I'm reigning you in on this.

3              THE DEFENDANT:  Thank you.  That's all my questions.

4      Thank you.

5              MS. FREEMAN:  No further questions, Your Honor.

6              THE COURT:  Do you want to keep this witness here or

7      release the witness?

8              MS. FREEMAN:  No, Your Honor, we release the

9      witness.

10             THE COURT:  Call your next witness.  Thank you.

11             MS. KRAFT:  Thank you.  The United States calls

12     Paule-Nathalie Clarke.

13             COURTROOM DEPUTY:  Do you swear that your testimony

14     will be the truth, the whole truth, and nothing but the truth,

15     so help you God?

16             THE WITNESS:  I do.

17             COURTROOM DEPUTY:  Please state and spell both your

18     first and last name for the record.

19             THE WITNESS:  Paule-Nathalie Clarke, P-A-U-L-E,

20     hyphen, N-A-T-H-A-L-I-E, C-L-A-R-K-E (Spelling).

21             THE COURT:  Take your mask down, please.  Thank you.

22                    PAULE-NATHALIE CLARKE

23             Whereupon, witness having been duly sworn,

24                    testified as follows:

25                    DIRECT EXAMINATION

```
 1   BY MS. KRAFT:
 2   Q    Thank you, Ms. Clarke.  And do you normally go by your
 3   middle name Nathalie?
 4   A    Yes, Nathalie.
 5   Q    Ms. Clarke, are you currently employed?
 6   A    I am not.  I am a caregiver to my mom.
 7   Q    How were you previously employed?
 8   A    I am an interior designer and I was employed with
 9   Haverty's Furniture Company.
10   Q    What was your title at Haverty's Furniture Company?
11   A    Design consultant.
12   Q    And where was that located?
13   A    I was responsible for two different stores, Stonecrest
14   off of Mall Parkway and as well as the Snellville store, Main
15   Street, Snellville.
16   Q    What did your job entail?
17   A    I basically was responsible for the complete design
18   process.  Customers, clients, would come in wanting to
19   purchase a sofa, purchase tables and chairs.  I would be
20   introduced to them, the salespeople or manager would give me
21   the lead, and I would introduce them to the program.  I would
22   be able to offer them complete design service, their living
23   space, designing from beginning to end, a complete look.
24        So basically my point was to sale.  If you come in for a
25   sofa, I sell you the whole room.
```

1    Q    How long were you employed at Haverty's Furniture?

2    A    About eight years.

3    Q    Did there come a time when you had a client named Marquet

4    Burgess Mattox El?

5    A    Yes.

6    Q    When did he first become your client?

7    A    My manager at the Snellville store introduced me to

8    Mr. Marquet Mattox the spring of 2018.

9    Q    How often did you meet with Mr. Mattox?

10   A    We had about five different meetings from beginning to

11   end of the process.

12   Q    And do you see Marquet Burgess Mattox El in the courtroom

13   today?

14   A    Yes, I do.

15   Q    Can you please describe him by where he is located and

16   what he is wearing?

17   A    He is to my right, seated at the desk.  He has on a black

18   hat, a suit, and he has a beard and wearing glasses as well.

19         MS. KRAFT:  Let the record reflect the witness has

20   identified the Defendant.

21   BY MS. KRAFT:

22   Q    When the Defendant became your client, Ms. Clarke, what

23   did the Defendant ask you to do?

24   A    He resided at a home, his home, his residence, and he

25   wanted me to basically furnish the entire home from basement

1    all the way up to all the bedrooms, with all of the

2    furnishings, all of the finishing touches, the accessories and

3    so forth.

4    Q     How long did that project take?

5    A     It was about a two to three month process.

6    Q     And was there anything unusual about the assignment?

7    A     A couple different things.  He wanted the design service

8    to be a completed look from beginning to end.  Usually it's

9    about a three step process.  Most people get the base

10   furniture first.  Furniture costs a lot of money.  So you get

11   the base furniture first.

12        And then the add-ons; your rug, a lamp and so forth.

13   Generally I can't sell or add on a lamp or rug if you don't

14   have a chair to sit on or if you don't have a bed to lay on.

15        And, then, the third process are the finishing touches

16   which is the accessories, the do-hickies, the things that I

17   make your room or your home look show room ready, you know,

18   really accessorized.  He wanted it all in one.

19        He wanted the invoice to only reflect complete purchase

20   price, meaning that I could not go back and add anything on.

21   I had to make it complete and I had to make it precise.  So in

22   that case it was unusual.

23        He did not have a budget.  Most people have a budget.

24   Most people give you a cap off.  He just basically wanted to

25   know what would it take to completely furnish the home and do

```
 1   it all in one step.

 2   Q    And did you visit the home in this process?

 3   A    Yes, I did.

 4   Q    How often?

 5   A    From beginning to end the home was maybe three times.

 6   Q    And where was that home located?

 7   A    In Lilburn, Georgia off of Lake Lucerne.  I believe the

 8   address is Morgan -- I forget the address, but it's off a Lake

 9   Lucerne in Lilburn, Georgia.

10   Q    And what did the home look like?

11   A    It was a stately home.  Really nice posh subdivision.

12   Gated subdivision.  Four-sided brick.  Well manicured lawn.

13   Meticulous work.  Really nice.  Really beautiful home.

14   Q    Now I want to show you what has been previously admitted

15   and published as Government's Exhibit 1.

16        MS. KRAFT:  Mr. Quintero, if you could pull up the

17   two pages of the exhibit side-by-side, please.

18   BY MS. KRAFT:

19   Q    Ms. Clarke, do you recognize what is depicted in this

20   photo?

21   A    Yes.

22   Q    And what is it?

23   A    This is the residence that I visited and completely

24   furnished.

25   Q    And that was for the Defendant?
```

```
1    A    Yes, ma'am.

2    Q    Who was living in the house at the time?

3    A    At the time a teenage son, two younger daughters, as well

4    as Mr. Mattox.

5    Q    How do you know that?

6    A    I furnished three bedrooms for the children, as well as

7    his bedroom.

8    Q    Other than the Defendant, did you consult with anyone

9    else about the design of the home?

10   A    No, ma'am.  He was in complete control.  I had no other

11   dealings with anyone else besides him.

12   Q    How did he describe the style he was looking for?

13   A    Elegant.  Very high end.  He wanted everything top-notch.

14   He wanted everything at a higher scale level.  A distinguished

15   look.  He wanted the home to be showcase ready.  Show room

16   ready.  Everything had to be at an elevated level.

17   Q    What types of items was he looking to purchase?

18   A    Everything.  The home was empty.  So from beds to tables

19   to chairs to accessories, every single piece of item I had to

20   supply.

21        MS. KRAFT:  Your Honor, may I have permission to

22   publish what has been previously admitted as Government's

23   Exhibit 16, the Haverty's Furniture records?

24        Mr. Quintero, if you could pull up Government

25   Exhibit 16, page 28837, which I believe is this first page.
```

```
1    BY MS. KRAFT:

2    Q    Can you read that, Ms. Clarke?

3    A    Yes.

4    Q    Were these some of the items that you helped the

5    Defendant to purchase?

6    A    Yes.

7              MS. KRAFT:  If we could zoom in on the box that says

8    delivery, Mr. Quintero.

9    BY MS. KRAFT:

10   Q    Ms. Clarke, was this the address of the house the

11   Defendant was seeking your assistance for?

12   A    Yes.

13   Q    And is that the name of the customer that you were

14   helping?

15   A    Yes.

16             MS. KRAFT:  Mr. Quintero, if we could now turn to

17   page 28773 (sic) in this exhibit.

18   BY MS. KRAFT:

19   Q    Ms. Clarke, what is this document?

20   A    It's basically a sales receipt outlining what was

21   delivered, all the items broken down.

22   Q    And is a signature asked of a client when delivery has

23   been made?

24   A    Yes.

25   Q    And whose name do you see in the signature box?
```

```
 1   A     The Defendant.

 2   Q     Okay.

 3             MS. KRAFT:  We can take down that exhibit now.

 4   Thank you.

 5   BY MS. KRAFT:

 6   Q     I believe, Ms. Clarke, you mentioned that you did not

 7   discuss a budget with the Defendant; is that correct?

 8   A     No.

 9   Q     Do you recall the Defendant rejecting any item that you

10   had selected because of cost?

11   A     No, not because of cost.

12   Q     Did he reject other items?

13   A     Yes.

14   Q     What were his reasons?

15   A     They were not up to par or weren't a certain look that he

16   wanted.  He wanted it to be a little bit more grandiose or a

17   little bit more extravagant.

18   Q     Did the Defendant tell you about the source of the money

19   he was using to pay for the furniture and decor?

20   A     Yes.

21   Q     And whom did he say it was from?

22   A     He said that this was from money that the government owed

23   him and that he was pulling it from a fund.  One of the

24   reasons he only wanted one invoice so that he could present it

25   and pull these funds out from money owed to him by the
```

1    government.

2    Q    And approximately how much in total did the Defendant pay

3    for everything?

4    A    If I'm not mistaken about $120,000.

5         MS. KRAFT:  No further questions.

6         THE COURT:  Your witness.

7                        CROSS EXAMINATION

8    BY THE DEFENDANT:

9    Q    Good morning.

10   A    Good morning.

11   Q    I was looking at the document that was shown on the

12   screen and it actually said that there was no delivery date

13   scheduled, but then there was another document that stated

14   that there was a signature for the delivery date.  Can you

15   tell me the actual delivery date?

16   A    Can you bring up the document again.

17        MS. KRAFT:  Mr. Quintero, it's Exhibit 16 and the

18   delivery page was page 28773.

19   BY THE DEFENDANT:

20   A    THE WITNESS:  So the stop -- far left corner, the

21   delivery would have been Saturday, April 21st, 2018.

22   Q    Can you tell me the date for the invoice.  You mentioned

23   that there was an invoice.  You mentioned that there was a --

24   that it was requested for an invoice, everything to be put on

25   an invoice of items that were being secured or items being

1   purchased.

2        Do you remember the date of the invoice?

3   A    No, I do not remember the date of the invoice.  During

4   the sale process basically what occurs is after I visit the

5   home, measure out the home, photograph the home, we talk about

6   the design, we talk about what is expected, the look, the feel

7   of the home.  I bring the client back to the store and I

8   present my thoughts and my ideas.  I present the furniture.

9   We walk around the show room.  I point out the items that I

10  am, you know, basically advising or submitting.

11       At that time we go back to the office and all of the

12  items that I am presenting in the look is on the invoice.  So

13  that would have been the date that he saw the invoice.

14  Q    So was everything completed within one day?

15  A    I'm sorry.

16  Q    Was everything completed within one day?

17  A    No.  Definitely not.  Not for that magnitude of a

18  project.

19  Q    So as far as the invoice being presented and payment or

20  settlement of the debt, was that all in one day?

21  A    No.  I presented to -- I presented to you, presented, as

22  well, the cost of the goods, then the approval of the items

23  and then once you submitted a cashier's check that's when the

24  purchase would have been made.  So that was a different day.

25  Q    You mentioned that there was a statement made to you in

1    regards to funds that was owed to me from the government.  Was

2    it from the government or was it funds that was actually owned

3    or owed to a trust or funds that were being received?  Which

4    one?  Was it the government or was it --

5    A    So, the story, or what I was told, was that these funds

6    were from the U.S. government owed to you.

7    Q    Did that come from me or did that come from someone else?

8    A    I don't know.

9    Q    So did I ever say, "Hey, the government owed me funds?"

10            MS. KRAFT:  Objection, Your Honor, it's hearsay.

11            THE COURT:  Well, I think I'm going to overrule the

12   objection.

13            State the question again.

14   BY THE DEFENDANT:

15   Q    Did I ever state the government owes me funds?

16   A    Yes.

17   Q    I stated that to you?

18   A    Yes.

19   Q    That the government owed me funds or --

20   A    Yes.  That these were funds owed to you by the U.S.

21   government.  Yes.

22   Q    And did I state the reason funds were owed to me?

23            MS. KRAFT:  Objection, Your Honor, it's hearsay.

24            THE COURT:  Go ahead and ask the question again.  I

25   didn't catch the end of it.

```
1    BY THE DEFENDANT:

2    Q    Did I ever state the reason that funds were owed to me?

3              THE COURT:  Overruled.  Go ahead.

4              If you can answer that go ahead and answer that.

5    BY THE DEFENDANT:

6    A    THE WITNESS:  Yes.

7    Q    I stated the reason?

8    A    Yes.

9    Q    And what was the reason?

10   A    You proved that you were of native American descent.

11   Q    You mentioned something about a Mrs. Mattox.  Was there

12   ever a Mrs. Mattox introduced?

13   A    I was never introduced, but I believe the mother's

14   children -- the children's mother dropped them off, came to

15   the home.  I did greet her, but I was never introduced to her.

16   Q    So is there an assumption of a Mrs. Mattox?

17   A    I assumed only because she brought the children home.

18   Q    You said she brought the children -- to drop the children

19   off or to bring the children home?

20   A    Yes.

21   Q    Was it to drop the children off or which was it?

22   A    So the children were not at the residence and I saw her

23   bring the children to the residence.  So, yes, she dropped the

24   children off.

25   Q    Do you have a date between -- as far as the invoice date
```

```
 1   and the purchase date, as far as the timeline?  The date of

 2   the invoice and the actual purchase date?

 3   A    So the date of the purchase would be, I believe, it was

 4   March 18th.  If we go back to the first exhibit.

 5   Q    Is that the same date of the invoice?

 6   A    No.

 7   Q    And what is the date of the invoice?

 8   A    It would have been at least two weeks prior to that or

 9   maybe a week prior to that when I presented.

10   Q    Is it possible that it could've been -- well, not

11   possible.  Let strike me that question.

12        You said a week to two weeks.  How would we know if it

13   was longer than two weeks?

14   A    The design process is not very long or drawn out.  Once I

15   present and give the invoice then the client or the customer

16   makes the purchase.  I believe that it took about maybe a week

17   for you to come back with a cashier's check with the amount.

18   Q    Was there any negotiations prior to meeting you -- was

19   there any negotiations with anyone else or conversations with

20   anyone else prior to meeting you?

21   A    No.  It was you and I.  My manager Charlene Harper

22   introduced us but there were no negotiations.

23   Q    Was there any conversations with any other sales

24   associate in the store prior to being introduced to you?

25   A    Not that I know of.
```

1   Q     Was there a gentleman that actually assisted you?

2   A     Yes.  The sales representative does assist me, yes.

3   Q     So was there a conversation with another sales associates

4   prior to being introduced to you?

5   A     I did not speak with the sales representative.  I spoke

6   with my manager, Charlene.  She was the one who advised of you

7   as a customer.

8   Q     Did I meet the sales associate prior to meeting you?

9   A     You would have had, yes.

10  Q     In meeting the sales associate, prior to meeting you, do

11  you know if there was any conversations in regards to items

12  that were of interest?

13        MS. KRAFT:  Objection, Your Honor.

14        She said that she wasn't present for that

15  conversation.

16        THE COURT:  Well, if she's not present for the

17  conversation she can't have any -- wouldn't know about that.

18  It's very unclear to me what the relevance of that is anyway.

19        THE DEFENDANT:  What I'm looking for, Your Honor, is

20  she mentioned that there was no conversation prior to her with

21  any of the sales associates.  She mentioned that there was an

22  invoice, but she's not exactly sure when the invoice was

23  presented.

24        So I'm wanting to see was there an invoice or

25  communication with someone else that would have generated or

```
 1   created an invoice prior to meeting her.
 2              THE COURT:  Ask her that question.
 3   BY THE DEFENDANT:
 4   Q    Is it possible -- I don't want to say is it possible.
 5   You mentioned that there was an invoice that was presented.
 6   You also mentioned that there was a conversation with someone
 7   else prior to meeting you.  Was there an invoice created
 8   through an alternative or another sales associate prior to
 9   meeting you?
10   A    Possibly, yes.
11   Q    Are you familiar with -- you said possibly.
12        So is the delivery date the same as the date of
13   purchase?
14   A    No, sir.
15   Q    So the date of purchase is -- what is considered the date
16   of purchase?
17   A    The date of purchase is prior to delivery.
18   Q    Bear with me please.  You mentioned that everything was
19   requested to be on a grand scale.
20        There was no mention in regards to -- well --
21              THE DEFENDANT:  No further questions.
22              THE COURT:  Redirect?
23              MS. KRAFT:  Just briefly, Your Honor.
24              Mr. Quintero, if we could pull up side by side of
25   Exhibit 16, pages 28761 and 28762.
```

```
 1                      REDIRECT EXAMINATION
 2    BY MS. KRAFT:
 3    Q    Can you read those, Ms. Clarke?
 4    A    Yes.
 5    Q    And what are they?
 6    A    Front and back cashier's check and as well as dates.
 7              MS. KRAFT:  And if we could zoom in on the date.
 8    BY MS. KRAFT:
 9    Q    What is the date on this first check?
10    A    March 18, 2018.
11    Q    Thank you.
12              MS. KRAFT:  And if we could zoom in on the second
13    check.
14    BY MS. KRAFT:
15    Q    And the date on this check?
16    A    March 26th, 2018.
17    Q    And do you recognize these checks as how the Defendant
18    paid for your services and the purchase of the furniture?
19    A    Yes.
20              MS. KRAFT:  No further questions.
21              THE COURT:  Do you have any questions?
22                      RECROSS EXAMINATION
23    BY THE DEFENDANT:
24    Q    Ms. Clarke, can you tell me the date of the invoice?
25    A    So, once again, I presented the invoice when I presented
```

```
 1    to you my thoughts, my ideas, the furniture, the accessories
 2    and so forth.  So the invoice would have been generated about
 3    a week -- the day of presentation.  I don't recall the exact
 4    date of the invoice itself.
 5    Q    So there was a space in time between the invoice and
 6    payment?
 7    A    Correct.
 8              THE DEFENDANT:  Okay.  That's all.
 9              THE COURT:  Call your next witness.  Are you going
10    to excuse this witness?
11              MS. KRAFT:  Yes, Your Honor.
12              THE COURT:  Travel safely.
13              MS. FREEMAN:  Your Honor, the United States calls
14    Special Agent Jeron Clark.
15              COURTROOM DEPUTY:  Do you swear that your testimony
16    will be the truth, the whole truth, and nothing but the truth,
17    so help you God?
18              THE WITNESS:  Yes.
19              COURTROOM DEPUTY:  Please state and spell both your
20    first and last name for the record.
21              THE WITNESS:  Jeron Clark.  J-E-R-O-N, C-L-A-R-K
22    (Spelling).
23    ///
24    ///
25    ///
```

1                        JERON CLARK

2          Whereupon, witness having been duly sworn,

3                    testified as follows:

4                    DIRECT EXAMINATION

5    BY MS. FREEMAN:

6    Q     Special Agent Clark, where are you currently employed?

7    A     The Internal Revenue Service.

8    Q     And what is your title there?

9    A     I'm a Special Agent with Criminal Investigation Division.

10   Q     What is the Criminal Investigation Division?

11   A     Essentially what we do is the division is pretty much

12   when fraudulent returns are filed we investigate them.  So

13   it's more than just special agents.  It's like a whole

14   different part of the IRS besides just the civil side.  But we

15   kind of investigate just fraud and criminal activity.

16   Q     So is that an entirely separate operation from what

17   Revenue Officer Freeman does?

18   A     Correct.  Because she's on the civil side.  Most people

19   who deal with the IRS they deal with the civil side.  So when

20   you think about the IRS it's usually auditors, revenue

21   officers and things.

