```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF GEORGIA
 2                        ATHENS DIVISION

 3              _____

 4  THE UNITED STATES OF AMERICA    :        3:20-cr-44(CAR)

 5          VS.                      :        August 18, 2021

 6  MARQUET ANTWAIN BURGESS MATTOX,  :        Athens, Georgia
    A/K/A MARQUET ANTWAIN BURGESS
 7  MATTOX EL, A/K/A MARQUET BURGESS :
    MATTOX, A/K/A ASIM ASHUNTA EL,
 8  A/K/A ASIM EL BEY,               :
                    Defendant
 9  _____

10                        JURY TRIAL

11                      VOLUME III OF III

12          BEFORE THE HONORABLE C. ASHLEY ROYAL,
            UNITED STATES COURT DISTRICT JUDGE

13

14  APPEARANCES:

15  FOR THE GOVERNMENT:    LYNDIE FREEMAN
                           US ATTORNEY'S OFFICE
16                         P.O. BOX 1702
                           MACON, GA 31201
17

18                         JESSICA KRAFT
                           150 M STREET, NE
19                         SUITE 400
                           WASHINGTON, DC 20002
20

21  FOR THE DEFENDANT:     PRO SE
                           MARQUET ANTWAIN BURGESS MATTOX
22  _____

23                   TAMMY W. DIROCCO, USCR
                         P.O. BOX 539
24                   MACON, GA 31202-0539
                        (478-752-3497)
25
```

1                        I N D E X

2                                              <u>PAGE</u>

3    Closing Argument by Ms. Freeman....................42

4    Closing Argument by The Defendant..................62

5    Final Closing Argument by Ms. Freeman.............76

6    Charging of the Jury by The Court.................81

7    Jury Verdict Published...........................105

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    DEFENDANT'S EXHIBITS

 2   NUMBER                DESCRIPTION              PAGE

 3   Def. 8    Final Decree of Name Change ..............13

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   August 18, 2021

2   9:00 a.m.

3   Athens, Georgia

4                    P R O C E E D I N G S

5          CSO OFFICER:  All rise.

6          THE COURT:  Good morning.

7          THE DEFENDANT:  Good morning.

8          MS. FREEMAN:  Good morning, Your Honor.

9          MR. KRAFT:  Good morning.

10          THE COURT:  At the end of the session yesterday I

11   reopened the evidence.  And what do you want to do today, Mr.

12   -- is there anything further you want to do?

13          THE DEFENDANT:  I would like to -- you mentioned on

14   yesterday I could reestablish the documentation.  So, of

15   course, I would like to reestablish the documentation with the

16   jury.

17          I know Ms. Freeman has already been released, but I

18   would like to have called Ms. Freeman as a witness, but she's

19   already been released.

20          THE COURT:  Hold on just one minute.  Now, what

21   evidence do you want to reestablish and how are you going to

22   do that?

23          THE DEFENDANT:  I would like to reestablish in

24   regards to as I mentioned the Full Faith and Credit issued by

25   the United States Secretary of State, also the rules for

1   accepting gifts by the Secretary of Treasury, the debt limits,

2   basically as stating that once certain obligations are held by

3   the Secretary of Treasury this is the limit the debts cannot

4   exceed this particular limit.

5        I would also like to establish in regards to the

6   name change decree in which Ms. Freeman mentioned that she

7   referenced Mattox, similar to what this Court has referenced,

8   Mattox, Mattox, Mattox.  But there is a name change decree

9   from Fulton County, Clerk of Superior Court, which basically

10  states the name of the petitioner, Marquet Antwain Burgess

11  Mattox shall be changed to Marquet Antwain Burgess Mattox El.

12       So I would like to present that as well showing that

13  there is a actual decree for a name change.

14       And I would like to -- in doing that I would have

15  the opportunity to provide clarity regarding the documents,

16  please.

17       THE COURT:  So are you going to testify?  Is that

18  what you are telling me?  Are you going to take the stand and

19  testify?

20       THE DEFENDANT:  I'm not saying I'm taking the stand.

21  So whether it's in the closing arguments.  I'm not exactly

22  sure how it's done.

23       THE COURT:  Well, the reason that I excluded the

24  various documents that you talked about was because there was

25  no evidence to support those documents.

1          And you can't just offer documents like this, a

2   foundation has to be laid.  And I don't know of any foundation

3   that was laid with the government's witnesses that authorize

4   the admission of D-1 through D-7.  That's what I said

5   yesterday and that's why I gave you the opportunity -- I

6   reopened the evidence to give you further opportunity, but

7   these don't come in.

8          There is not anything that I can think of that you

9   can tell me, short of something that came out from the

10  government's witnesses either on direct or cross examination,

11  that would make these exhibits admissible.

12         THE DEFENDANT:  Well, you mentioned that the Supreme

13  Court decision stated that -- and you read that decision, that

14  as far as the documents being brought forth or the documents

15  being utilized.  And if you could actually kindly read that

16  decision again that you read several days ago.

17         THE COURT:  I don't think I have that up here in

18  front of me anymore.  I don't have that in front of me

19  anymore.

20         The documents can be used if they are admitted into

21  evidence and I think that is your misunderstanding here.

22         You can make an argument to the jury but the

23  argument has to be based in the evidence that they heard that

24  was admitted pursuant to the Federal Rules of Civil Procedure

25  and subject to cross examination and you had the full

1    opportunity to cross examine.

2         So, --

3         THE DEFENDANT:  You mentioned yesterday that I would

4    have the opportunity to reestablish with the jury.  And the

5    only way that I am thinking to reestablish with the jury would

6    be through the closing arguments, basically explaining this is

7    what was presented, this is what the rules -- going by the

8    actual guidelines of the rules.  Even if you are stating that

9    you are not allowing the jury to review the documents for

10   themselves I would still have the opportunity to actually

11   speak to the jury to say that here are the rules, these are

12   the rules that were actually utilized --

13        THE COURT:  Well, let me explain something to you.

14   You can't sandbag the Court and the government by not taking

15   the witness stand and being subject to cross examination and

16   being subject to the admissibility of your evidence under the

17   Federal Rules of Evidence.  You can't do that and then stand

18   up over here and give your testimony to the jury.  That is not

19   the way this system works.

20        And if you want to testify, fine.  Come over here,

21   we will swear you in, you can testify and you will be cross

22   examined.

23        As I told you several times about that, but what you

24   are proposing to do, to stand up and talk to this jury in your

25   closing argument about matters that are not in evidence and

1    what you think about those, that's not permissible.

2              THE DEFENDANT:  Well, you're saying it's permissible

3    in the opening statement?

4              THE COURT:  I'm saying in the opening statement you

5    can testify about what you expect the evidence to show.  That

6    is not evidence in the case.

7              And so I don't know what the evidence is going to

8    show.  I don't know what the evidence shows until the evidence

9    comes in.

10             So if somebody says something in the opening

11   statement and it doesn't come in there is not anything I can

12   do about that.  But I said you can't testify in the opening

13   statement.

14             THE DEFENDANT:  With all due respect, Your Honor,

15   I'm not testifying in the opening statement.

16             THE COURT:  The opening statement is over.  So we

17   are not dealing with that anymore.  Now we are dealing with

18   the closing argument.

19             And I can tell you -- let me just give you some

20   points here.  You know, the closing argument is important, but

21   as the Supreme Court said in *Herring versus New York*, "that's

22   not to say that closing arguments in a criminal case must be

23   uncontrolled or even unrestrained.  The presiding Judge must

24   be and is given great latitude in controlling the duration and

25   limiting the scope of closing summations.  He may limit the

1   time of counsel to a reasonable time and may terminate

2   argument when continuation would be repetitive.  He may ensure

3   that the argument does not stray unduly from the mark, or

4   otherwise impede the fair and orderly conduct of the trial.

5   In all respects he must have broad discretion."

6            And then there are other cases that have been

7   decided in the Supreme Court and decided in the Eleventh

8   Circuit and the old Fifth Circuit.

9            "The District Court may exclude a closing argument

10  that would have injected confusion about the actual crime

11  charged.  The District Court did not err when it exercises

12  great latitude to prevent Harris closing argument from

13  straying unduly from the mark.  The Court repeatedly held that

14  an attorney may not say anything to the jury implying that the

15  evidence supporting the attorney's position exists, but has

16  not been introduced at trial.  And he may not state that he

17  could have called additional witnesses who would have

18  supported his version of the case."

19           So you can't say in closing argument that because

20  you have been detained you have not been able to get your

21  witnesses or your documents together.  You had multiple

22  hearings with me.  You could have made request at that time.

23           You had an attorney at every hearing we've had,

24  including Monday, and all you had to do was ask that attorney

25  to get this information for you, but you didn't do that.  And

1    so you can't talk to the jury about that.

2            So there are other propositions related to that but

3    I think I have given you a pretty good outline of what you can

4    do in the closing argument.

5            THE DEFENDANT:  With all due respect, sir, I never

6    suggested or proposed mentioning to the jury anything about

7    not having the opportunity to gather certain documents.

8            But I do -- as I went back, in regards to

9    conversations on yesterday that was presented to the jury,

10   that was established to the jury, that for one, the Internal

11   Revenue Service or the IRS and the Treasury are not one in the

12   same.

13           So are you saying I can't reference that in the

14   closing statement?

15           THE COURT:  I think that there are a number of

16   things that you can say that was part of the evidence here.

17           I sat down with my law clerks this morning and we

18   talked about the evidence and we talked about the things that

19   we thought you should be able to say from some of the evidence

20   that was admitted, but it has to be based on the evidence.

21           THE DEFENDANT:  It was also admitted that the

22   Treasury and the IRS are not one in the same.  They are

23   totally different.  And that the IRS agents who actually

24   testified confirmed that they don't work for the Treasury,

25   they work for the IRS and that the rules and the guidelines

1    for the IRS and Treasury are different.  And that the treasury

2    accept gifts -- or the IRS does not accept gifts.  That was

3    established.

4            THE COURT:  I'm not quite sure the last thing you

5    said was established.  But I think it was part of the evidence

6    and I think you can talk about those things.

7            But there is no evidence in this case that you

8    submitted anything to the Department of the Treasury.

9            There is some evidence in the case that you

10   submitted something, the nature of which was not described,

11   other than it was not legal tender.  It was not backed up by

12   the government.  That was the testimony of that.

13           So I think that you submitted something is in the

14   evidence despite the fact that's probably what you said and

15   not --

16           THE DEFENDANT:  It was stated that it wasn't

17   permissible in regards to the Internal Revenue Service, but as

18   far as the rules of the Treasury he couldn't speak in regards

19   to the Treasury because he doesn't work for the treasury.

20           THE COURT:  That's right.  And you don't know

21   anything about what the Treasury Department does either.

22   There's no evidence about that.

23           THE DEFENDANT:  Well, he also admitted or he

24   confirmed that as far as the checks to the trust were issued

25   by the Treasury, they weren't issued from the Internal Revenue

1   Service.  So there was nothing --

2          THE COURT:  I think you can talk about that.  That

3   is evidence.

4          What you are talking about, it seems to me, is these

5   are matters that have come from the witness stand.  And I'm

6   not trying to give you -- I'm not giving you legal advice, but

7   I am thinking in terms of what you might be able to say that

8   is admissible and what you might say that is not admissible.

9          So there are certainly some things that you pointed

10  out that have, in some fashion or another, come from the

11  witnesses or maybe from the documents.  For example, like the

12  check that you mentioned.

13         THE DEFENDANT:  And in regards to the name change,

14  that came from the witness.  That was brought forth.

15         THE COURT:  What is the name change?  Is that this

16  document that --

17         THE DEFENDANT:  It's not that document.  There is a

18  name change degree that was actually connected to --

19         THE COURT:  Let me see that.

20         THE DEFENDANT:  (Provides document to Judge).

21         MR. KRAFT:  Your Honor, I don't believe the

22  government has been provided a copy of this.

23         THE COURT:  I'm sure you haven't.  I will give you a

24  copy in just a minute.

25         I don't have a problem with that being admitted.  It

1    appears to be a state document that comes from the Superior

2    Court of Fulton County.

3            I think it's probably -- show that to them, please.

4            MS. FREEMAN:  Your Honor, for what it's worth with

5    regard to the name change, the Indictment does list a number

6    of his aliases, including Marquet Antwain Burgess Mattox El.

7            THE COURT:  Right.

8            MS. FREEMAN:  We do not object to this document,

9    Your Honor.

10           THE COURT:  I'm going to call that D8 and we are

11   going to admit that.

12                    (Defendant's Exhibit # 8 admitted.)

13           THE COURT:  What else?  So I have admitted that.

14           How do y'all want to do the argument?  Are you going

15   to split it or how's it going to go?

16           MS. FREEMAN:  You mean in terms of rebuttal, Your

17   Honor?  I was planning to do both opening and rebuttal.

18           THE COURT:  Okay.  That's fine.

19           And what did I tell you yesterday?  45 minutes, 40

20   minutes, 30 minutes?

21           MS. FREEMAN:  It might be 30.

22           THE COURT:  Okay.  That's fine.

23           MS. FREEMAN:  Either 30 or 45, either is fine with

24   us.

25           THE COURT:  How do you want to break it up?

 1          MS. FREEMAN:  We would reserve whatever final 10

 2  minutes of the time that Your Honor gives as rebuttal.

 3          THE COURT:  Okay.  Anything else that you have that

 4  you want?

 5          THE DEFENDANT:  Yes.  Is it possible, the Supreme

 6  Court case that you read in regards to the evidence several

 7  days ago, is it possible before starting for us to cover that

 8  particular Supreme Court case.

 9          Because to my understanding, it was stating that I

10  would have the ability to establish these particular

11  documents.  I don't know that if it's stated that I would need

12  to establish it through testifying, et cetera, but I'm asking

13  if you could actually kindly reread that, please.

14          THE COURT:  I don't know where it is.  Sally will go

15  get it.

16          LAW CLERK:  I'll get it.

17          THE DEFENDANT:  Thank you.

18          THE COURT:  I think this may be what you are

19  thinking about.  And this is from *Cheek versus US*.

20              "Of course, in deciding whether to

21              credit *Cheek's* good faith relief claim the

22              jury would be free to consider any

23              admissible evidence -- any admissible

24              evidence from any source showing that

25              *Cheek* was aware of his duty to file a

1              return and treat wages as income,

2              including evidence showing his awareness

3              of the relevant provisions of the code and

4              regulations.  The Court decisions

5              rejecting those interpretations of

6              authoritative rulings and the Internal

7              Revenue Service or any contents of the

8              personal income tax returns and forms

9              accompanying the instructions."

10         Maybe that is not what you were looking for.

11         I know I had another case up here and I don't

12   remember what that was.  I may have been reading from the

13   other case but I don't find it.

14         But the reality is that if the jury can consider

15   whatever evidence is admitted, but it has to be admitted.

16   That's the point.  And it has to be admitted from the witness

17   stand, under oath, subject to the Federal Rules of Evidence

18   and subject to cross examination.