22          So a lot of people aren't aware that we exist, but yeah

23   it's a separate branch.

24   Q     How does the IRS decide that some kind of tax issue

25   should go to you on the criminal side as opposed to just

1   dealing with the civil side?

2   A    It's more of the intent.  So we have within criminal

3   investigation we have a Scheme Development Center.  The Scheme

4   Development Center essentially is when all the returns come

5   in -- I don't know how it works, but it's some kind of like

6   algorithms or whatever, they look at certain characteristics

7   of the returns that are sent in to see if anything looks fishy

8   or something doesn't look correct on it.

9        Then once they see that they do a little bit like

10  in-depth kind of background check on what was sent in.  If it

11  rises to the occasion where they want an agent to look at it

12  then they will refer it over to us and then we do a thorough

13  investigation.

14  Q    And Special Agent Clark, how long have you been Special

15  Agent with the IRS Criminal Investigation Division?

16  A    Seventeen years approximately.  A little over 17 years.

17  Q    In those 17 years have you developed any kind of

18  specialty with regards to the kinds of crimes that you look

19  at?

20  A    Yes.  Refund fraud was one of the specialties that I

21  have.  As I stated earlier, we do have the Scheme Development

22  Center.

23       So I was kind of the liaison from when they would send

24  over all of the referrals.  I would look at them first, see if

25  it rose to the occasion and then I would send them out to like

the other agents in my group, because I was over the Atlanta

Field Office which consist of Georgia and Alabama.

So depending on where the fraud was taking place I would

send it to the agent that would work it and do like a thorough

investigation on it.

Q    So talking about specifically refund schemes.  How does a

tax fraud investigation work on a refund scheme in a general

level?

A    So, again, so what happens is they will look at it --

like when the returns come in and then they will look at what

is generating the refund.

So a lot of times if withholdings, false incomes, false

deductions, anything that looks fraudulent, like really

fraudulent, then that is considered like a refund scheme.

Because it's usually more than just one return.  It's usually

multiple returns with similar characteristics.  So it's not

just one return.  It will be a lot of returns and then they

will group them together as a scheme.

Q    Now, when a tax return is filed with the IRS, does the

IRS know automatically if the taxpayer is being honest with

their numbers?

A    No, we do not.  The IRS is a trust based system.  So when

the returns come in we believe that it's correct.  Because

when you're filing a return you're saying that you're filing

an accurate and correct tax return.

1    So we go on the assumption that you're filing a correct

2  and accurate tax return.

3  Q    Is there an attestation that the taxpayer is required to

4  sign at the end of the return stating basically that?

5  A    Yes, yes, there is.

6  Q    And that they understand that the law requires them to be

7  truthful when they file that return?

8  A    Yes.

9  Q    And does the IRS have a way of secretly checking on how

10  much money or assets somebody has in a bank account when they

11  receive the return?

12  A    No, we do not.

13  Q    Does the IRS automatically know how much a taxpayer made

14  in income in a year?

15  A    No.

16  Q    How would the IRS know if somebody had made income at the

17  time of the filing of their return?

18  A    Okay.  So, how this would happen is like everybody if you

19  have a job most people have -- are W-2 earners.

20    So what would happen is your employer sends the

21  information to the IRS and says this is the amount of money

22  that this particular person earned through the year.

23    Different businesses might send information like 1099s,

24  like if you are a contractor.  I don't know if anybody -- but

25  if you get a 1099 that is also sent to us.

1    So the only information that we have for income is
2  documents that they would send in saying this is what this
3  person earned.
4  Q    And are business and trust any different in this respect
5  with regards to how income is reported than individuals?
6  A    No, they are not.
7  Q    So, in terms of a tax refund, does the IRS know when you
8  file your tax refund or tax return, rather, and ask for a
9  refund if that is, indeed, the actual money that is owed to
10 you?
11 A    We do not know.  Again we believe whatever you file is
12 correct.  So we go on that assumption that it is correct.
13 Q    And in your experience with criminal investigations and
14 refund schemes, in particular, is it actually fairly
15 commonplace that people abuse that trust of the IRS?
16 A    Yes.
17 Q    Are you the lead case agent in the criminal investigation
18 of a tax refund scheme involving a Marquet Mattox?
19 A    Yes, I am.
20 Q    Tell us how the scheme worked?
21 A    Okay.  So, as I stated earlier, how this Scheme
22 Development Center works is they actually sent the referral
23 over to me.  What it entailed was at the time it was like four
24 tax returns.  Two of them had refunds issued and two of them
25 were stopped.  They had the same commonalities of the address

1    was the same, 2625 Piedmont Road, and the IP address was the

2    same on a couple of them, and the device ID was the same on

3    some of the returns.

4        So that's why it was qualified as a scheme and it was

5    sent over to me.

6    Q    Overall how did, just in general terms, the refund scheme

7    get fraudulent refunds?

8    A    The fraudulent withholding.

9    Q    How much money, over all, was stolen from the United

10   States government in the course of this scheme?

11   A    Over $5 million.

12   Q    Who got that $5 million?

13   A    Marquet Mattox.

14   Q    Who told you that Marquet Mattox was the one who got that

15   money?

16   A    He told me he got the money.

17   Q    Who told you that Marquet Mattox was the one who filed

18   the tax returns that got him that $5 million?

19   A    He told me he got the money.

20   Q    And did he tell you he filed those tax returns?

21   A    Yes.  He said he filed the tax returns.

22   Q    Okay.  Let's talk about how you got to that point.

23            MS. FREEMAN:  Mr. Quintero, could you please bring

24   up the Indictment and the list of trusts from the bottom of

25   page 2 to the top page 3.

BY MS. FREEMAN:

Q    Special Agent Clark, can you see that?

A    Yes, I can.

Q    And if you could please just speak as best you can straight into the microphone.  I'm sorry, this barrier makes it very hard for me to hear.

Are these 12 Trusts the Trusts that you investigated?

A    Yes.

Q    And are these 12 Trusts associated with the Defendant in this case, Marquet Mattox?

A    Yes.

Q    You mentioned a minute ago that some of these Trusts had some things in common.  I believe you mentioned a physical address in common; is that correct?

A    Yes.

Q    What do you mean by physical address?

A    Okay.  So, when the returns were submitted to the IRS the address on the return was 2625 Piedmont Road, Suite 56, Box 507.

Some of the returns, because of the way that it was submitted, might not have had like the suite number or the box on it, but they all had the 2625 Piedmont Road address in Atlanta.

Q    And what other identifying factors did these Trusts have in common?

1   A    The trustee was the same on them.  The amount of money

2   that they were asking was similar, large amounts.

3   Q    What about their methods of submission?

4   A    Some of them were electronic and some of them were

5   mailed.

6   Q    And was there anything you could tell in common from how

7   they were filed electronically?

8   A    The electronic ones had the same IP address.  Well, they

9   had two IP addresses, but they all had -- the ones that were

10   filed utilized two different IP addresses.

11   Q    Did you notice anything consistent amongst the returns

12   filed for these Trusts with regard to the income?

13   A    All of the income was very large.  Usually the

14   withholding would either match the income or half of the

15   income.

16   Q    What's significant about the income matching the

17   withholding?

18   A    Essentially you're guaranteeing yourself a refund.

19   Because there is no tax bracket that is a hundred percent.  So

20   if you are saying every dollar that you earned you're giving

21   over to the IRS.  That's essentially what the tax return said.

22   "I earned $17 million, I didn't get any of it, all of it went

23   straight to the IRS."

24   Q    Okay.  So, let's look at some examples of what you're

25   talking about together.

1          MS. FREEMAN:  Mr. Quintero, can you bring up

2     previously admitted and published Exhibit 4-1.  And let's

3     start with the -- if you could please zoom in on the Kemahra

4     Investment Trust, highlighting just those lines on page 4-1.

5     BY MS. FREEMAN:

6     Q    So, Special Agent Clark, looking at these returns all

7     having been filed on behalf of the Kemahra Investment Trust

8     for tax years 2015 and 2016, what's wrong with this picture?

9     A    Well, they are high refunds, high income and there are

10    amended returns too.

11    Q    Well, what is the significance of an amended return?

12    A    So essentially what an amended return is, if you file a

13    tax return and something -- you might get some additional

14    information.  Like on a personal level, like if you filed a

15    tax return and maybe like one of your W-2s hadn't come in

16    after you had already filed it, you would amend the return

17    because you would say, oh, I received this information

18    additionally because I had already filed a tax return.

19         So the point of an amended return is if you get some

20    additional information to amend their first return that you

21    submitted.

22    Q    What is significant about the amended returns you see on

23    the screen?

24    A    So, if you look at it -- so the first return that he

25    filed was a 2015 tax year.  He's saying that he made $155,000.

1    He's saying that on this there were payments to the IRS of

2    $75,000.  About a year later he filed an amended return saying

3    he still earned that same -- total income was the same, 155,

4    but now he's saying instead of just 75,000 that was withheld

5    on his behalf, 155,000.

6        So essentially what he's saying is everything that he

7    made in the beginning was taken out.  He would have known that

8    when he filed the first return because he wouldn't have gotten

9    any money.  So there would have been no additional information

10   that he could've received.  It's like, "Oops, oh, yeah, I

11   didn't get any money."

12   Q    And is that because withholding would have happened in

13   the past?

14   A    Yes.

15   Q    Now, what's the effect if you file an amended return with

16   the same income but you raise up the withholding like that?

17   What does that do to a refund?

18   A    So if you look at it, initially he received $9,932.  So

19   then he said, "Oops, I forgot."  And then now he's requesting

20   $89,932.  Luckily we stopped it, but that's what he was

21   requesting.

22   Q    Now, what do you notice about tax year 2016?  That is the

23   alternating second and fourth lines there.

24   A    So in 2016 he's saying now he earned almost $10 million.

25   And then he had withholding payments of $5 million.

1      Again, a couple of months later he's now saying, "Oops,

2  now I made $17,660,000 and all of that was again withheld on

3  my behalf and now $170,660,000 in withholding."

4      So initially he was requesting $660,000 as a refund and

5  then when he amended the return he would again ask for

6  $10 million.  Again, luckily, we stopped this from going out.

7  Q    Now, do you know, is there anything of significance you

8  notice the difference between 2015 versus 2016?

9  A    Only real difference is the amount of money that went

10 out.  And I guess the IP address is different on the last '16

11 is different from the first two that he submitted.

12 Q    Is there anything of interest about the change in income

13 from 2015 to 2016?

14 A    I mean it's a huge amount like 155 to 17 million

15 ultimately.

16      MS. FREEMAN:  Mr. Quintero, could you please pull up

17 the same Exhibit 4-1, but this time zoom in on the dates from

18 mid November 2017, which are the bottom three lines of page 1

19 flowing over top of three lines of page 2.

20 BY MS. FREEMAN:

21 Q    Special Agent Clark, looking at these lines what's wrong

22 with this picture?

23 A    Okay.  So the first thing if we notice they were all

24 either filed on the 17th or the 18th.  There are, what, six

25 different entities here that he controlled.

1       If you look at it the numbers are slightly similar.  So

2  what it looks like is possibly -- we do have filters so maybe

3  they are just trying to change it a little bit so it doesn't

4  look like it's the exact number that's going through.  But

5  they are all pretty much the same thing.

6       Again, the first one, Burgess Mattox Bey Trust is saying

7  17,660,000 with hundred percent being claimed as payments.

8       Then he filed on the same day for the Kamili Investment

9  Trust 17,600,000 this time instead of the 660.  And again a

10 hundred percent was supposedly sent over to the IRS of

11 17,600,000.

12      Then the next day he goes back, he files a different

13 return for the Kemahra Investment Trust, 17,660,000, again a

14 hundred percent.

15      Then he files another one for Burgess Mattox Bey

16 Investment Trust, the 17,660, again hundred percent.

17      And then he filed another one, Marquet Antwain Burgess

18 Mattox Trust 17,000 -- I'm sorry 17,660,000, again the same

19 amount for payments.

20      And then the last one he changes it a little bit for the

21 Kamili Investment Trust 17,690,000 and then withholding was

22 17,670,000.

23 Q    And what to you is of significance about the dates in

24 which these six returns are filed?

25 A    I mean, they are all pretty much the same day.  He's

1    requesting, if you look at it, what's that, 10, 20, 30, 40,

2    50, $60 million in refunds in those two days.

3    Q    What else seems to be the same when you look at these six

4    in a row?

5    A    The IP address is the same on them.

6    Q    And what does that indicate to you that the IP address is

7    exactly the same for each of these six returns being filed?

8    A    They were all filed by the same person.

9         And another thing, if you look at the returns, I mean I

10   don't know how many of y'all have filed returns, but do y'all

11   ever have like round numbers.  Like every return that is filed

12   has round numbers.  Like that rarely happens.  For the most

13   part there's always -- there is never exact numbers for

14   whenever you make an income.

15   Q    And do you recall the type of income that was -- that

16   this was labeled on the returns?

17   A    Interest income.

18   Q    What is interest income?

19   A    So interest income would be, to my understanding, is --

20   I'm pretty sure most of y'all know what interest is where if

21   you have money in the bank you get like a percentage of what's

22   being held.  So based on this, the 600, 700,000,000 had to be

23   held in each one of these accounts to generate interest of

24   $17 million.

25        So this is saying each one of these different entities

1   had hundreds of millions of dollars that would have earned

2   interest income of 17 million each.

3   Q    And have you ever seen, to your recollection, interest

4   income declared on a tax return that came out evenly in the

5   tens or hundreds of thousands of dollars?

6   A    I have not, no.

7   Q    And why is that mathematically?

8   A    Because like I said, there is usually some kind of

9   variance.  It's like it's never usually just a flat number.

10  And then everybody has the same amount, like, I mean, those

11  are just red flags.

12  Q    Is it because it's calculated as a percentage, a small

13  percentage in order to get interest.  What does that

14  number tend to look like?

15  A    It's usually -- it's not rounded and then it's

16  compounded.  So it's not even just like a flat rate.  It's

17  usually compounded.  So then it's interest compounded on

18  interest compounded.  So it's never usually just a straight

19  number.

20  Q    When you look at all six of these returns filed from the

21  same place at roughly the same time, was that suspicious to

22  you as someone who investigates refund schemes?

23  A    Yes, it was.

24  Q    So let's talk about that IP address a little bit.

25          MS. FREEMAN:  Mr. Quintero, can you pull up what's

1  been previously admitted and published as Exhibit 5.

2  BY MS. FREEMAN:

3  Q    So you mentioned you saw all these IP addresses were the

4  same.  As you looked at these tax returns what did you do to

5  figure out who that IP address was tied to?

6  A    Okay.  So some of the steps that I took during the course

7  of the investigation was to try to identify who filed the tax

8  return.

9       When tax returns are submitted to the IRS, again, the IP

10 addresses are captured.  So I saw the returns that were filed

11 and what IP address was captured.  So then we subpoenaed to

12 get information on the IP address and this is what it came

13 back to.

14 Q    And did this record come back from a subpoena you sent to

15 Charter Communications?

16 A    Yes.

17      MS. FREEMAN:  Mr. Quintero, can you zoom in on the

18 target details block only at the top of that first page.

19 BY MS. FREEMAN:

20 Q    Is that one of those IP addresses that you subpoenaed?

21 A    Yes.

22      MS. FREEMAN:  Mr. Quintero, can you layer the top of

23 that box from Exhibit 5 and bring up below it Exhibit 4-1

24 previously admitted and published and zoom in on the top two

25 tax return lines from that exhibit?

BY MS. FREEMAN:

Q    Special Agent Clarke, explain what we're looking at here?

A    Okay.  So, when I requested the information -- when I subpoenaed the information I needed to give them specific dates and times of when the IP address was used.

So if you look at it -- like I said, in our system it showed that on September 10th, 2016 and September 22nd, 2016 these two entities filed tax returns from IP address 24.181.4.255.

So if you look at it it matches the information that I requested to what they sent back was confirmed by these addresses and then the information that they said it went back to Marquet Mattox.

Q    And did you, in fact, follow up on whether the address associated with this IP address is tied to Mr. Mattox?

A    Yes.  I did some internal searching on IRS and it indicated that at some point Mr. Mattox was associated to the address at 155 Carriage Court in Athens, Georgia.  And also when I spoke to Mr. Mattox he said that his previous address was 155 Carriage Court in Athens, Georgia.

Q    So he admitted that he lived at that address?

A    Yes.

Q    And, just to be clear, when someone e-files a return that goes through the Internet; is that correct?

A    Yes, it does.

1    Q    And is the internet an instrumentality of interstate

2    commerce?

3    A    Yes.

4              MS. FREEMAN:  Mr. Quintero, can you please take down

5    that exhibit.

6    BY MS. FREEMAN:

7    Q    Now, Special Agent Clark, you mentioned that these trusts

8    and the returns had in common a physical address?

9    A    Yes.

10   Q    What business was located at that address?

11   A    So another step that I took was once I saw the addresses

12   I wanted to see if it was a business, like what was going on

13   with it.  Because, again, these are trust accounts so you want

14   to see if there is like a physical location.

15        When I went to the address that was listed it was

16   actually a UPS store.  At that point I try to get the records

17   to see who owned the box at the UPS store and Mr. Mattox was

18   the one who owned the box.

19             MS. FREEMAN:  Mr. Quintero, can you please pull up

20   what's been previously admitted as Exhibit 17.  Your Honor,

21   permission to publish this exhibit?

22             THE COURT:  Go ahead.

23   BY MS. FREEMAN:

24   Q    Special Agent Clark, are these those records you got from

25   the UPS Store?

```
 1   A    Yes, they are.
 2   Q    And who controlled the UPS box that you subpoenaed the
 3   records for?
 4   A    Mr. Mattox.  During the time that I talked to him --
 5   again when I talked to him he said that he controlled the box.
 6   And these kind of documents show that he controlled the box.
 7            MS. FREEMAN:  Mr. Quintero, can you please go to
 8   page 27677 and zoom in on boxes four and five.
 9   BY MS. FREEMAN:
10   Q    Special Agent Clark, did you review this part of the
11   record?
12   A    Yes, I did.
13   Q    Who are these names listed here?
14   A    These are the children of Mr. Mattox, my understanding.
15   Nycholas, Nailah, Niara.  Kemahra is the middle name of
16   Nycholas, I believe.  And then Nakeisha Watson is the mother
17   of the children.
18   Q    And were the names listed on this UPS box application of
19   any investigative interest compared to the trusts you were
20   looking at?
21   A    Yes.  He filed a lot of trusts.  He had a lot of trusts
22   associated with them and a lot of these names come up on the
23   trusts that we had linked to him.
24   Q    Have you observed, in the course of your investigation,
25   the Defendant using a number of aliases?
```

1    A    Yes.

2    Q    Can you tell us some of the aliases that you have

3    confirmed are associated with the Defendant?

4    A    It was Marquet Antwain Burgess Mattox, Marquet Antwain

5    Burgess Mattox El, Asim Ashunta El and Asim El Bey I have

6    linked to him.

7    Q    Did you have an opportunity to ask the Defendant about

8    filing these tax returns with these various trusts?

9    A    Yes, I did.

10   Q    Tell us how you were able to talk to him?

11   A    So part of the investigation is when you identify who it

12   is you want to kind of get their side of the story to see

13   exactly, you know, what was going on.