19         THE DEFENDANT:  Excuse me.  I apologize.

20         THE COURT:  Go ahead.

21         THE DEFENDANT:  There were several things mentioned

22   or brought forth on yesterday -- and I know I'm going back to

23   the checks, et cetera -- in which there was the testimony that

24   the IRS never issued anything.  The IRS and the Treasury are

25   not one in the same.

1              That as far as Puerto Rico, et cetera, or the

2    Secretary of Treasury, that was actually brought forth by the

3    witnesses, two witnesses, Mrs. Freeman and Mr. Clark.

4              So since those things were mentioned am I not able

5    to mention things that they or --

6              THE COURT:  You can't use those to get these

7    admitted into evidence, 1 through 7.

8              THE DEFENDANT:  I understand that part.

9              THE COURT:  Okay.

10             THE DEFENDANT:  What I'm asking is -- if those

11   individuals have made statements such as, you know, he stated

12   he's not exactly sure how the documents were delivered to the

13   Internal Revenue Service.  He didn't see the envelope, as far

14   as what the document was received in or to even see if it was

15   addressed to the Treasury or if it was addressed to the --

16   again, he, as far as the referral that came to him he's not

17   exactly sure where the documents came from.

18             And he also mentioned that he said -- you mentioned

19   that there were documents sent to Puerto Rico and other

20   places.  But if the documents are sent to Puerto Rico, et

21   cetera, and that's the Secretary of Treasury, is that not able

22   to be mentioned?

23             THE COURT:  Well, the problem is that you said

24   what -- I think that you pretty much accurately characterized

25   what his testimony was but you don't get to fill in the

1   blanks.

2          Do you understand?  You don't get to fill in the

3   blanks about what he didn't say.  You don't get to say, well,

4   but I did the envelope and the envelope was, you know, to the

5   Secretary of Treasury.  You don't get to fill in the blanks.

6          THE DEFENDANT:  Okay, I got that part.

7          So if he said -- so if nothing was ever mailed -- if

8   nothing was ever --

9          THE COURT:  Let's stop just a minute.  I'm going to

10  ask Ms. Paul to go back and tell the jury that we are dealing

11  with some legal issues and we will get to them as soon as we

12  can.  Is that okay?

13         THE DEFENDANT:  Yes, that's, okay.

14         THE COURT:  Go ahead, sir.

15         THE DEFENDANT:  If there was nothing ever mailed to

16  the Internal Revenue Service and the Internal Revenue Service

17  and the Treasury are not one in the same, and as you

18  mentioned, he's not sure how the documents -- he's not sure,

19  if I'm not mistaken, he said he's not sure where the referral

20  came from and he's not sure where the documents came from in

21  his statement.

22         So if he is not exactly sure where the documents

23  came from am I not able to say -- I'm not exactly sure how the

24  documents ended up at the Treasury -- excuse me, ended up at

25  the Internal Revenue Service.  Because that's what he said.

1   He's not exactly sure, so I'm not exactly sure.

2           THE COURT:  Well, I think that you can certainly say

3   what he said.

4           THE DEFENDANT:  Okay.

5           THE COURT:  But what you think about it -- there's

6   no evidence of what you think about it in this court.

7           THE DEFENDANT:  So if he is not sure how the

8   documents ended up at the Internal Revenue Service and I'm not

9   sure how the documents ended up at the Internal Revenue

10  Service, and the documents were not mailed to the Internal

11  Revenue Service, is that filling in the blank?

12          THE COURT:  Yes.  It's filling in the blank because

13  he didn't know where it was mailed, and so what he said is the

14  only evidence in this case about that document.

15          THE DEFENDANT:  Well, even asking additional

16  questions when he was called to the stand I was even limited

17  as far as questions I could ask.

18          THE COURT:  You were limited because he told you

19  that he doesn't work for the Secretary of the Treasury and he

20  doesn't know what their procedures are.

21          And he told you that, I think, four different times

22  and then that's when I called you down about that.

23          THE DEFENDANT:  So that if in the conversation --

24  and I think I'm on point with this one and I apologize if it

25  sounds redundant -- in that interview or the interview that

1  took place where he stated that he is not sure how the

2  documents ended up at the Internal Revenue Service and I'm not

3  exactly sure how the documents ended up at the Internal

4  Revenue Service.  Then he mentioned that, "You said the

5  documents were mailed to the Treasury.  You said the documents

6  were mailed to Puerto Rico" is what he actually testified.

7           THE COURT:  He didn't testify that they were.  He

8  said that's what you said.

9           THE DEFENDANT:  So, he said -- you said -- so with

10 him saying, "you said they were mailed to this place, you said

11 they were mailed to this place" am I not able to say "I'm not

12 exactly sure how they ended up at that particular location?"

13 Because as he quoted during the meeting I said they were

14 mailed to -- I'm repeating what he said.

15          THE COURT:  You can't explain what you did unless

16 you get on the witness stand and testify under oath and are

17 subject to cross examination.

18          THE DEFENDANT:  I'm only repeating --

19          THE COURT:  You can't take the opportunity to stand

20 before this jury and explain why you did what you did and why

21 you thought it was important unless you get on the stand and

22 testify.

23          So you told me you don't want to testify and that's

24 fine.  There is no problem with that at all.

25          The overwhelming number of criminal cases the

1    defendant almost never testifies.  But that is nothing to do

2    with whether you testify or you don't testify.  I am just

3    pointing out that that's not unusual.

4            THE DEFENDANT:  Repeating what he stated, I'm not

5    even given an opportunity to repeat what he stated.

6            THE COURT:  Yeah, you have the opportunity to repeat

7    what he stated.

8            THE DEFENDANT:  Forgive me.  I think there could be

9    -- Maybe I'm not explaining it correctly.  So I do apologize.

10           But Mr. Clark said during the meeting, "you said

11   this was mailed to the Treasury, not to the IRS."  So am I not

12   able to say -- because I'm repeating what he said.

13           THE COURT:  Yeah.  I think you can say -- yeah, I

14   think you can say that he testified that you told him -- yeah,

15   I think you can testify to that.

16           THE DEFENDANT:  Okay.  I just wanted to make sure.

17   I apologize, I wasn't saying it correctly or seeing it

18   clearly.

19           THE COURT:  I keep telling you that I think there

20   are a number of things that you can say in your closing

21   argument but you can't use that as a basis of your testimony

22   to the jury in closing argument.

23           You can't turn your closing argument into your

24   testimony.

25           THE DEFENDANT:  Let me ask this question.  If the

1    Internal Revenue Service --

2              THE COURT:  Wait just one minute.

3              THE DEFENDANT:  I apologize.

4              THE COURT:  Go ahead.  Now, I'm back with you.

5              THE DEFENDANT:  Thank you.

6              Still in the same lane of what I was just speaking

7    of or similar of Mr. Clark saying, "Well, you said that you

8    mailed it to the Treasury and not to the Internal Revenue

9    Service."

10             But the young lady who testified, I think the very

11   first young lady who is the keeper of records for the Internal

12   Revenue Service, basically or stating or admitting that the

13   Internal Revenue Service processed or attempted to process

14   documentation or return that I said to Mr. Clark was never

15   mailed to the Internal Revenue Service.

16             THE COURT:  Well, her testimony was "no payment was

17   ever made."  I think that was no tax payments were ever made.

18   She was talking about -- I don't remember her saying that

19   something was trying to be processed by it or something that

20   you submitted was processed by the IRS that was in any form of

21   payment.  Did I miss that or not?

22             MR. KRAFT:  No, Your Honor, that's our understanding

23   as well.

24             THE DEFENDANT:  She stated that, "This is what we

25   received.  This is what we received as far as --"  This is

1    what was mailed -- this is what was mailed, this is what was

2    received, here are the numbers.

3            Correct, as you said, there was no payment made to

4    the Internal Revenue Service.

5            But as Mr. Clark stated, you said you mailed it to

6    the -- you said you mailed it to the Treasury.

7            THE COURT:  Well, there was no testimony, that I

8    remember from her, about trying to cash or otherwise use some

9    money -- some negotiable instrument that you sent up there.

10   Am I correct about that?

11           MR. KRAFT:  Yes, Your Honor.  Ms. McClain did not

12   speak to that.  Her testimony was clear that --

13           THE COURT:  Yeah, she didn't get into that at all.

14   You didn't get that out of that woman.

15           So, you have been trying to make your case with this

16   issue with these various people and you didn't really make

17   much progress at all on that, but you definitely didn't make

18   much progress with Ms. McClain on that.

19           THE DEFENDANT:  No.  Well, with Ms. McClain she did

20   state that this is what was mailed, here are the numbers to

21   the documents as far as what was mailed.

22           What I'm stating is --

23           THE COURT:  She --

24           THE DEFENDANT:  I apologize.

25           THE COURT:  Go ahead.

 1            THE DEFENDANT:  What I'm stating is, if that's what

 2   was -- if that's what was mailed -- and it was reiterated

 3   multiple times to Mr. Clark.  As Mr. Clark said, you said you

 4   didn't mail it, you said you mailed it to the Treasury and not

 5   to the Internal Revenue Service.  I guess the question

 6   becomes, how was it received by the Internal Revenue Service

 7   if Mr. Clark said he doesn't know how it was received by the

 8   Internal Revenue Service.  He doesn't know how it got to the

 9   Internal Revenue Service.  So the question becomes --

10            THE COURT:  No connection between what he was

11   talking about and Ms. McClain, who was the IRS Court Witness

12   Coordinator.

13            So I'm not going to allow you to contend or argue

14   that something she said indicated that whatever this

15   mysterious document is was actually received by the IRS.

16   That's out.

17            THE DEFENDANT:  Okay.

18            Now, Mr. Clark did state -- it was placed on the

19   screen that it was mailed on June 3rd.  It was, like you

20   said, it shows that June 3rd it shows it was time stamped

21   August 7th, but it still goes back to you said you didn't mail

22   it -- you said you mailed it to the Treasury, and this is what

23   Mr. Clark said.  Excuse me.  You said you mailed it to the

24   Treasury and not to the IRS.

25            So am I not able to reference that document that was

1    actually on the screen?  Because Mr. Clark was actually

2    talking about the document that was on the --

3              THE COURT:  What document is that?

4              MR. KRAFT:  Your Honor, I believe he's referring to

5    Exhibit 3-15 which was the tax return filed -- received by the

6    IRS on August 7th, 2019, signed by the Defendant on June

7    1st.

8              I do not believe that Special Agent Clark stated

9    that that went to the Treasury or that the Defendant said it

10   went to the Treasury.  I believe his testimony was --

11             THE COURT:  Well, that's a tax return.

12             MR. KRAFT:  -- that it was a tax return received by

13   the IRS.

14             THE COURT:  Is that what you're referring to or are

15   you referring to something else?

16             THE DEFENDANT:  I'm referring to documents in

17   general.

18             THE COURT:  Documents in general don't get it here.

19   They have to be specific.

20             THE DEFENDANT:  Okay.

21             THE COURT:  Whatever you sent to wherever you sent

22   it has never been identified in this court nor has it ever

23   been testified to by you of why you sent it or what the

24   purpose was or what you intended to do with that.

25             The only evidence in this Court that I know about or

```
 1    that I can remember -- and I think the people agree with me,
 2    the prosecutors and my law clerks -- is that there was
 3    something sent somewhere that ended up at the IRS that was not
 4    legal tender.  But we don't know what it was because it was
 5    never identified.
 6              THE DEFENDANT:  Well, I know I can't -- if there was
 7    something sent to the IRS and we don't know what it was, it's
 8    also been established that we don't know where it came from or
 9    we don't know how it got to the IRS.  And the IRS is saying
10    that they received something but they're not sure where it
11    came from.  They are not sure how it was referred to them, but
12    they also said, as per their guidelines, it's not legal
13    tender.
14              THE COURT:  You can say that they got something and
15    they didn't know where it came from and they didn't know how
16    they got it.  Again, I keep telling you, you can argue what
17    the evidence was.  But you're trying to connect each one of
18    these.  There is a dot that can't be reached here and that's
19    the dot you most want.  And you can't reach that dot because
20    there is no evidence in the case to support what that document
21    was, why it was sent, who received it or, at least, how it got
22    to the IRS, what the purpose of it was.
23              THE DEFENDANT:  So if we're not sure how it got to
24    the IRS or we're not sure what the front of the envelope
25    stated -- because he mentioned he's not sure -- that question
```

 1   was asked of him, where is the front of the envelope and he

 2   said he's not sure.

 3          So if we are not sure who it was addressed to, if

 4   we're not sure how the Internal Revenue Service received it, I

 5   guess the question becomes -- How am I accused of wrongdoing

 6   if the Internal Revenue Service has no idea where the document

 7   came from or --

 8          THE COURT:  Well, I think that you can make that

 9   argument.  That if they don't know where this one document --

10   this one whatever it was -- came from, then I think that you

11   could argue that that throws their whole case out the window.

12   I don't know.

13          I mean, they have made out their case.  There is

14   sufficient basis to satisfy Rule 29 requirement, you're not

15   entitled to a Motion for Judgment of Acquittal in this case.

16          THE DEFENDANT:  Your Honor, am I not able to say

17   that Special Agent Clark requested documents from Wells Fargo,

18   he requested documents from Charter Communications and he

19   requested documents for Haverty's, but there is no evidence

20   that Special Agent Clark requested any documents from the

21   Treasury.

22          THE COURT:  Well, I think that is accurate, he

23   didn't request any documents from Treasury.

24          THE DEFENDANT:  Am I able to say that Special Agent

25   Clark said he didn't see any business activity for the trust.

1    But Special Agent Clark also stated that he's not able to see

2    anything that takes place with the Treasury because he doesn't

3    work for the Treasury.

4            So that doesn't necessarily mean that the trust did

5    not have business activity if Mr. Clark couldn't see the

6    business activity.

7            THE COURT:  I think you can say that but there is no

8    testimony that there was ever any business related to the

9    trust.

10           The testimony was that the bank accounts were set up

11   after the -- at least one of the very first of the deposits

12   made of the IRS check.  I'm pretty sure that was the evidence

13   in the case.

14           THE DEFENDANT:  He stated that -- forgive me, Your

15   Honor.  He stated that he didn't see any business activity.

16           THE COURT:  I agree.  You can say that.

17           I just want to be clear, the reason that we are

18   going through this process, at this point, is so that there

19   does not have to be a lot of objections during the course of

20   his closing argument, which I expect there will be from the

21   government --

22           THE DEFENDANT:  During the course of what?

23           THE COURT:  -- when he errs beyond what he's

24   authorized to do.  So I'm trying to work through this.  I'm

25   not going to go a lot longer with it.

1          THE DEFENDANT:  I apologize.  I missed some of that,

2    Your Honor.

3          THE COURT:  No.  I said the reason that I'm going

4    through this with you is so that there won't be a lot of

5    objections by the government.  The objections won't be

6    necessary when you depart from the evidence and you start

7    giving your opinions about things.  Because they are going to

8    stand up and they're going to object.

9          So I'm trying to anticipate some of these problems

10   so that it will go smoothly.

11          THE DEFENDANT:  Your Honor, were you not able to

12   find the case that you was originally reading several days ago

13   that --

14          THE COURT:  No, I didn't find that, but I don't

15   think it really makes any difference.