14        So myself and another agent we went to his house and he

15   didn't answer the door.  We left a card.  Approximately five

16   or 10 minutes later -- it might have been a little bit longer

17   than that -- but he called us back.  I told him I had wanted

18   to talk to him.  I said we can go back to your house if you'd

19   like.  He requested to go someplace else.  And I said, well,

20   you can meet us in the office.

21        So he met us in the office downtown and talked to us.

22   During the time, we always say it's voluntarily, you can leave

23   at any time because he's not under arrest or anything, we just

24   want to get his side of the story.

25   Q    And did he, in fact, arrive of his own volition?

```
1   A     Yes.

2   Q     Did he agree to talk to you?

3   A     Yes, he did.

4   Q     Did you threaten him in any way?

5   A     No, I did not.

6   Q     Did you remind him, multiple times, that he was allowed

7   to leave at any time?

8   A     Yes.

9   Q     Did he appear to understand that he could leave at any

10  time?

11  A     Yes.

12  Q     And did he eventually leave of his own volition?

13  A     Yes.

14  Q     In the course of this conversation, first, what was the

15  exact date, if you recall?

16  A     I believe it was April 22nd, 2019.

17  Q     So on April 22nd, 2019 did Marquet Mattox admit that he

18  filed the tax returns where the name of the trustee was listed

19  as Asim El Bey?

20  A     Yes.

21  Q     Did he admit that he filed the tax returns resulting in

22  four fraudulent refunds being paid to him?

23  A     Yes.

24  Q     Did he admit that he filed the 1041 Trust Returns for

25  multiple, including the original and amended returns, for the
```

1   Kemahra Investment Trust in tax years 2015 and 2016?

2   A    Yes.

3   Q    Did he admit he filed multiple 1041 returns for the

4   Marquet Antwain Burgess Mattox Trust for tax years 2015 and

5   2016?

6   A    Yes.

7   Q    Did he admit that he filed multiple tax returns for 2015

8   and 2016 in the Burgess Mattox Bey Trust?

9   A    Yes.

10  Q    Did he tell you anything special about the Burgess Mattox

11  Bey Trust?

12  A    So, essentially, the Burgess Mattox Bey Trust was like

13  the parent or like the one on top.  Everything else was kind

14  of underneath.  That's the one that funded everything else.

15  So, that was the main one and all these others, one -- I guess

16  some were subsidiaries.  I'm not sure.  But that one was the

17  main one.

18  Q    According to him?

19  A    Yes.

20  Q    Did he also admit that he filed multiple 1041s tax year

21  2016 for the Kamilya Investment Trust?

22  A    Yes.

23  Q    As well as the Kamili and Watson El Trust.  Did he admit

24  to filing returns for those?

25  A    Yes.

```
1    Q    Now did he refer to setting up a trust known as the
2    Nwatson Trust?
3    A    Yes, he did.
4    Q    And did he tell you where that name came from, Nwatson?
5    A    He said that it was the name of his children's mother.  I
6    went further into it and asked him did she know about it?  And
7    he said that she had nothing to do with the Trust.  He just
8    kind of make one up for her.
9    Q    And did he tell you he set it up without her knowledge or
10   consent?
11   A    Yes.
12   Q    Did he admit to you that the Burgess Mattox Bey
13   Investment Trust and Marshana El Investment Trust were in debt
14   to the IRS for millions of dollars?
15   A    Yes.
16   Q    And that those two trusts were, in fact, his entities
17   that he controlled?
18   A    Yes.
19   Q    What did he tell you about the business activities of all
20   these trusts?
21   A    They did not have any business activity.
22   Q    They did not have any business activity?
23   A    No, they did not.
24   Q    Did he tell you who controlled the trusts?
25   A    He controlled everything.
```

1  Q     Did he tell you who controlled the bank accounts, such as
2  they existed, related to those trusts?
3  A     He controlled the bank accounts.
4  Q     Did he tell you who signed the refund checks associated
5  with these trusts?
6  A     Yes.  He signed them.  During the investigation, like
7  during the interview I brought the actual checks, copies of
8  them, and showed him and he confirmed that that was his
9  signature on the checks.
10 Q     And to be clear, were those checks for approximately
11 $2.5 million, $325,000, $2.1 million and about $9,900?
12 A     Yes.
13 Q     Did he admit to you he, in fact, prepared and filed all
14 the returns for the Burgess Mattox Bey Investment Trust,
15 Marshana El Trust and Kemahra Trust?
16 A     Yes, he did.
17 Q     I think you mentioned earlier he talked about the UPS
18 box.  What did he tell you about that?
19 A     He said he was the one who controlled it.  He was the
20 only one who had access.
21 Q     That he was the only person that accessed that box?
22 A     Yes.
23 Q     And did he tell you that he may have received a notice
24 from the IRS about frivolous tax filings and that he was going
25 to get charged a $5,000 penalty?

1   A    Yes.  That kind of came up.  Because prior to the

2   interview we do a background check and I saw that there were

3   some documents that had already been submitted to him, like

4   frivolous stuff.  I looked in the systems.  So this

5   correspondence had been sent to him.

6        So that was part of the questioning when I got there just

7   to make sure that he did receive it.  And then, like I said,

8   he did talk about the $5,000 frivolous fraud penalty.

9   Q    And could you tell, in fact, from those records that that

10  notification did go out to him?

11  A    Yes, because that was the address.  Again, it would have

12  went to his PO Box and he was the one who controlled it.  So

13  he would have been the one who received it.

14  Q    Do you recall the date that that frivolous filing notice

15  would have gone out?

16  A    I believe it was sometime in 2016.  It was prior to when

17  I talked to him a couple of years.  Because like I said, it

18  was so many entities you have to look at everything to see

19  what does what.  But I believe it was around 2016.

20  Q    And did you observe, from looking at IRS records, whether

21  he continued to file tax returns of this nature after getting

22  that frivolous filing warning?

23  A    Yes.  If you notice the returns that we had talked about

24  just on that date of November 17th that was all after 2016.

25  Q    So with regards to Exhibit 4-1 there are multiple returns

on that exhibit that he filed after getting this frivolous

returns warning?

A    Yes.

Q    Did he tell you -- did you investigate, as you look at

these returns with the false income and the false withholding,

whether, in fact, Mr. Mattox had sent in money towards the

withholding he claimed?

A    Yes.  So, again, during the course of the investigation

you look at every line that is on the tax return and you try

to see if it's correct or not.  With the withholding there

were no payments ever submitted to the IRS.

        So, like I stated early, like if an entity sends in

withholding amounts like that, would be reported.  But even if

you send in withholding you still had to send in a payment.

So there's another system that you look at to see if actual

payments was submitted, and there were no payments submitted

to the IRS.

Q    No withholding for any of these trusts?

A    Yes.  There were no payments submitted to the IRS.

Q    So if a tax return says they paid millions of dollars in

withholding is that true or false?

A    That would be false if no payments are sent.  Like you

can say what you want in a return, but if you don't actually

send the payment in it wasn't ever withheld from you.

Q    And did you discuss where he currently resided when you

1    interviewed him?

2    A    Again when I went to talk to him we went to the house at

3    1054 Morgan Garner Drive in Lilburn, Georgia.

4    Q    And where did he say he lived previously?

5    A    155 Carriage Court in Athens, Georgia.

6    Q    So after you interview him -- I believe you said it was

7    April 22nd, 2019 -- and he basically knows, at this point,

8    that there are federal agents investigating him for fraud, did

9    he file anymore tax returns?

10   A    Yes, he did.

11          MS. FREEMAN:  So, Mr. Quintero, let's pull up what

12   we have on the Burgess Mattox Bey Trust for tax year 2016.  So

13   I'm talking about Exhibit 4-1, previously admitted and

14   published.  If you could call out the lines related to Burgess

15   Mattox Bey Trust tax year 2016.

16   BY MS. FREEMAN:

17   Q    Special Agent Clark, could you explain what we're looking

18   at here?

19   A    Okay.  So these are some of the returns that were filed

20   for Burgess Mattox Bey Trust.  I can just walk you through it.

21          So the first one that he filed September 22nd, 2017.

22   On this one he's claiming he had $250,000 in income, the

23   payments to the IRS was more than 250,000.  He's saying that

24   he had payments of 600,000, which a refund of 500,000 was

25   claimed, which would have been more than the income.

1       A couple of months later he filed again for this entity.

2   Now at this time he's saying, "Oops, I didn't make 250, I had

3   income of 17,600,000."  But again, oops, again, like I forgot

4   to tell you that I had 17 million withheld from that

5   17 million that I previously just came to realize that I had.

6   At this point he's asking for $10 million.

7       Then a couple months after that he's now saying I made

8   $142,156,200 and I had withholdings -- I made payments to the

9   IRS of 71,700,000 and a refund was requested for 10 million on

10  that return.

11              MS. FREEMAN:  Your Honor, permission to publish

12  Exhibit 3-15, which has been previously admitted.

13              THE COURT:  All right.

14              MS. FREEMAN:  Mr. Quintero, can you bring up Exhibit

15  3-15.  And if you could scroll down a page and zoom in on that

16  date filed stamp in the middle there.

17  BY MS. FREEMAN:

18  Q    Special Agent Clark, what is the date that the IRS

19  received this return?

20  A    August 7th, 2019.

21  Q    And what is significant about that in relation to when

22  you interviewed him?

23  A    This would have been -- I interviewed him in April.  So

24  what's that five, six, seven -- a couple of months.  It would

25  have been, what, four or five months after I spoke to him.

1          MS. FREEMAN:  And Mr. Quintero, if you could zoom

2   back out to the full-page.  And then if you could turn to

3   page 029397.  Mr. Quintero, could you zoom in on the text

4   there to get rid of some of that white space.

5   BY MS. FREEMAN:

6   Q    Special Agent Clark, what is this document that we're

7   looking at?

8   A    So when he filed -- this was a return that was mailed in.

9   It's an amended return.  You're supposed to make a statement

10  on what you are changing on the return.  And according to this

11  that this is what he submitted with the amended return saying

12  that he did not receive any income for the 2016 tax return and

13  he's amending it from previously -- as I previously stated the

14  last return that he filed for this entity he's claiming he

15  made $142 million and now he's saying, "Oops, I made a

16  mistake, now it's zero."

17  Q    I'm sorry, what was the last thing you said?

18  A    He said now it's zero.  Like I didn't make any income.

19  Q    Have you ever seen a tax return before that was amended

20  to say instead of I received $142 million, now my income is

21  zero?

22  A    No.

23  Q    And what trust is this for?

24  A    This is the Burgess Mattox Bey Trust.

25  Q    And is that the same Burgess Mattox Bey Trust that he

```
 1    discussed at length with you in the interview?

 2    A    Yes.

 3    Q    And did you tell him you were investigating that trust?

 4    A    Yes.

 5    Q    The significance of changing the income to zero, what

 6    does that do to the refund that then would have been owed on

 7    this amended return?

 8    A    Well, if you just change the income then the withholding

 9    stands.  So then the refund would actually go up.

10    Q    All right.

11         MS. FREEMAN:  Mr. Quintero, could you scroll back up

12    one page and zoom in on the text on that page.

13    BY MS. FREEMAN:

14    Q    So if you amend all of these numbers, in this fashion,

15    what happens?

16    A    So now everything is zero.  It's saying zero income, zero

17    withholding.

18    Q    So, in essence, did he go from demanding a $10 million

19    refund roughly to now demanding nothing?

20    A    Correct.

21         MS. FREEMAN:  Your Honor, we do have a bit more to

22    do with this witness.  I know you're checking the time.  If

23    this was a natural --

24         THE COURT:  The food is not here yet.  Keep going.

25    I just checked.
```

Tammy W. DiRocco * Federal Reporter * 478-752-2607

1          MS. FREEMAN:  I will continue.

2     BY MS. FREEMAN:

3     Q    Special Agent Clark, let's now move on to talking about

4     the money.

5          Knowing the Defendant had gotten these four refund checks

6     what did you do in order to trace the money?

7     A    I got records from the banks just to see where the money

8     went, if there was any activity prior to the refunds or the

9     entities.

10    Q    Was there any activity prior to the refunds?

11    A    No.

12    Q    Why not?

13    A    The bank accounts weren't opened up until -- the initial

14    deposits for the Kemahra Investment Trust bank account and the

15    Burgess Mattox Bey Investment Trust accounts were opened the

16    day that he deposited the fraudulent refund checks.

17    Q    So did you find any evidence that these trusts even had a

18    bank account before they suddenly received these refund

19    checks?

20    A    No.  Again they were opened up when he got the check and

21    that's when he opened up the bank account.  These were the

22    initial deposits.

23         MS. FREEMAN:  Your Honor, permission to publish

24    Exhibit 8-1 previously admitted.  These are the Wells Fargo

25    Bank records.

```
 1              THE COURT:  Go ahead.

 2              MS. FREEMAN:  Mr. Quintero, please pull up 8-1

 3   page 028581.  And if you could zoom in on the dates.  Yes, the

 4   first section at the top.

 5   BY MS. FREEMAN:

 6   Q    Special Agent Clark, can you tell the date that this

 7   account appears to have been created or applied for?

 8   A    November 22nd, 2016.

 9              MS. FREEMAN:  Mr. Quintero, could you please pull up

10   page 028070 which is the first deposit item in this bank

11   record.  I apologize.  It might be under Exhibit 8-2, page

12   028070.  And if you zoom in on that deposit slip at the top,

13   please.

14   BY MS. FREEMAN:

15   Q    Special Agent Clark, what's the date on this deposit

16   slip?

17   A    November 22nd, 2016.

18   Q    And what entity is this account in the name of?

19   A    Burgess Mattox Bey Investment Trust.

20              MS. FREEMAN:  Mr. Quintero, if you could go in this

21   same exhibit to page 028071 and zoom in on that check, please,

22   with the back.

23   BY MS. FREEMAN:

24   Q    Special Agent Clark, is this the check that's associated

25   with that deposit slip we just looked at that was dated 11-22?
```

```
1   A     Yes.

2   Q     And is this check deposited essentially the same day the

3   account is applied for?

4   A     Yes.

5   Q     Were you able to see if this trust had a bank account

6   prior to this one with Wells Fargo Bank?

7   A     No, they did not.

8   Q     Now, did you also, in addition to obtaining the

9   statements, the signature cards, the deposits and checks, did

10  you pull up surveillance records from the bank to see who

11  might be using this account?

12  A     Yes.  So, part of the subpoena request anything that they

13  have on file related to the account.  Sometimes it will send

14  to you and they did send some surveillance footage in there.

15        MS. FREEMAN:  Mr. Quintero, can you please bring up

16  the first page of Exhibit 8-3 previously admitted.

17  BY MS. FREEMAN:

18  Q     Special Agent Clark, who's in this photo?

19  A     Mr. Mattox.

20  Q     And was this photo gathered in response to a bank records

21  subpoena related to the account for the Burgess Mattox Bey

22  Investment Trust?

23  A     Yes.

24  Q     And is that the same trust and same account that received

25  fraudulent refund scheme money that you were investigating?
```

1   A    Yes.

2   Q    Now, let's talk about what else you saw in the bank

3   records for these trusts.  Where did the money primarily come

4   from that was deposited into this trust?

5   A    The false refunds.

6   Q    Did you make a chart analyzing the deposit activity that

7   you observed?

8   A    Yes, I did.

9        MS. FREEMAN:  And Ms. Paul, could you please switch

10  the input to witness and attorneys only.

11       Mr. Quintero, if you could pull up Exhibit 15-1

12  previously provided to the Defendant.  And this is

13  demonstrative aid 15-1.

14  BY MS. FREEMAN:

15  Q    Special Agent Clark, can you see this on your screen?

16  A    Yes.

17  Q    Is this that chart you prepared of the deposit activity?

18  A    Yes.

19  Q    Would it be helpful for you in explaining and summarizing

20  the deposit activity of the bank accounts you examined?

21  A    Yes.

22       MS. FREEMAN:  Your Honor, permission to publish 15-1

23  as a demonstrative exhibit to aid the jury.

24       THE COURT:  Well, and I'll just caution the jury

25  again that the testimony and evidence in the case is going to

1    be what he testifies about.  This is just helpful because of

2    the complexity of it.  So this is not really the evidence,

3    it's just something to help you understand the evidence.

4            So keep that in mind when you review this.

5            Go ahead, you may publish it.

6            MS. FREEMAN:  Ms. Paul, if you would please publish.

7            THE COURT:  She's trying.

8    BY MS. FREEMAN:

9    Q    Special Agent Clark, walk us through what we're seeing

10   here.

11   A    So, when I got all the bank records back it said there

12   were multiple accounts that he had.  So what I did was I

13   totaled up all of the deposits that were made in the various

14   accounts.  The net deposits was $5,021,339.17.  Out of the net

15   deposit $5,015,810.20 were IRS refund checks.

16       The interest received from a bank -- you know, if you

17   have money in the bank you're going to receive interest.

18       The other category was just -- he made purchases and they

19   sent -- refunds were sent back to it.  Like if he went to

20   Kroger or anything, if you get like a refund on something that

21   you purchase that falls in the other category.  So I just

22   wanted to capture, like, everything just to show like even the

23   other things that came in was just pretty much what he had

24   spent.  They were just coming back from like the retail

25   stores.

1    Q    Special Agent Clark, in examining the deposits related to

2    these accounts, did you see any legitimate business activity

3    in these accounts?

4    A    No, I did not.

5    Q    Where does the money come from that funds these accounts?

6    A    The fraudulent refunds.

7    Q    So, now, let's talk about various forms of spending that

8    you observed from the account.  What was the biggest spending

9    item that you noticed?

10   A    The house.

11   Q    By the house, what do you mean?

12   A    The house that he lived at at the 1054 Morgan Garner

13   Drive in Lilburn.

14   Q    And what was the second largest purchase that you recall?

15   A    I believe it was an Escalade.

16   Q    Now, did you make a chart analyzing the expenditure

17   activity that you observed?

18   A    Yes, I did.

19          MS. FREEMAN:  Ms. Paul, if you could please swap the

20   input back to witness and the attorneys only.

21          And Mr. Quintero, please pull up Exhibit 15-2

22   previously provided to the Defendant.

23   BY MS. FREEMAN:

24   Q    Special Agent Clark, can you see this chart?

25   A    Yes.

1  Q    Is this that chart you prepared analyzing the

2  expenditures?

3  A    Yes.

4  Q    Would it be helpful for you in explaining and summarizing

5  the expenditure activity of the bank accounts you examined?

6  A    Yes.

7          MS. FREEMAN:  Permission to publish 15-2 as a

8  demonstrative under Your Honor's same instructions?

9          THE COURT:  Same rule applies here.  I think he's

10 going to testify about it anyway, but, go ahead.

11 BY MS. FREEMAN:

12 Q    Special Agent Clark, as this pops up on the big screen

13 walk us through what you are seeing?

14 A    Okay.  So, what I did here was this is just what I

15 observed from the bank records.  As I said, this isn't all of

16 the spending.  There are -- just like a larger category of

17 other where I couldn't -- like if he spent somewhere else and

18 I wasn't sure of I just didn't even include it in one of these

19 categories.

20      So what I did was I went line by line through all of the

21 transactions on the bank account, the bank account 4976 was

22 the one that pretty much was the one that he used to spend all

23 of the money.

24          MS. FREEMAN:  Mr. Quintero, just to make it larger

25 for everyone to see if you could just zoom in on the actual

1    chart portion.

2    BY MS. FREEMAN:

3    Q    So let's talk about some of those major expenditures.

4    You mentioned the house.  Where do we see that on the chart?

5    A    That would be on the right side, second one from the

6    bottom.