16          What the jury can consider -- there are a number of

17   things that the jury could possibly have considered in this

18   case, but they weren't admitted.

19          Proper foundation was not laid and as a consequence

20   they can't consider those things.

21          But I did read to you from that Supreme Court

22   opinion where it said, they can rely on admissible evidence.

23   They can't rely on inadmissible evidence.  So that is the

24   essence of that.

25          THE DEFENDANT:  If I'm not mistaken you was reading

1   a case that said something in regards to regardless of how

2   bizarre it may seem -- because you stated that you weren't --

3   some of the things that came to light you weren't aware

4   that -- as far as the document that was referenced was from

5   2015.  You were thinking it was recent.  And that case, I

6   think, shed additional light where you said, well, I'm going

7   to allow these documents.  But --

8            THE COURT:  And that was in anticipation of the fact

9   that the proper foundation would be laid, but it wasn't laid.

10  That's what I explained yesterday, that I admitted certain

11  documents.

12           And, of course, some of the things I didn't

13  understand -- I didn't understand what you meant by

14  Defendant's Exhibit Number 7 that I ruled out based on 403,

15  the like of confusion it would cause the jury.  But this is

16  just a document that is out there in the ether.  There is not

17  anything that connects it to this case.

18           Well, I think that we need to move forward with the

19  closing arguments, and I have given you a lot of information

20  about the parameters of closing argument.  And I have given

21  you some specific ideas about that and I don't -- we have been

22  going now for probably close to an hour -- going over all

23  this.  And I think that what we need to do is bring the jury

24  in.

25           Is there anything from the government?

1          MS. FREEMAN:  Your Honor, we just want to clarify

2    for the record that the defense's case if it -- to the extent

3    it was reopened that he has, indeed, rested.

4          THE COURT:  That's a good idea.

5          Have you rested, sir?

6          THE DEFENDANT:  (No response).

7          THE COURT:  Do you know what rest means?  That means

8    that you are not going to put up any more evidence.

9          THE DEFENDANT:  Your Honor, I don't have total

10   clarity.  So it would be kind of premature to rest.  Even if

11   the jury is still waiting it would be premature to rest.

12         THE COURT:  I doubt if there are ever any lawyers in

13   the federal court, in a criminal case of this nature, that

14   have complete clarity.

15         So for that matter neither does the Judge.  We have

16   to operate with what we have.

17         There are rules that are very clear and specific and

18   I have tried my best to follow those rules and make sure that

19   the witnesses follow the rules.

20         So, if you don't have anything to offer now -- I

21   gave you the evening, you know, to think about this further.

22   That's why I reopened the evidence, specifically to give you

23   the opportunity to think about this some more about what you

24   wanted to do.

25         And so I have given you the opportunity and if you

1    don't have anything that you want to offer at this point then

2    I think we have to move forward.

3         THE DEFENDANT:  Your Honor, I know you're saying

4    that you gave me the evening to think or to put together a

5    closing statement.  But, Your Honor, if I'm in shackles and

6    chains for three hours, an hour and a half there, an hour and

7    a half back, if I'm in shackles and chains for three hours it

8    minimizes.  So, again, if I'm in shackles and chains for three

9    hours and whatever else is going on at the jail, then I'm

10   limited or I was limited.

11        THE COURT:  Right.  Well, I mean, you've had months

12   to prepare for this.  You obviously have done quite a bit of

13   preparation.  We have had multiple hearings and, you know,

14   you've had plenty of opportunity to think about this.

15        So I think we're going to have to move ahead unless

16   you have something that you want to offer into evidence.

17        THE DEFENDANT:  I would want to request a

18   continuance, at least 24 hours in lieu of having, I guess,

19   additional conferences.  Because even in requesting a

20   continuance I still have an hour and a half ride back to Butts

21   County in shackles and chains so I'm not able to write.  I'm

22   not able to take notes for at least three hours, an hour and a

23   half there, an hour and a half back.

24        And you said that typically you would give the time

25   as however long it took for the trial.  And if it'd taken two

```
 1   days I've only been given one.
 2          THE COURT:  Well, I've given you the full
 3   opportunity to offer evidence in the case.  I've sat here now
 4   for quite a long time explaining to you the rules that apply.
 5          I think that you've had ample opportunity and I'm
 6   going to deny your motion for continuance.
 7          THE DEFENDANT:  So, having at least -- having at
 8   least an hour to continuously prepare a closing statement
 9   would that be denied as well?
10          THE COURT:  What's the government's position on
11   that?
12          MS. FREEMAN:  Your Honor, we don't have an objection
13   to that.
14          THE COURT:  Okay.
15          THE DEFENDANT:  Is it okay if I sit in the back?
16          THE COURT:  Well, I think what I need to do is to
17   call the jury in and let them know what we are going to do.
18          What I may do is just release them and tell them if
19   they want to go out and walk around for an hour and come back
20   at 10:45 they can do that.  I don't know.
21          Do y'all have any recommendations about that?
22          MS. FREEMAN:  (No response.)
23          THE DEFENDANT:  (No response.)
24          THE COURT:  All right.  Let's bring the jury in.
25     (Jurors enter courtroom 9:48 a.m.)
```

1          THE COURT:  Good morning, ladies and gentlemen.  I

2     hope y'all are doing well today.

3          Now, we have spent quite a bit of time because we

4     started before 9:00 o'clock dealing with a wide variety of

5     legal issues and I have had to make a number of rulings.

6          I think what we're going to need though is another

7     hour before we can actually begin the closing arguments in

8     this case.

9          So what I'm going to do is recess court for an hour.

10    You can sit back there for an hour or you can go walk around

11    Athens if you want to.  I will leave it up to you for what you

12    want to do.  But it is very important that you be back in an

13    hour, okay.  I want you back here at 10:45 and then we're

14    going to proceed with that.  Okay?  All right.

15         Thank you very much.  And don't talk among

16    yourselves about the case or to anyone else.

17     (Jurors exit courtroom 9:50 a.m.)

18         THE COURT:  If it's okay with the Marshals you can

19    stay right there.  Will it be all right?  And then you will

20    have all the exhibits and everything you need.  You won't have

21    to carry them back.  Will that work for you?

22         THE DEFENDANT:  I would prefer to sit --

23         THE COURT:  I can't hear you.

24         THE DEFENDANT:  I apologize.  I would prefer -- it's

25    a little warmer in the back.

1          THE COURT:  That's fine.  However you want to do it.

2          THE DEFENDANT:  Thank you, sir.

3          MR. KRAFT:  Your Honor, we just had one

4  clarification.  We just wanted one clarification that the

5  Defendant has, in fact, rested his case.

6          THE COURT:  Well, no, I think he's going to see what

7  he can come up with and we'll -- but if he doesn't come back

8  with anything then we are going to move into the close of the

9  trial.

10          MR. KRAFT:  Thank you.

11    (Recess at 9:51 a.m.)

12          CSO OFFICER:  All rise.

13    (Reconvene with counsel and defendant 10:46 a.m.)

14          CSO OFFICER:  All rise.

15          THE COURT:  Mr. Mattox, do you have any more

16  evidence you want to offer to the Court?

17          THE DEFENDANT:  I would like to recall Special Agent

18  Jeron Clark back to the stand.

19          THE COURT:  You can't recall the witness.  The

20  witness has been excused.  And you also had the opportunity to

21  cross examine him.  You cross examined him and you had him on

22  direct examination and he has been excused.

23          I'm sorry, he's actually back there.  I'm sorry.  I

24  see.

25          For what purpose?

1            THE DEFENDANT:  I have some additional questions for

2     Mr. Clark that I would like to ask.

3            THE COURT:  What are the questions?

4            THE DEFENDANT:  I want to know if -- he mentioned

5     that the Internal Revenue Service and the Treasury are two

6     totally different entities or two totally different places.  I

7     wanted to know do the two entities ever communicate?

8            And I want to know if there was a request from the

9     Treasury to the Internal Revenue Service to retrieve or to

10    collect any funds?

11           I would like to know if he requested any records

12    from the Treasury, similar to during his investigation as he

13    did with Haverty's, as he did with Wells Fargo, Charter

14    Communication, et cetera.

15           Did he collect any documentation from the Treasury

16    and did he communicate with anyone from the Treasury to

17    confirm or verify that there were any gifts given to the

18    Treasury?

19           I wanted to know if mail is received -- if mail is

20    addressed to the Treasury but received by the IRS is it

21    forwarded to the Treasury?

22           And I want to know that if he doesn't work for the

23    Treasury -- as he stated he doesn't work for the Treasury --

24    if he doesn't work for the Treasury and he also confirmed that

25    he can't see anything that goes on with the Treasury, then can

```
 1    he definitely state that there was no business for the trust
 2    if he wasn't able to see -- if he is not able to see anything
 3    from the Treasury.
 4              I want to know did he communicate with the Treasury
 5    at all?  And did the Treasury communicate with him that the
 6    gifts were unacceptable or not acceptable?
 7              And I want to know do the IRS keep copies of all
 8    envelopes, because I was asking about the envelope on the
 9    screen and he said he wasn't sure what happened to it.  I
10    wanted to know if they keep copies of all envelopes?
11              And if the rules for the Treasury are different from
12    the rules from the IRS?
13              THE COURT:  Well, that has been answered in court.
14              THE DEFENDANT:  Well, I didn't get the --
15              THE COURT:  Go ahead.
16              THE DEFENDANT:  He has confirmed that the rules --
17              THE COURT:  You had the opportunity to do a thorough
18    and sifting cross examination on Mr. Clark.  You had two shots
19    at him.
20              You're asking about the same questions -- they
21    aren't the same questions, but they are the same topic that
22    you dealt with over and over again.
23              So I'm not going to let you recall him as a witness
24    in this case for that.  You had your opportunity.  I gave you
25    abundant opportunity and now that maybe you didn't ask a few
```

1   questions that you wish you had asked, that's not a basis for

2   you to recall him.  You can't do that.

3          THE DEFENDANT:  I got that part but, Your Honor, you

4   cut me off.  You told me that I was limited in regards to the

5   cross examination, sir.

6          THE COURT:  Only after you had done extensive cross

7   examination on that issue.  And these questions are redundant

8   any way.  Some of them.  Not all of them.  But some of them

9   were redundant anyway from the testimony that was given by one

10  or more of these witnesses.

11         Go ahead.  What else?  What questions do you have

12  not related to the Treasury?

13         THE DEFENDANT:  This would be an IRS question, I

14  think so, if mail is received by the IRS and it's not

15  addressed to the IRS but addressed to another entity.

16         THE COURT:  You have covered that question too.

17         THE DEFENDANT:  I didn't get an answer to it and --

18         THE COURT:  Well, that's been covered in the

19  evidence.  There is no evidence from you about anything that

20  you sent, any purpose that you had, any intent, any motivation

21  whatsoever for what you supposedly sent in, the sole basis of

22  which is what you told the Agent when he was talking to you

23  about these forms.  And so I don't see that there is any

24  relevance to that.

25         THE DEFENDANT:  If I'm calling him as a witness, not

```
 1   as far as -- I was looking at it different.  One as a witness

 2   and one in cross examination.  In cross examination there is

 3   only a limited scope of questions that you can ask based upon

 4   what the government has already established in regards to

 5   evidence.

 6         But if he's brought forward as a witness to answer

 7   questions and if I'm asking if the Internal Revenue Service

 8   received mail that's not addressed to them, how is it possible

 9   for them to open and process mail that's not addressed to

10   them?

11         THE COURT:  That was a question that you should have

12   asked or you could have asked and so we're not going to bring

13   him back at this stage of the case for that purpose.

14         THE DEFENDANT:  Okay.

15         THE COURT:  So that is out.  What else?

16         THE DEFENDANT:  I think that's it.  Thank you, sir.

17         THE COURT:  Are we ready to proceed with the closing

18   arguments?

19         I am assuming that you don't have any evidence that

20   you want to present.  So you are closing your case at this

21   point?  You are resting?

22         THE DEFENDANT:  Well, everything that I requested is

23   denied.

24         THE COURT:  That's right.  And you'll have a right

25   to appeal that.  You will have the right to appeal that.
```

1          THE DEFENDANT:  So is it -- respectfully on that, is

2     it denied solely for me to go to an appeal?  I'm respectfully

3     asking.  I'm not sure.

4          THE COURT:  Say that again.

5          THE DEFENDANT:  I mentioned to you that everything

6     that I requested is denied.  And I was just wondering was

7     there a reason for everything that I'm requesting denied.

8          THE COURT:  Yes, I just told you.  Because you had

9     two opportunities to ask those questions.  They are questions

10    that are on the topic that you discussed with him and you

11    discussed with him that topic so much that I had to cut you

12    off because you were continuing to ask the same question.

13          So you had the opportunity to do this and you didn't

14    ask the questions and so that's why I got it off.

15          Some of it may be irrelevant anyway because there's

16    not anything to connect this.  There is no nexus.

17          For whatever it was -- we don't even know what was

18    mailed.  There is no nexus to this case with what was mailed

19    or what the purpose of it was.  We don't have any of that in

20    this case.  It's probably irrelevant.

21          THE DEFENDANT:  I apologize for not being clear.  I

22    was asking in regards to nearly everything that I have

23    requested, not just in regards to Mr. Clark.

24          But nearly everything that I have requested,

25    motions, et cetera, everything has been denied.  I was asking

```
1   was there a reason that nearly everything I have requested --
2   nearly, not everything, because you did give me the
3   opportunity --
4            THE COURT:  Well, you know, I don't know if you are
5   asking me to tell you a reason for every time I ruled against
6   you in the last three days or not?  But I typically explained
7   why I ruled against you.  I very often cited the code section
8   from the Federal Rules of Evidence.
9            THE DEFENDANT:  Thank you for your kindness.
10           THE COURT:  All right.
11           MS. FREEMAN:  Your Honor, we just wanted to clarify
12   for the record which defendant's exhibits were actually
13   admitted and going back to the jury?
14           THE COURT:  D8, the birth certificate.
15           MS. FREEMAN:  Thank you, Your Honor.
16           THE COURT:  Anything further?
17           THE DEFENDANT:  Excuse me, sir.  It was the name
18   change, it wasn't the birth certificate.  It was the name
19   change.
20           THE COURT:  The name change was D8.
21           MR. KRAFT:  That is our understanding as well.  That
22   D8 is the name change.
23           THE COURT:  Let me have it Nora.
24           Defendant's Exhibit D8, Final Decree Changing Name
25   of Adult.
```

1          THE DEFENDANT:  Is it possible for me to have a

2   copy, please, sir?

3          THE COURT:  Yes, certainly.  In fact, you can hold

4   onto that.

5          Now, are we ready to bring the jury in?

6          MS. FREEMAN:  The government is ready.

7          THE COURT:  Mr. Mattox?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Okay.  Bring the jury in.

10    (Jurors enter courtroom 10:58 a.m.)

11         THE COURT:  Ladies and gentlemen, I want to thank

12   you for being patient.  We have had many matters we had to

13   deal with.  This is a complex case in many ways and we have to

14   be careful to give time and attention to all the important

15   matters.