7    Q    And what is the total house expenses number that we're

8    looking at?

9    A    It's almost $900,000.

10    Q    And break down for us in general what we're looking at

11    from that $900,000.

12    A    So how I categorized the house expenses was pretty much

13    anything that was related to the maintenance, the

14    improvements, lawn care, buying the house, furniture, pretty

15    much anything related to the actual property itself.

16        I broke it down further into categories like the

17    furniture.  He went to Haverty's and spent $127,000 at

18    Haverty's.

19    Q    And what is this improvements number?

20    A    The improvements.  When I looked at the expenses it

21    was -- there were a lot of like electronic, home electronic

22    things where it looks like he probably has like surround sound

23    theater room type of deal in the house somewhere.  So it was

24    like improvements like that.

25        There was painting going on.  It looks like he upgraded

1    his whole HVAC system to a brand-new system.  So that would be

2    all considered in the improvements.

3    Q    Now you mentioned also a car.  Where do we see that on

4    this chart?

5    A    If you go over to the left side of the chart, it says

6    total auto expenses.

7    Q    And what's that number of total auto expenses that you

8    calculated?

9    A    $161,000.

10   Q    And what makes up that $161,000?

11   A    Primarily it's the Escalade.  Prior to this investigation

12   I was not aware that Escalades cost that much.  So when I saw

13   the price going to like the Cadillac place I thought maybe it

14   was multiple vehicles.  But, no, it was just the one Escalade.

15   Q    And how did you confirm that it was not, in fact,

16   multiple vehicles?

17   A    Again, I requested the records related to the

18   transaction.  When I looked at the records, apparently it was

19   hot because it wasn't like just the baseline.  It was probably

20   the most expensive Escalade you can buy.  It had like

21   upgrades, the grills, the nice wheels, all that other stuff

22   was added onto it.

23         MS. FREEMAN:  Mr. Quintero, if you could just bring

24   up previously admitted and published Exhibit 14.

25

1  BY MS. FREEMAN:

2  Q    Is this that car?

3  A    Yes.

4         MS. FREEMAN:  Your Honor, permission to publish

5  previously admitted Exhibit 13.  Your Honor, may we publish

6  previously admitted 13?

7         THE COURT:  Yes.

8         MS. FREEMAN:  Mr. Quintero, please bring up just the

9  first page of that.  If you could zoom in on that check.

10 BY MS. FREEMAN:

11 Q    Special Agent Clark, is that just the base price for the

12 Escalade that you saw?

13 A    Yes.

14 Q    And were there, in fact, customizations added into the

15 Escalade as well?

16 A    Yes.

17 Q    But these were part of those records that you requested

18 from Classic Cadillac?

19 A    Yes.

20        MS. FREEMAN:  Mr. Quintero, could you please go back

21 to Exhibit 15-2 and zoom in on the demonstrative aid portion.

22 BY MS. FREEMAN:

23 Q    What other expenses of note did you calculate out from

24 the Defendant's accounts?

25 A    Well, when I'm looking at going through things, like I

112

1   saw a lot of food.  Like he was eating a lot.  Like, I mean,

2   every day it seemed like he was eating out two or three times

3   a day.  And if you look at that he spent $40,000 on food.  And

4   that was like over a two year period, $40,000 on food.

5       This was just like eating out, this is not groceries.

6   This is like eating out.

7       Dental.  A lot of checks had like handwritten notes on

8   the memo line.  So in the dental like I think he spent like

9   about 12 or $13,000 on -- three of us kids got braces and

10  himself.  And I guess the upkeep for the braces.  Like I don't

11  have braces so I don't know like what the upkeep is.  But

12  there was a lot of expenses towards dental.

13  Q    What about any retail spending did you notice?

14  A    He traveled a lot like -- and when he traveled it wasn't

15  just like bottom of the barrel, like it was luxury.  Like he

16  was staying at boutique hotels.  I would see like -- I don't

17  know if he was getting limos when he was getting there or what

18  he was doing, but he was living a luxurious lifestyle.  He was

19  going to Miami.  He was going to LA.  New York.  Myrtle Beach.

20  I mean, $143,000 on travel.  Again, this is two years.  So

21  that's almost like $70,000 a year in traveling.

22  Q    And what about fitness?  What was that category?

23  A    I guess he works out a lot.  If you look at the

24  transactions there's a lot of payments saying "personal

25  trainer."  I believe part of it said gymnastics.  So I'm

```
1   assuming it was maybe one of his kids gymnastics.  But there
2   was a lot of -- just like the regular gym.  He had a personal
3   trainer.  There was gymnastics.  I think there was like
4   self-defense classes.
5        The good thing about Mr. Mattox he's meticulous with a
6   lot of the checks so it's easy to identify what these expenses
7   was for.  Because all I had to do was -- I just looked at what
8   the check said.
9   Q    And if the jurors wanted to review those checks for
10  themselves is that part of Exhibit 8-1 through 2 that you have
11  also reviewed?
12  A    Yes.
13  Q    What about entertainment?  What does entertainment mean
14  on this chart?
15  A    Things like to Ticketmaster.  He went to Top Golf a lot.
16  But it was interesting because like there was like a charge
17  for $7,000 to Ticketmaster.  So I'm like, I don't know what
18  kind of event that he went to that's $7,000, like one purchase
19  was $7,000.  There was other Ticketmaster -- but he did go to
20  Top Golf a lot too.
21  Q    And there is one category on here on the right side in
22  one of the dark bubbles that says $90,000 IRS payments.  What
23  is that?
24  A    So he owed the IRS money for his personal tax return.  He
25  owed about 70,000.  I don't know the exact number, but it was
```

```
1    around $70,000 that he had owed the IRS.

2         He paid that money with the fraudulent refund checks that

3    he got from his trust.  He also paid an additional $5,000 each

4    year for his personal tax returns for '14, '15, '16 and '17.

5         Again, I showed him these, like, we discussed this during

6    my interview and he said he paid that money using the

7    fraudulent refund money.

8    Q    Now, he didn't call his scheme, per se, fraudulent?

9    A    Yes.  No, he did not.

10   Q    But he admitted that that money came from the scheme that

11   you determined to be fraudulent?

12   A    Yes.

13        MS. FREEMAN:  Mr. Quintero, could you please pull up

14   Exhibit 4-2.  This is a demonstrative aid that's been

15   previously published with other witnesses.  And if you could

16   zoom in on just the table portion.

17   BY MS. FREEMAN:

18   Q    Special Agent Clark, do you recognize this chart?

19   A    Yes, I do.

20   Q    Have you examined every line of it?

21   A    Yes.

22   Q    Have you confirmed that every number on this chart is

23   correct?

24   A    Yes.

25   Q    Based on the tax returns and records of the IRS?
```

```
1    A    Yes.

2    Q    And, similarly, have you reviewed Exhibit 4-1, which is

3    the two-page version of this chart involving further returns?

4    A    Yes.

5    Q    But is this demonstrative aid specifically referring --

6    and I'm looking at the left side column -- to the Counts in

7    this Indictment?

8    A    Yes.

9    Q    And have you confirmed that these numbers, dates, trusts

10   entities, DLN, everything, refunds claimed, match the Counts

11   alleged in the Indictment?

12   A    Yes.

13   Q    Did you investigate whether these trusts had anywhere

14   near the income levels claimed in that column?

15   A    Yes.  I investigated and that was not the case.  Those

16   are false numbers.

17   Q    Did you check to see, looking at the refund claim on the

18   return column towards the far right -- these refunds that were

19   claimed on each of these tax returns were these numbers true

20   or false?

21   A    Repeat that, I'm sorry.

22   Q    The refunds that the Defendant claimed he was owed on

23   each of these tax returns are those amounts truly what he was

24   owed?

25   A    Oh no, those are false numbers.  He was not owed that
```

1    money.

2    Q    Is every single refund claimed in that column a false

3    claim?

4    A    Yes.

5    Q    Nevertheless, did the IRS rely on these amounts on at

6    least four occasions, in the larger chart, to process four

7    refund checks?

8    A    Yes.  We are a trust-based system so we believed they

9    were accurate so we sent them out.

10   Q    And that relied on the attestation at the end of the

11   trust where the Defendant asserted, under penalty of law, he

12   was telling the truth when he filed these returns?

13   A    Yes.

14   Q    What did the U.S. Government pay out to the Defendant in

15   refunds as a result of this fraudulent tax refund scheme?

16   A    Over $5 million.

17   Q    Who got the government's money?

18   A    Mr. Mattox.

19         MS. FREEMAN:  No further questions.

20         THE COURT:  We don't have any food here yet.  I can

21   give y'all a break and you can sit back there and wait or we

22   can continue.  But we've been going now for a while.  I wanted

23   to leave that up to y'all?  So what do y'all want to do?  Do

24   you want to just stop now and take a break or do you want to

25   keep going?

```
 1              THE JUROR:  Take a break.

 2              THE COURT:  Take a break.  Okay, that's fine.

 3        (Jurors exit courtroom 12:20 p.m.)

 4              THE COURT:  Do you have another witness after this

 5   witness?

 6              MS. FREEMAN:  Your Honor, we do not plan to call any

 7   additional witness.  However, there is one matter I did want

 8   to bring to your attention before we break.

 9              THE COURT:  Okay.  So this is your last witness and

10   you're going to rest your case; is that what I understand?

11              MS. FREEMAN:  Yes, Your Honor.  We're going to

12   double check the documents before we officially rest, but that

13   is the plan.

14              THE COURT:  And what is matter you wanted to bring

15   up?

16              MS. FREEMAN:  Your Honor, we've observed that there

17   are two individuals in the rear of the courtroom.  We're not

18   sure if these are intended to be witnesses for the Defendant,

19   but if they are, we are asking the Court to inquire as to the

20   rule of sequestration.

21              THE COURT:  Do you know the two people in the

22   courtroom?

23              THE DEFENDANT:  Yes, sir.  I know the two people in

24   the courtroom.

25              THE COURT:  Do you plan to use them as witnesses in
```

1  the case?

2          THE DEFENDANT:  Right off I'm not 100 percent sure

3  but I don't think so, but I'm not hundred percent sure.

4          THE COURT:  Well, they would be covered by the rule

5  of sequestration which means they can't be in the courtroom.

6          Now, if you're not going to use them they can stay

7  in the courtroom and that's fine.

8          THE DEFENDANT:  Okay.

9          THE COURT:  But if they are going to be a witness

10  then they have to step out and they have to stay out until the

11  time that you call them.

12          So, it is entirely up to you what you do with them.

13  You're telling me you don't think you're going to call them.

14  So you can either tell me you're not going to call one or both

15  of them and if you tell me that you don't know then I'm going

16  to ask them to stay outside.

17          THE DEFENDANT:  I would say at this point I don't

18  plan to call either one of them.

19          THE COURT:  Okay.  There is no changing of the

20  point.  Do you understand?

21          THE DEFENDANT:  I understand.

22          THE COURT:  Y'all can stay in the courtroom.  Thank

23  you.

24          Do you expect to have any witnesses in this case?

25          THE DEFENDANT:  Right off, Your Honor, I do not have

1    any witnesses for this case.

2              I would like for the Secretary of Treasury to be a

3    witness and also the individuals who approved the account with

4    the Secretary of Treasury.  But I'm not exactly sure how that

5    is done or how that is structured or how that's possible.

6              THE COURT:  Well, I don't know, to start off with,

7    that under any circumstances it would be possible, but it's

8    certainly not possible in the middle of the trial.

9              And we have had multiple hearings and I have given

10   you the opportunity to ask questions and make proposals to me

11   and you have never said anything about that.  You've never

12   said anything about -- I mean, you filed a motion for

13   discovery which we're going to deal with later, not now.

14             And this is why you needed an attorney because

15   attorneys know when things have to be done and you can't wait

16   until trial to ask for things like that.  And so you can't --

17   I mean, it's too late for that.

18             THE DEFENDANT:  Your Honor, in regards to the

19   Secretary of Treasury you mentioned multiple times you can't

20   mention or you mention that -- you can't mention anything

21   about the Secretary of Treasury in Puerto Rico, you can't

22   mention anything about the --

23             THE COURT:  No, no.  Let me read this to you.  This

24   is Federal Rule of Evidence 611(b).

25                  "Cross examination should not go

1              beyond the subject matter of the direct

2              examination and matters affecting the

3              witness's credibility."

4         There was nothing with this witness, for example,

5    that had anything whatsoever to do with the Secretary of the

6    Treasury or Puerto Rico.  That was not the inquiry.  The

7    inquiry was your acts and this man's investigation.

8         And so if you want to get on the witness stand and

9    testify about what you did in Puerto Rico or what happened in

10   Puerto Rico that's fine, within the normal limits.  I'm not

11   restricting you from doing that.

12        But we are simply talking about what you can do in

13   cross examination versus what you can do when you present your

14   case, your side of the case.

15        THE DEFENDANT:  Your Honor, if I may respond,

16   please.

17        THE COURT:  Yes.

18        THE DEFENDANT:  The witness mentioned that there

19   were returns -- I just want to make sure I got the notes

20   correctly -- the government asked the witness about returns

21   being filed and I'm speaking in regards to Ms. Freeman.  She

22   asked Ms. Freeman if there was any returns filed.  Ms. Freeman

23   mentioned that -- she said there was returns filed and she

24   said she also mentioned that the bonds were worth -- she

25   mentioned that the bonds were worthless.  And then Ms. Freeman

1    mentioned that bonds were sent to different locations.

2            So, with all due respect, Your Honor, I wasn't the

3    one who brought up Puerto Rico.  That came from the government

4    asking Ms. Freeman about bonds and Ms. Freeman stated that

5    bonds were sent to Puerto Rico and other locations.

6            So since Ms. Freeman brought it up I did ask about

7    Puerto Rico.

8            THE COURT:  She didn't ask this witness about it?

9            THE DEFENDANT:  You're correct.  I'm speaking in

10   regards to Ms. Freeman.

11           THE COURT:  Right.  And I'm focusing on what I just

12   told you, trying to explain to you what the rule is

13   number one.  Because I brought it up before and I thought I

14   would read it to you.  But I already had it out because I

15   wasn't going to let you cross examine this man about some

16   topic that wasn't covered in the direct examination.  And

17   there was no question about bonds and there was no question

18   about the Secretary of the Treasury.

19           You're trying to make your case with the

20   government's witness and that's okay up to a point but there

21   are limitations to that and I just told you what one of them

22   is.

23           So what else?  I don't want you to misunderstand

24   what my rulings are.

25           THE DEFENDANT:  I have a question, Your Honor.

1          THE COURT:  Okay.

2          THE DEFENDANT:  So asking the witness -- the witness

3    stated multiple times, "Nothing was received by the IRS.

4    Nothing was received by the IRS."  So is it out of the scope

5    to ask -- in which the two agents before him wasn't able to

6    answer the question -- well, one of the agents answered part

7    of it.  But is out of the scope to ask, "Is there a difference

8    between the Treasury and the Internal Revenue Service?"

9          THE COURT:  That has nothing to do with this.

10   That's part of your case.  You're trying to say that you sent

11   money, apparently bonds or something, to the Secretary of the

12   Treasury and that didn't come up.  That's part of your case.

13         You can testify about that but nothing about the

14   Secretary of the Treasury came up in this direct examination.

15   And so I'm limiting you.  This witness testified for a long

16   time and he had a lot of information.  And so there is a

17   wealth of cross examination that you can do against him if you

18   choose to do so.

19         THE DEFENDANT:  Your Honor, I do have quite a few

20   notes that I'm double checking.

21         THE COURT:  Okay.  We will be adjourned and if you

22   have further questions we will talk, but we're going to break

23   right now.

24         THE DEFENDANT:  Thank you.

25         CSO OFFICER:  All rise.

1    (Recess 12:33 p.m.)

2    (Resume at 1:38 p.m.)

3          CSO OFFICER:  All rise.

4          THE DEFENDANT:  You asked me if I was going to call

5    any witnesses.  I would like to call Special Agent Clark as a

6    witness, please.

7          THE COURT:  This man is a witness.

8          THE DEFENDANT:  When it's my turn.  You asked am I

9    going to call any witnesses.  So when it's my turn I would

10   like to call Special Agent Clark as a witness, please.

11         THE COURT:  Well, it's your turn to question him

12   right now.  You don't want to do that?

13         THE DEFENDANT:  Yes.  I would like to question him

14   now.  But in the cross examination the rules state that I'm

15   only able to question in regards to -- in regards to the

16   questions that the government has -- there's a scope --

17         THE COURT:  I see.  I see what you mean.  Let's

18   proceed.

19         Bring the jury in, please.

20    (Jurors enter courtroom at 1:40 p.m.)

21         THE DEFENDANT:  Good afternoon, Mr. Clark.  Are you

22   able to hear me?

23         THE WITNESS:  I can't hear you.

24         THE COURT:  You're going to have to speak up.  I

25   don't think the witness heard you and I couldn't hear you.

```
 1              THE DEFENDANT:  Are you able to hear me now?
 2              THE WITNESS:  I can hear you now.
 3                       CROSS EXAMINATION
 4    BY THE DEFENDANT:
 5    Q    Good afternoon.
 6    A    How are you doing?
 7    Q    I'm great.  Mr. Clark, you mentioned that you've been
 8    with the Internal Revenue Service for 17 years?
 9    A    Yes.
10    Q    Have you been in the same job position for 17 years?
11    A    Yes.
12    Q    And that's as Special Agent, Criminal Investigations
13    Division?
14    A    Yes.
15    Q    You also mentioned that yourself and Ms. Freeman are
16    pretty much -- you don't have the same job functions or job
17    activities; is that correct?  If I'm not mistaken you
18    mentioned that yourself and Ms. Freeman you two don't have the
19    same job or the same job functions; is that correct?
20    A    That is correct.
21    Q    So would that mean that there are different job functions
22    or different departments throughout the Internal Revenue
23    Service?
24    A    Yes.
25    Q    You also mentioned that there were multiple IRS checks
```

```
1    received.  But as I notice on the screen I didn't see any of
2    the checks with the IRS or Internal Revenue Service on it.
3    Did I miss something?
4    A    You said checks received?
5    Q    Excuse me.  You mentioned that there were multiple checks
6    mailed or there was multiple checks received and you called it
7    a fraudulent tax scheme.  You said there were multiple checks
8    that were received?
9    A    Yeah, that was sent to you.
10   Q    That was sent to the trust?
11   A    Yes.
12   Q    The checks that were shown on the screen, you stated that
13   they were IRS checks.  But the checks that were shown on the
14   screen I didn't see IRS or Internal Revenue Service on the
15   checks.  Did I miss something?
16   A    They were generated due to refunds from my IRS tax
17   returns.
18   Q    But was the IRS the issuer of the checks?
19   A    It was the Department of Treasury.
20   Q    You also mentioned, Mr. Clark, that there was no
21   withholdings.  Can you please kindly explain to me what
22   exactly is withholdings?
23   A    Withholding is money that is sent to the IRS based on
24   taxes that are owed.
25   Q    And are those withholdings only sent to the IRS?
```

1   A     You said are they only sent to the IRS?

2   Q     Yes.

3   A     Yes.  In this instance, yes.  Related to the tax returns

4   they would be sent to the IRS.

5   Q     Bear with me, please.  You also mentioned that there were

6   or that there were, there are, multiple trusts?