16         You are now going to hear the closing arguments in

17   this case.  The government has the opportunity for the opening

18   argument and then Mr. Mattox will be able to argue to you and

19   then the government will have the opportunity to respond.

20   That is standard procedure, the way we always do it in federal

21   court.

22         I want you to remember what I told you when I gave

23   you the preliminary charge and I think I told you, probably

24   once since then, that what the lawyers say and what Mr. Mattox

25   says is not evidence in the case, in the closing argument.

1          So they have the opportunity to tell you what they

2    remember the evidence is and make arguments and try to present

3    it in terms of their case.  They have the opportunity to do

4    that.

5          But the only evidence in this case came from the

6    witnesses who you heard and the documents that were -- the

7    exhibits that were admitted by the Court.  You will have all

8    the admitted exhibits out with you.  You will have the

9    opportunity to review those.

10          You will also have a copy of the jury charge that I

11    am going to give you.

12          So what we're going to do is we're going to move

13    forward.  We're going to hear all the arguments and I'm going

14    to let you go to lunch and when you come back I'm going to

15    charge you and then you can deliberate.  Okay.

16          Very good.  Ms. Freeman.

17          MS. FREEMAN:  Ladies and gentlemen of the jury,

18    Marquet Mattox, the Defendant, sitting there in this case, is

19    on trial for filing essentially false tax returns, lying about

20    the money on those returns and reaping the benefits for

21    himself.

22          Marquet Mattox lied to the IRS and he did it again,

23    and again, and again.

24          This is the case in a nutshell.  The Defendant

25    filed, amongst other things, these 10 false returns and he did

1    it as part of an intentional scheme to defraud, sending nine

2    of them through the Internet, an instrumentality of interstate

3    commerce, and he did that to deceive and cheat the IRS and he

4    cheated the United States government out of millions of

5    dollars to his benefit.

6            He lied in essentially three ways.  He lied about

7    what those trusts made, their income.  He lied on those

8    returns about what he paid on behalf of those trusts,

9    withholding and other payments.  And he lied about what he was

10   due.  He lied on those tax returns in that refund column about

11   what he should receive.  And those refunds are the crux of

12   things because that's what he was trying to steal from the

13   government.

14           And you have heard evidence of, seen charts, to the

15   fact that he tried to steal over $165 million from the United

16   States Treasury.  He succeeded in about five of that million.

17           These are the three statutes in play.

18           Now, the Court, as the Judge mentioned, is going to

19   instruct you on the law after we are done with our arguments.

20   That is the only body of law, what the Court gives you, that

21   is under your considerations.  No other statutes are you

22   concerned to worry about other than what the Court tells you.

23           But because we know that the Court is going to give

24   you these instructions, in relatively layman's terms, we are

25   going to go over now to make sure that, you know, we've shown

1   you how the evidence meets the elements of those statutes and

2   how those tie together.

3          The three statutes in play are wire fraud, false

4   claims against the United States government, and theft of

5   government funds.

6          Let's talk about the first one.  So false claims.

7   Essentially, the Defendant knowingly presented a false claim.

8   And what we allege, those are the 1041 Trust Tax Returns that

9   you saw the list of, and that they were based on false or

10   fraudulent material facts.  Faked up numbers that the IRS

11   relied on.  Because as you heard a couple of different

12   witnesses say, it's a trust-based system.

13          You know, at the end of the tax return, like I know

14   a lot of y'all would have seen over the years, it says, you

15   know, I swear under penalty of perjury.

16          The IRS is relying on that swearing that you are

17   telling the truth and that's why they pay the refunds they do.

18          And that the Defendant did this intentionally,

19   knowing these claims were false and fraudulent.

20          The Defendant is also charged with nine Counts of

21   wire fraud and these two charges again really dovetail

22   together.  Because what we have alleged is that those same tax

23   returns, it's just nine of them, he e-filed or sent through

24   the Internet.

25          As part of -- the Defendant knowingly devised or

1    participated in a scheme to defraud the IRS via false or

2    fraudulent pretenses or representations of material fact.  So

3    you can see very similar to the false claims account, and that

4    he intended to defraud and that he transmitted or caused to be

5    transmitted a wire in interstate commerce.

6           And, finally -- well, actually there are a couple of

7    terms of art in there I did want to go over.  So scheme to

8    defraud, false and fraudulent statements and representations.

9    These might not be words that we use all the time outside the

10   court of law.  So the Court will instruct you as to what

11   exactly those mean.

12          A plan or course of action designed to deceive or

13   cheat money.  That's a scheme to defraud.  And a false or

14   fraudulent statement or representation, in layman's terms, a

15   lie.  Right?  If you say something that's untrue and you

16   communicate it in this fashion, that is a false or fraudulent

17   statement of representation.

18          But it's not just if you outright lie.  If you say

19   the sun is shining when it's raining.  If you say it's day

20   when it's night.

21          It's also reckless indifference to the truth.  Just

22   sending whatever and not caring if it's accurate, if it's

23   true.  Reckless indifference to the truth is also a fraudulent

24   representation in terms of wire fraud.

25          Also it includes half-truths and concealing material

facts.  That's not necessarily what we're talking about in this case, but that is part of what the law covers.

Materiality.  In other words, did it matter to somebody?  Did somebody listen to your lie, your fraudulent representation and do something as a result trusting you.

And in this case you saw the IRS trusted him probably a couple more times than we are happy about, but nevertheless they did rely on what he submitted.

And, finally, that the intent to defraud is proven. That he intended to use these false representations in order to cause a loss.  Well, we know what he wanted when he did this.  He wanted money.  He certainly showed how he enjoyed that money and intended to cause that loss as a result.

Which dovetails with the final charge and this is perhaps the simplest of the three.  Theft of United States government funds, money or property belonging to the United States government, you saw those Treasury checks, they're in evidence.  You can review them if you'd like in the deliberation room.  He stole or converted to his own use those funds.

He's admitted a lot of this, right?  He deposited those checks.  He endorsed them and he spent it on himself.

And finally that the value of what was stolen is greater than a thousand dollars, which for just Count 20, relating to one of those trusts, it was 2.8 million.

1          What does knowingly mean?  What does willingly mean?

2    These are also parts of the law under your consideration.

3          Knowingly means did something voluntarily of your

4    own free will.  Nobody had a gun to your head.  Nobody made

5    you do it.  This was your decision.

6          And intentionally.  You did it with intent to do

7    exactly what you were doing.

8          And willfully.  This is an interesting one.  So to

9    do something willfully you have to have a bad purpose to it.

10   One of those ways you can have a bad purpose is to disobey or

11   disregard the law in the course of your scheme.  And you will

12   hear from the Judge that you need not be aware of the specific

13   law.

14         I'm sure you know many people are charged with

15   crimes all the time and they don't necessarily half memorize

16   the Code Section of what they did wrong when they did it,

17   right?  But they are still accountable for that crime.  That

18   is that same general concept here.

19         In a nutshell, he can be wrong about the law.  He

20   can be really, really wrong about the law but still be guilty.

21         When in doubt, however, I always say, confer, talk

22   about the Judge's instructions.  You will be given a copy of

23   those.

24         What you will be voting on are just the Counts,

25   there are 20 Counts involving 10 specific false tax returns.

1   You will see that the Indictment alleges a lot more

2   information on it and it's called a speaking Indictment.  It

3   gives you some background on the scheme.

4          One of the things I do want to highlight for you,

5   however, is the jury instruction on conjunctively charged

6   Counts.  It's kind of a mouthful.  But what that means is when

7   the government has charged that he did three kinds of false

8   representations you only have to unanimously agree on one for

9   that Count, specifically with regards to false claims, for him

10  to be guilty of that false claim.

11         So he submits a false tax return and he lied about

12  what he made, he lied about what he paid, and he lied about

13  what he was due in terms of a refund.  You only have to agree

14  on one of those things for that to be a false claim in and of

15  itself.

16         Reasonable doubt.  Now this is one that everybody

17  has probably heard at some point in their lives on TV.  The

18  government -- we have the burden of proof here.  We welcome

19  it.  We have proven this case beyond a reasonable doubt.

20         What does beyond a reasonable doubt mean?  It

21  doesn't mean, as you will hear the Judge say, a guilt beyond

22  all possible doubt.  The government only has to exclude

23  reasonable doubt with regards to the Defendant's guilt.  And a

24  reasonable doubt is a real doubt based on your reason and

25  common sense.

1          When you swear the oath to be a juror, when you go

2     through the questioning to make sure you don't have any

3     biases, the Court ask you to check your biases at the door.

4     But they don't ask you to check your brains at the door, they

5     don't ask you to check your life experience at the door.  You

6     get to apply your common sense to the facts and law at hand.

7          One other thing I do want to mention.  There were a

8     number of summary charts shown to y'all in the course of this

9     trial.  One of those will be going back in evidence, that's

10    Exhibit 4-1 and that is the two-page summary of all the

11    fraudulent tax returns that the government alleged in this

12    case, totaling around $165 million.  That includes more than

13    the 10 Counts that are under consideration.

14         There are a number of other demonstrative charts,

15    charts that don't go back with you in your binders for

16    deliberation.  I'm going to show them to you one last time and

17    make sure you don't feel like you have missed anything.

18         This is one of those.  I kind of refer to this as a

19    cheat sheet because it has the Counts listed on the far left

20    column referring to which of these returns applies to each

21    Count that is alleged.  This is one of those that won't go

22    back with you.

23         But ultimately what this exhibit refers to is the

24    fact that there are three trusts, out of the dozen or so that

25    were mentioned, that are part of the charged Counts.  The

1   Burgess Mattox Bey Investment Trust, the Kemahra Investment

2   Trust and the Burgess Mattox Bey Trust.

3          The fraudulent scheme in this case is essentially

4   this; the Defendant made a trust, he did nothing with it, he

5   filed a false tax return stating he had income, when he

6   didn't, in this trust.  And that he paid the IRS either all of

7   that income taking home no money whatsoever for himself or

8   that he paid most of it over to the IRS.

9          And, then, he checked to see did he get a refund?

10  Did it pay out?  Did it work?  Sometimes it did, sometimes it

11  didn't.

12         If it does work and you get that check from the

13  Treasury, oh, well, I guess I got to do something with this

14  check now in order to get -- I guess I better open up a bank

15  account for that sham trust.  Oh, and then I'll file again.

16         As you saw, multiple times, amended tax returns.  As

17  soon as he got paid for one of those trusts he would file

18  again for the same tax year, this time asking for more money.

19         But if it doesn't work, all right, let's change

20  things up a bit and let's see if we can get around those IRS

21  filters, let's change the numbers, move them around.  You saw

22  that in the charts as well that he would file over and over,

23  lying again, and again, and again to the IRS.

24         As you see in these numbers there's a lot of

25  suspicious things here.  Right?  Look at those round numbers.

1    I'm going to point you to the total income claimed column.

2    Look at that.  All these even round thousands.  Does that look

3    like interest income to you?

4           Special Agent Clark told you that when you get

5    interest on something it tends to be calculated in

6    percentages.  When was the last time you saw in a bank

7    account, if they paid you interest, that it didn't come out to

8    like $12.87 and some kind of like -- because they are dividing

9    it and dividing it by these tiny little fractions.  They never

10   come out to these thousands of dollars.  That is an indication

11   that the Defendant made these numbers up out of whole cloth,

12   pulled them out of nowhere.  That's that kind of reckless

13   indifference to the truth that we talked about earlier, which

14   is forbidden by law, when you file these tax returns.

15          But also knowing falsity.  Because how can you

16   actually believe something is true when you know you made it

17   up.

18          And, again, you see some of these numbers filed --

19   these trusts filed repeated amended returns for the same tax

20   year.  I think Special Agent Clark referred to it as "Oops".

21   Right?  That's what it looks like he is doing.  He gets paid

22   and then he amends it and tries to get more money.  "Oops, I

23   forgot that I actually paid --"  If you look at those top two

24   lines there.

25          So this is the Burgess Mattox Bey Investment Trust,

1   both tax year 2015.  The first time he files it on this chart

2   he says his income is 4.881 million and it stays the same when

3   he amends it in that next line.  But what's interesting is

4   that he goes from saying, oh, I paid 2.440 million in

5   withholding and then, you know, a year later, oops, I meant to

6   say I paid all 4 whatever million in withholding.  That is an

7   indicia of knowing falsity.  That's how you know he knows this

8   isn't right.  This isn't accurate.

9        But he swore to it nonetheless when he sent it to

10  the IRS and they relied on it to their detriment paying out

11  that second larger refund.

12        We do have the burden to prove that it was, in deed,

13  the Defendant who did this crime.

14        It wasn't really in dispute though, as you have

15  seen, you know, from the evidence in front of you.  He used

16  his name or some version of his name on the overwhelming

17  majority of documents in this case.

18        He went to the UPS store, he gave them his driver's

19  license.  That's him.  He said, I'm going to control this box.

20  He told Special Agent Clark, yeah, that's my UPS box, I'm the

21  only one that controls it.

22        He told Special Agent Clark that he had prepared and

23  filed the returns that led to those four refund checks.  But

24  we didn't just take his word for it.  We followed up the IP

25  addresses.  Right?

1           Those e-file tax returns all tied back to his

2    residence, 155 Carriage Court, Athens, Georgia, here in the

3    Middle District of Georgia.  And he also admitted he used to

4    live there.

5           And he is the one, as you saw from all the bank

6    records, who reaped the benefits.  And this is him at the bank

7    doing just that.

8           So one of the main lies in this case is that the

9    Defendant lied about what he made on those tax returns.

10   Right?  He said he had millions and millions of dollars in

11   interest income.  Millions of interest, which means he had to

12   have even more millions and millions of dollars sitting

13   somewhere earning that interest.

14          Well, you will have the bank records to look at for

15   yourself, but as you have heard multiple witnesses say, that

16   money didn't exist.  There was no asset.  There was no bank

17   account.  There was nothing to earn that interest.  It wasn't

18   real.  These trusts were a sham.

19          The only money that everyone who looked at the bank

20   records saw that came into Marquet Mattox's pocket came from

21   the United States government.  Came from those fraudulent

22   refunds.  Came from this wire fraud.  Came from these false

23   claims.

24          How else can we tell that these trusts are a

25   complete sham?  Well, this so-called professional trustee has

had no declared personal income since 2003.  And he made a
point of asking Revenue Officer Freeman on the stand, "Well,
isn't it true that I don't have to pay -- I don't have to
filed those tax returns if I'm unemployed?"  He wanted to make
a big point.  I'm not caught not filing tax returns I should
have because I have been unemployed.  Well, there you go.
He's not employed.  He's not running these trusts.

It seems like a legitimate businessman, who would be
running millions and millions of dollars worth of trust,
should be entitled to earn a living.  Right?  Some kind of
trustee fee, but you didn't see that.  Right?  Because these
trusts aren't real.

They didn't have bank accounts and most of all they
didn't have business activities, which he admitted to the IRS
when he was interviewed.  Oh no, they don't have business
activities.  Does that sound like a legit trust to you?