7   A     Correct.

8   Q     Is it a crime to have multiple trusts?

9   A     No, it is not.

10  Q     You also mentioned that you requested or subpoenaed, if

11  I'm not mistaken, bank statements from Wells Fargo or

12  documents from Wells Fargo.  As I was looking through the

13  binders I noticed that there were multiple duplicates.  Is

14  that an error?  There are multiple duplicates of checks.

15  A     You're saying that there were multiple checks?

16  Q     No.  What I'm stating is as I look through -- you

17  mentioned that you requested the documents from Wells Fargo

18  Bank?

19  A     Yes.

20  Q     As I look through the documents from Wells Fargo Bank I

21  noticed that there are multiple duplicates of the same item.

22  Is that an error or is that -- I'm trying to understand the

23  reason for the multiple duplicates of the same item?

24  A     Sometimes we would follow up if, like, I requested

25  something initially and it wasn't in the initial production of

127

1    records I would follow up with them in saying we weren't

2    produced this.  So sometimes they might overlap and send it

3    again.

4    Q    And I noticed in the binders, the documents from Wells

5    Fargo, that there were several items -- there are four

6    duplicates of the same item.  Does that mean it was requested

7    on four different occasions?

8    A    Again, I'm not sure.  Like I said, if we request

9    something and they don't send it to us I will follow up with

10   them saying this hasn't been requested and then sometimes they

11   will send duplicates.

12   Q    You mentioned that there was an initial meeting on April

13   22nd, 2019.  And you mentioned that there were a lot of

14   things mentioned and a lot of things said in the meeting.  You

15   also mentioned that there were several things that I admitted

16   to.

17         I want to know was it that I admitted to several things

18   or did you make the comment you're going to assume it was me?

19   A    You said did I -- when I showed you the checks I asked

20   you did you sign these and you said, yes.  So you admitted to

21   signing the checks.  Is that what you're asking?

22   Q    In regards to the trust and business activity, et cetera,

23   there was a lot of questions that was asked in that meeting in

24   general.  And you mentioned that, okay, "I'm going to assume

25   this was you.  I'm going to assume this was you."  So there

1    was a lot of things in that meeting that you made assumptions?

2    A    And then you would have confirmed it.

3    Q    Excuse me.

4    A    And then you would have confirmed what I was assuming.

5    Q    Was that meeting recorded?

6    A    No, it was not.

7    Q    You also mentioned that there was no business activity

8    for the actual trust.  Did I state that there was no business

9    activity for the trust or is that an assumption --

10   A    No, that's what you told me.

11   Q    That there was no business activity for the trust?

12   A    Yes.

13   Q    Did we have a conversation and I mentioned to you that

14   the trust existed because -- the trust existed a year prior

15   but the trust was actually settling debt.  And you said,

16   "Well, I'm going to assume this.  I'm going to assume this?"

17   A    Well, what you said was you had set up the trust and it

18   had something to do with investments, correct?  That was how

19   they were initially supposed to be set up, and then you said

20   that they didn't do what you had intended them to do, but they

21   had not done anything.

22   Q    That they didn't do what they were intended to do?

23   A    Correct.

24   Q    A year prior?  A year ago or a year prior, not that they

25   weren't doing any business at that particular time of the

1   conversation?

2   A    Correct.  But you stated that they had not done any

3   business activity.

4   Q    A year prior?

5   A    You said they had not done any business activity.

6   Q    You also mentioned that there was a frivolous filing

7   warning.  Can you tell me the date for the frivolous filing

8   warning and what trust received that frivolous filing warning?

9   A    I'm not sure.  Because like I said, what I did was I

10  looked -- because since there were multiple trusts there -- I

11  think the document number is 3176 or 3175.  Those are letters

12  that are sent regarding those correspondence and then I looked

13  on the -- and it showed that they had been sent out.

14       So the actual date I'm not sure of.  I just recall seeing

15  those, prior to me talking to you.  But I don't recall the

16  exact date that they would have been sent out.

17  Q    Do you recall the trust that they were sent to?

18  A    I believe it was all of them, but I'm not sure.  Because

19  like I said, I looked at all of the trusts that were linked to

20  you and they are voluminous.

21  Q    You mentioned that the first meeting was April 22nd,

22  2019 and you also mentioned that there were documents or a

23  return, et cetera, sent after the actual first meeting of

24  April 22nd, 2019.  That particular document that was shown on

25  the screen that was showing a received date, can you tell me

```
1    what was the mail date?  The date it was mailed.

2    A    I do not know.  We only have when it's received.

3    Q    Do you know what's the protocol in regards to receiving,

4    sorting and time stamping the mail?

5    A    My understanding is when they receive it they stamp it

6    received.  I don't know what the lag time is.  My

7    understanding is when they receive a document they stamp it as

8    that's the day that they received it.

9    Q    So if this document was mailed prior to or if this

10   document was mailed -- yeah, prior to April 22nd, then you

11   wouldn't know or you wouldn't have documentation showing when

12   it was mailed and exactly when it was received and when it was

13   time stamped?

14   A    Well, if I recall correctly, the amended statement that

15   you had in that trust document said June -- Said June.  So you

16   were saying on that date in June that this is why you were

17   amending the tax return.

18        So that letter right there you were saying on at least

19   June -- I don't recall the exact date, but I believe that it

20   was in June -- I'm talking about the last page of the return

21   that we talked about where you said that you had no income.

22   That was dated June of 2019, if I'm not mistaken.

23   Q    How are you or the Internal Revenue Service able to

24   distinguish whether an entity has business activity?

25   A    You said how are we able to determine?
```

```
1   Q    Yes.

2   A    Well, what I do is I look at bank records to see if there

3   is any kind of activity going on.  See if there are any

4   expenses that look like business expenses.  See if there is

5   any income coming in that looks like income generated from a

6   business or just any kind of income coming in.

7   Q    So if there is a small business that doesn't have a bank

8   account -- I will skip on that question.  Strike that, please.

9        Multiple times in your statement you mentioned there was

10  nothing sent to the Internal -- excuse me.  You said, "There

11  was nothing sent to the IRS.  There was nothing sent to the

12  IRS.  There was nothing sent to the IRS."

13       Do you recall in a meeting on April 2019, you or your

14  business partners, stating or admitting we don't know how to

15  process it, so it's just sitting or possibly in the garbage?

16  A    I don't recall that statement.  But it might have been

17  regarding to frivolous stuff.  So what happens is a different

18  process happens when frivolous documents are sent to the IRS.

19  It goes to like the frivolous department.  I don't know how

20  the frivolous department processes everything.  We just know

21  that it gets there eventually.

22       So it might have been sent and went to the frivolous, but

23  if it was a payment it would have been registered.  So no

24  payment would have been submitted to the IRS that was

25  acceptable.
```

```
1    Q    Did you recall an additional statement that yourself or

2    your partner, "Our people are just number crunchers so don't

3    send it to us, we don't know how to process it?"

4    A    I don't recall that.  You are saying I said that?

5    Q    I said yourself or your partner.  It was a long meeting,

6    it was yourself and it was Mr. Barutio in a meeting for about

7    several hours.  It was yourself or your partner, one of the

8    two, made the statement.  Do you recall that statement?

9    A    I do not recall that specifically, no.

10              THE DEFENDANT:  Thank you, Mr. Clark.

11              THE COURT:  Redirect.

12              MS. FREEMAN:  Briefly, Your Honor.

13              Mr. Quintero, could you please pull up Exhibit 3-15

14   and look at page 29393, and this has been previously admitted

15   and published.  And if you could, please, zoom in on that date

16   stamp in the very center, first.

17                      REDIRECT EXAMINATION

18   BY MS. FREEMAN:

19   Q    Special Agent Clark, is this the date stamp we looked at

20   before that the Defendant just asked you about?

21   A    Yes, it is.

22   Q    And is that August 7th, 2019?

23   A    Yes.

24   Q    Does that post date your interview?

25   A    Yes, that is after, yes.
```

```
1   Q     Which, I believe, was in April?

2   A     Yes.

3             MS. FREEMAN:  Mr. Quintero, if you could zoom back

4   out and go down to where it says sign here.  And if you could

5   just drag a zoom all the way across there.

6   BY MS. FREEMAN:

7   Q     Special Agent Clark, I know it's handwritten there next

8   to what appears to be the Defendant's signed name.  But can

9   you read the date on that?

10  A     Looks like it says June 1st, 2019.

11  Q     And is that consistent with how you have seen the

12  Defendant sign his own name on other documents?

13  A     Yes.

14  Q     So does this appear to be the Defendant attesting that he

15  filed this return himself on approximately the 1st of June

16  2019?

17  A     Yes.

18            MS. FREEMAN:  No further questions.

19            THE COURT:  Recross?

20            THE DEFENDANT:  Just a moment, Your Honor.

21                      RECROSS EXAMINATION

22  BY THE DEFENDANT:

23  Q     Mr. Clark, you mentioned that in the meeting -- or you

24  mentioned -- excuse me -- you mentioned today that there was

25  nothing received, nothing received by the IRS.  There was
```

```
1    nothing received by the IRS.

2    A    I said no payments were received, sir.

3    Q    No payments received.  No payments received.  Can you

4    give me the definition of payment?

5    A    Negotiable instrument that is acceptable by the IRS.

6    Q    Negotiable instrument?

7    A    That is accepted by the IRS.

8    Q    And can you give me the definition of negotiable

9    instruments that are accepted?

10   A    My understanding is checks, money orders, cash.

11   Q    Are those the only three?

12   A    To my understanding, that's what they accepted as

13   payment.

14   Q    So there could be more?

15   A    Possibly.

16   Q    So do you recall, in the meeting April 22nd, 2019, a

17   question of asking where are the gifts that were sent?  Where

18   are the gifts that were sent?  In that meeting -- and I'm

19   asking this question because you said there was no payment.

20   There was no payment.  But in that meeting you stated --

21   excuse me.  Here you stated there was no payment.  There was

22   no payment sent.  But in the meeting on April 22nd the

23   question that was asked of you and Mr. Barutio is, what

24   happened to the actual payments that were sent?  What happened

25   to the actual negotiation instruments that were sent?  Do you
```

```
 1   recall what your response was?
 2   A    Well, the documents that you're describing was not real
 3   money.  It was just something that it appeared that you
 4   printed out and then sent in.  So it wasn't backed by any kind
 5   of financial institution.  Is that what you're talking about
 6   those?
 7   Q    You said negotiable instrument.  Can you help me?
 8   A    Because the documents that you sent in that said
 9   cashier's checks on the top and it had a whole bunch of stuff
10   on the side, but it wasn't backed by anybody.  So essentially
11   I could have done the same thing that you did just print
12   something on a piece of paper and sent it in and said that it
13   was $17 million.
14   Q    Was that sent to the Internal Revenue Service?
15   A    I'm not sure where that was sent.  What you -- you told
16   me you had sent it to people.  But, again, if you would have
17   sent it to the IRS that probably would have been deemed
18   frivolous because it's not backed by a financial institution.
19   So you just can't make up documents, send it in and saying
20   this is money.
21   Q    When you say people.  Can you identify people?  You said
22   -- you told me it was sent to people.  Can you identify?
23   A    I think you did state that it was the Treasury, Secretary
24   of Treasury, you said you sent.  And then you did say you sent
25   it to Puerto Rico.
```

1    Q    But no negotiable instruments were sent to the Internal

2    Revenue Service?

3    A    My understanding of what you told me at that time was you

4    said you sent it to them.  That's who you sent it to.

5    Q    During your investigation were there any negotiable

6    instruments sent to the Internal Revenue Service?

7    A    Any payments?

8    Q    Any negotiable instruments -- well, let's say negotiable

9    instruments?

10   A    Again, if you're referring to the documents that you

11   created and sent in you might have sent them in but they would

12   not have been accepted as payments.  Is that what you're

13   asking?

14   Q    Bear with me for a second.  On one hand we have the issue

15   of there was no payments sent in.  On the other issue we have

16   that there were negotiable instruments or acceptable, but

17   you're not exactly sure of the guidelines?  So, --

18   A    The documents that you sent in that you said that you

19   sent it was not accepted as payments because it was not backed

20   by a financial institution.  The documents that I looked at

21   that you said that you sent it appeared to be something that

22   you created and you sent in.  That's what I'm saying.

23   Q    Now, if a negotiable instrument or a bond or whatever is

24   permissible or acceptable by the Secretary of Treasury was

25   sent to the treasury, how did it get to -- how did it get to

1    the Internal Revenue Service?

2    A    I don't know where you sent it.  Again, there were

3    frivolous documents that you sent in.  The letter was sent to

4    you saying these are frivolous documents.  The frivolous

5    documents that you sent in consisted of these documents that

6    you created -- or I believe that you created -- because it

7    wasn't backed by a financial institution, it was sent to the

8    IRS.  So they were deemed frivolous.  You were told they were

9    deemed frivolous and you continued to send them in, is my

10   understanding of what happened.

11   Q    I'm asking how did they get to -- if they were never sent

12   to the IRS how did they get to Internal Revenue Service?

13   A    They might have been sent in.  I don't know.

14        You asked me what did we talk about at the interview.

15   And then my answer to that was you told me that you sent it to

16   the Secretary of Treasury and somebody in Puerto Rico.  That

17   was the question that I answered for you.

18   Q    Okay.  But never stated that it was sent to the Internal

19   Revenue Service.

20   A    When we had that discussion you told me those were the

21   two people, in particular, who you sent the information to.

22   Q    When you completed your investigation was there any

23   negotiable instrument, any documents sent to or any negotiable

24   instrument, any bonds, any negotiable instrument sent to the

25   Internal Revenue Service?

1          THE COURT:  Other than what he has already told you

2     four times was sent?  Other than that?

3          THE DEFENDANT:  He didn't answer the question,

4     Your Honor.

5          THE COURT:  He's answered four times about what you

6     sent.  So...

7          THE DEFENDANT:  No.  I'm asking was it sent to the

8     Internal Revenue Service.  He never stated yes or no.

9     BY THE DEFENDANT:

10    A     THE WITNESS: I said that if it was sent to the IRS --

11    like I said, there were frivolous documents that were sent to

12    the IRS.  The frivolous correspondence -- that was a letter

13    that was sent to you saying this is frivolous documents.

14         So, yes, the IRS at some point received those frivolous

15    documents.

16    Q     Were they received from the trusts?  Were they received

17    from a third party?  How did the Internal Revenue Service

18    receive the documents if they were never sent to the Internal

19    Revenue Service is what I'm asking?

20    A     I don't know.

21    Q     Okay.

22    A     I don't know if you sent them -- like, I don't know --

23    they were received by the IRS.

24         THE DEFENDANT:  Thank you, Mr. Clark.

25         MS. FREEMAN:  Nothing further, Your Honor.

```
1              THE COURT:  And are you resting at this point?
2              MS. FREEMAN:  The United States rests.
3              THE COURT:  Ladies and gentlemen, the government has
4    completed their case.  The Defendant has the opportunity to
5    present their case, but there are some motions that I need to
6    deal with.
7              So what I'm going to ask you to do is step back
8    there and we will call you back out after I have made the
9    appropriate rulings.  All right.
10             Thank you very much.
11      (Jurors exit courtroom 2:06 p.m.)
12             THE COURT:  You filed a motion for discovery.  This
13   is your motion.  You filed it yesterday.  We already had the
14   jury in the courthouse and we were in the process of beginning
15   the trial.
16             You're asking for items, to start off with, that I
17   don't think you are entitled to have, all this business about
18   bonds.  I don't think you're entitled to have any of that.
19             You were told in the pretrial order that motions had
20   to be filed within 14 days of the pretrial conference.  And
21   this is one of the issues, a motion like this would be one of
22   the issues.  So you had ample opportunity to raise this.
23             I had multiple hearings in this case for your
24   benefit.  I don't think I have ever had a criminal case in
25   which I've had as many pretrial hearings as I have had in this
```

```
1    case.
2            And so the law is that under the Rules of Criminal
3    Procedure you don't have unlimited right to discovery.  This
4    is actually like an interrogatory or request for admission
5    that you can file under the civil procedure rules.  But I am
6    overruling the motion for discovery.
7            The next thing is you filed a motion -- was it this
8    morning or was it yesterday -- your motion for relief from the
9    final judgment order proceeding.  Did you file that today or
10   was it yesterday?
11           THE DEFENDANT:  That was today.
12           THE COURT:  That's what I thought.  Well, to start
13   off with there is no motion for relief from a final judgment
14   order or proceeding in a criminal case.  You filed this under
15   Rule 60 of the Civil Procedure.  The Rules of Civil Procedure.
16   This doesn't apply.
17           I will deem this to be a Rule 29 Motion for Judgment
18   of Acquittal, which is a motion that can be made in a criminal
19   case.  And it is made within the appropriate time because it's
20   typically after the government presents their evidence and
21   then closes their evidence, that a motion for judgment of
22   acquittal is appropriate.
23           So I'm going to deem this a Motion for Judgment of
24   Acquittal and I'm going to deny the motion.  This is utter
25   nonsense.  And so we are not going to grant your motion based
```

1    on any of that.

2            If there is something else you would like to talk

3    about that you haven't raised already.  There is no basis in

4    what you filed.  I guess this was filed on Monday.  I guess

5    this was yesterday.  The very lengthy -- the lengthy -- it

6    looks like -- well, this is what you read into court yesterday

7    morning.  And I'm going to let you testify about these things,

8    with the limits I've already imposed, and I'm going to let you

9    argue these things in your closing argument, if you want to.

10            But the government has presented a solid case

11   against you for all the Counts of the Indictment.  The

12   evidence is certainly sufficient for you to be found guilty in

13   this case.  I'm not saying that that's what they are going to

14   find and I'm not saying that you are guilty, but there

15   certainly is sufficient evidence for this to go to the jury.

16   So I'm going to deny that motion.

17            Is there anything else you want to say?

18            THE DEFENDANT:  You mentioned that, if I'm not

19   mistaken, you said -- did you say utter nonsense?  Did you use

20   the term utter nonsense?

21            THE COURT:  I can't understand what you're saying.

22            THE DEFENDANT:  When you were referring to the

23   motion --

24            THE COURT:  Well, we talked about three motions.

25   Start by telling me which one.

1              THE DEFENDANT:  The Motion for Relief from a Final

2    Judgment Order or Proceeding.  You mentioned that it would be

3    a motion for judgment and acquittal that you was denying.

4              THE COURT:  Right.

5              THE DEFENDANT:  And I was asking did you use the

6    term utter nonsense?

7              THE COURT:  Utter nonsense?  Yes.  Utter nonsense.

8              THE DEFENDANT:  So I would like to ask the Rules

9    that were followed -- because the Rules were followed in this

10   particular motion.

11             THE COURT:  No, you didn't follow the rules.  I just

12   told you that you filed a motion under the civil rules and

13   this is a criminal case.  So you didn't follow it.

14             THE DEFENDANT:  I think that's all the questions I

15   have for now.

16             THE COURT:  Okay.  Now, you had indicated earlier

17   that you wanted to ask him some questions as your witness.  Do

18   you still want to do that or not?

19             THE DEFENDANT:  I would like to.

20             THE COURT:  You would like to?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Okay.  Bring the jury back.

23             I'm not going let you cover what you've already

24   covered with him on cross examination.

25             Do you understand that?

1              THE DEFENDANT:  Yes, sir, I understand that.

2              THE COURT:  So this needs to be something new.

3      (Jurors enter courtroom 2:12 p.m.)