This income that he claims on his tax returns it's
just outright false.  These are not honest earnings that
regular people -- you know, you get a paycheck, maybe there is
some withholding from that paycheck and then you file your tax
return when it's due.  You pay if you owe a little more and
hopefully you get a refund because maybe you paid a little
more than you needed to to the IRS.

Well, he didn't pay a dime, because you also saw
there was nothing, nothing, paid to the IRS out of those bank

1    accounts other than for his own personal debts.

2            Here's another way you can tell circumstantially

3    that these sham trusts were a complete fraud.  So he used

4    multiple aliases, always changing his name.  Right?  And

5    always changing the names of the trusts ever so slightly.  Let

6    me open a new one in the name of the daughter.  Let me open a

7    new one in the name of my son and file them under different

8    names and aliases.  This is not how a legitimate trustee acts.

9    This tells you he's trying to hide something.

10           Why is he being so sketchy about it if this is so

11   legit?  And why is he evasive when Susan Freeman goes to his

12   house to just serve him with paperwork saying, hey, the IRS

13   has noticed we should not have paid some money that we did.

14   So here you go.  And he would not even identify himself to

15   her.

16           You know, it seems like if you are a legitimate

17   businessman, operating legitimate trusts, you know what you

18   say, oh, yeah, this is a mistake, these are my trusts.  Why

19   are you here IRS?  I haven't done anything wrong?  But that's

20   not what happened.  Instead he was evasive.

21           And on top of that, constantly amending these

22   returns shows you that it's not legitimate.  And the

23   amendments are not small as we have seen.  Millions of dollars

24   difference.  Right?

25           Seems like somebody would notice if they paid

1   millions of dollars more than they should have.

2           Consciousness of guilt.  Also manifested in three

3   ways in his scheme.  When it's working and he's getting paid,

4   he employs the same strategy.  Give me more.

5           Here's an example of that.  That first line that we

6   talked about a minute ago, the 4.8 million.  4.8 million on

7   the income and then suddenly he amends the withholding to go

8   from 2.4 million to 4.8 million.  Keep trying if it's working,

9   right?

10          But then you see below.  Here's from November 2017.

11  Four different trusts.  The first one he gets a payoff.

12  Right?  So he keeps trying.  He's, like, let me try with all

13  these other trusts.  I just got me another check.  But it

14  doesn't work.  And so he just keeps modifying and modifying

15  and modifying.  Let me shift these numbers and names around.

16  Let's try some different names and different numbers.

17          Here's the 17th and 18th of November 2017.

18  Magically, six different trusts, with six different names,

19  filed from his home, Carriage Court in Athens, Georgia --

20  that's what that IP address tied to -- all for some variation

21  with a couple changes of $17 million.

22          He really, really wanted $10 million from the United

23  States government this time.  Luckily, it didn't work.

24          And, again, I'll refer you to the jury instruction

25  about how you can tell he knows this is not true.  He has a

1    reckless indifference to the truth that he can just tweak

2    things and file them over, and over, and over again.

3              He really wants that $10 million, but that doesn't

4    mean he is actually owed that $10 million.  Claiming that he

5    is, is false.

6              Here's another way you can tell.  It's impossible

7    for all of these things to be true at the same time.  Yet,

8    nevertheless, the Defendant swore in three different tax

9    return filings that they were.

10             These are all for tax year 2016, all for the same

11   trust, the Burgess Mattox Bey Trust.  Look how different these

12   numbers are.  He goes from $250,000 in income to saying, oops,

13   $17 million of income, oops, $142 million of income.  You

14   can't have all of those be true.

15             And then see the withholding or the payments he

16   claimed he paid to the IRS.  Those don't match up either.

17   Look how high those numbers are.  He knows that's not true.

18             With this escalation of what he tries to claim to

19   the United States government he gets on the investigators

20   radar.  Then the real truth comes out.

21             He gets confronted.  And suddenly when he says, oh,

22   um, you're investigating me?  Oh, you might take my stuff?

23   Oh, there is a federal agent leaving a card on my door, wants

24   me to come downtown to talk to him.

25             When I filed that $142 million tax return what I

1    really meant was zero.

2            Here are the two numbers and here, as we showed you

3    in Government's Exhibit 3-15, this is that tax return he filed

4    after he was confronted by both a revenue officer and law

5    enforcement.  In April 2019 he's interviewed by Special Agent

6    Clark and June he files this.

7            And there is that letter, which looks like Special

8    Agent Clark was right.  He did date that letter June 3rd

9    where he amends his return and says this entity did not

10   receive any income in tax year 2016.  Oh, look, he told the

11   truth for once.

12           But what did it take?  April 2018 he gets told --

13   this stuff that you are filing is frivolous.  We're going to

14   assess you a $5,000 penalty.  That should get your attention

15   and it certainly did.  I know if I got told I had to pay the

16   IRS $5,000 for something, I'd be, what?  What did I do wrong?

17           Well, then Susan Freeman shows up at his door, "The

18   IRS is going to start taking things from you."  And then

19   Special Agent Clark shows up and says, "We are investigating

20   you criminally."

21           Then suddenly what if I just back away slowly?  Does

22   that work?  If I just claim now it was zero all along?  That's

23   not how this works.

24           How else do you know he did it?  Look at the

25   proceeds?  Look at what he spent it on?  These aren't the

1   operations of a trust.  These aren't business expenses.  He's

2   just enriching himself with this fraudulent scheme.

3          Remember the charge for theft of United States

4   government funds, that he stole or knowingly converted the

5   money to his own use.

6          This was all spent on him before the IRS was able to

7   take action.

8          Whose accounts are these?  He controls them.  He

9   admitted it.  He's the one that spent this money.  He doesn't

10  have anyone to blame.  He can't pass it off on some other guy.

11  This is just him.

12         With a beautiful car and a lovely home, purchased

13  with United States government funds.

14         Marquet Mattox lied to the IRS.  He did it again,

15  and again, and again.

16         He used a scheme to defraud with made up numbers,

17  income, withholding of payments and refunds owed.  He deceived

18  and cheated the IRS through these sham trusts.  He knew what

19  he was filing was false.  He didn't care what was false or

20  true, 17 million, 142 million, zero.  He filed what he wanted

21  so that he could absolutely disregard what was required of him

22  under the law.  Even when he was told to stop.  Even when he

23  was told he's being criminally investigated he continued with

24  his scheme, knowingly, willingly, intentionally.  Knowing he's

25  never paid a single dime of withholding to the IRS and he

```
 1   stole millions of dollars.
 2          The Defendant has been proven guilty beyond a
 3   reasonable doubt.  He filed these 10 false tax returns, nine
 4   of them through the Internet.  He stole $2.8 million from the
 5   United States government through one of those trusts alone.
 6          The government is confident that when you conclude
 7   your deliberations you will find the Defendant guilty beyond a
 8   reasonable doubt of all 20 Counts.
 9          THE COURT:  Mr. Mattox, your turn.
10          THE DEFENDANT:  I have a question.
11          THE COURT:  You have a question?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Take the jury out, please.
14     (Jurors exit courtroom at 11:31 a.m.)
15          THE COURT:  What is your question?
16          THE DEFENDANT:  You have limited the scope of things
17   that I could say, you have already ruled them out.
18          I wanted to know am I also ruled out rebutting
19   anything that Ms. Freeman just mentioned.  Because you said,
20   you know, you can't say this, you can't say this, you can't
21   bring this up, you can't bring this in, you can't bring these
22   documents in, I'm ruling these documents out.
23          So am I also ruled out of rebutting anything she
24   just --
25          THE COURT:  You can argue against what she says, as
```

1   long as it's part of the evidence.

2            THE DEFENDANT:  Okay.

3            THE COURT:  Do you understand?  It's --

4            THE DEFENDANT:  But there is a lot that has --

5   forgive me for cutting you off -- there is a lot that's been,

6   as of yesterday and this morning, ruled out as far as being a

7   part of the evidence that pretty much put me in a position

8   that I'm not able to argue with because it's now ruled out.

9            THE COURT:  Right.  You got that right.

10           THE DEFENDANT:  Okay.

11           THE COURT:  Because the closing arguments are

12  controlled by the evidence that was admitted and because you

13  can't testify.  She relied on the evidence and went through

14  and that's what you're supposed to do.

15           THE DEFENDANT:  Can Ms. Freeman testify?  You said I

16  can't testify.  Is she able to testify?

17           THE COURT:  No.  She's not able to testify.

18           THE DEFENDANT:  So she's not able to be sworn in and

19  testify if questions were asked of her?

20           THE COURT:  Well, I don't understand your question.

21  She is not a witness in the case.

22           THE DEFENDANT:  I know we're at the point where --

23  forgive me for cutting you off -- we're at the point where we

24  are beyond the witness, but if I wanted to call Ms. Freeman as

25  a witness and ask questions of her could I have?

```
 1              THE COURT:  Not now.

 2              THE DEFENDANT:  Right.

 3              THE COURT:  And I don't think you could earlier

 4    either but definitely not now.

 5              THE DEFENDANT:  Okay.  Thank you.

 6              THE COURT:  Can I bring the jury back?

 7              THE DEFENDANT:  Yes.

 8     (Jurors enter courtroom at 11:35 a.m.)

 9              THE COURT:  All right, Mr. Mattox.

10              THE DEFENDANT:  Ladies and gentlemen of the jury,

11    good morning.

12              THE COURT:  You're going to have to speak up,

13    Mr. Mattox, and make sure that I can hear you.  Because I

14    didn't hear what you just said.

15              THE DEFENDANT:  I said good morning.  Are you able

16    to hear me now?

17              THE COURT:  You may need to speak louder.  I think

18    the court reporter is having trouble hearing you.

19              THE DEFENDANT:  I do apologize.

20              Ladies and gentlemen, as you just heard from the

21    government, stating that there were multiple trusts that was

22    actually structured.  But it's also confirmed that there is no

23    crime in having multiple trusts.

24              And the government stated that there were multiple

25    trusts structured and there was nothing legitimate or there
```

was nothing done with those actual trusts.

In which Mr. Clark confirmed, Special Agent Clark confirmed that he works for the Internal Revenue Service, he does not work from the Treasury.  And he also confirmed that he's not able to see anything that is actually completed or he's not able to see anything in regards to the Treasury.

He confirmed that the Treasury and the Internal Revenue Service are two totally different entities, two totally different places, two totally different distinct places.  And he also confirmed that the rules and the guidelines for the Treasury are different from the rules and the guidelines for the Internal Revenue Service.

Special Agent Clark also confirmed that the Treasury does receive and agree to receive gifts, intangible personal property, negotiable instruments as he stated, but the Internal Revenue Service does not.

Special Agent Clark also confirmed that there is no limit in the amount of gifts that can be given, whether it's in the form of a negotiable instrument or intangible personal property.  And hopefully you know the definition of intangible personal property and I'm not attempting to insult anyone's intelligence.

Am I able to give the definition of intangible personal property?

THE COURT:  We can talk about that later.  You go

1   ahead.

2          THE DEFENDANT:  Ms. Freeman also mentioned or the

3   government also mentioned that I didn't have any business

4   activity with the Internal Revenue Service.

5          And as you remember in the conversation or in the

6   cross examination of Mr. Clark, I never stated that I had or

7   the trust had any business activity with the Internal Revenue

8   Service.  It was always stated with Mr. Clark, didn't I say or

9   wasn't it said that the documentation was mailed to the

10  Treasury, not the Internal Revenue Service?

11         Mr. Clark also confirmed that no checks was ever

12  issued from the Internal Revenue Service.  That the checks

13  were issued from the Treasury.  But the Internal Revenue

14  Service or the IRS are stating that they issued multiple

15  checks and that they are attempting to collect or receive

16  funds for something they never issued.  The Internal Revenue

17  Service never issued one check and Mr. Clark confirmed on

18  yesterday that the Internal Revenue Service was never the

19  issuer.

20         Mr. Clark also stated that he did not see any

21  business activity for the trusts, but he also confirmed --

22  well, he said he didn't see any business activity for the

23  trusts and I reminded him of the conversation for the meeting

24  that we had and I mentioned to him "Didn't I inform you that

25  the trusts operated 12 months prior?"  But he said he didn't

1    recall.

2              And he also confirmed that he couldn't see anything

3    that goes on with the Treasury because he doesn't work for the

4    Treasury, which would indicate that he couldn't see anything

5    as far as business activity that was beyond the Internal

6    Revenue Service, if it's on the side of the Treasury, if you

7    have two totally different entities.

8              So if it's on the side of the Treasury he can't see

9    it and he confirmed that he is not able to see any activity

10   for the Treasury.

11             He also confirmed that if gifts, payments, et

12   cetera, are given to the Treasury he has no ability to see it.

13   He has no ability to verify or confirm it because he doesn't

14   work for the Treasury.  He works for the Internal Revenue

15   Service.

16             But he's accusing me of a crime.  If the rules for

17   the Internal Revenue Service are totally different from the

18   rules for the Treasury and the Treasury, as he confirmed,

19   accepts negotiable instruments and intangible personal

20   property, how do you accuse me of a crime of following the

21   rules.

22             How does Mr. Clark accuse me of a crime and I have

23   never had any business with the Internal Revenue Service?

24             Mr. Clark mentioned that he's not sure how the

25   documents were received by the Internal Revenue Service.  And

1    the question was asked, "How did you receive these documents?"

2    and he said, "I don't know."  And I asked, "Where is the

3    envelope that the documents was mailed in?"  And he says he

4    doesn't know.

5             So at this point Mr. Clark is confirming he's not

6    exactly sure how documents were delivered to the Internal

7    Revenue Service if I have told him those documents were sent

8    to the Treasury, which is a totally different entity than the

9    Internal Revenue Service.

10            But I'm being accused of a crime.  And

11   documentations, we have no idea, even with the Special Agent,

12   how documentations that were sent to the Treasury were

13   delivered to the Internal Revenue Service.

14            Ms. Freeman and Mr. Clark and the other individuals

15   with the Internal Revenue Service testified that the trust

16   never paid anything to the Internal Revenue Service, which is

17   absolutely correct.  Because it was always stated and

18   confirmed the gifts were given to the Treasury, not to the

19   Internal Revenue Service.

20            So how do you accuse me of a crime when you have

21   also confirmed that the trust didn't give you anything.  The

22   trust gave nothing to the Internal Revenue Service, but the

23   Internal Revenue is claiming that they are injured.  They're

24   claiming that it was stolen from the Internal Revenue Service

25   but the Internal Revenue Service also confirmed that the

1    Internal Revenue Service never issued one check.  Not one

2    check.

3              But, again, they also confirm that negotiable

4    instruments and intangible personal property is acceptable

5    with the Treasury but not with the Internal Revenue Service,

6    but I have had no business dealings with the Internal Revenue

7    Service.

8              I have a name change decree from Fulton County Clerk

9    of Superior Court that my name has been changed.  And if you

10   reference me or refer to me as a former name am I being

11   evasive if I'm saying, no, that's not me, because I have a

12   court order that my name was changed.