4              THE COURT:  Ladies and gentlemen, the government has

5      rested and Mr. Mattox has the opportunity to present his case

6      at this point.  And he wants to ask the Government's witness,

7      who you just saw testify, wants to ask some questions of the

8      witness as a part of his case.

9              And you will recall I told you there were some

10     restrictions or I told him there were some restrictions about

11     what you could do on cross examination.  But he is authorized

12     to call this witness as a witness.

13             So, let him ask the questions.

14                        JERON CLARK

15         Whereupon, witness having been PREVIOUSLY sworn,

16                     testified as follows:

17                     DIRECT EXAMINATION

18     BY THE DEFENDANT:

19     Q    Mr. Clark, my objective is to assure that I don't ask the

20     same questions that have already been asked of you.

21         Mr. Clark, can you tell me what is actual, with the

22     Internal Revenue Service, cancellation of debt?

23     A    Can you repeat that.

24     Q    Can you tell me, in regards to the Internal Revenue

25     Service or the Treasury, what is the actual definition or

1    meaning for cancellation of debt?

2    A    My understanding is if you have a debt -- so say, for

3    instance, you have a mortgage.  No, let's not use a mortgage.

4    Let's use a credit card.  Say you spent a lot of money on a

5    credit card and you owe the credit card company $20,000.  You

6    did not pay them the $20,000.  You owed -- maybe you made a

7    couple payments and then you still owed them $18,000.  They

8    had a negotiation with you where they said if you pay us a

9    thousand dollars we will cancel the remaining debt.  So the

10   difference in what you paid and what you owed would be

11   considered what the cancellation of debt is.

12        That is my understanding of what the cancellation of debt

13   is.

14   Q    So is the Internal Revenue Service's cancellation of debt

15   or discharge of debt income?

16   A    It would be in that instance that I just stated.

17   Q    So if a trust had -- if a trust or myself canceled or had

18   debt that was canceled, it would be considered income, what

19   you just stated, so that would consist of business activity.

20   A    If you incurred a legitimate debt, correct.

21   Q    Does the Internal Revenue Service accept intangible

22   personal property?

23   A    As what?

24   Q    Payment.

25   A    I am not sure if they do or not.

1    Q    Does the Secretary of Treasury accept intangible personal

2    property as payment?

3    A    I believe they accept it as gifts.  But my understanding

4    of that is anything that you give to them goes to the general

5    fund of debt.

6         So, say, for instance, I give a gift to the Department of

7    Treasury, that goes to the overall debt.  It's not allocated

8    to me, myself.  It would be allocated to the overall United

9    States debt.  So it wouldn't be attributed to my debt, it

10   would be attributed to the United States' debt.

11   Q    Is that the rule or is that your --

12   A    No, I believe when I read it that's what it said.

13   Q    But you're not 100 percent sure?

14   A    I mean, that's not my background.  But I know that I did

15   read it.  And my understanding of what it said was, gifts to

16   the Treasury goes to the United States' debt.  That's what it

17   said.

18   Q    So basically the Treasury accepts intangible personal

19   property but the Internal Revenue Service does not?

20   A    Like I said, I don't know what they would be accepting it

21   for.

22   Q    I'm just trying to -- the basis of just intangible

23   personal property just in general.

24   A    Like I don't understand why somebody would give the IRS

25   -- like, we receive payments for taxes and things like that.

```
 1        So another entity might get the intangible and claim it
 2   on their return, but that intangible wouldn't be sent to the
 3   IRS is my understanding.
 4   Q    So if the intangible personal property is not sent to the
 5   Internal Revenue Service, but it is sent to the actual
 6   Treasury, are you able to see it?
 7   A    Am I able to see it?
 8   Q    On your screen?  Do you have access to it?
 9   A    You said on my screen?  Like are you saying in the
10   Internal Revenue's -- in our system?
11   Q    Within your job, yes.
12   A    Our system is payments made to the IRS.
13   Q    But anything that goes to the Treasury, for the sake of
14   clarity, you don't see that, you only see --
15   A    My system is IRS, any payments that are made to the IRS.
16   Q    Okay.  So if intangible personal property went to the
17   Treasury and not to the IRS, as you have established, it
18   wasn't sent to the IRS, nothing was sent to the IRS, and it
19   went to the actual Treasury and the Treasury accepts --
20             MS. FREEMAN:  Objection, Your Honor.  At this point
21   he's badgering the witness with repeated, repeated questions.
22   The witness has already answered or stated he doesn't know the
23   answer to.
24             THE DEFENDANT:  I wanted to ask how is it frivolous.
25             THE COURT:  Ask the question again.
```

```
1    BY THE DEFENDANT:
2    Q    You stated that the Internal Revenue Service does not
3    accept intangible personal property.  The Treasury does
4    accept intangible personal property.  I'm wanting to know
5    if intangible personal property is sent to the Treasury and
6    they accept it how is -- is it considered frivolous from the
7    IRS?
8    A    So that would have been if there was a frivolous document
9    sent to the IRS that would be what is deemed frivolous.
10        I'm not saying that you sent -- I'm saying the documents
11   that you sent to the IRS was deemed frivolous.  I can't say
12   what you sent anywhere else because I don't know anything
13   about that.  I'm saying the documents that you sent to the IRS
14   were deemed frivolous.
15            THE COURT:  Mr. Mattox, Rule 602 of the Federal
16   Rules of Evidence require personal knowledge in order to be
17   able to answer a question.  That is the foundation that has to
18   be laid for a person to even give any evidence.
19   BY THE DEFENDANT:
20   Q    Mr. Clark, you mentioned that there was no interest
21   income.  Do you have the personal knowledge of whether gifts
22   can create or generate interest income?
23   A    You're kind of low.  It's hard for me to hear you.
24   Q    You mentioned that there was no interest income?
25   A    Correct, on the tax returns.
```

1   Q    I'm asking, based upon your knowledge, can intangible

2   property or a gift create or generate interest income?

3   A    I don't believe so, but I'm not positive.

4        Because my understanding of the basis like income

5   interest is usually generated from money being held somewhere

6   and that generates the interest.

7   Q    So if it was a negotiable instrument that is the

8   intangible personal property and the negotiable instrument has

9   interest -- so, if it's a negotiable instrument and it has two

10  percent interest a year and that negotiable instrument is

11  given as a gift, would there be interest?

12  A    Like I'm trying to answer your question.  Can you repeat

13  that because I'm kind of -- it's --

14  Q    Can you hear me now?

15  A    I can hear you, but it's -- you're kind of going all over

16  the place and I'm trying to get to what you're trying to ask

17  me.

18  Q    I'm talking about negotiable instruments or intangible

19  personal property.

20  A    Yes.

21  Q    So if intangible personal property, negotiable

22  instruments, are accepted by the Treasury, and provided that

23  negotiable instrument carries interest in the amount of

24  two percent, two percent per year, and is given to the

25  Treasury as a gift, does that mean that instrument will

```
 1   generate interest?
 2   A     There would have to be some kind of -- like you just
 3   can't make up saying this is interest.  Like, that's what I
 4   feel like you are asking.
 5        So if I have some kind of entity and I say that this
 6   entity is generating interest, can I then report that as
 7   interest income?  Is that what you're asking me?
 8   Q     No.  What I'm asking is, if I'm the issuer of the
 9   instrument.
10   A     Okay.
11   Q     So if I'm the issuer of the instrument or if the trust is
12   the issuer of the instrument, the trust can actually determine
13   the amount of interest, if the trust is giving that instrument
14   to you as a gift or giving that instrument to you as a loan.
15        So the trust would have the ability to specify that we're
16   going to charge one percent a year, we're going to charge two
17   percent a year for giving you this gift.
18   A     Yes.  So, if you're saying if somebody gives you money or
19   something, you as the trust saying I'm going to charge you
20   two percent on that.  The interest on what was given, the
21   physical or whatever you're saying what was given, is that
22   considered interest?
23   Q     Can that be considered interest?
24   A     I guess in terms of -- if you're saying like that is
25   interest, but is it really interest?
```

```
1    Q    If the trust has intangible personal property that it has

2    given to the Treasury as a gift, does the trust have the

3    ability to dictate --

4    A    So can you -- So, I'm trying to break it down to

5    something that I can understand.

6         So you're saying if they have something.  So, if they

7    have a house, does that follow?  If the trust owns a house?

8    Q    I follow you.

9    A    Or something, and then they're saying that this house is

10   now worth more because I'm holding this house, the interest

11   now goes up because I'm holding this house for you?

12        Is that what you're saying?

13   Q    No.  No, sir.  That's not what I'm saying.

14        THE COURT:  You need to move on to another issue

15   because you have beat this one enough and the witness is

16   confused.

17        And I think that your questions are unclear, despite

18   the fact that you have asked the same questions over and over

19   again.  The questions are unclear.  And so I'm going to ask

20   you to move on.  I think we have a 403 problem here.

21        Go ahead.

22   BY THE DEFENDANT:

23   Q    In your scope -- I know your line of work is with the

24   Internal Revenue Service.  With your scope of what you know --

25   and it's possible you already answered this question and if so
```

Tammy W. DiRocco * Federal Reporter * 478-752-2607

1    I humbly apologize.  I think you did.

2        How would one determine if gifts have been given,

3    intangible personal property, to the Treasury?

4    A    Again, I am the IRS.  So I don't know what -- I don't

5    know how to check to see what would have been sent to the

6    Secretary of Treasury.

7        I know what I can look for and what was sent to the IRS.

8    And the information on the return you said was sent to IRS.

9    So that's why I look for what was sent to the IRS.  I can't

10   talk about -- I don't know what you would have sent to the

11   Treasury.

12   Q    In regards to gifts that are permissible by the Internal

13   Revenue Service, is there a limit on the amount of gifts that

14   can be given to settle debt or to --

15   A    I'm not sure if there is a limit.  I guess it would be a

16   limit up to what you owe.  I'm not aware if there is a limit

17   on -- because usually on somebody sending money to the IRS it

18   is for a payment for a tax debt.  So if you owe taxes you pay

19   up to how much you owe in taxes.

20   Q    If gifts are given to the Secretary of Treasury --

21           THE COURT:  We're not going to talk about anymore

22   gifts given to the Secretary of Treasury.  Because he has

23   already told us he doesn't know about that, which means he

24   doesn't have personal knowledge of it, which means that he

25   doesn't have the foundation for Rule 602.  He works for the

1    IRS.

2            THE DEFENDANT:  The question I'm wanting to ask,

3    Your Honor, is if gifts are given to one entity that's

4    permissible, is it a crime?

5            THE COURT:  If what?

6            THE DEFENDANT:  If gifts are given to the Secretary

7    of Treasury is it a crime?  If the intangible personal

8    property, is it a crime if the Treasury say that they accept

9    it, is it a crime to give the gift?

10            THE COURT:  You're asking for a legal opinion now

11    about what the criminal statutes hold.  Is that what you want

12    from this witness?

13            THE DEFENDANT:  No.  I'm asking -- because he

14    testified or he stated -- as a witness he stated that this was

15    fraudulent or he stated that there are several things that

16    were done fraudulently.

17            So I'm wanting to know if the gifts were given,

18    according to the Rules, is it fraud?  Is it a crime if gifts

19    were given according to the Rules.

20            THE COURT:  To the Secretary of the Treasury, that

21    was your question, right?

22            THE DEFENDANT:  And not to the Internal Revenue

23    Service.

24            THE COURT:  He's already testified he doesn't know

25    about that.  So I'm not allowing that question.

```
1    BY THE DEFENDANT:
2    Q    You also mentioned that in reviewing bank statements that
3    there were quite a few expenses.  Is it a crime to travel?
4    A    No.
5    Q    Is it a crime to work out?
6    A    No.
7    Q    Is it a crime to eat out?
8    A    No.
9              THE DEFENDANT:  Thank you, Mr. Clark.
10                        CROSS EXAMINATION
11   BY MS. FREEMAN:
12   Q    Just one question.  Special Agent Clark, is it a crime to
13   pay for travel, eating out and working out with money you
14   stole from the United States Government?
15   A    Yes.
16             MS. FREEMAN:  No further questions.
17             THE COURT:  You can resume your seat.  Thank you.
18             What's next, Mr. Mattox?
19             THE DEFENDANT:  I didn't get an opportunity to rebut
20   what the government just asked Mr. Clark.
21             THE COURT:  What now?
22             THE DEFENDANT:  I wasn't given the opportunity to
23   rebut what the government just asked Mr. Clark.
24             THE COURT:  I'm sorry.  I thought you were finished.
25   Come on back up.
```

REDIRECT EXAMINATION

BY THE DEFENDANT:

Q    Mr. Clark, the government just mentioned that -- or the question that was asked of you, is it a crime in regards to money that was stolen -- if I'm not mistaken -- stolen from the United States or stolen from the government.  But on the screen it showed that the checks were from the Treasury and you also mentioned that the checks were issued from the Treasury.

So was anything stolen from the Internal Revenue Service?

A    They were stolen because they should not have been issued.

Q    But were they stolen --

A    The theft occurred when the false return was filed, was generated, a false check that should not have been issued.  So that's where the crime was committed.

Q    Okay.  But was it taken from the Internal Revenue Service?

A    Yes.

Q    But you stated that the Treasury was the issuer?

A    Yes.  The IRS -- a tax return was filed with the IRS. The checks are issued from the Department of Treasury.  The checks are not issued from the IRS.  The tax returns that generate the check was from the IRS.

Q    But the funds themselves were from the Treasury?

1    A    Department of Treasury.

2          THE DEFENDANT:  Okay.  Thank you.  That was my only

3    question.

4          THE COURT:  All right.

5          MS. FREEMAN:  No further questions, Your Honor.

6          THE COURT:  All right, sir.  You can return to your

7    seat.

8          What's next, Mr. Mattox?

9          THE DEFENDANT:  I would like to ask in regards to

10   making statements.  Because I don't have -- I don't have

11   additional witnesses.

12         So are we at the point of closing arguments or are

13   we at the point of --

14         THE COURT:  Well, step back out just a minute,

15   ladies and gentlemen.  I need to deal with one matter.

16    (Jurors exit courtroom 2:32 p.m.).

17         THE COURT:  Mr. Mattox, if you don't have any other

18   witnesses then you need to decide whether you're going to

19   testify in this case or not testify.  And I have discussed

20   this with you multiple times.  And you have the right to

21   testify and you can take the stand and you can give a

22   narrative in the form of testimony.  You don't have to be

23   examined by someone.  And you are limited, however, by some of

24   the parameters that I imposed earlier, I think, yesterday.

25         For example, I'm not going to let you talk about the

1    Fourth Amendment.  I think that you also understand, because

2    I've made this clear several times, that you do not have to

3    testify.  And if you don't testify that cannot be used against

4    you.

5            The government, for example, can't say, well, he

6    didn't testify and that shows he's guilty or anything like

7    that.

8            The burden of proof is always on the government in

9    this case.  It never shifts to you.  And that is beyond a

10   reasonable doubt.

11           And when it comes time to charge the jury that's

12   what I'm going to charge the jury.  So you need to decide if

13   you want to testify or not and if you're going to testify you

14   need to testify now.

15           I will also say that if you have any documentary

16   evidence or whatever, something that you want to submit, now

17   would be the appropriate time to do that, so there may be some

18   things that you want to.

19           But the first question is -- don't shuffle papers.

20   Please listen to me and then I will let you shuffle papers.

21   All right.

22           You need to decide if you're going to testify or

23   not.  So are you going to testify?  And if you testify you

24   will be cross examined.  That is just part of it.  You open

25   yourself to the cross examination.

1        But I'm not saying anything one way or the other

2   about whether you should or shouldn't, I'm just trying to

3   advise you of your constitutional rights.

4        So, what do you want to do?

5        THE DEFENDANT:  I'm not taking the stand, Your

6   Honor.

7        THE COURT:  So, you are not going to testify.  All

8   right.

9        Now, what we can do at this point is to take a short

10  break and you can go through and if there are some things that

11  you want to admit, that you want to offer to the Court, then I

12  will consider those things.

13       Keep in mind that exhibits 1 through 4 are already

14  in evidence.  So those are there.

15       And whatever else you might want to offer would need

16  to be admissible under the Federal Rules of Evidence, like

17  everything else in this court.

18       So do you know what you want to offer now or do you

19  need some time to look.  Tell me what you need?

20       THE DEFENDANT:  I have an idea what I want to offer,

21  but I would ask for the time to assure that I have it put

22  together thoroughly.

23       THE COURT:  Okay.  That's fine.  Tell me how long do

24  you think you're going to need?  How long do you think we need

25  a break?

1          What's getting ready to happen, so you will

2    understand, is once the evidence is closed -- and I think that

3    is getting ready to happen when you offer whatever you want to

4    offer into evidence -- then we are going to have the charge

5    conference and then we can make the closing arguments.  Okay.

6          THE DEFENDANT:  We're doing the charge conference

7    and the closing arguments today?

8          THE COURT:  Yes.  I think so.

9          THE DEFENDANT:  What is, I guess, the maximum time

10   allowed for me to -- there is one document that is --

11         THE COURT:  Well, I tell you what.  Tell this

12   gentleman when you are ready to start back, okay?

13         THE DEFENDANT:  Okay.

14         THE COURT:  And then we will come back.

15         THE DEFENDANT:  Thank you.

16         CSO OFFICER:  All rise.

17    (Recess 2:37 p.m.)

18    (Resume 2:55 p.m.)

19         CSO OFFICER:  The Court is now back in session.

20   Please be seated and come to order.

21         THE COURT:  Mr. Mattox, is this all you're

22   interested in introducing into evidence or were there other

23   things?

24         THE DEFENDANT:  There are two additional documents I

25   wanted to say --

```
1              THE COURT:  Have you shown them?
2              THE DEFENDANT:  I have not shown them.
3              THE COURT:  Take a look.  Have you seen this one?
4         MS. FREEMAN:  No, Your Honor.
5              THE COURT:  I will trade with you.  Y'all go ahead
6    and finish with that.  Have you looked at those?
7              MS. FREEMAN:  We've seen enough, Your Honor.
8              THE COURT:  Why don't you give me that back and let
9    me go back here and make some copies of it.  So just stand by.
10             Is this it?  These three documents?
11             THE DEFENDANT:  I was asking because I didn't get a
12   chance to thoroughly write the one that the clerk has.  The
13   one that the clerk has in her hand I was asking if she could
14   actually print it off the Internet because I don't have
15   Internet access or I could hand write it because it's not
16   finished.
17             THE COURT:  It's not finished.  What's not finished
18   about it?
19             THE DEFENDANT:  There is quite a bit of scribble on
20   the document.
21             THE COURT:  I see what you're saying.  Okay.
22             But the content, this is the total content you
23   wanted?  Is that what you're telling me?
24             THE DEFENDANT:  That's the content but I would like,
25   if possible, for that one particular document 3113 if the
```

1   clerk can print it off the internet.  Great.  If not I can sit

2   and hand write it.

3             THE COURT:  Do y'all have any objection to this?

4             MS. FREEMAN:  Yes, Your Honor, under Rules 403, 402,

5   and 901.

6             THE COURT:  Tell me?  Tell me what?

7             MS. FREEMAN:  Confusion of the issues, lack of

8   probative value, lack of relevance, lack of authentication.

9             THE COURT:  We need to get this put in a form that

10  we can all work with at the same time.

11            So what I have done is I have printed out Section

12  3113 and replaced what you had written that you had scribbled

13  on, as you described it.