13             And if I have never had any business activity with

14   you but you're stating that you're investigating me or you're

15   investigating the trusts and you are requesting funds to be

16   returned back to the Internal Revenue Service but the Internal

17   Revenue Service never gave anything.  They never gave any

18   funds.

19             And if you ask me a question such as Ms. Freeman

20   said, well I made a statement -- I made a statement that the

21   funds need to be returned or we need the funds back.  And

22   Ms. Freeman said that my response was nothing.  There was no

23   response from me at all.  I didn't say we are going to.  I

24   didn't say anything.

25             But she also said that she took that as refusal

1  because there was no comment at all.  So if there is no

2  comment at all is it right to assume that I refused or is it

3  right to assume that I admitted.  Is it right to assume for

4  being silent in which, I think, the Constitution does give you

5  the right to remain silent.

6          And am I being evasive if my name has legally been

7  changed?

8          Ms. Freeman also stated that as far as the uses of a

9  trust and as far as what's permissible for the uses of a

10 trust, she confirmed that meals are permissible, that a trust

11 can pay for meals.  That a trust can pay for various things.

12         But the government is stating that the trust paid

13 for these meals and the trust paid for this.  And it was even

14 asked of Ms. Freeman, "Is it permissible for a trust to own an

15 automobile or pay for an automobile?"  And she confirmed, yes.

16         But the government is painting a grim picture to

17 state that these monies were stolen from the IRS and the IRS

18 has confirmed they received nothing and they gave nothing.  So

19 it would be impossible for anything to have been stolen from

20 the Internal Revenue Service.

21         As we notice there was no witnesses whatsoever

22 brought forward from the Treasury.  All the witnesses that

23 were brought forward are from the Internal Revenue Service.

24 And the Internal Revenue Service confirmed that they are

25 totally different from the Treasury.

1          The Internal Revenue Service also confirmed that
2   they can't see anything in regards to the Treasury and what
3   the Treasury does and the Treasury business.  They have no
4   idea.  They can't see it.
5          So back to the point of Mr. Clark stating that he's
6   not exactly sure how documents were referred to him or how the
7   Internal Revenue Service received documents.  That I've stated
8   multiple times to Mr. Clark those documents were mailed to the
9   Treasury.  But I'm accused of a crime of the Internal Revenue
10  Service receiving documents that were never mailed to the
11  Internal Revenue Service.
12         But Mr. Clark stated he's not exactly sure how they
13  received the documents or where the referral came from with
14  the documents.
15         Please bear with me.
16         So again the question becomes, how does the Internal
17  Revenue Service accuse me of a crime when I have never had any
18  business with the Internal Revenue Service?
19         How does the Internal Revenue Service accuse me of
20  wrongdoing when I never had any business with the Internal
21  Revenue Service?
22         How does the Internal Revenue Service accuse me or
23  the trust of theft when there's never been any business with
24  the Internal Revenue Service and the Internal Revenue Service
25  confirmed that they never mailed one check.  Not one.

1       The checks were mailed from the Treasury and it was

2   confirmed with Mr. Clark during an interview.  The

3   documentation were mailed to the Treasury.

4       And it was also stated on the witness stand --

5   wasn't it stated by you or your partner that the Internal

6   Revenue Service received documents, but they didn't know how

7   to process the documents so the documents was just sitting.

8   Mr. Clark confirmed, yes, the documents are just sitting if

9   they don't know how to process them.  But the documents were

10  never sent to the Internal Revenue Service to be processed.

11      It's also confirmed that again -- I know it's

12  reiterating, but the Treasury receives or rules or guidelines

13  that they do accept intangible personal property.  They do

14  accept negotiable instruments.

15      So if the Treasury does accept negotiable

16  instruments and accept intangible personal property, how do

17  you accuse me of the intent to defraud the Internal Revenue

18  Service?

19      If the Treasury does accept negotiable instruments

20  and intangible personal property, how do you accuse me of a

21  scheme to defraud the Internal Revenue Service?

22      And is has been confirmed, multiple times, nothing

23  was ever sent to the Internal Revenue Service.  But the

24  Internal Revenue Service is claiming injury.  That they lost

25  millions.

1         So even the return that was shown on the screen on

2    yesterday, that was dated on June 3rd and timestamped for

3    August 7th, 2019, there is still no idea how the Internal

4    Revenue Service received documents that was sent to the

5    Treasury, for the Treasury to process and not -- excuse me.

6         So if the Internal Revenue Service claimed that they

7    never issued one check, is it wrong for the Internal Revenue

8    Service to claim that something was stolen from them?

9         If the Internal Revenue Service claimed that they

10   never issued one check, is it wrong for the Internal Revenue

11   Service to go and take something that they never gave?

12        But, again, the picture was painted as a scheme.

13   That was a repetitious scheme.

14        So if documentation is mailed to the Treasury, based

15   upon the Treasury accepting gifts, is there a scheme committed

16   against the Internal Revenue Service?  But the Internal

17   Revenue Service is saying that there was a scheme, a tax

18   refund scheme against the Internal Revenue Service.  Nothing

19   was ever given to the Internal Revenue Service.

20        The government stated that on the returns -- on one

21   return it stated a certain amount of income.  On another

22   return it stated zero income.  If gifts are given, when

23   negotiable instruments are given, and nothing has been

24   returned, wouldn't it be the equivalent to that it was

25   withheld?  If it was never returned, and it definitely wasn't

returned from the IRS because they confirmed they didn't issue anything.

So if I gave you a gift and you didn't return the gift, didn't you withhold it?  So you still have the gift.

So if the trust corrected an error, to say, well, hey, I gave Suzie a gift.  I gave -- and it was withheld because it wasn't returned.  They still have it because it wasn't returned.

And, again, there was a young lady on the stand who stated on Monday, from the Internal Revenue Service, the keeper of the records, there was nothing ever paid to the Internal Revenue Service.

So if there was nothing ever paid to the Internal Revenue Service, if there was no negotiable instruments to the Internal Revenue Service, if there were no intangible personal property given to the Internal Revenue Service, how does the Internal Revenue Service claim that they were injured if nothing was ever given to them?

How does the Internal Revenue Service state that they were defrauded out of millions when they never issued ten dollars?  They never issued two dollars.

So how can you, as a jury, state that I injured you if you never gave -- you didn't give me anything.

So as you deliberate, based upon the information or the evidence that has been given or the evidence that has been

1  presented, remember the Internal Revenue Service and the

2  Treasury are two totally different places in which any of us

3  were taught that the Internal Revenue Service and the Treasury

4  are the same place.  The Internal Revenue Service and the

5  Treasury do the same thing.

6         But as I asked the young lady, "Is the Secretary of

7  Treasury over the Internal Revenue Service?"  Her response

8  was, "I don't know.  I don't know."

9         And I asked Ms. Freeman had she ever been to the

10 Treasury and she said, no.

11        And Mr. Clark confirmed that the Treasury and the

12 Internal Revenue Service are totally different.

13        So you have an entity or individuals claiming that I

14 injured them and I never had any business with them.  Claiming

15 that they were defrauded out of millions.

16        But you can't claim that I defrauded you out of

17 millions or either the trusts defrauded you out of millions

18 when you haven't given millions.  There wasn't 5 million from

19 the Internal Revenue Service or the IRS.  There wasn't

20 2 million from the IRS.

21        So if the Treasury gave checks for $2 million, but

22 we noticed that the Treasury wasn't called forward to testify.

23 The Treasury wasn't called forward to say that they were

24 injured.  The Treasury wasn't called forward to say that they

25 were defrauded.  The Treasury wasn't even called forward to

```
 1    state that the negotiable instruments or intangible personal
 2    property were unacceptable as the Internal Revenue Service
 3    stated that intangible personal property is not acceptable to
 4    the Internal Revenue Service, but the intangible personal
 5    property is acceptable to the Treasury.  But the Treasury
 6    wasn't brought forward to testify to confirm whether or not it
 7    was acceptable or whether or not they were injured.  But they
 8    were the ones who issued the checks.  Not the IRS.
 9            So how do you hold me -- or punish -- or how do you
10    punish me for -- I didn't have any business activity with the
11    IRS.  So how do you attempt to punish me or punish me for -- I
12    didn't steal anything from the IRS.  I didn't swindle, I
13    didn't defraud the IRS out of anything.
14            And if the IRS mysteriously received documents that
15    were mailed to the Treasury and through their investigation
16    and having a conversation with me, it was confirmed that the
17    documents were mailed to the Treasury.  Is there any reason
18    the Special Agent didn't forward the documents to the
19    Treasury?  Is there any reason the documents remain with the
20    Internal Revenue Service in lieu of being forwarded to the
21    Treasury?
22            Is there a reason --
23            So I ask you to please take all of the information
24    into consideration and as you see that I didn't receive
25    anything from the Internal Revenue Service, but they're
```

1    claiming that I defrauded them.  But the Treasury wasn't

2    brought forward to claim whether or not they were injured.

3            But the documentation -- the mail, the envelopes

4    that were received by the Internal Revenue Service, um, as I

5    asked Mr. Clark where is the envelope and he stated, I don't

6    know.

7            So if I've stated to Mr. Clark that the

8    documentation was mailed to the Treasury and not the Internal

9    Revenue Service, but Mr. Clark take the initiative to start an

10   investigation, but the documents were never intended for the

11   Internal Revenue Service, because it was explained to

12   Mr. Clark in a meeting or in an interview.

13           So there is no willful intent to injure, there is no

14   willful intent to defraud, there is no willful intent of theft

15   if it's been stated to you in a five hour meeting.

16           And as the government stated, I wasn't arrested by

17   Mr. Clark.  Mr. Clark never stated that I couldn't leave.  I

18   voluntarily sat with Mr. Clark and his partner for five hours

19   and answered their questions.  So am I evasive if I'm sitting

20   with you for five hours?  Answering your questions.

21           And do you accuse me of a crime when it appears

22   there was an error or it appeared that the documentation was

23   never meant or intended for the Internal Revenue Service, it

24   was always intended for the Treasury, but for some reason

25   never forwarded to the Treasury.

1          So is that willful intent?  Is that malicious

2   activity on my part?  Is that me attempting to steal from the

3   Internal Revenue Service and I'm telling the Internal Revenue

4   Service I never mailed anything to you.  I never sent anything

5   to you at all.

6          Thank you.

7          THE COURT:  Response, closing.

8          MS. FREEMAN:  Ladies and gentlemen, it appears that

9   Mr. Mattox is -- if I understand him correctly -- main dispute

10  with the evidence in this case is that he didn't steal from

11  the IRS, instead he stole from the Treasury.

12         I'll just refer you back to the Judge's instructions

13  and to the charges that are in this case.

14         Theft of United State Government funds.  The checks

15  were from the Treasury.  That is not in dispute.  They were

16  the result, however, of a fraudulent scheme perpetrated on the

17  IRS through tax returns, which you don't really file with the

18  Treasury, you file with the IRS hoping that they will send you

19  a nice check that says United States Treasury at the top.

20         The bottom line is that these trusts had no business

21  activities full stop.  That's what Special Agent Clark told

22  you.  That's what Revenue Officer Freemen told you she also

23  saw from the bank records.

24         The bottom line is that the Defendant didn't pay a

25  dime of the withholding and of the payments he claimed on the

1    tax returns.

2             Look at those tax returns in deliberation.  You will

3    notice none of them say anything about gifts or about the

4    Secretary of the Treasury or negotiable instruments.  They

5    just say, I made a whole lot of millions of dollars and I

6    withheld from those millions of dollars or I paid little bits

7    of money here and there.  But he doesn't say anything in those

8    tax returns about the Secretary of Treasury or gifts.  He

9    doesn't declare that because that wasn't his story at the

10   time.  It may be his story now.

11            But you can't withhold gifts in the way he is

12   describing.  Even if you could, that's not what he put on the

13   tax returns.  Right?  Ultimately the issue is the falsity of

14   the returns that have been filed that are there for you to

15   review.

16            And you can't withhold income that doesn't exist

17   because he didn't have that money from which to withhold to

18   send to the IRS.  He didn't declare these gifts of the

19   Secretary of Treasury.  This is a story, it's smoke and

20   mirrors designed to confuse you.  Just like, oh, I stole from

21   the Treasury and not from the IRS, therefore you can't find me

22   guilty of stealing this particular way.  Well, the

23   instructions will tell you, you absolutely still can.

24            And even if -- even if you give him all the benefit

25   of the doubt in the world about the gifts, so-called, to the

1    Secretary of Treasury, he still lied about the income that

2    didn't exist and he lied that he was actually due those

3    refunds when he knew he wasn't.

4              He stole from the United States Government.   He

5    defrauded the IRS in order to steal from the United States

6    Government.

7              We ask that you find him guilty on all counts.

8              THE COURT:  All right, ladies and gentlemen.  I'm

9    going to send you to lunch now.  I want you back at 1:15,

10   please.  And when you come back I will give you the jury

11   charge and then you will be able to begin your deliberations.

12             Thank you very much.  Remember not to talk to anyone

13   about the case.

14             Thank you.

15     (Juror's exit courtroom at 12:08 p.m.)

16             THE COURT:  We are going to get y'all a copy of the

17   charge that I intend to give.  There were a number of changes.

18   There were some withdrawals of charges.  I think those -- I'm

19   not going to say that.  I'm not sure about that.

20             But anyway, we have made some changes which I would

21   call clerical and tried to adapt the changes in minor ways to

22   the evidence in the case.  I doubt if you will even know the

23   difference, but anyway, I want y'all to go over those.  And if

24   you have any questions or issues or any additions or deletions

25   to the charges then we will deal with that.

1          The second thing I want to deal with is I want to

2    make sure that all of the exhibits are ready to go out.  So we

3    are not -- we're going to do that now.  We are not going to

4    wait until after the charge.

5          Is there anything else we need to take up?

6          MS. FREEMAN:  Not from the government, Your Honor.

7          THE DEFENDANT:  Your Honor, I did not get a chance

8    to rebut the ending of the closing or of the government.  Is

9    that standard?

10          THE COURT:  Yes.  Right.  You don't get to respond

11   to that.  The government has the burden of proof.

12          Anything else?

13          THE DEFENDANT:  That will be all, Your Honor.

14          THE COURT:  So we're going to get you a copy of the

15   charge and I want you to look at all the exhibits and then

16   once you have done all that I will come back in here and we

17   will talk about any objections or problems.  Okay?

18          Thank you.

19          CSO OFFICER:  All rise.

20     (Recess at 12:10 p.m.)

21          CSO OFFICER:  All rise.  This Honorable Court is

22   again in session.

23     (Resume at 12:35 p.m.)

24          THE COURT:  We'll take up the jury charges first.

25   Any objections or corrections, additions for the government?

1          MS. KRAFT:  No objections from the government,

2    Your Honor.

3          THE COURT:  So it looks okay?

4          MS. FREEMAN:  Yes, Your Honor.

5          THE COURT:  What about you?

6          THE DEFENDANT:  No, sir, Your Honor, I don't have

7    any objections.

8          THE COURT:  Then what about the evidence?  Is that

9    all set to go?  Does anybody have any objections or problems

10   with that?