14            And then the public debt limit and then the -- so

15  what I'm going to do up here -- let's see, do we have any

16  exhibit stickers --

17            So I have marked, Accepting Gifts, D-5.  Public Debt

18  Limit 6.  And Defendant's Exhibit 7 is bonds, certificates, so

19  forth and so on.

20            And so do you want to respond to what the -- I'm

21  inclined to let these in.

22            MS. FREEMAN:  Your Honor, we would object as to the

23  lack of foundation as to reliance that is actually been laid

24  for these.

25            THE COURT:  Okay.  There is no foundation that has

1   been laid for these exhibits.

2           THE DEFENDANT:  The foundation has been laid, Your

3   Honor, because it's been stressed or it has been said

4   multiple, multiple times, that the Treasury accepts gifts of

5   intangible personal property, which basically 3113 confirms

6   that the Secretary of Treasury confirms that the Secretary of

7   Treasury does and will accept gifts of intangible personal

8   property and the intangible personal property received shall

9   be sold and the proceeds will be used to reduce the public

10  debt.  That's for Title 3113.  So that has been established.

11          And Title 31 U.S.C. pretty much -- it basically

12  states that the face of an amount of an obligation -- the face

13  of an amount of an obligation issued under this chapter and

14  the face amount of the obligation whose principal and interest

15  are guaranteed by the United States Treasury.  And it gives

16  the foundation for the Full Faith and Credit that was issued

17  by the United States Secretary of State, which is a direct

18  obligation of the United States and it gives the foundation

19  for the value of the Full Faith and Credit and indemnity that

20  was issued in 2015.

21          Also as far as Title 18, obligations and other

22  securities of the United States give the foundation in regards

23  to -- it says that all bonds, bills, et cetera, are

24  obligations of the United States that are drawn by or upon two

25  authorized offices of the United States and the true bill --

1        THE COURT:  There is no evidence in this case of any

2  bonds or any payments made.

3        THE DEFENDANT:  It states in the Rule that a

4  redemption -- redemption or cancellation -- excuse me.  If you

5  can bear with me for a moment, Your Honor.

6        Redemption or cancellation consist of -- bear with

7  me for one second -- and Title 18 U.S.C. -- Title 18 U.S.C. 8,

8  it established that bills, et cetera, are drawn by authorized

9  offices of the United States and canceled stamps are

10  obligations of the United States.

11        And being that the True Bill was drawn by two

12  authorized offices of the United States it actually

13  establishes that the True Bill is an obligation of the United

14  States because it was drawn by two offices of the United

15  States.

16        Secondly, --

17        THE COURT:  Which proposition is this that you're

18  talking about now?

19        THE DEFENDANT:  You were speaking of Title 18,

20  obligation and other securities of the United States.

21        THE COURT:  So it's not one of your exhibits?

22        THE DEFENDANT:  Yes.  I would like for it to be an

23  exhibit.

24        MS. FREEMAN:  Your Honor, I think he might be

25  referring to this excerpt, which I believe you labeled

Tammy W. DiRocco * Federal Reporter * 478-752-2607

```
1    Exhibit 7.

2            THE COURT:  Okay.  What's in blue?  What is in blue

3    is what you're talking about?

4            THE DEFENDANT:  Correct.

5            THE COURT:  Well, I don't understand what this has

6    to do with anything.  There is no evidence of bonds,

7    certificate of indebtedness, National Bank currency, Federal

8    Reserve notes, Federal Reserve Bank notes, coupons, United

9    States notes, on and on and on.  I don't know that there has

10   been anything like that in this case that you presented.

11           THE DEFENDANT:  In regard to bills, the True Bill --

12   the bills, if you continue on it confirms that --

13           THE COURT:  We're clearly not talking about a True

14   Bill.  That is clearly not talking about an indictment.  It

15   has to do with money.

16           THE DEFENDANT:  Correct.  And the government's True

17   Bill has a declared value -- to declared values within the

18   True Bill.  One -- and if I'm not mistaken, on page three,

19   four, roughly around 168 million and on page 4 it has a

20   declared value of 2 million --

21           THE COURT:  There's no declaration of the value

22   there.  I don't follow that at all.

23           THE DEFENDANT:  It's stating in regards to an

24   injury.  It's stating an injury or it's stating an amount of

25   money that was lost or an amount of money that is owed.
```

1              So would that not signify an amount of money that is
2    owed or an amount of money, as far as a declared value, that
3    this is owed, this is what was taken, this is what was seized,
4    this is what we're asking for in return.
5              THE COURT:  You're talking about the indictment is
6    that?
7              THE DEFENDANT:  Correct.  I know you called it an
8    indictment, Your Honor, but when you turn to page 8 of the
9    Indictment it says, True Bill.  And when I look up the
10   definition of true it means exact.  When I look up the
11   definition of bill, it means an amount of money that is due.
12             THE COURT:  Well, true bill has a specific legal
13   terminology and it doesn't have anything to do with money.  It
14   has to do with the acts and effects of the grand jury.
15             I think this is very misleading.  What you are
16   proposing to do with this is very misleading and I think not
17   relevant.  But even if it is, I think there is a 403 problem
18   with it in terms of misleading.
19             I think you clearly are reading this incorrectly.
20   This is not talking about a True Bill.
21             So if you're offering this for the purpose that the
22   indictment was a bill covered by this, then I'm not going to
23   allow this into evidence.  And that's what it sounds like.
24             THE DEFENDANT:  Your Honor, even if you look at --
25   even if you look at -- even if you look at 31 U.S.C.

1    3113(a)(2)(D) and (e)(1)(A) establish that an obligation --

2    excuse me -- that an obligation of the government is redeemed

3    and canceled once the obligation is given to the government.

4    And Title 50 U.S.C. 4305(b)(2) and 12 U.S.C. 2, Section

5    95(a)(B)(2) establishes once the obligation or property has

6    been delivered to the government it shall be a full discharge

7    acquittance, et cetera.

8              THE COURT:  There's no evidence that that has

9    happened in this case.

10              THE DEFENDANT:  The evidence -- you have it in the

11    True Bill and you have it labeled as Exhibit 1, Defendant

12    Exhibit 1.

13              THE COURT:  Defendant Exhibit 1, I thought, was your

14    birth certificate.

15              THE DEFENDANT:  No, you have it as Defendant

16    Exhibit 1.

17              THE COURT:  Let me see that, Nora.

18              THE DEFENDANT:  The true bill was actually --

19              THE COURT:  Yes, Defendant's Exhibit 4 is the True

20    Bill.

21              THE DEFENDANT:  So that has taken place.  That has

22    happened.  The True Bill was given to the Court.  The True

23    Bill was given to the government as per the instructions for

24    31 U.S.C. 3113 which established that an obligation of the

25    government is redeemed and canceled and retired once the

1   obligation is given to the government, which it has been given

2   to the government.  It also establishes in 50 U.S.C.

3   4305(b)(2) and 12 U.S.C. 2, Section 95(a)(B)(2) once the

4   obligation of the property has been delivered to the

5   government there shall be a full discharge and acquittance.

6   So both of those have taken place, Your Honor.

7          THE COURT:  Anymore from the government on this?

8          MS. FREEMAN:  Your Honor, we just maintain our

9   objections as to relevance, confusion of issues, waste of

10  time.  Note that some of these appear to be statutes which,

11  you know, the final statement on the law will be the Court's

12  instructions, of course, to the jury.  We're not allowed to

13  present any statute, printouts to the jury anymore than the

14  Defendant should be.

15         And, as far as whether the Indictment settles any

16  kind of debt, that is not a question before the jury upon

17  which they are to make a finding.  So it doesn't tend to make

18  any relevant fact more or less probable; therefore, it's

19  irrelevant.

20         THE COURT:  Well, this is what I'm going to do.  I

21  am not going to allow number 7 because I think that that is

22  very likely to confuse the jury.  But I will let in 5 and 6.

23  I don't really know what the public debt limit -- there's not

24  been any testimony in this case about the public debt limit.

25         THE DEFENDANT:  In the opening statement, yes, sir,

167

1   there was.

2         THE COURT:  There is no evidence in this case.  No

3   evidence in this case about the public debt limit.  What you

4   said in the opening statement is not evidence in this case.

5         I don't remember any testimony from any of the

6   witnesses about it.

7         MS. FREEMAN:  That's correct, Your Honor.  He

8   attempted on cross examination of the government's witnesses

9   many times in repetition to solicit information of this

10  nature.  They were not able or competent to testify to what he

11  was trying to elicit.

12        And as far as his case in chief, he has presented no

13  testimonial evidence whatsoever.

14        THE COURT:  Do you want to respond?

15        THE DEFENDANT:  Well, Your Honor, as I mentioned,

16  the witnesses that was brought forth or even that the

17  government brought forth, the government did not bring forth

18  the Secretary of Treasury.  The government did --

19        THE COURT:  The --

20        THE DEFENDANT:  -- if you could let me, please --

21        THE COURT:  Go ahead.

22        THE DEFENDANT:  -- the government didn't bring forth

23  anyone from the Secretary of Treasury's office, which has

24  always been stated that the gifts were given to the Secretary

25  of Treasury's office, according to the rules.

168

1          THE COURT:  No.  There is no evidence in this case

2     that any gifts were given to the Secretary of State or

3     Secretary of Treasury.

4          THE DEFENDANT:  Your Honor, being that -- as I

5     mentioned to you, being that I have been held in detention

6     since October I wasn't given the opportunity to retrieve the

7     documents to verify and confirm that these documents were --

8          THE COURT:  You could've asked me for that at the

9     first hearing and I would have done what I could have done to

10    help you with that if you had expressed that to me, or in the

11    second hearing, or in the third hearing, but you never brought

12    it up.  You never asked for that.

13         And so I always try to give you the opportunity in

14    these hearing -- and this is one of the reasons that we had

15    multiple hearings, because you were pro se and I was trying to

16    accommodate you and to help you along the way within the

17    limits of what a District Court Judge can do for a pro se

18    Defendant.

19         THE DEFENDANT:  Well, you asked if I had the actual

20    documents and I mentioned to you that I don't have direct

21    access to the documents.  And if I'm not mistaken you

22    suggested the aid or the assistance of an attorney, in which I

23    respectfully decline.  But as far as me directly, I wasn't

24    given access to retrieve those documents to present --

25         THE COURT:  Well, the government has no burden to

```
1    give you something like that.  May be some burdens in certain
2    areas that they have to turn over to you, but not anything
3    like that.
4            The government doesn't have to prove your case.  You
5    have to prove your case.  The government just has to prove
6    their case.  Their case is driven by the indictment and it's
7    driven by the statute that delineates the elements of the
8    crime charged in the statute.
9            THE DEFENDANT:  I understand that the government has
10   to prove their case, but I was actually -- I want to say, so
11   to speak, deprived of the opportunity to get the specific
12   documents to present as the evidence because I wasn't given
13   the opportunity to do so.
14           And even in regards to having the opportunity for
15   the revocation of the detention order, you have actually
16   declined that twice.
17           THE COURT:  Well, I did -- I just told you you had
18   multiple opportunities when we had the hearings.
19           THE DEFENDANT:  I requested a --
20           THE COURT:  The last hearing was how long ago?  Two
21   weeks ago, three weeks ago.  I don't remember when it was.  It
22   was fairly recently.
23           THE DEFENDANT:  I requested the revocation for the
24   detention order and it was declined twice.
25           THE COURT:  That's right.  I thought you were an
```

 1  escape risk and I still do.

 2          THE DEFENDANT:  I could never be -- with all due

 3  respect, Your Honor, with the United States Full Faith and

 4  Credit Guarantee guaranteeing --

 5          THE COURT:  That guarantees zero in this court.  You

 6  have no comprehension of what you're talking about, sir.  That

 7  means nothing here.

 8          THE DEFENDANT:  Okay.

 9          THE COURT:  Maybe you can talk to the jury about it,

10  but I don't know that you can.  But it doesn't mean anything

11  to me.

12          What else?

13          Did they get a copy of the jury charges?  Did you

14  bring those in?

15          LAW CLERK:  Yes.

16          THE COURT:  Where is my copy?

17          THE DEFENDANT:  Thank you, Your Honor.

18          THE COURT:  So we've got -- I'm going to let in,

19  what did I say, 5 and 6.

20          MS. FREEMAN:  Your Honor, just to clarify for

21  purposes of the record, has the defense rested?

22          THE COURT:  That's my understanding.  You're resting

23  now, right?

24          THE DEFENDANT:  Yes.  I would need an opportunity to

25  put together the closing statement, Your Honor.

1          THE COURT:  How long do you think that will take

2    you?

3          THE DEFENDANT:  Can I ask this question?  How long

4    is permissible for the closing statement?  I know the opening

5    statement was 30 --

6          THE COURT:  Well, I think probably about 30 to 40

7    minutes.

8          THE DEFENDANT:  For the closing statement?

9          THE COURT:  Yes.  In a case that has lasted a day

10   and a half that is generous.

11         THE DEFENDANT:  What are the possibilities --

12         THE COURT:  Usually I kind of give the time limits

13   based on how many days the trial last and this one hasn't

14   lasted very long.

15         THE DEFENDANT:  So what are the possibilities of

16   9:00 tomorrow morning?  That would give me the opportunity to

17   get back to Butts County to eat, to shower and to start

18   structuring the closing statement.

19         THE COURT:  Okay.  I'm going to let the jury go home

20   and tell them to be back at 9:00 tomorrow morning.

21         Bring the jury in, please.

22         THE DEFENDANT:  Thank you, Your Honor.

23    (Jurors enter courtroom 3:24 p.m.)

24         THE COURT:  Ladies and gentlemen, we have been

25   discussing various legal issues and the last thing that we

1    need to do, before we have the closing arguments in this case,

2    is to go over the jury charges.  And rather than keeping you

3    here today and really not having probably long enough to get

4    that done, plus have the closing arguments, I'm going to send

5    you home now.

6              And you will come back tomorrow morning, and when

7    you get back there that will be the opportunity for the

8    parties to make their statements to you, their arguments to

9    you.

10             The closing arguments are the opportunity for the

11   attorneys and Mr. Mattox to explain to you what they think the

12   evidence has shown.  It is not evidence.  The closing argument

13   is not evidence, it's just what the lawyers argue about the

14   evidence.

15             So I'm going to excuse you now and I want you to be

16   back at 9 in the morning and hopefully by -- I don't know --

17   10:30 you will get the jury charge and you will be able to

18   begin your deliberations.

19             I want to thank the parties.  This case moved along

20   very promptly and I thank you for the patience and please be

21   careful riding home.

22     (Jurors exit courtroom 3:26 p.m.)

23             THE COURT:  Does everybody have a copy of the jury

24   instructions?

25             LAW CLERK:  I'm getting them there.  (retrieving for

1    attorneys).

2            THE COURT:  What we're going to do is I'm going to

3    give y'all the opportunity to read those.  I'm going to step

4    off the bench and I'm going to give y'all the opportunity to

5    read those.

6            And I will tell you that it is my practice to come

7    up with the jury charge.  I am always happy to receive

8    recommendations but we typically strictly go by the charge

9    book.

10           And there may be -- and I expect you're going to

11   find there are some things that the government requested that

12   we don't have in there and we can take that up.

13           But first what we're going to do is we're going to

14   go over what I am proposing and see if you have any objections

15   or corrections related to that.  And then if there are any

16   omissions or something that you think is important then we

17   will deal with that.

18           But I will tell you that I don't typically

19   substitute words that some party likes better than what the

20   Court likes.  All right.  So keep that in mind.

21           COURTROOM DEPUTY:  All rise.

22     (Recess 3:29 p.m.)

23     (Resume 3:54 p.m.)

24           THE COURT:  We are going to go over these and I'm

25   having -- now that the evidence is over and concluded and now

1    that we are to the charge stage, I realize I'm going to have

2    to revisit some of these documents, some of these exhibits

3    that I previously admitted for the Plaintiff.

4              So we're going to go through the jury charges first

5    and then I'm going to go back over the charges.  And Nora,

6    hand me those right there.  Thank you.

7              Now typically the way I do this is I just go through

8    these page by page.  A lot of this is -- some of this is just

9    standard routine, the way we always do it.

10             You have to decide -- your decision must be based

11   only on the evidence and all that.  Does anybody have any

12   objection to instruction number one?

13             MS. FREEMAN:  No objection for the government

14   on one, Your Honor.

15             THE COURT:  Number two.  If you have an objection --

16   I will just go through here.  What I call the operative

17   charges and those are the ones that explain the elements of

18   the defense are in the back and those are the ones that are so

19   important.  Not that the others aren't important but the

20   others are ones that we always use.

21             I will point out that instruction number two, you

22   see where it says annotations and comments.  That all comes

23   out.  That will not be in there.

24             And I will also tell you that I give the jury a copy

25   of the jury charge.  And so that will go out with them.

1          And this is just in here for comment sake, but I do

2    think it's important that because he is representing himself

3    that that has no bearing on his guilt or innocence.

4          Three, this is the reasonable doubt instruction.

5    Again, this is a standard instruction.  It's one I have

6    probably been giving for 20 years.

7          And then four, take a look at four.  As I said

8    before you may consider only the evidence that I have admitted

9    in the case, evidence includes testimony of witnesses and

10   exhibits admitted, but anything the lawyers say or the

11   Defendant acting as his own lawyer says.  Now that has been

12   added here because of the obvious reason.  And I think it's

13   important that that go in there.

14         And then, you know, explain about direct and

15   circumstantial evidence.  I have explained that in the

16   preliminary charge.

17         And then the credibility of witnesses.  Once again

18   this was very much like what we already did in the morning

19   session, yesterday's morning session.

20         And then six, impeachment of witnesses.  I don't

21   know that there has been an impeachment of a witness in this

22   case.  I can't think of a situation.  I think there has been a

23   prior inconsistent statement, which is the way we normally get

24   into these.  Let me look at this.

25         MS. FREEMAN:  Your Honor, the government doesn't

1   object to it either way.

2          THE COURT:  Well, I think the second paragraph is

3   pretty good.  Well, I don't know.  I mean, this is an

4   impeachment of a witness by a prior inconsistent statement.  I

5   do not think that's happened in this case.  I do not remember

6   that happening in this case.

7          MS. FREEMAN:  No, Your Honor.  I believe all the

8   points of impeachment are cross related to what they stated on

9   direct and didn't refer to prior inconsistent statements.

10          THE COURT:  That's not impeachment by a prior

11   inconsistent statement though.

12          MS. FREEMAN:  No, Your Honor.

13          THE COURT:  What do you think about this one?

14          THE DEFENDANT:  Your Honor, I have no objection.

15          THE COURT:  Do you have an objection to me taking it

16   out?  I don't think it needs to be charged.  And I don't want

17   to charge anything to the jury extra.  The simpler you make it

18   with them the better it is.

19          I mean, this implies that somebody misstated

20   something.  I'm going to take that one out.