11         MS. FREEMAN:  No objections from the government,

12   Your Honor.

13         THE DEFENDANT:  No objections.

14         THE COURT:  So that will go out immediately.  The

15   jury is going to be back in probably about 40 minutes and I

16   want to charge them as soon as they get back and that doesn't

17   give you a lot of time to get some lunch, but maybe you can.

18   Just be back at 1:15 is what I said.  All right.

19         Anything beyond the jury charges or the exhibits?

20   Any other requests, any other things?

21         MS. FREEMAN:  Not from the government, Your Honor.

22         THE DEFENDANT:  No, sir, Your Honor.

23         THE COURT:  Very good.  Thank you.

24         CSO OFFICER:  All rise.  We are in recess until

25   1:15.

```
1      (Recess for lunch at 12:37 p.m.)

2      (Resume at 1:20 p.m.)

3           CSO OFFICER:  All rise.

4           THE COURT:  Are you ready for me to bring the jury

5    back in or is there something we need to do first?

6           MS. FREEMAN:  Nothing from the government, Your

7    Honor.

8           THE DEFENDANT:  I don't have anything right now,

9    Your Honor.

10           THE COURT:  Very good.  Bring the jury in.

11      (Jurors enter courtroom at 1:20 p.m.)

12           THE COURT:  Ladies and gentlemen, it is my duty to

13    instruct you on the rules of law that you must use in deciding

14    this case.  After I've completed these instructions, you will

15    go back to the jury room and begin your discussions or what we

16    call deliberations.

17           You must decide whether the government has proved

18    the specific facts necessary to find the Defendant guilty

19    beyond a reasonable doubt.

20           Your decision must be based only on the evidence

21    presented here.  You must not be influenced in any way by

22    either sympathy for or prejudice against the Defendant or the

23    government.

24           You must follow the law as I explain it, even if you

25    do not agree with the law, and you must follow all of my
```

1  instructions as a whole.  You must not single out or disregard

2  any of the Court's instructions on the law.

3        The indictment or formal charge against the

4  Defendant isn't evidence of guilt.  The law presumes every

5  defendant is innocent.  The Defendant does not have to prove

6  his innocence or produce any evidence at all.  A Defendant

7  does not have to testify, and because Mr. Mattox chose not to

8  testify you cannot consider that in any way while making your

9  decision.  The Government must prove guilt beyond a reasonable

10  doubt.  If it fails to do so you must find the Defendant not

11  guilty.

12        The Defendant has decided to represent himself in

13  this trial and not to use the services of a lawyer.  He has a

14  constitutional right to do that.  His decision has no bearing

15  on whether he is guilty or not guilty and it must not affect

16  your consideration of the case.

17        The Government's burden of proof is heavy, but it

18  doesn't have to prove a Defendant's guilt beyond all possible

19  doubt.  The Government's proof only has to exclude any

20  reasonable doubt concerning the Defendant's guilt.

21        A reasonable doubt is a real doubt, based on your

22  reason and common sense after you've carefully and impartially

23  considered all the evidence in the case.

24        Proof beyond a reasonable doubt is proof so

25  convincing that you would be willing to rely and act on it

1   without hesitation in the most important of your own affairs.

2   If you're convinced that the Defendant has been proved guilty

3   beyond a reasonable doubt, say so.  If you are not convinced,

4   say so.

5           As I said before, you must consider only the

6   evidence that I have admitted in this case.  Evidence includes

7   the testimony of witnesses and the exhibits admitted.  But

8   anything the lawyers said or that the Defendant said acting as

9   his own lawyer isn't evidence and isn't binding on you.

10          You shouldn't assume from anything I've said that I

11  have any opinion about any factual issue in this case.  Except

12  for my instructions to you on the law, you should disregard

13  anything I may have said during the trial in arriving at your

14  own decision about the facts.

15          Your own recollection and interpretation of the

16  evidence is what matters.

17          In considering the evidence, you may use reasoning

18  and common sense to make deductions and reach conclusions.

19  You shouldn't be concerned about whether the evidence is

20  direct or circumstantial.

21          Direct evidence is the testimony of a person who

22  asserts that he or she has actual knowledge of a fact, such as

23  an eyewitness.

24          Circumstantial evidence is proof of a chain of facts

25  and circumstances that tend to prove or disprove a fact.

1   There is no legal difference in the weight you may give to

2   either direct or circumstantial evidence.

3          When I say you must consider all the evidence, I

4   don't mean that you must accept all the evidence as true or

5   accurate.  You should decide whether you believe what each

6   witness had to say, and how important that testimony was.  In

7   making that decision, you may believe or disbelieve any

8   witness, in whole or in part.  The number of witnesses

9   testifying concerning a particular point doesn't necessarily

10  matter.

11         To decide whether you believe any witness, I suggest

12  that you ask yourself a few questions:  Did the witness

13  impress you as one who was telling the truth?  Did the witness

14  have any particular reason not to tell the truth?  Did the

15  witness have a personal interest in the outcome of the case?

16  Did the witness seem to have a good memory?  Did the witness

17  have the opportunity and ability to accurately observe the

18  things he or she testified about?  Did the witness appear to

19  understand the questions clearly and answer them directly?

20  Did the witness's testimony differ from any other testimony or

21  other evidence?

22         There has been evidence that the Defendant made

23  certain statements before trial in which the Government claims

24  he admitted certain facts charged in the indictment.

25         You must consider that evidence with caution and

great care.  You must decide for yourself whether the
Defendant made the statement, and if so, how much weight to
give to it.  To make these decisions, you must consider all
the evidence about the statement, including the circumstances
under which it was made.

The indictment charges twenty separate crimes,
called "counts" against the Defendant.  Each count has a
number.  You'll be given copies of the Indictment to refer to
during the deliberations.

Counts One through Nine charge the Defendant with
wire fraud, in violation of Title 18, United States Code,
section 1343.

Counts Ten through Nineteen charge the Defendant
with false claims against the United States Government, in
violation of Title 18, United States Code, Section 287.

Count Twenty charges the Defendant with theft of
government funds, in violation of Title 18, United States
Code, Section 641.

When a statute specifies multitude alternative ways
in which an offense may be committed, the indictment may
allege the multiple ways in the conjunctive, that is, by using
the word "and".  If only one of the alternatives is proved
beyond a reasonable doubt, that is sufficient for a
conviction, so long as you agree unanimously as to that
alternative.

1          You'll see that the indictment charges that a crime

2    was committed on or about a certain date.  The Government does

3    not have to prove that the crime occurred on an exact date.

4    The Government only has to prove beyond a reasonable doubt

5    that the crime was committed on a date reasonably close to the

6    date alleged.

7          The word "knowingly" means that an act was done

8    voluntarily and intentionally and not because of a mistake or

9    by accident.

10         The word "willfully" means that the act was

11   committed voluntarily and purposely, with the intent to do

12   something the law forbids; that is, with the bad purpose to

13   disobey or disregard the law.  While a person must have acted

14   with the intent to do something the law forbids before you can

15   find that the person acted willfully, the person need not be

16   aware of the specific law or rule that his conduct may be

17   violating.

18         It is a Federal crime to use interstate wire, radio,

19   or television communications to carry out a scheme to defraud

20   someone else.

21         The Defendant can be found guilty of this crime only

22   if all the following facts are proved beyond a reasonable

23   doubt:  One, the Defendant knowingly devised or participated

24   in a scheme to defraud someone by using false or fraudulent

25   pretenses, representations or promises.

1          Two, the false pretenses, representations, or

2   promises were about a material fact.

3          Three, the Defendant acted with the intent to

4   defraud; and,

5          Four, the Defendant transmitted or caused to be

6   transmitted by some communication in interstate commerce to

7   help carry out the scheme to defraud.

8          A scheme to defraud means any plan or course of

9   action intended to deceive or cheat someone out of money or

10  property by using false or fraudulent pretenses,

11  representations, or promises.

12         Let me go back.  I'm going to reread four.

13         The Defendant transmitted or caused to be

14  transmitted by wire some communication in interstate commerce

15  to help carry out the scheme to defraud.

16         A scheme to defraud means any plan or course of

17  action intended to deceive or cheat someone out of money or

18  property by using false or fraudulent pretenses,

19  representations, or promises.

20         A statement or representation is false or fraudulent

21  if it is about a material fact that the speaker knows is

22  untrue or makes with reckless indifference to the truth, and

23  makes with the intent to defraud.  A statement or

24  representation may be false or fraudulent when it is a

25  half-truth, or effectively conceals a material fact, and is

1    made with the intent to defraud.

2            A material fact is an important fact that a

3    reasonable person would use to decide whether to do or not to

4    do something.  The fact is material if it has the capacity or

5    natural tendency to influence a person's decision.  It doesn't

6    matter whether -- it doesn't matter whether the decision-maker

7    actually relied on the statement or knew or should have known

8    the statement was false.

9            To act with intent to defraud means to act knowingly

10   and with the specific intent to use false or fraudulent

11   pretenses, representations, or promises to cause loss or

12   injury.  Proving intent to deceive alone, without the intent

13   to cause loss or injury, is not sufficient to prove intent to

14   defraud.

15           The Government does not have to prove all the

16   details alleged in the indictment about the precise nature and

17   purpose of the scheme.  It also doesn't have to prove that the

18   material transmitted by interstate wire was itself false or

19   fraudulent; or that using the wire was intended as the

20   specific or exclusive means of carrying out the alleged fraud,

21   or that the Defendant personally made the transmission over

22   the wire.  And it doesn't have to prove that the alleged

23   scheme actually succeeded in defrauding anyone.

24           To use interstate wire communications is to act so

25   that something would normally be sent through wire

1    communications in the normal course of business.

2              Each separate use of the interstate wire

3    communications as part of the scheme to defraud is a separate

4    crime.

5              It is a Federal crime to knowingly make a false

6    claim against any department or agency of the United States.

7              The Internal Revenue Service is a department or

8    agency of the IRS -- is a part of an agency of the United

9    States.

10             The Defendant can be found guilty of this crime only

11   if all the following facts are proved beyond a reasonable

12   doubt:

13             One, the Defendant knowingly presented a false claim

14   against the United States to an agency of the United States.

15             Two, the claim was based on a false or fraudulent

16   material fact; and

17             Three, the Defendant acted intentionally and knew

18   that the claim was false and fraudulent.

19             A claim is false or fraudulent if it is untrue when

20   made and the person making it knows it is untrue.  But the

21   Government doesn't have to show that the Governmental

22   department or agency was, in fact, deceived or misled.

23             It's not a crime to make a false claim unless the

24   falsity or fraudulent aspect relates to a material fact.  A

25   misrepresentation is material if it contains a material fact

that is false.  A material fact is an unimportant fact -- not

some -- A material fact is an important fact, not some

unimportant or trivial detail that has a natural tendency to

influence or is capable of influencing a department or agency

in reaching a required decision.

The Defendant does not have to directly submit the

claim to an employee or agency of the United States.  It is

sufficient if the Defendant submits the claim to a third party

knowing that the third party will submit the claim or seek

reimbursement from the United States or a department or agency

thereof.

It is a federal crime to steal or convert any money

or property belonging to the United States and worth more than

$1,000.

The Defendant can be found guilty of this crime only

if all the following facts are proved beyond a reasonable

doubt:  One, the money or property described in the indictment

belonged to the United States, two, the Defendant knowingly

stole or converted the money or property to his own use or to

someone else's use; three, the Defendant knowingly and

willfully intended to deprive the United States of the use or

benefit of the money or property and, four, the money or

property had a value greater than 1,000.

The word value means the greater of one the face,

par, or market value, or two, the price, whether wholesale or

1    retail.

2          It doesn't matter whether the Defendant knew that

3    the United States owned the property.  But it must be proved

4    beyond a reasonable doubt that the United States did, in fact,

5    own the money or property, that the Defendant knowingly stole

6    or converted it, and that the value was greater than $1,000.

7          To steal or convert means to wrongfully or

8    intentionally take the money or property belonging to someone

9    else with the intent to deprive the owner of its use or

10   benefit permanently or temporarily.

11         A taking doesn't have to be any particular type of

12   movement or carrying away.  But any appreciable and

13   intentional change in the property's location is a taking,

14   even if the property isn't removed from the owner's premises.

15         Each count of the indictment charges a separate

16   crime.  You must consider each crime and the evidence related

17   to it separately.  If you find the Defendant guilty or not

18   guilty of one crime, that must not affect your verdict on any

19   other crime.

20         I caution you that the Defendant is on trial only

21   for the specific crimes charged in the indictment.  You are

22   here to determine from the evidence in this case whether the

23   Defendant is guilty or not guilty of those specific crimes.

24         You must never consider punishment in any way to

25   decide whether the Defendant is guilty.  If you find the

1   Defendant guilty, the punishment is for the Judge alone to

2   decide later.

3          You've been permitted to take notes during the

4   trial.  Most of you, perhaps all of you, have taken advantage

5   of the opportunity.

6          You must use your notes only as a memory aid during

7   deliberations.  You must not give your notes priority over

8   your independent recollection of the evidence.  And you must

9   not allow yourself to be unduly influenced by the notes of

10  other jurors.

11         I emphasize that notes are not entitled to any

12  greater weight than your memories or impressions about the

13  testimony.

14         Your verdict, whether guilty or not guilty, must be

15  unanimous -- in other words, you must all agree.  Your

16  deliberations are secret, and you'll never have to explain

17  your verdict to anyone.

18         Each of you must decide the case for yourself, but

19  only after fully considering the evidence with the other

20  jurors.  So you must discuss the case with one another and try

21  to reach an agreement.  While you are discussing the case,

22  don't hesitate to re-examine your own opinion and change your

23  mind if you become convinced that you were wrong.  But don't

24  give up your honest beliefs just because others think

25  differently or because you simply want to get the case over

1    with.

2              Remember that in a very real way you are judges,

3    judges of the facts.  Your only interest is to seek the truth

4    from the evidence in this case.

5              When you get to the jury room choose one of your

6    members to act as your foreperson.  The foreperson will direct

7    your deliberations and speak for you in the court.

8              A verdict form has been prepared.  And this is the

9    verdict form.  You will not have any trouble understanding

10   this.  It's broken down according to counts.  And this is

11   essentially a way for you to express your verdict so that we

12   can all understand what your verdict is.

13             I will tell you that you will see on this last page

14   that there is a space for all of you to sign and when you

15   reach your verdict then the foreperson needs to date it and

16   sign it, and then each one of you should sign in those spaces

17   below.

18             I will tell you that if you wish to communicate with

19   me at any time, please write down your message or question and

20   give it to the Court Security Officer.  The Court Security

21   Officer will bring it to me and I'll respond as promptly as

22   possible either in writing or by talking to you in the

23   courtroom, but I caution you not to tell me how many jurors

24   have voted one way or the other at any time.