21          THE DEFENDANT:  I would object to taking it out,

22   Your Honor, please.

23          THE COURT:  On what basis?

24          THE DEFENDANT:  On the basis that it doesn't give

25   the jury the opportunity to read this and the jury to use

```
 1    their own -- as the document would say -- common sense to
 2    think back if there were things that were misstated, if there
 3    were things that were said inaccurately, to give the jury the
 4    opportunity to thoroughly weigh the statements, and I think
 5    removing this could actually hinder, in my opinion.
 6            THE COURT:  Can you point out any witness in the
 7    trial of this case, who at some time before the trial of this
 8    case, said or did something, didn't say or do something that
 9    was different from the testimony on trial today.  That's what
10    this is about.  That's what a prior inconsistent statement
11    amounts to.
12            THE DEFENDANT:  Your Honor, to be -- I think it
13    could be a -- it may be an opinion in which I feel that there
14    were things that were prior and inconsistent that were
15    actually completed, facilitated or done by the Internal
16    Revenue Service and the --
17            THE COURT:  How did you impeach them?
18            THE DEFENDANT:  How did I impeach them?
19            THE COURT:  Yes.
20            THE DEFENDANT:  I did not impeach them.
21            THE COURT:  Okay.  Then we're not going to give that
22    charge.
23            The note taking, that needs to be -- that's in the
24    wrong place.  That needs to be -- that needs to be before 18.
25    Well, we're changing the numbers now.  That should come before
```

1   the duty to deliberate.  Okay.  That doesn't need to be in the

2   middle of all this.

3             Number eight, there's been no evidence that

4   Defendant made certain statements in which the government

5   claims he admitted certain facts...  There has been evidence

6   that made certain statements -- the only thing about this is

7   this Defendant has made no statements at trial.  And so as a

8   consequence of that it seems to me that if we're going to use

9   this it needs to say, "There's been evidence the Defendant

10  made certain statements before trial or during the

11  investigation or something else."

12            What's the government's position on this?  I think

13  you may have requested something like this.

14            MS. FREEMAN:  Yes, Your Honor.  We believe we

15  requested something similar.  We are fine with the

16  clarification if you wanted to insert something along the

17  lines of what you just described.  We have just checked and

18  ours is the same.  It's from the modern Federal Jury

19  Instructions.  Slightly different wording, but essentially the

20  same.

21            THE COURT:  I'm just going to put before trial.  Do

22  you have any objection to that?

23            THE DEFENDANT:  I'm not sure.  Can you tell me

24  exactly how it's going --

25            THE COURT:  The way it's going to read now it's

```
1   going to say, "There has been evidence that the Defendant made
2   certain statements before trial in which the government claims
3   he admitted certain facts charged in the indictment."
4           THE DEFENDANT:  And as far as certain statements,
5   Your Honor, I'm not agreeing to it because the witnesses
6   stated --
7           THE COURT:  I know you're not agreeing to it.  The
8   question is whether there was evidence or not?  And I think
9   that Clark -- was that the last witness -- testified that he
10  admitted to him.  I mean, there were various admissions that
11  "he sent in the form.  That he signed the form.  That he got
12  the money from the form."  I mean, those were all admissions
13  that he testified this Defendant said during the
14  investigation; is that correct?
15          MS. FREEMAN:  That's correct, Your Honor.
16          THE DEFENDANT:  Well, the gentleman also mentioned
17  that -- there were several things that he mentioned that they
18  were his assumption.  There was also the witness, Ms. Freeman
19  --
20          THE COURT:  No, you put that word out there.  What
21  he said was, "I assume so and so, that you did so and so."
22  And then you said you did it.  And so that was the way I
23  remember his testimony.
24          THE DEFENDANT:  Even with Ms. Freeman, Your Honor,
25  she mentioned that -- if I'm not mistaken -- she used her
```

1    assumption or her opinion, that's the way that she took it.

2    Because there was no response.  So she assumed that there was

3    a --

4            THE COURT:  Well, it only has to be one statement.

5    But there were -- I just counted three.  So I think there were

6    others on that.

7            And there were statements that you made to the

8    Haverty's lady.  There were statements that you made -- well,

9    you didn't bring the Cadillac people in, but you brought the

10   house people in.  I mean, there were statements that you made

11   about the purchases.

12           Now those were not really directly -- they were

13   indirectly related.  I don't know if those count or not.

14           But I'm going to go ahead and charge this.

15           I'm going to take out -- now I'm on nine.  I don't

16   think I need to tell them again about the summary charge.

17   That's very simple to understand.  I told them about it

18   yesterday.  I told them again today.  Another chart came up

19   and I looked over and they were shaking their heads like they

20   -- I didn't have to say it.  They already understood it.  So

21   that's going to come out.

22           So there will be no instruction number 9.  That is

23   coming out.

24           I'm going to change "You'll be given a copy" to

25   "You'll be given copies."  Because I want -- I may have

1    already done that.  Have I done that yet?  Do they have copies

2    of the Indictment?  Does anybody know?

3              COURTROOM DEPUTY:  The Indictment?

4              THE COURT:  Yes.

5              COURTROOM DEPUTY:  No.

6              THE COURT:  So I'm going to change that.  They will

7    all have copies.  "You will be given copies of the Indictment

8    to refer to."

9              And this is kind of an introduction.  Does anybody

10   have a problem with number 11?

11             MS. FREEMAN:  Not the government, Your Honor.

12             THE COURT:  Mr. Mattox?

13             THE DEFENDANT:  (No audible response).

14             THE COURT:  And then number 12, given -- charge

15   committed on or about.  That is standard.

16             Knowingly, that's standard.

17             Willfully?  All right.  "The word willfully means

18   that the act was committed voluntarily and purposely with the

19   intent to do something the law forbids; that is, with the bad

20   purpose to disobey or disregard the law.  While a person must

21   have acted with the intent to do something the law forbids

22   before you can find that the person "willfully," the person

23   need not be aware of the specific law or rule that his conduct

24   may be violating."

25             Does anybody have any problems with that?

1        MS. FREEMAN:  No, Your Honor.

2        THE DEFENDANT:  (No audible response).

3        THE COURT:  Now instruction 13 deals with the

4  elements of wire fraud.  And these are the elements that the

5  jury needs to understand.  "That the government has to prove

6  beyond a reasonable doubt, in order to return a guilty verdict

7  against you."

8        To me this looks straightforward and proper.

9        MS. FREEMAN:  No objection, Your Honor.

10        THE COURT:  Do you have an objection?

11        THE DEFENDANT:  I do not.

12        THE COURT:  And then the same with false claims

13  against the government.

14        MS. FREEMAN:  No objection, Your Honor.

15        THE COURT:  What about you, Mr. Mattox?  Again this

16  is just the outline of the elements of the crime and

17  description of what it means.

18        Do you have a problem with that, Mr. Mattox?  In

19  other words, there are multiple counts here but they aren't

20  all the same crime alleged in each count.

21        And there are, in fact, three different crimes that

22  are alleged.  And we have been over two of the elements of

23  those counts, specific counts.  And now we are looking at 15,

24  which has to do with theft of government money or property.

25        Again, this is actually the simplest of the three.

1          MS. FREEMAN:  Your Honor, we did have a question

2     about number 15.

3          THE COURT:  Hold on.  Okay.

4          MS. FREEMAN:  So we note that in the instruction we

5     had seen before, for instance, element number 2, we have seen

6     it say, "Knowingly stole or converted."  And then it refers

7     further down to "stole or converted" at the bottom of the page

8     where it says "that the Defendant knowingly converted it."

9          But then on the final page it says "to steal or

10    convert."  So it's defining both terms and we're just

11    wondering if there is a purposeful admission of the steal

12    terminology and, if so, if it should be all three.

13         THE COURT:  So you want number 2 to say "the

14    Defendant knowingly stole or converted?"

15         MS. FREEMAN:  Yes, Your Honor.

16         THE COURT:  So we will change that to make it

17    consistent.

18         MS. FREEMAN:  And then at the bottom of the page

19    where it says that "the Defendant knowingly stole or

20    converted."

21         THE COURT:  Okay.  Put that in there.

22         THE DEFENDANT:  I object.

23         THE COURT:  Have you got that, Matthew?  Did you

24    want to say anything about that?

25         THE DEFENDANT:  I was saying I object.  "The

1    Defendant stole or converted."  Basically in 31 U.S.C. 3113 it

2    states that to give gifts to the Secretary of Treasury, to

3    convert to money --

4            THE COURT:  Okay.  Well, there's no evidence of any

5    gifts to the Secretary of Treasury.  This is simply a

6    statement.  This is simply a statement of the law.

7            And, you know, stole or converted, those are

8    synonyms, not a lot of difference in that.  But some juror may

9    have the conception that stealing is going into somebody's

10   pocket or going into somebody's car or their house and

11   somebody may not know exactly what converted means.  So I

12   think that it's appropriate to do it that way.

13           Number 16.  Sixteen says, Good faith is a complete

14   defense.  Defendants is an ... essential part, acting in good

15   faith ... sincerely believing that he was exempted from the

16   tax laws.  There's not any testimony in this case about that.

17           MS. FREEMAN:  That's correct, Your Honor.  We, if

18   anything, think the opposite has been said, that he wants to

19   use the tax laws to his advantage.

20           THE COURT:  I don't know why we give that charge in

21   this case.

22           THE DEFENDANT:  I agree.

23           THE COURT:  What do you have to say about that, sir?

24           THE DEFENDANT:  I stated I agree with you, sir.

25           THE COURT:  Okay.  And then punishment.  This is

1    just to let them know -- because jurors -- different systems

2    have different procedures to sentencing.

3            I know when I first started practicing law, many

4    years ago, the jury would sentence the defendants after they

5    were convicted.  So they would be convicted and then you send

6    them back and they would come back out and they would say we

7    give him three years.

8            But I assume that's not the way it's done in the

9    state anymore.  But it's clearly not the way it's done in

10   federal.  But they need to know this.  Because if they don't

11   they're going to say, do we sentence him today?

12           So it's very straightforward.

13           Duty to deliberate.  This is another proposition,

14   another proposition here.  That is the basic fundamental

15   proposition that they have the duty to deliberate.

16           And then the verdict.  We don't have a verdict form,

17   do we?  We need a verdict form.  We will get up a verdict

18   form.  And I think it's probably going to be something in

19   which it just goes down the Counts of the Indictment and says,

20   you know, Count One, guilty or not guilty; Count Two, guilty

21   or not guilty, that kind of thing.  It seems simple here for

22   that purpose.

23           MS. FREEMAN:  Yes, Your Honor, especially given

24   conjunctive and disjunctive language, there need only be one

25   element of falsity proven per count.

```
1          THE COURT:  Right.  So we will come up with that and
2    it will be pretty simple what I just outlined.
3          So anything further?
4          The expectation is, when I go through these, if
5    somebody has a problem they are going to tell me, which is why
6    I gave y'all the opportunity -- I gave you, I don't know, 15
7    to 20 minutes to review these things.
8          But now that we have gone through it and -- you will
9    receive tomorrow a copy of the changes and what will be in
10   final form, according to what I have described and what we
11   have agreed to.
12         LAW CLERK:  There's a verdict form in the back of
13   your binder.
14         THE COURT:  Oh, there's a verdict form?
15         LAW CLERK:  Yes.
16         THE COURT:  I don't see it.
17         LAW CLERK:  It's in the back of your trial notebook.
18         THE COURT:  Oh, my trial -- okay, okay.  Now I see
19   it.
20         This is done exactly like I said.
21         Ms. Freeman, you want to come up and take a look at
22   this and then you give it to Mr. Mattox?
23         (Ms. Freeman complies).
24         THE COURT:  Does that look okay to you?
25         MS. FREEMAN:  Yes, Your Honor.
```

```
 1              THE COURT:  This is a simple -- sometimes we get
 2    into some of these civil cases and they can really be
 3    complicated, but this is straightforward.
 4              How does that look, sir?
 5              THE DEFENDANT:  It looks fine.
 6              THE COURT:  All right.  Give it back.
 7              Now, I admitted some evidence on behalf of the
 8    Defendant in this case, and I sat down and I looked over the
 9    jury charges and reflected over the evidence as I went through
10    that.
11              There's no testimony in this case about giving any
12    gifts or accepting any gifts.  There is certainly no evidence
13    in this case that the federal government accepted any gifts.
14    And so I'm not going to allow Defendant's Exhibit to go out.
15              Likewise, I have already said that D7 is not going
16    out.  And likewise, there's no evidence in this case about the
17    public debt limit.
18              THE DEFENDANT:  Your Honor, I object, please.
19              THE COURT:  Wait just a minute.  There is no
20    evidence in this case about any public debt limit.  And so I
21    don't see why Defendant 6 ought to go out.
22              THE DEFENDANT:  In regards to the --
23              THE COURT:  You need to speak up so I can hear you.
24    You are a soft-spoken man.  The acoustics in this courtroom
25    are not good.
```

1          THE DEFENDANT:  Your Honor, in regards to the public

2    debt limit, it is to establish an obligation whose principal

3    and interest are guaranteed.  So since the Full Faith and

4    Credit is an obligation, then, therefore it establishes that

5    the obligation, principal and interest are guaranteed by the

6    United States Government.

7          THE COURT:  But there is not anything that's been

8    guaranteed.  There's not anything that has been accepted and

9    there's not anything that has been offered.

10          THE DEFENDANT:  The document in and of itself

11    show -- basically stating that it's a Full Faith and Credit,

12    therefore, it is an obligation of the United States being Full

13    Faith and Credit and issued by the Secretary of State.  It is

14    an obligation of the United States.

15          THE COURT:  This document does not, in any way,

16    connect nor has it been connected in any way to any evidence

17    in this case.  And it certainly hasn't been connected to this

18    proposition of the public debt limit.

19          None of the witnesses from the government testified

20    about any debt limit or any obligation or any of that.

21          THE DEFENDANT:  You are correct, none of the --

22    well -- in regards to the witness who testified had no

23    knowledge in regards to the rules or the guidelines in regards

24    to the Treasury because the witnesses -- several of the

25    witnesses who testified are with the Internal Revenue Service

```
1    in which they did confirm that the Internal Revenue Service
2    and the Treasury rules and guidelines are different.
3              THE COURT:  Right.
4              THE DEFENDANT:  So no one testified in regards to
5    the -- in regards to the Treasury because that is not their
6    lane, it's not who they work for.
7              THE COURT:  Then you are agreeing with me, there is
8    no evidence in here about any public debt limit, anything
9    related to that?
10             THE DEFENDANT:  There is in regards to an
11   obligation.
12             THE COURT:  There's nothing about any obligation
13   except your obligation related to these trusts tax forms that
14   you submitted.  That's what this case has been about.
15             THE DEFENDANT:  The case, Your Honor, has been
16   about -- has been about the Full Faith and Credit that was
17   given to the Secretary of Treasury in 2015.  The gifts that
18   was given to the Secretary of Treasury in 2015 --
19             THE COURT:  No evidence of any gifts given in 2016.
20             THE DEFENDANT:  -- in which the Internal Revenue
21   Service have confirmed that they have no ability to see any
22   gifts.
23             THE COURT:  Do you want to say something about this?
24             MS. FREEMAN:  No, Your Honor.
25             THE DEFENDANT:  In which the Internal Revenue
```

1    Service confirmed that they're not able to see any gifts that

2    are given to the Secretary of Treasury so they are not privy

3    to anything other than what is within the systems of the

4    Internal Revenue Service.

5              So I'm actually being -- the witnesses brought forth

6    from the Internal Revenue Service there were no witnesses

7    brought forth from the Secretary of Treasury.  So there was

8    never anything given to the Internal Revenue Service in

9    regards to gifts.  The gifts were given to the Treasury.

10             THE COURT:  There is no evidence of any gift given

11   to the Treasury.  The only evidence in this case is that you

12   offered something that was of no value.

13             Once again, the last witness testified to that, that

14   you offered whatever it was that you offered it was not backed

15   up by a bank and it was not legal tender.

16             THE DEFENDANT:  This was backed up by the United

17   States Department of State who is the issuer of it.  This was

18   not given to the Internal Revenue Service.  So the last person

19   --

20             THE COURT:  This document is not self identifying

21   for purposes of what you're talking about.  There is really no

22   evidence.  As a matter of fact, I'm not sure why it's even in

23   here.

24             I mean, I admitted this yesterday when you brought

25   this out because I wanted it to be on the record and I wanted

1    it to be clear because it's obviously important to your case.

2          But now we are at a different place and where we are

3    now is the evidence in this case is closed.  And so there is

4    no evidence whatsoever about what this means.

5          There is no evidence whatsoever about -- this

6    document essentially certifies your birth certificate, but

7    that has nothing to do with this case.

8          THE DEFENDANT:  Your Honor, the last person that

9    spoke wasn't presented this particular document.  The last

10   person that spoke, if I'm not mistaken, has not seen this

11   particular document.  So the last person that spoke I don't

12   think could have knowledge or any educated response in regards

13   to the document and its value.

14         THE COURT:  I agree with you completely.  You are

15   saying what I'm saying, that there's no evidence related to

16   that.

17         THE DEFENDANT:  Well, Your Honor, you also stated

18   that in regards to the Supreme Court, since the actual

19   documents were submitted in 2015 or that these documents were

20   submitted, these documents were signed in 2015, not in 2019,

21   not in 2020 after the actual True Bill was issued, that the

22   Supreme Court says that I still have the right or the ability

23   to present it to the jury.

24         THE COURT:  Do you have any observations you'd like

25   to make or response to what he has to say?

1            MS. FREEMAN:  Your Honor, the right to make some

2    form of reliance defense is not unfettered per the Supreme

3    Court law that you discussed before.

4            He has to lay the proper foundation and tie it to

5    actual evidence in the case, otherwise it is not a defense

6    that has been laid a foundation for and is no longer available

7    to him.

8            THE DEFENDANT:  Your Honor, are you going to read

9    the Supreme Court decision that you was reading on yesterday.

10   I think it was on yesterday.

11           THE COURT:  This is what I'm going to do.  I will

12   tell you that -- I didn't figure out until about an hour ago

13   what you were trying to do with this True Bill.  But there has

14   not really been any evidence of that in this case either.  And

15   so -- about this document.

16           This is what I'm going to do.  I am going to -- in

17   light of the failure of any evidence about Defendant's

18   Exhibit 1, Defendant's Exhibit 2, Exhibits 4, 6 -- I've

19   already ruled out 7 and 5. -- I'm going to rule out all those

20   exhibits.

21           But, what I'm going to do is I'll give you the

22   opportunity to reopen the evidence and if you can establish

23   something that will allow any of those to come in then I will

24   give you the opportunity to do that.

25           THE DEFENDANT:  So am I reestablishing with the jury

```
 1   or I'm reestablishing with the Court?
 2            THE COURT:  You have to reestablish it in the
 3   evidence.  You have to reestablish it in the evidence and that
 4   means before the jury.  So that's where we stand with that.
 5            THE DEFENDANT:  Okay, Your Honor.
 6            MS. FREEMAN:  Understood, Your Honor.
 7            THE COURT:  Anything else?
 8            MS. FREEMAN:  No, Your Honor.
 9            THE DEFENDANT:  No, sir, Your Honor.  Thank you,
10   sir.
11            THE COURT:  See y'all at 9:00 o'clock in the
12   morning.
13            MS. KRAFT:  Thank you, Your Honor.
14            CSO OFFICER:  All rise.
15
16                  (Proceedings concluded at 4:29 p.m.)
17                          END OF RECORD
18
19
20
21
22
23
24
25
```

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, Tammy W. DiRocco, Federal Official Court Reporter,

 4   in and for the United States District Court for the Middle

 5   District of Georgia, do hereby certify that pursuant to

 6   Section 753, Title 28, United States Code, that the foregoing

 7   is a true and correct transcript of the stenographically

 8   reported proceedings held in the above-entitled matter and

 9   that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12                          Dated this 26th day of October, 2022

13

14

15                    _____
                      Tammy W. DiRocco CCR, CVR
16                    Federal Official Court Reporter

17

18

19

20

21

22

23

24

25
```