25             Now, you will have a copy of this out, what I just

1    read to you.  And so I am going to let you go out but we have
2    one minor detail to take care of.
3            You might have noticed that there are 14 chairs and
4    the jury is only 12, made up of only 12.  So two of you are
5    what we call alternates.  And I think you can probably figure
6    out because we have 14 chairs that we regularly have
7    alternates in these cases.  And so the two of you who are
8    alternates are Frank Runyon Junior and Charles E. Bunn.  And
9    so you will not participate in the deliberations.  We will let
10   you go sit in the hearing room and the CSO or someone from the
11   court will take you back to where that is.  You are here in
12   the event that someone becomes ill and cannot continue in the
13   deliberations and then you would have to take that persons
14   place.
15           So, thank you very much.  Step back there and you
16   can begin your deliberations.  We will bring the exhibits out
17   to you right away.
18     (Jurors exit courtroom at 1:38 p.m.)
19           Where are we on the redaction?  I think what I told
20   you to do is to do what you wanted to do with it and I would
21   hear from the Defendant.  And I can't remember whether we took
22   that up or not.  I think we did take it up.  I think he did
23   say he objected to the redaction.  And maybe you came back and
24   said it didn't matter to you one way or the other.
25           MS. FREEMAN:  Yes, Your Honor, he had some kind of

```
1   objection at our first pretrial hearing when we started trial
2   week.
3              THE COURT:  Right.
4              MS. FREEMAN:  And I believe you did say that you
5   were going to grant the motion to strike that portion of the
6   forfeiture allegation.  We provided to Ms. Paul a redacted
7   version of the indictment.  We also provided a copy of that to
8   the Defendant.  If you wish we can deliver more copies of
9   that.
10             THE COURT:  I told them that I would give each one
11  of them a copy of the indictment, so we need to do that.  So
12  Ms. Paul has the redacted version.
13             COURTROOM DEPUTY:  I do.
14             THE COURT:  So she can make the copies of that.
15             I have taken that out.  I'm overruling the
16  objection.  I think that can just be confusing to the jurors.
17  There's not really anything for them to decide.  So that is
18  the reason I'm allowing it to be done in the fashion that you
19  have done it.
20             Anything else now that I have charged the jury?
21             MS. FREEMAN:  Not from the government, Your Honor.
22             THE DEFENDANT:  I have a question about the modified
23  True Bill.  So if the document is modified or altered then
24  it's not considered authentic, correct?
25             THE COURT:  The modification does not make any
```

1    substantive difference in the indictment.  So it is still a

2    valid indictment.

3          THE DEFENDANT:  But you are not making any notation

4    stating modifications or changes?

5          THE COURT:  No.  No.

6          THE DEFENDANT:  So if 31 U.S.C. 3113(a)(2)(D) is

7    stating that once given to the government the actual

8    obligation is canceled but in lieu of the obligation being

9    canceled you're actually modifying it and representing it.

10          THE COURT:  Well, I don't think you understand the

11    purpose of the indictment.  What was requested in this case

12    related to the forfeiture component of the case, it's not

13    unusual.  I know I have redacted indictments before.  There is

14    no substantive or legal change in the indictment.  It doesn't

15    in any way alter or give you any additional exposure to a

16    guilty plea.  So there is not a problem with that.  I am

17    allowing them to do that which is why I did it.

18          THE DEFENDANT:  So even if, again, 31 U.S.C. 3113

19    states that once the actual obligation, which the indictment

20    or the True Bill is an obligation of the United States.

21          THE COURT:  There is no obligation.  I don't know

22    what you mean by obligation.  But there is no obligation.  The

23    indictment is merely the vehicle that the government uses as

24    the basis for the presentation of the evidence.  And it simply

25    states the -- in very, very summary fashion, the crimes that

 1   you have been indicted for.

 2           And my recollection from several hearings back was

 3   that you were pursuing this civilly.  Did I get that right?

 4           MS. FREEMAN:  Yes, Your Honor.  So Revenue Officer

 5   Susan Freeman, her department within the IRS has filed a lien,

 6   I believe, or is in that process.

 7           THE COURT:  Right.  And that's why you're not

 8   pursuing the forfeiture in this case?

 9           MS. FREEMAN:  Correct.  If anything it's to prevent

10   the Defendant from having to fight two options of the same

11   seizing of the house.

12           THE COURT:  Right.

13           THE DEFENDANT:  But I'm still mentioning that in

14   regards to Title 18, Subsection 8, it basically states that

15   the bill or the True Bill is an obligation of the United

16   States because they are two authorized representatives of the

17   United States that actually sign.

18           THE COURT:  That has nothing to do with this.  So

19   I'm overruling your objection.  All right.

20           Thank you very much.

21           THE DEFENDANT:  Thank you.

22           THE COURT:  Any other objections or issues?

23           THE DEFENDANT:  No, sir, right now, Your Honor.

24   Thank you.

25           CSO OFFICER:  All rise.

```
 1      (Recess at 1:45 p.m.)

 2      (Resume at 2:45 p.m.)

 3          CSO OFFICER:  All rise.

 4          THE COURT:  So this is a question from the jury.

 5   And you all have a copy of it.  And I have various ways to

 6   respond to this.  But let me read it and put it in the record

 7   and this will be made part of the record.

 8          And I will tell you that what I typically do is

 9   something simple and straightforward.  I just write on it and

10   sign it and send it back.  And then before it's sent back

11   Ms. Paul will make a copy of it and make it part of the

12   record.

13          Why was Mr. Mattox appeal process not concluded?

14   With reference to due process?

15          It's our recollection that this issue came up with

16   your first agent.  I can't remember that woman's name now.

17          MS. FREEMAN:  Revenue Officer Susan Freeman.

18          THE COURT:  Yes, right.  And it was a question about

19   whether or not the government could take his car and other

20   property.  And her response was that there was concern that he

21   would try to dispose of it and they felt at risk, so they got

22   the authority to do that.

23          And then there was a question about the appeal.  And

24   she said the appeal was still pending.

25          Of course this does not deal with the criminal
```

1    matter.  This deals with the civil matter, the way I see it.

2    I don't see that this is an issue in the case.

3            And so we need to respond to the jury.  There is

4    certainly not any evidence about it.

5            So I'm looking to hear from y'all to see what you

6    would propose and we may take a break and I may talk to some

7    of my law clerks some more about this or not.  Do you have a

8    position on how to respond?

9            MS. FREEMAN:  Your Honor, I think it might be

10   important because the question references due process.  To

11   make sure that the jury understands the difference between it

12   being the appeal associated with the civil component versus

13   this, the criminal case, to the extent Your Honor is able to

14   clarify that, just so that there is not any kind of issue

15   about criminal due process being violated.  Because I believe

16   that's what was attempted to be elicited in cross by the

17   Defendant but that is not actually what the witness testified

18   to.

19           THE COURT:  What do you say?

20           THE DEFENDANT:  I'm disagreeing with the prosecution

21   in regards to the -- as far as due process in the civil

22   matter.  It started as a civil matter.  So even though it

23   started as a civil matter, the due process or the appeal

24   process was never completed before moving on to a --

25           THE COURT:  Well, that appeal -- there is no civil

```
 1    appeal to a criminal indictment.  They may involve the same

 2    substance but they are on entirely different tracks.

 3           And so I don't understand how what you just said

 4    affects this.  There is no civil due process that has to be

 5    resolved before somehow or another a criminal case can be

 6    brought.  They don't connect.

 7           THE DEFENDANT:  Excuse me, Your Honor.  Your Honor,

 8    there was an appeal in place starting, I think, somewhere

 9    around February of 2019 and that appeal would have been at

10    least in place or going forward.  It never concluded, possibly

11    12 months or so prior to a wrongful indictment.  In regards to

12    an affidavit by a public official stating that there was

13    criminal wrongdoing.  There still was an appeal in place

14    disputing everything that moved forward to cause an indictment

15    to be issued.

16           THE COURT:  Do you want to respond to that?

17           MS. FREEMAN:  Your Honor, I will just note that the

18    way the testimony played out the civil investigation and the

19    criminal investigation operated independently.  To be clear,

20    there was no civil referral to criminal later.  They both came

21    to the case independently of each other.

22           THE COURT:  So let's go back.  What are you

23    proposing that this say?

24           THE DEFENDANT:  Just a moment, Your Honor.

25           THE COURT:  Sure.
```

1          THE DEFENDANT:  To be totally honest, this would be

2   a question from the appeals department asking them the reason

3   that they haven't completed the appeals.

4          THE COURT:  There is no more evidence about this.

5   We can't do that.

6          The trial of the case is over and the jury has been

7   charged and the jury is deliberating so there is not any more

8   evidence that is going to come in.

9          THE DEFENDANT:  The question -- forgive me -- it's

10  asking why wasn't the appeals process concluded?  I'm not sure

11  why the appeals process hasn't been concluded.

12         THE COURT:  That's right.  There's no evidence of

13  it, but it's not relevant anyway.

14         THE DEFENDANT:  You're saying there's no evidence of

15  it but it was brought forth as evidenced by Ms. Freeman.

16         THE COURT:  There's no evidence of why it's not been

17  concluded.

18         THE DEFENDANT:  You're correct.

19         THE COURT:  There's no evidence of that.

20         You want to tell me again what you are -- now that

21  we have gone back and forth, what do you think about this?

22         MS. FREEMAN:  As far as -- is Your Honor comfortably

23  factually distinguishing between the testimony of Revenue

24  Officer Freeman and Special Agent Clark, you know, referring

25  to the civil case being the one that has a pending appeal and

1    that no violation of criminal due process or constitutional

2    process in a criminal case has been alleged or is a question

3    before the jury.

4              THE DEFENDANT:  I would have to object with what

5    Ms. Freeman just stated.  Because there was, in a motion, in

6    regards to denial of due process in the criminal process that

7    was objected or overruled by the Judge.  So that wouldn't be

8    totally accurate.

9              THE COURT:  Okay.  Let's take a short break and I

10   will come back.

11             CSO OFFICER:  All rise.

12   (Recess at 2:54 p.m.)

13   (Resume at 2:58 p.m.)

14             CSO OFFICER:  All rise.  Court is now back in

15   session.  Be seated.

16             THE COURT:  I don't like what you have offered.

17   There is too much information.

18             But here is my proposal.  "Why was Mr. Mattox's

19   appeal process not concluded?"  "There is no evidence about

20   why the appeal process was not concluded."

21             And then part two of the answer would be, "Failure

22   to conclude the process is not an issue in this case."

23             What's the government's position on that?

24             MS. FREEMAN:  That's fine with us, Your Honor.

25             THE DEFENDANT:  I would object, Your Honor.  Because

1    if the process -- if the appeals process was completed and the

2    appeal process is in my favor -- even if there was a seizure

3    of anything, it would have been returned.  So I would have to

4    disagree or object.

5             THE COURT:  Well, as I've already pointed out to you

6    the forfeiture, which is what that was, this is part of the

7    forfeiture process.

8             MS. FREEMAN:  No, Your Honor, this is part of the

9    jeopardy levy process initiated by the revenue side.

10            THE COURT:  I see.  Okay.  Well, as part of the

11   processes he is to get value back for what was supposedly

12   fraudulently taken?

13            MS. FREEMAN:  Yes, Your Honor.

14            THE COURT:  Different title, same idea.

15            So that process has nothing to do with your criminal

16   liability.  And I think that one or more of the jurors is

17   confused about this.

18            So I am happy to give you the opportunity to respond

19   to that, what I just said.

20            THE DEFENDANT:  Are you stating you're going to have

21   to give me an opportunity to respond or did I misunderstand

22   you, Your Honor?

23            THE COURT:  Yeah.  I gave her the opportunity to

24   respond to what I just said.  You bring these up.  Once again,

25   you are confusing the civil rules with the criminal rules.

1          Hold on one minute.  "There's no evidence about why

2    the appeal process was not concluded.  Failure to conclude the

3    appeal process is not an issue in this criminal case."

4          The government agrees and you object, right?  Any

5    further objection other than what you have already said?

6          THE DEFENDANT:  I would ask -- how do we know

7    Defendant or for certain that completing the appeals process

8    wouldn't have had any bearings on --

9          THE COURT:  How do I know that?

10         THE DEFENDANT:  I'm not saying how do you know, sir.

11   I'm asking how do we know?

12         THE COURT:  Well, I know as a matter of law that it

13   wouldn't.  I know that this operation is running as a criminal

14   operation.

15         And whatever you could have raised or offered in an

16   appeal process you could have presented in this court.  So it

17   might have been some other things too that you could have

18   raised in every other place, but --

19         THE DEFENDANT:  Thank you, Your Honor.

20         THE COURT:  All right.  So I am going to let

21   Ms. Paul make a copy of that and she will give both of you a

22   copy and she will give it out to the jury.

23         CSO OFFICER:  All rise.

24     (Recess at 3:03 p.m.)

25     (Reconvene at 3:24 p.m.)

```
 1              CSO OFFICER:  All rise.

 2              THE COURT:  I understand they have a verdict.  Bring

 3    the jury in, please.

 4      (Jurors enter courtroom at 3:27 p.m.)

 5              THE COURT:  I understand you have a verdict; is that

 6    correct?

 7              THE JUROR:  (Juror nodding head affirmatively.)

 8              THE COURT:  Would you pass it to the Court Security

 9    Officer, please, and he will hand it to me.

10              THE JUROR:  (Juror complies).

11              THE COURT:  Thank you very much.

12              It looks like all the boxes are checked as to each

13    Count here.  And Ms. Sanford you are the foreperson?

14              THE JUROR:  Yes.

15              THE COURT:  It appears to me that, as I instructed

16    you to do, each one of you jurors has signed your name on the

17    verdict; is that correct?

18              THE JUROR:  (Nodding heads affirmatively).

19              THE COURT:  And by that I assume that each one of

20    you agree with the verdict; is that correct?

21              THE JUROR:  (Collectively)  Yes, sir.

22              THE COURT:  If that is not correct raise your hand

23    and let me know.

24              THE JUROR:  (No response).

25              THE COURT:  But y'all do unanimously agree to the
```

1   verdict that is stated here; is that correct?

2          THE JUROR:  (Collectively)  Yes, sir.

3          THE COURT:  This case of United States versus

4   Marquet Antwain Burgess Mattox, the jury has found you guilty

5   on all Counts.

6          Is there anything from the government?

7          MS. FREEMAN:  No, Your Honor.

8          THE COURT:  Anything from you?

9          THE DEFENDANT:  No, sir, Your Honor.

10         THE COURT:  If you will step back in there, please.

11  Thank you.

12    (Jurors exit courtroom at 3:30 p.m.)

13         THE COURT:  That concludes this case.  Thank you for

14  your cooperation.

15         THE DEFENDANT:  Thank you.

16         CSO OFFICER:  All rise.  This Honorable Court stands

17  adjourned for the day.

18

19               (Proceedings concluded at 3:30 P.M.)

20                    END OF RECORD

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Tammy W. DiRocco, Federal Official Court Reporter,

4    in and for the United States District Court for the Middle

5    District of Georgia, do hereby certify that pursuant to

6    Section 753, Title 28, United States Code, that the foregoing

7    is a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter and

9    that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12                      Dated this 26th day of October, 2022

13

14

15                      _____
                        Tammy W. DiRocco CCR, CVR
16                      Federal Official Court Reporter

17

18

19

20

21

22

23

24

25

Tammy W. DiRocco * Federal Reporter * 478-752-2607